UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | | |
|---|---|---|
| In re: | ) | Case No. 6:18-bk-6821-KSJ |
| | ) | |
| DON KARL JURAVIN, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

## MOTION FOR RECONSIDERATION OF FINAL ORDER GRANTING CHAPTER 7 TRUSTEE'S MOTION TO APPROVE SALE OF ASSETS SUBJECT TO OVERBID AND FOR APPROVAL OF OVERBID PROCEDURES

The Debtor, Don Karl Juravin, by and through undersigned counsel, and pursuant to Rules 7052, 9023 and 9024 of the Federal Rules of Bankruptcy Procedure, hereby files this Motion for Reconsideration of the Final Order Granting Chapter 7 Trustee's Motion to Approve Sale of Assets Subject to Overbid and for Approval of Overbid Procedures, and in support thereof further states as follows:

1. On May 29, 2020, the Chapter 7 Trustee filed a Motion to Approve Sale of Assets Subject to Overbid and for Approval of Overbid Procedures (the "Sale Motion") (Doc. No. 349).

2. As part of the Sale Motion, the trustee sought permission of the court to sell the following:

> Any and all of the Bankruptcy Estate's interest in websites, blogs, and **social media accounts**, together with any and all content thereon and passwords necessary to control the websites, blogs, and social media accounts.

3.      On July 2, 2020, the Court entered an Order Granting Chapter 7 Trustee's Motion to Approve Sale of Assets Subject to Overbid and for Approval of Overbid Procedures (the "Bid Procedures Order") (Doc. No. 377).

4.      On July 23, 2020, the Debtor filed a Motion for Clarification and/or to Amend Order Granting Chapter 7 Trustee's Motion to Approve Sale of Assets Subject to Overbid and for Approval of Overbid Procedures (the "Clarification Motion") (Doc. No. 382).

5.      The Clarification Motion was heard in connection with the final sale hearing on August 17, 2020 (the "Sale Hearing").

6.      The basis of the Clarification Motion was seeking a determination that the Bankruptcy Estate did not have an interest in the Debtor's personal social media accounts, i.e. that the Debtor's personal social media accounts were not property of the estate.

7.      On September 2, 2020, the Court entered a Final Order Granting Motion to Approve Sale of Assets Subject to Overbid and for Approval of Overbid Procedures (the "Final Sale Order") (Doc. No. 392).

8.      The Final Sale Order did not exclude the Debtor's personal social media accounts.  In fact, the Court found that the Trustee did have the authority to sell the Debtor's personal social media accounts.

9.      The Final Sale Order is void, solely as it pertains to the sale of the Debtor's personal social media accounts, in that such accounts are not property of the estate.

10.      The Debtor seeks reconsideration of the Final Sale Order, or in the alternative, that the Final Sale Order be amended or altered to remove the Debtor's social media accounts.

11.     The issue of whether social media accounts are property of the estate is an issue of first impression in the Middle District of Florida, and nearly every other District in the United States.

12.     During the Sale Hearing, an interested party cited to the only reported decision on this issue, i.e. *In re CTLI, LLC*, 528 B.R. 359 (Bankr. S.D. Tex. 2015).  The Court in *In re CTLI, LLC*, was presented with the issue of whether business social media accounts are property of a company's bankruptcy estate.  *Id.* at 361.

13.     In finding that such business social media accounts were property of a company's bankruptcy estate, the Court distinguished such accounts from the personal accounts of celebrities (*persona* accounts, which may have value) and those of average individuals.  *Id*. at 367.

14.     The Court in *In re CTLI, LLC* specifically found that personal accounts are not likely property of a bankruptcy estate.  In dicta, the Court stated the following:

> The primary limitation on recognition of a *persona* as estate property is the 13th Amendment's prohibition on involuntary servitude.  Just as a debtor may not assume contracts that would require any individual to perform personal services, 11 U.S.C. § 365(c); *Matter of Tony*, 724 F.2d 467, 469 (5th Cir. 1994), a debtor may not use estate property in a manner that would require any individual to perform personal services.  Because the value in a Facebook Page or Profile lies in the ability to reach Friends or Fans through future communications, **the property interest in an individual Profile would likely not become property of the estate**.

*Id.* at 367 (emphasis added).

15.     The only other real source of legal analysis on social media accounts and bankruptcy law is from a law review article that concludes that a personal social media account is a "liberty" interest and not a "property" interest, and thus, would not be part of a bankruptcy estate.  *See Smit Gautam, #Bankruptcy: Reconsidering "Property" To Determine The Role of*

*Social Media in the Bankruptcy Estate*, 31 Emory Bankr. Dev. J. 127 (2014).  A copy of the article is attached hereto as Exhibit "A."

16.    Ms. Gautam's article analogizes social media accounts to "expectancies" in determining whether they should be considered property of the estate:

> A major dispute in bankruptcy cases involving property of the estate is the includes of future profits or proceeds, sometimes referred to as "expectancies."  One consideration of these expectancies is that they hold "a very valuable legal right that is of no value to anyone but the debtor.  This characterization is analogous to the reason that social media accounts should not be treated as property because, while they may be valuable, that value is created by and inherent to the user.

17.    Her article also cites to an incident where an entrepreneur sought to sell his Twitter account for value, however, Twitter interceded and prevented the sale, because the account did not belong to the account user, and thus, could not sell something that was not his property.

18.    Finally, the United States District Court for the Southern District of Florida has held that, under Florida law, an individual does not have a property interest in the "likes" on a Facebook Page. *Mattocks v. Black Entm't TV LLC*, 43 F.Supp.3d 1311 (S.D. Fla. 2014).

### Timeliness of Motion

19.    This motion for reconsideration is to be filed no later than 10 days from entry of the subject order, in this case, the Final Sale Order.  The Final Sale Order was entered on September 2, 2020, which made the deadline for filing a motion for reconsideration September 12, 2020.

20.    September 12, 2020 fell on a Saturday, thus making the deadline Monday, September 14, 2020.

WHEREFORE, the Debtor respectfully requests this Honorable Court enter an Order: (i) granting this Motion; (ii) amending or altering the Final Sale Order to remove social media accounts from the assets that were sold in the Final Sale Order; and (iii) granting any such further relief that this Court deems just and proper under the circumstances.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via CM/ECF or United States Mail, first class and postage prepaid, on all parties listed on the attached Mailing Matrix, this 14th day of September, 2020.

_/s/ Aldo G. Bartolone, Jr._
ALDO G. BARTOLONE, JR.
Florida Bar No. 173134
BARTOLONE LAW, PLLC
1030 N. Orange Ave., Suite 300
Orlando, Florida 32801
Telephone: (407) 294-4440
Facsimile: (407) 287-55544
E-mail: aldo@bartolonelaw.com
Attorney for Debtor

# #BANKRUPTCY: RECONSIDERING "PROPERTY" TO DETERMINE THE ROLE OF SOCIAL MEDIA IN THE BANKRUPTCY ESTATE

## ABSTRACT

*Social media has become increasingly necessary for staying connected in our globalized and tech-savvy society. Although social media has become a staple of modern life and a regular part of business, the legal definition of social media remains undefined.*

*State legislatures have remained silent on the topic, but as business and individual account holders find themselves seeking bankruptcy relief, it becomes clear that treatment under the Bankruptcy Code depends on definitions that do not yet exist. The question of how social media should be characterized leaves bankruptcy courts uncertain as to whether social media accounts should be included in the bankruptcy estate.*

*While social media encompasses aspects of property, intellectual property, and other rights, this Comment argues that social media does not fit solely into any of these categories. Instead, this Comment argues for the classification of a social media account as more similar to a personal privilege than a traditional property right. This Comment concludes that state legislatures should legally define social media to foster predictability of its role in bankruptcy proceedings.*

## INTRODUCTION

The explosion of social media has become undeniably evident in recent years. Sixty-four percent of social media users use social media services, such as Facebook and Twitter, at least once a day.[1] As of 2014, Facebook had 132 million unique visitors each month, Twitter had 32 million, and Pinterest had 27 million.[2] Each of these services also received millions of visitors each month to their respective mobile applications.[3]

---

[1] *The U.S. Digital Consumer Report*, NIELSEN 16 (Feb. 10, 2014), http://www.nielsen.com/content/corporate/us/en/insights/reports/2014/the-us-digital-consumer-report.html.

[2] *Id.* at 18.

[3] *See id.*

The impact of social media extends beyond how many people "like,"[4] "favorite,"[5] or "retweet."[6] For example, a new law in California, nicknamed the "Eraser Bill," requires that by January 1, 2015, all websites on which a California minor is registered, including social media services, must include a function to delete content minors previously posted.[7] From a business perspective, social users have generated lucrative returns. For example, retailers have seen their marketing efforts on social media services result in higher sales.[8] Facebook and Twitter both filed for initial public offerings within a year of one another, revealing revenues over $3 billion[9] and $300 million,[10] respectively.

Celebrities, in particular, are highly visible on social media by using accounts across multiple services. Even individuals with no prior fame have gained hundreds of thousands of followers and subscribers through their unique online personalities.[11] Besides popularity, these online celebrities have capitalized on their social-media followings to create new income streams.[12]

It is uncertain whether this social media presence would be a property interest included in the bankruptcy estate if an online celebrity were to file for bankruptcy. This Comment argues that because a social media presence includes inherent liberty interests beyond the scope of property, an individual's

---

[4]   Posts on Facebook are followed by a "like" button, which allows other users to show their support for the post. *Like*, FACEBOOK, https://www.facebook.com/help/452446998120360/ (last visited Jan. 9, 2015).

[5]   The "favorite" feature is the Twitter-equivalent of the Facebook like button. *Favoriting a Tweet*, TWITTER HELP CENTER, https://support.twitter.com/articles/20169874-favoriting-a-tweet (last visited Jan. 9, 2015).

[6]   Posts on Twitter may also be "retweeted", which allows users to share a tweet originally posted by another user. *FAQs About Retweets (RT)*, TWITTER HELP CENTER, https://support.twitter.com/articles/77606-faqs-about-retweets-rt (last visited Jan. 9, 2015).

[7]   *See* CAL. BUS. & PROF. CODE § 22581 (2014).

[8]   *See* Joel Schectman, *Social Media Finally Delivering on Promise of Higher Sales*, WALL ST. J. (Sept. 24, 2013), http://blogs.wsj.com/cio/2013/09/24/social-media-finally-delivering-on-promise-of-higher-sales (describing how social media services have begun offering retailers digital tools to target relevant consumer demographics).

[9]   Facebook Inc., Registration Statement (Form S-1) 9 (Feb. 1, 2012).

[10]   Twitter, Inc., Registration Statement (Form S-1) 2 (Oct. 3, 2013).

[11]   *E.g.*, Amy O'Leary, *The Woman with 1 Billion Clicks*, *Jenna Marbles*, N.Y. TIMES (Apr. 12, 2013), http://www.nytimes.com/2013/04/14/fashion/jenna-marbles.html (noting that Ms. Marbles has more than one billion views and eight million subscribers on YouTube).

[12]   *E.g.*, Rachel Quigley, *YouTube Star Who Rose to Fame After Hilarious Drunk Makeup Tutorial Now Has More Than One Billion Hits and 8.2 Million Subscribers*, DAILY MAIL (Apr. 13, 2013), http://www. dailymail.co.uk/news/article-2308780/Jenna-Marbles-YouTube-star-rose-fame-hilarious-drunk-makeup-tutorial-billion-hits-8-2-million-subscribers.html (estimating that Ms. Marbles may have earned $346,827 in 2012 from advertising revenues).

social media account cannot be assigned a value. Therefore, the social media presence should be excluded from the bankruptcy estate.

Part I of this Comment provides the framework for understanding social media and the treatment of property under the Bankruptcy Code (the "Code"). Part II is divided into three subparts. Part II.A conceptualizes social media as an extension of the user's identity and explains how social media accounts contain some of the characteristics of a traditional property interest. Part II.B analyzes the social media service's terms of service to determine who owns the content posted by the user. Lastly, Part II.C considers existing law and how it can be analogized and applied to social media. This Comment concludes that social media accounts should not be included in the bankruptcy estate. Further, legislatures should define what elements of a social media account qualify as property under the Code.

## I.  BACKGROUND

### A.  What Is Social Media?

Social media has been defined as "websites and applications which enable users to create and share content or to participate in social networking."[13] Social media has been divided into six categories:[14] collaborative projects,[15] blogs and microblogs,[16] content communities,[17] social networking websites,[18] virtual game-worlds,[19] and virtual social worlds.[20] This Comment will focus primarily on blogs and microblogs, content communities, and social networking websites, although much of the argument applies to other forms of social media as well.

A social media post may contain words, pictures, videos, or any combination thereof, created by the user or someone else and shared by the

---

[13] OXFORD ENGLISH DICTIONARY ONLINE, http://www.oed.com/view/Entry/183739?redirected From=social+media (last visited Feb. 10, 2015).

[14] Andreas M. Kaplan & Michael Haenlein, *Users of the World, Unite! The Challenges and Opportunities of Social Media*, 53 BUS. HORIZONS 59, 62–64 (2010).

[15] *E.g.*, WIKIPEDIA, http://www.wikipedia.org (last visited Jan. 9, 2015).

[16] *E.g.*, TUMBLR, https://www.tumblr.com (last visited Jan. 9, 2015).

[17] *E.g.*, YOUTUBE, http://www.youtube.com (last visited Jan. 9, 2015).

[18] *E.g.*, FACEBOOK, http://www.facebook.com (last visited Jan. 9, 2015); TWITTER, http://www.twitter.com (last visited Jan. 9, 2015).

[19] *E.g.*, WORLD OF WARCRAFT, http://us.battle.net/wow (last visited Jan. 9, 2015).

[20] *E.g.*, SECOND LIFE, http://secondlife.com (last visited Jan. 9, 2015).

user.[21] These types of content are all subject to applicable copyright law.[22] The value of a social media user's posts is not only related to the content itself, but also to who is posting the content.

## B. What Is Property Under the Bankruptcy Code?

Famed legal scholar Dean William Prosser once wrote, "It seems quite pointless to dispute over whether such a right is to be classified as property."[23] The statement is an understanding of the difficulty in accurately defining what is "property," and an acceptance that property is perhaps more of an elusive concept than a concrete category. Nonetheless, the need to determine what exactly constitutes property remains important in the bankruptcy context.

Upon filing of a bankruptcy petition, the bankruptcy estate is created pursuant to § 541 of the Code.[24] The bankruptcy estate is a new legal entity, separate and distinct from the debtor.[25] Thus, when property is included in the estate, the trustee has control over the property, including the authority to use and sell it for the benefit of creditors.[26] In essence, the ownership rights of the property transfer from the debtor to the bankruptcy estate.

Section 541 defines property of the bankruptcy estate as "all legal or equitable interests of the debtor in property as of the commencement of the case."[27] While § 541 defines which of the debtor's interests are included in the estate, it does not address the threshold question of what constitutes the debtor's legal or equitable interests in a particular type of property. The Supreme Court of the United States clarified this omission by stating, "Property interests are created and defined by state law," and these state law definitions apply in bankruptcy proceedings.[28]

---

[21]  *See* Toni Ahlqvist et al., *Social Media Roadmaps: Exploring the Futures Triggered by Social Media*, VTT TECHNICAL RES. CENTRE FIN. 13 (Nov. 2008), http://www.vtt.fi/inf/pdf/tiedotteet/2008/T2454.pdf.

[22]  The Copyright Act of 1976 extends copyright protection to "original works of authorship fixed in any tangible medium of expression," with works of authorship including categories such as literary, musical, pictorial, graphic, and audiovisual works. 17 U.S.C. § 102 (2012).

[23]  William Prosser, *Privacy*, 48 CALIF. L. REV. 383, 406 (1960).

[24]  11 U.S.C. § 541(a) (2012).

[25]  *See id.*; *In re* Dow Corning Corp., 270 B.R. 393, 398–99 (Bankr. E.D. Mich. 2001) (citing Frank v. Mich. State Unemployment Agency (*In re* Thompson Boat Co.), 252 F.3d 852, 854 (6th Cir. 2001)).

[26]  11 U.S.C. § 704(a).

[27]  *Id.* § 541(a)(1).

[28]  Butner v. United States, 440 U.S. 48, 55 (1979).

Section 541 has been interpreted to include both tangible and intangible property interests.[29] Intellectual property is "a category of intangible rights protecting commercially valuable products of the human intellect and comprising primarily trademark, copyright and patent rights."[30] Case law has recognized goodwill as an intellectual property interest eligible for inclusion in the bankruptcy estate.[31]

Section 554 permits the trustee to abandon property of the estate that is either a burden or of inconsequential value or benefit.[32] It also permits the court to order the trustee to abandon property on request of a party of interest.[33] This abandoned property then vests in the debtor.[34]

A major dispute in bankruptcy cases involving property of the estate is the inclusion of future profits or proceeds, sometimes referred to as "expectancies."[35] One consideration of these expectancies is that they hold "a very valuable legal right that is *of no value to anyone but the debtor*."[36] This characterization is analogous to the reason that social media accounts should not be treated as property because, while they may be valuable, that value is created by and inherent to the user.

## II.  PROOF OF CLAIM

### A.  Social Media as a Pseudo-Property Interest

The personal nature of social media supports this Comment's argument that one's social media account should not be treated as property within a bankruptcy proceeding. The first question to consider is who actually owns the content: the user or the social media service? One example raises questions about the ownership and alienability of a user's social media account. In 2008,

---

[29]   5 COLLIER ON BANKRUPTCY ¶ 541.03[3] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010).

[30]   BLACK'S LAW DICTIONARY 930 (9th ed. 2009).

[31]   *See In re* Prince, 85 F.3d 314 (7th Cir. 1996); FitzSimmons v. Walsh (*In re* FitzSimmons), 725 F.2d 1208 (9th Cir. 1984).

[32]   11 U.S.C. § 554(a).

[33]   *Id.* § 554(b).

[34]   5 COLLIER ON BANKRUPTCY, *supra* note 29, at ¶ 554.02[3]; *see In re* McGowan, 95 B.R. 104, 106 (Bankr. N.D. Iowa 1988).

[35]   5 COLLIER ON BANKRUPTCY, *supra* note 29, at ¶ 541.02 ("The status of property acquired by an individual following the filing of the bankruptcy case is not always clear."); *see* Parks v. Dittmar (*In re* Dittmar), 618 F.3d 1199 (10th Cir. 2010).

[36]   ELIZABETH WARREN & JAY LAWRENCE WESTBROOK, THE LAW OF DEBTORS AND CREDITORS 121 (6th ed. 2009) (emphasis added).

B.J. Mendelson created an account on Twitter for a cross-country breast cancer awareness tour he was planning with the 1 in 8 Foundation.[37] He became the first non-celebrity, non-brand, non-media outlet to be placed on Twitter's Suggested User List, which appears on users' profile pages to suggest popular accounts to follow.[38] An entrepreneur was offering to purchase from Twitter a two-year placement on the Suggested User List.[39] Mendelson heard about this offer and offered to sell his spot on the Suggested User List for $250,000, which would be donated to the 1 in 8 Foundation.[40] Twitter prevented the sale.[41]

While users are not able to sell their accounts, in some cases they may share control over their social media accounts. Since 2012, the Twitter account @MichelleObama has been managed by staff members of the President Obama 2012 presidential campaign with First Lady Michelle Obama's own tweets signed "-mo."[42] In 2013, the Twitter account @FLOTUS was started by the Office of the First Lady, once again with First Lady Michelle Obama's own tweets signed "-mo."[43] Each account features Michelle Obama's likeness in the profile picture and both have tweets written by her.[44] The similarity of the accounts and the shared control makes ownership of the accounts unclear.

### 1. The Nature of Fame and the Right of Publicity

The nature of social media accounts makes it difficult to determine the delineation between the individual and the individual's expression. Other types of personal property are physically distinct from their creator. But because social media involves the continued posting by the account holder, the user has a continued connection with the account. There is a source of identity and fame

---

[37]  Humberto Martinez, *An Unlikely Twitter Star*, TIMES UNION (Aug. 28, 2009, 1:00 AM), http://www.timesunion.com/entertainment/article/An-unlikely-Twitter-star-556883.php.

[38]  *See id.*

[39]  Erick Schonfeld, *How Much Is a Suggested Slot on Twitter Worth? Jason Calacanis Offers $250,000*, TECHCRUNCH (Mar. 12, 2009), http://techcrunch.com/2009/03/12/how-much-is-a-suggested-slot-on-twitter-worth-jason-calacanis-offers-250000.

[40]  Michael Arrington, *Hey Twitter, Here's a Way to Call Jason's Bluff and Maybe Fight Breast Cancer*, TECHCRUNCH (Mar. 20, 2009), http://techcrunch.com/2009/03/20/hey-twitter-heres-a-way-to-call-jasons-bluff-and-maybe-fight-breast-cancer.

[41]  *See* B.J. Mendelson, *About B.J. Mendelson*, B.J. MENDELSON – THE MARK TWAIN OF SOCIAL MEDIA (Aug. 29, 2013), http://bjmendelson.com/2013/08/29/about-brandon-mendelson.

[42]  *Michelle Obama (@MichelleObama)*, TWITTER, https://twitter.com/michelleobama (last visited Jan. 9, 2015, 5:12 PM).

[43]  *The First Lady (@FLOTUS)*, TWITTER, https://twitter.com/flotus (last visited Jan. 9, 2015, 5:12 PM).

[44]  *Compare Michelle Obama (@MichelleObama)*, *supra* note 42, *with The First Lady (@FLOTUS)*, *supra* note 43.

attached to popular social media accounts.[45] People interact with these accounts because they identify the account with the person or company controlling it.[46]

The right of publicity is the right to control the commercial use of one's name or likeness.[47] Though the right of publicity has been treated as having foundations in property law,[48] it remains a somewhat amorphous concept. About half the states have recognized that there is commercial value in the identity of a celebrity.[49] State laws on this issue differ considerably in their recognition of publicity rights.[50] Without a standardized definition of what is included in the right of publicity, choosing the applicable state law presents its own challenge.

A celebrity's right of publicity may become a "right of value" when the celebrity endorses a tangible product that would express the right of publicity "in certain things of value."[51] In other words, the right of publicity has no value until the name or image of the famous figure is attached to something tangible.[52] Professors Jacoby and Zimmerman argue that fame has become a commodity, and therefore is subject to liquidation in a chapter 7 bankruptcy.[53] They also acknowledge the practical difficulty in that "the [right of publicity] may need to be disentangled from its residual overlay of personal rights."[54] Unless the social media account itself is tied to a tangible and saleable product, there is no right of value in the account itself.

Primary issues of the distinction between commercial and non-commercial social media posts include creating a standard that could be applied to determine commerciality, the amount of discretion given to a trustee in using such a standard, and the threat of judicial review. Consider the case of Ree

---

[45] *E.g.*, O'Leary, *supra* note 11 (stating that Ms. Marbles has more than one billion views and eight million subscribers on YouTube).

[46] *Cf.* Michelle Garrett, *Why Do People Read Blogs?*, BRITMUMS (Jan. 27, 2012), http://www.britmums.com/2012/01/why-do-people-read-blogs (listing an interest in connecting with the author as among the reasons why people read blogs).

[47] *See* Haelan Labs., Inc. v. Topps Chewing Gum, Inc., 202 F.2d 866, 868 (2d Cir. 1953).

[48] *Id.*

[49] Melissa B. Jacoby & Diane Leenheer Zimmerman, *Foreclosing on Fame: Exploring the Uncharted Boundaries of the Right of Publicity*, 77 N.Y.U. L. REV. 1322, 1324 n.7 (2002).

[50] *Id.* at 1332.

[51] Timothy Terrell & Jane Smith, *Publicity, Liberty, and Intellectual Property: A Conceptual and Economic Analysis of the Inheritability Issue*, 34 EMORY L.J. 1, 20 (1985).

[52] *See id.*

[53] Jacoby & Leenheer Zimmerman, *supra* note 49, at 1322–23.

[54] *Id.* at 1323.

Drummond, who translated the success from her blog on homeschooling, cooking, and life on an Oklahoma ranch into advertising revenue estimated around $1,000,000,[55] several best-selling cookbooks, a television show on Food Network, and movie rights to her memoir. While blog posts promoting products are commercial in nature, it is unclear whether, for example, a post merely consisting of two photographs of purple peppers Drummond grew in her own garden would be commercial.

Second, the time to sort through more than seven years of blog posts,[56] four years of Facebook posts,[57] 15,217 tweets,[58] and 580 pins[59] to determine which are commercial in nature, and therefore may invoke a publicity right, would be a daunting task. Additionally, the administrative costs incurred would also be significant.

A third practical concern is the treatment of publicity rights within the bankruptcy system. Debtors are required to either liquidate their publicity rights or pay for the right to retain them.[60] Both liquidation and purchasing the right to retain their account, and the right of publicity invested in it, would require a valuation of the account itself. While valuation would be difficult, it would not be impossible.[61] An appraisal of the components of the social media account may include valuing advertising revenue, intellectual property, and goodwill.[62]

---

[55] Anna Viele, *How Much Do Bloggers Make? Case Study: Ree Drummond AKA The Pioneer Woman*, ABDPBT, http://www.abdpbt.com/personalfinance/how-much-do-bloggers-make-case-study-ree-drummond-aka-the-pioneer-woman (last visited Jan. 9, 2015).

[56] *See* Ree Drummond, THE PIONEER WOMAN | REE DRUMMOND, http://thepioneerwoman.com (last visited Jan. 10, 2015); Ree Drummond, TASTY KITCHEN: A HAPPY RECIPE COMMUNITY, http://tastykitchen.com (last visited Jan. 10, 2015).

[57] *See* Ree Drummond, *The Pioneer Woman - Ree Drummond*, FACEBOOK, https://www.facebook.com/thepioneerwoman?ref=ts (last visited Jan. 10, 2015).

[58] *See* Ree Drummond, *Ree Drummond (@thepioneerwoman)*, TWITTER, https://twitter.com/thepioneerwoman (last visited Jan. 10, 2015, 9:20 AM).

[59] *See* Ree Drummond, *Ree Drummond | The Pioneer Woman*, PINTEREST, http://www.pinterest.com/thepioneerwoman (last visited Jan. 10, 2015, 1:54 PM). Pinterest defines "pins" as "visual bookmarks." *Pins*, PINTEREST, https://help.pinterest.com/en/guide/pins (last visited Feb. 10, 2015).

[60] Jacoby & Leenheer Zimmerman, *supra* note 49, at 1327–28.

[61] *See* John Biggs, *A Dispute over Who Owns a Twitter Account Goes to Court*, N.Y. TIMES, Dec. 26, 2011, at B1, *available at* http://www.nytimes.com/2011/12/26/technology/lawsuit-may-determine-who-owns-a-twitter-account.html.

[62] An application called Social Valuator has developed a proprietary algorithm to calculate the value of a Twitter account based on the number of followers, lists, and age of the account. *Twitter Value*, SOCIAL STATS, http://howmuchismytwitterworth.com (last visited Jan. 10, 2015).

A major policy concern is how liquidation of the social media account would affect one of the primary aims of the bankruptcy system—to create a fresh start for the debtor.[63] Heather Armstrong, a self-proclaimed "professional blogger," has earned her living from advertising revenue and selling products on her blog.[64] If she were to file for bankruptcy, with her blog and other social media accounts included in the bankruptcy estate, she would have to recreate her online persona through new accounts and regain subscribers. This loss of control over her social media accounts and related persona would counteract a major goal of the bankruptcy system and deprive Armstrong of her future income stream and customer base from those accounts.[65]

For an online personality such as Armstrong, treating her social media presence as a property interest to be included in the bankruptcy estate would be a deprivation of her livelihood. If a social media presence is recognized as a liberty interest, that is as an intangible interest outside the sphere of valuable property interests for distribution among creditors, then Fifth Amendment concerns of deprivation of liberty without due process would be implicated.[66] Additionally, depriving the debtor of a liberty interest would violate the purpose of the bankruptcy system. This deprivation would impinge on the debtor herself, thereby negating the policy of providing a fresh start.

### 2. Taking a Step Back and Rethinking "Property"

An alternate way of analyzing property is the central case model used by Professor Terrell.[67] The central case model begins with the "most essential, irreducible elements" of the "focal meaning" of the paradigmatic example of property.[68] The "focal meaning" is determined by how the term property is used in practice.[69] The analysis then expands outward to determine just how far from the central case an interest can be before it is too peripheral to be

---

[63]  Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934) ("[Bankruptcy] gives to the honest but unfortunate debtor . . . a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt."). The debtor's fresh start and what constitutes property of the estate under § 541 are inherently related. *See* Segal v. Rochelle, 382 U.S. 375, 380 (1966).

[64]  Heather Armstrong, *About*, DOOCE, http://dooce.com/about (last visited Jan 10, 2015).

[65]  *But cf.* Jones v. Jones (*In re* Jones), 43 B.R. 1002, 1005 (N.D. Ind. 1984) ("Inclusion of an asset in a bankruptcy estate is no longer determined by reference to the nature of the asset and how the asset relates to the debtor's situation.").

[66]  U.S. CONST. amend. V.

[67]  *See* Timothy P. Terrell, *"Property," "Due Process," and the Distinction Between Definition and Theory in Legal Analysis*, 70 GEO. L.J. 861 (1982).

[68]  *Id.* at 866.

[69]  *See id.* at 865–74.

considered property.[70] The parameters of what is encompassed within property are established by identifying the commonly understood characteristics of property. Absent those characteristics, the given example is not property.[71]

One application of the central case model reduces the essential characteristics of property to three rights (use, exclusion, and transfer) and three rules for violating these rights (punishment, damage, and liability).[72] Whether a social media account is property begins by determining whether the three rights are present. A social media user has the right to use his or her own account as long as he or she abides by the service's terms of service.[73] The exclusion right arguably exists in the form of the user controlling who can and cannot interact with their account.[74] On the surface, the transfer right seemingly exists in the form of control over who has access to the account.

An analysis of these terms of service shows that these social media services do not fit this definition of property. As Pinterest's Terms of Service states, "[W]e grant you a limited, non-exclusive, non-transferable, and revocable license to use our Products."[75] The terms limited, non-exclusive, non-transferable and revocable all suggest a user's lack of total control or ownership over the account. The first three rights are not established here because the use is limited and can be revoked by Pinterest at any time, and exclusion and transferability are forbidden. On the other hand, the rules of punishment, damages, and liability for interference with these rights do exist. For example, Facebook's Statement of Rights and Responsibilities specifies

---

[70] *See id.*

[71] *See id.*

[72] *Id.* at 868 n.23.

[73] *See Statement of Rights and Responsibilities*, FACEBOOK (Nov. 15, 2013), https://www.facebook.com/legal/terms; *Terms of Service*, PINTEREST, http://about.pinterest.com/terms (last visited Jan. 10, 2015) [hereinafter *Pinterest Terms of Service*]; *Terms of Service*, TWITTER (Sept. 8, 2014), https://twitter.com/tos [hereinafter *Twitter Terms of Service*]; *Terms of Service*, YOUTUBE (June 9, 2010), https://www.youtube.com/t/terms [hereinafter *YouTube Terms of Service*].

[74] For example, Twitter permits a user to block another user from interacting with his or her account. *Blocking Users on Twitter*, TWITTER, https://support.twitter.com/articles/117063-blocking-users-on-twitter (last visited Jan. 10, 2015).

[75] *Pinterest Terms of Service*, *supra* note 73; *see also Statement of Rights and Responsibilities*, *supra* note 73 ("[Y]ou grant us a non-exclusive, transferable, sub-licensable, royalty-free, worldwide license to use any IP content that you post on or in connection with Facebook (IP License)."); *Twitter Terms of Service*, *supra* note 73 ("Twitter gives you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software that is provided to you by Twitter as part of the Services."); *YouTube Terms of Service*, *supra* note 73 ("These Terms of Service, and any rights and licenses granted hereunder, may not be transferred or assigned by you . . . .").

twelve forbidden actions necessary to protect the Facebook community.[76] In summation, while it appears that these rights of property do not apply to social media services, his rules of property do.

This creates a blurred dichotomy that suggests social media accounts are a pseudo-property interest possessing only some property characteristics. Since social media is a relatively new phenomenon, its social context is still changing. What is clear is that social media services allow their users some control over their accounts, but that control is not absolute.

## B.  Ownership of Social Media

A social media user owns his or her original posted content, subject to applicable intellectual property law[77] and conditions imposed by the social media service.[78] However, in posting the content, a license is created for the service to use and reproduce that same content.[79] Because social media services' terms of service expressly state that users have ownership over self-generated content, it is possible that this content could be included in the bankruptcy estate.

The implications of including user-generated content in the bankruptcy estate are multifold. Depending on the payment schedule of an advertiser who sponsors a social media user's posts, not only could the posts be included in the estate, but also any prepetition and postpetition proceeds received as a

---

[76]   *Statement of Rights and* Responsibilities, *supra* note 73.

[77]   Digital Millennium Copyright Act, Pub. L. No. 105-304, 112 Stat. 2860 (codified in scattered sections of 17 U.S.C.).

[78]   *See Statement of Rights and Responsibilities*, *supra* note 73 ("You own all of the content and information you post on Facebook . . . ."); *Pinterest Terms of Service*, *supra* note 73 ("You retain all rights in, and are solely responsible for, the User Content you post to Pinterest."); *Twitter Terms of Service*, *supra* note 73 ("You retain your rights to any Content you submit, post or display on or through the Services."); *YouTube Terms of Service*, *supra* note 73 ("For clarity, you retain all of your ownership rights in your Content.").

[79]   *See Statement of Rights and Responsibilities*, *supra* note 73 ("[Y]ou grant us a non-exclusive, transferable, sub-licensable, royalty-free, worldwide license to use any IP content that you post on or in connection with Facebook (IP License)."); *Pinterest Terms of Service*, *supra* note 73 ("You grant Pinterest and its users a non-exclusive, royalty-free, transferable, sublicensable, worldwide license to use, store, display, reproduce, re-pin, modify, create derivative works, perform, and distribute your User Content. We reserve the right to remove or modify User Content for any reason . . . ."); *Twitter Terms of Service*, *supra* note 73 ("By submitting, posting or displaying Content on or through the Services, you grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense) to use, copy, reproduce, process, adapt, modify, publish, transmit, display and distribute such Content in any and all media or distribution methods . . . ."); *YouTube Terms of Service*, *supra* note 73 ("[Y]ou hereby grant YouTube a worldwide, non-exclusive, royalty-free, sublicenseable and transferable license to use, reproduce, distribute, prepare derivative works of, display, and perform the Content . . . .").

result of those posts.[80] For example, another party, such as the social media company itself, might reproduce the debtor's original content. This would result in additional content attributable to the user and of value to the estate.

Presumably, the automatic stay provisions of the Code[81] would negate the terms of service of a social media service that typically would allow for modification or removal of the content.[82] While in effect, the automatic stay prohibits most attempts to reach the debtor's assets, with violations resulting in damages.[83] For example, assume a video that included a paid advertisement was uploaded to YouTube prepetition. Once the bankruptcy petition was filed, the video, as well as the revenue stream generated by the advertising would be included in the bankruptcy estate. In essence, the automatic stay would freeze any prepetition content posted by a debtor on a social media account, such that that the social media service could not modify or remove it during the bankruptcy case.

### 1. Social Media, Intellectual Property, and Executory Contracts

There are two main types of contractual relationships that commonly exist in social media among revenue-earning users. The first type, the "Terms of Service Contract" is created when the user agrees to the terms of service for a particular social media service.[84] The result is a contract created between the user and the service.[85] Arguably, agreeing to the Terms of Service Contract also transforms the user into a licensor by granting the social media service a non-exclusive license to content posted by the user.[86] Simultaneously, the user

---

80    *See* 11 U.S.C. § 541(a)(6) (2012) ("Proceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case."); *id.* § 541(a)(7) ("Such estate is compromised of all the following property [including] . . . [a]ny interest in property that the estate acquires after the commencement of the case.").

81    *Id.* § 362.

82    *See, e.g.*, *Pinterest Terms of Service*, *supra* note 73 ("We reserve the right to remove or modify User Content for any reason . . . .").

83    11 U.S.C. § 362(k).

84    Typically, this occurs when users click an "I Agree" button when creating an account.

85    *See Statement of Rights and Responsibilities*, *supra* note 73 ("[T]his statement is an agreement between you and Facebook . . . ."); *Pinterest Terms of Service*, *supra* note 73 ("You may use our Products only if you can form a binding contract with Pinterest, and only in compliance with these Terms . . . ."); *Twitter Terms of Service*, *supra* note 73 ("You may use the Services only if you can form a binding contract with Twitter . . . .").

86    *See, e.g.*, *Twitter Terms of Service*, *supra* note 73 ([Y]ou grant us a worldwide, non-exclusive, royalty-free license . . . ."). Similar language is present in the terms of service of each social media service discussed in this Comment. For example, Facebook's Statement of Rights and Responsibilities specifically refers to its license as the "IP license," and also states, "This IP License ends when you delete your IP content or your

becomes a licensee of the social media service, which grants the user a non-exclusive license to use the service.[87] The second type of contractual relationship, the "Advertising Contract," is the contract created between the user and an advertiser who sponsors or pays for posts by the user.[88]

The Terms of Service Contract is more complex because of the dual ongoing intellectual property licenses. The user grants the social media service rights to the user's posts. Those posts, which are original works of authorship fixed within a tangible medium, are eligible for copyright protection under the Copyright Act.[89] In exchange, the social media service grants the user rights to use its original software and website to post the content.[90]

Intellectual property laws generally require that an intellectual property licensing agreement be treated as a "personal" contract, thereby precluding performance by a non-party to the original licensing agreement, unless the licensor consents to such performance.[91] This is because non-exclusive intellectual property licenses do not transfer any ownership interest in the intellectual property from the licensor to the licensee, but rather only grant permission for use of the intellectual property.[92] This permission for use is considered a personal right, not a property right.[93] As a result, a licensee generally is not allowed to assign its rights under the intellectual property

---

account unless your content has been shared with others, and they have not deleted it." *Statement of Rights and Responsibilities*, *supra* note 73.

[87] *See Google Terms of Service*, GOOGLE+ (Apr. 14, 2014), http://www.google.com/intl/en/policies/terms ("Google gives you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you by Google as part of the Services."); *Twitter Terms of Service*, *supra* note 73 ("Twitter gives you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software that is provided to you by Twitter as part of the Services.").

[88] *See* MATTHEW S. EASTIN, HANDBOOK OF RESEARCH ON DIGITAL MEDIA AND ADVERTISING: USER GENERATED CONTENT CONSUMPTION 248–61 (Terry Daugherty & Neal M. Burns eds., 2010).

[89] 17 U.S.C. § 102 (2012).

[90] *See Google Terms of Service*, *supra* note 88 ("Google gives you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you by Google as part of the Services."); *Twitter Terms of Service*, *supra* note 73 ("Twitter gives you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software that is provided to you by Twitter as part of the Services.").

[91] Peter M. Gilhuly, Kimberly A. Posin & Ted A. Dillman, *Intellectually Bankrupt?: The Comprehensive Guide to Navigating IP Issues in Chapter 11*, 21 AM. BANKR. INST. L. REV. 1, 2 (2013).

[92] Madlyn G. Primoff & Eric G. Weinberger, *E-Commerce and Dot-Com Bankruptcies: Assumption, Assignment and Rejection of Executory Contracts, Including Intellectual Property Agreements and Related Issues Under Sections 365(c), 365(e) and 365(n) of the Bankruptcy Code*, 8 AM. BANKR. INST. L. REV. 307, 317 (2000).

[93] Gilhuly et al., *supra* note 92, at 6.

license without the licensor's express permission.[94] Moreover, the licensor is allowed to refuse performance from any party other than the original licensee.[95] Here, the social media service, as licensor, may refuse performance from anyone other than the original registered user of the account. Thus, a court's determination that an intellectual property license is a personal license may impair the debtor's assignment of licensed intellectual property.[96]

Executory contracts are contracts in which there is outstanding performance due by each contracting party.[97] Section 365 of the Code gives the trustee the ability to assume, assign, or reject any executory contract, subject to court approval.[98] This power enables the trustee to assume, or accept, contracts that are beneficial to reorganization, while allowing the trustee to reject those contracts that are not.[99] When the trustee rejects a licensor's intellectual property license, the licensor has the option to treat the rejection as a breach of contract or termination of the intellectual property license and can then assert a claim for damages.[100]

Although the Code provides the non-debtor licensee with a right to bring a claim against the debtor-licensor, § 365(n) explicitly protects a licensee's rights "to such intellectual property . . . as such rights existed *immediately before the case commenced*."[101] This language strongly suggests that § 365(n) does not protect a licensee's interest in future intellectual property created after the case commenced because this interest does not vest until that intellectual property is created.[102] As a licensee under the Terms of Service Contract, a social media service's rights to content do not vest until the user has created the content. If the content is created postpetition, then the licensee's rights to it are not protected under § 365(n).

Ongoing intellectual property contracts are typically considered executory contracts.[103] Following this, the Terms of Service Contract and the Advertising Contract are executory contracts. These executory contracts are subject to

---

94   *See id.* at 11.
95   *Id.* at 12.
96   *Id.*
97   Tonry v. Hebert (*In re* Tonry), 724 F.2d 467, 468 (5th Cir. 1984); 3 COLLIER ON BANKRUPTCY, *supra* note 29, at ¶ 365.02 n.3.
98   11 U.S.C. § 365(a) (2012).
99   *Id.*
100   *See id.* § 365(n).
101   *Id.* § 365(n)(1)(B) (emphasis added).
102   Gilhuly et al., *supra* note 92, at 39.
103   *See id.* at 2 (citing *In re* Kmart Corp., 290 B.R. 614, 618 (Bankr. N.D. Ill. 2003)).

section § 365(n), which lists the trustee's options in regards to executory contracts when the debtor is a licensor to intellectual property. The trustee may choose to reject or accept the contract, and must follow certain provisions if the social media service, as licensee, elects to retain its rights in the licensing agreement with the user.[104]

## 2. *Effects of Filing for Bankruptcy on Social Media*

The ramifications of a trustee assuming control of a social media account and having the power to accept or reject contracts under § 365 extend beyond the trustee's treatment of the debtor's licensing agreement with a social media service. First, a trustee must accept or reject contracts with advertisers who sponsor posts and provide revenue for the user.[105] Because rejection of an executory contract is treated as a contract breach, the advertiser, as the non-debtor party, would have a claim for breach of contract against the debtor.[106] This claim for damages would be treated as a prepetition unsecured claim, making the advertiser an unsecured creditor under § 502(g).[107] Such prepetition unsecured claims have relatively low priority in the bankruptcy system[108] and are unlikely to be paid in full,[109] the result of which may have a chilling effect on social media marketing and advertising campaigns.

A second consequence of the Terms of Service contract is the possibility of a preference action. Section 547 of the Code provides the trustee with the power to avoid any transfer of a property interest of the debtor made while the debtor was insolvent, or made on or within ninety days before the filing of the petition.[110] As argued above, a social media user agreeing to the Terms of Service is equivalent to the user granting the social media service a license. If the granting of that license was made while the debtor was insolvent, or within ninety days prior to the bankruptcy filing, the granting of that license may be a transfer subject to an avoidance action under § 547.[111]

Third, the value of social media posts lie in their origin from the user. If control of an account were transferred to another entity, the value of the

---

[104]   11 U.S.C. § 365(n).

[105]   *Id.*

[106]   *See id.*

[107]   *Id.* § 502(g).

[108]   *Id.* § 507(a)(3).

[109]   Gilhuly et al., *supra* note 92, at 36.

[110]   11 U.S.C. § 547(b)(4)(A).

[111]   Gilhuly et al., *supra* note 92, at n.5.

account would likely decline. Without the user creating value through his or her association with the account, the trustee may deem the account worthless and abandon it under § 554. Similarly, even shared control between the user and trustee may decrease the account's value because of uncertainty regarding who is creating the posts.

It remains to be seen how the social media world would react to interference by trustees or bankruptcy courts with a user's social media account. The repercussions will be unpredictable without a uniform standard for the treatment of social media accounts in bankruptcy.

## C.  *Applying Old Law to New Technology*

Without a clear definition of social media in bankruptcy, another approach is to analyze how nonbankruptcy law treats interests that are similar to social media accounts.

### 1.  *Nonbankruptcy Law and Website URLs*

While courts have not yet addressed whether social media constitutes a property right to be included in the bankruptcy estate, the Virginia Supreme Court has encountered the similar question of whether a website domain name constitutes a property interest subject to garnishment in a state law collection action.[112] In *Network Solutions, Inc. v. Umbro International, Inc.*, the court determined that the debtor had a contractual right to a domain name and this right was the product of a contract for services, and therefore not subject to garnishment.[113] The domain name itself was held to be an intangible asset consisting of the rights delineated in the contract.[114] The registrant and holder of the domain name had no separate intellectual property rights in the domain name itself.[115] The court reasoned that domain names like telephone numbers are unique.[116]

This comparison can be extended to social media accounts. Like domain names and telephone numbers, social media accounts are unique. A social media user's page comes with its own unique webpage uniform resource locator ("URL") and, in many cases, its own identifiable name as well. If, as

---

[112]  Network Solutions, Inc. v. Umbro Int'l, Inc., 529 S.E.2d 80 (Va. 2000).
[113]  *Id.* at 81.
[114]  *Id.*
[115]  *See id.* at 86.
[116]  *Id.* at 82–83.

the Virginia Supreme Court held, domain names are nonpossessory interests in intangible property, then URLs, identifiable names, and social media accounts are also nonpossessory interests in intangible property under nonbankruptcy law. Since the status of property in bankruptcy is determined by applicable state nonbankruptcy law,[117] state law may determine URLs, identifiable names, and social media accounts to be nonpossessory interests in intangible property and not eligible for inclusion in the bankruptcy estate.

## 2. Nonbankruptcy Law and Trademarks

Trademarks are another legal interest to which a social media account can be analogized. Trademarks are federally protected under the Lanham Act[118] and state unfair competition statutes. A trademark is any word, name, symbol, device, or any combination thereof used in commerce to identify and distinguish one person's goods from the goods of another person.[119] A trademark cannot be sold or assigned "in gross," meaning sold or assigned without including the goodwill that the trademark symbolizes.[120]

By analogy, this assignability requirement may be applied to a social media username. A username identifies and distinguishes the source of the content of one user from another with the commercial aspect derived from the value associated with the account. A social media account is "in gross" when it is unattached from the goodwill created by and inherent to the user who created the content. The account would be unattached from this goodwill if the debtor no longer exercised control over the account because of its inclusion in the bankruptcy estate. Such an assignment would violate the restriction on assigning a trademark in gross.

The policy of trademark law is to promote competition and protect consumers.[121] In support of this policy, the Federal Trade Commission revised

---

[117]  Butner v. United States, 440 U.S. 48 (1979).

[118]  15 U.S.C. §§ 1051–1141n (2012).

[119]  *See id.* § 1127.

[120]  *Id.* § 1060(a)(1) ("A registered mark or a mark for which an application to register has been filed shall be assignable with the good will of the business in which the mark is used, or with that part of the good will of the business connected with the use of . . . the mark."); *see* Ph. Schneider Brewing Co. v. Century Distilling Co., 107 F.2d 699, 703 (10th Cir. 1939) ("It may be stated as a general rule that a trade-mark may not be assigned in gross. It cannot be assigned separate and apart from the good will with which it is associated.").

[121]  Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 28 (2003) ("The Lanham Act was intended to make actionable the deceptive and misleading use of marks, and to protect persons engaged in . . . commerce against unfair competition." (quoting 15 U.S.C. § 1127) (internal quotation marks omitted)).

its online advertising disclosure guidelines in March 2013.[122] These guidelines protect consumers by requiring social media accounts to be accountable to their followers and subscribers. The guidelines require disclosures of sponsored posts to be "clear and conspicuous,"[123] such as using the word "ad" in a sponsored tweet.[124] For example, a tweet reading "@TwitterUser: Loving my new X Brand shoes! #ad"[125] furthers trademark policy by indicating the origin of the tweet from @TwitterUser and that the tweet is a paid endorsement from X Brand.

Assume now that @TwitterUser were to file for bankruptcy and the trustee were to include @TwitterUser's account in the bankruptcy estate. Assume that the trustee would now have control over the @TwitterUser account with no interference or objections raised by Twitter, and that the trustee assumed @TwitterUser's contract with X Brand for sponsored posts. If the trustee were to use his or her authority under the Code to maintain the debtor's property,[126] the trustee could tweet from @TwitterUser's account. However, the trustee would have no incentive to tweet the general, non-commercial posts that @TwitterUser previously posted to attract followers.

The trustee would likely only post tweets that would generate revenue for the estate. This would have two effects. First, only posting sponsored tweets would likely alienate followers to the account. This would reduce followers and affect the value of the account and its attractiveness to advertisers. Second, the trustee's control of the account would be deceptive to followers who associate the account with a particular user and not the trustee. This example illustrates how, even if all other hurdles to including a social media account in the estate were removed, allowing a trustee to have control of a debtor's social media account would violate principles of trademark law and consumer protection.

---

[122]  Fed. Trade Comm'n, *.Com Disclosures: How to Make Effective Disclosures in Digital Advertising*, FED. TRADE COMMISSION (Mar. 2013), http://www.ftc.gov/system/files/documents/plain-language/bus41-dot-com-disclosures-information-about-online-advertising.pdf.

[123]  *Id.* at 6.

[124]  *Id.* at A-18.

[125]  The # symbol is used to create a "hashtag," which is placed before a keyword or phrase in a tweet to categorize it. The hashtag can be clicked on to view all other tweets that include the same hashtagged keyword or phrase. *Using Hashtags on Twitter*, TWITTER HELP CENTER, http://support.twitter.com/articles/49309-using-hashtags-on-twitter (last visited Jan. 13, 2015).

[126]  *See* 11 U.S.C. § 704 (2012).

CONCLUSION

With the increasing ubiquity of social media, the question of its treatment in bankruptcy is inevitable. While social media accounts may be assigned value, the ambiguity of ownership of the accounts, the right of publicity, and practical concerns all suggest that social media accounts should not be included in the bankruptcy estate. By analogizing a social media account to a license or a trademark, it is clear that presence on a social media service is more akin to a personal privilege than a property right. As a personal privilege, the social media account is worthless when disassociated from the user who created the goodwill of the account.

The time has come for the legislature to recognize that an interest in a social media account should not be alienable or transmissible because it is not property in the traditional sense. The inherent liberty interests of a social media presence extend far beyond the scope of property. The need for a legal definition of social media is imperative to guide lawyers and courts when issues surrounding social media inevitably arise in bankruptcy.

SMITA GAUTAM[*]

[*] Executive Symposium Editor, *Emory Bankruptcy Developments Journal*; J.D. Candidate, Emory University School of Law (2015); B.S.B.A., B.A., The Ohio State University (2012). I would like to thank Professor Rafael Pardo for his guidance in developing this Comment. I would also like to thank the staff of the *Emory Bankruptcy Developments Journal* for their work in polishing this Comment. Finally, special thanks to my parents for pretending to read this Comment.

Label Matrix for local noticing
113A-6
Case 6:18-bk-06821-KSJ
Middle District of Florida
Orlando
Mon Sep 14 16:44:39 EDT 2020

American Express National Bank
c/o Becket and Lee LLP
PO Box 3001
Malvern, PA 19355-0701

Bella Collina Property Owner's Associat
c/o Becker & Poliakoff
100 Whetstone Place
Suite 302
Saint Augustine, FL 32086-5775

Ben-Zvi Law Firm
23 Bar-Cochva
Bnei-Brak, Israel

DCS Real Estate Investments, LLC
636 U.S. Hwhy One
Suite 100
North Palm Beach, FL 33408-4611

(p)FEDERAL TRADE COMMISSION
ASSOCIATE DIRECTOR
DIVISION OF ENFORCEMENT
600 PENNSYLVANIA AVE NW MAIL DROP NJ-2122
WASHINGTON DC 20580-0001

Mercedes-Benz Financial Services USA LLC
c/o Ed Gezel
Bk Servicing, LLC
PO Box 131265
Roseville, MN 55113-0011

(c)NATURAL VITAMINS LABORATORY CORPORATION
12845 NW 45TH AVE
OPA LOCKA FL  33054-5119

Wilmington Financial Services, LLC
c/o David M. Landis, Esq.
Mateer & Harbert, P.A.
P O Box 2854
Orlando, FL 32802-2854

Yip Associates
One Biscayne Tower
2 S. Biscayne Boulevard
Suite 2690
Miami, FL 33131-1815

Zuckerman & Co.
Ea Yarkon St 113
Tel Aviv Israel

Anna Juravin
15118 Pendio Drive
Montverde, FL 34756-3606

Anna Juravin
Ralph Strzalkowski & Amber Robinson
695 Central Ave Ste. 264
St. Petersburg, FL 33701-3669

Bella Collina Property Owner's Associat
c/o William C. Matthews, Esq.
Shutts & Bowen LLP
300 S. Orange Avenue, Suite 1600
Orlando, FL 32801-3382

Bella Collina Property Owners Assoc Inc.
c/o Aegis Community Mgmt Solutions, Inc.
8390 Championsgate Blvd., Suite 304
Championsgate, FL 33896-8313

Carl H. Settlemyer, III, Esq.
Federal Trade Commission
600 Pennsylvania Avenue NW
Mail Drop CC-10528
Washington, DC 20580-0001

Citibank, N.A.
701 East 60th Street North
Sioux Falls, SD 57104-0493

Consumer Opinion Corp.
c/o Randazza Legal Group
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117-3400

DCS Real Estate Investments, LLC
c/o David M. Landis, Esq.
PO Box 2854
Orlando, FL 32802-2854

Dr. Free
11 Walnut Street, #12350
Green Cove Springs, FL 32043

FLORIDA RIGHTS LAW FIRM OBO ANNA JURAVIN
695 CENTRAL AVE STE 264
ST PETE FL 33701
AROBINSON@AROBINSONLAWFIRM.COM
RS@LAWYERONWHEELS.ORG 33701-3669

Florida Department of Revenue
Bankruptcy Unit
Post Office Box 6668
Tallahassee FL 32314-6668

Internal Revenue Service
Centralized Insolvency Operation
Post Office Box 7346
Philadelphia, PA 19101-7346

Internal Revenue Service
PO Box 7346
Philadelphia, PA  19101-7346

Julia Kalatusha
32 Borochov
Tel Aviv, Israel

Juvarin, Inc.
P. O. Box 560510
Montverde, FL 34756-0510

Karan Arora
12815 NW 45th Avenue
Opa Locka, FL 33054-5100

Karan Arora
c/o Michael A. Nardella, Esq.
Nardella & Nardella, PLLC
135 W. Central Blvd., Suite 300
Orlando, FL 32801-2435

Lake County Tax Collector
Attn:  Bob McKee
Post Office Box 327
Tavares FL 32778-0327

Mercedes-Benz Financial
P. O. Box 961
Roanoke, TX 76262-0961

Mercedes-Benz Financial Services USA LLC
c/o BK Servicing, LLC
PO Box 131265
Roseville, MN 55113-0011

Mercedez-Benz Financial
PO Box 961
Roanoke, TX 76262-0961

Must Cure Obesity Co.
15118 Pendio Drive
Montverde, FL 34756-3606


Noam Ben Zvi
10/93 Rishon Lezion Street
Petachtiachba, Israel

Opinion Corp.
c/o Randazza Legal Group
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117-3400

PSR Developers, LLLP
3900 Centennial Drive
Suite C
Midland, MI 48642-5996


Paul B. Spelman, Esq.
Federal Trade Commission
600 Pennsylvania Avenue NW
Mail Drop CC-10528
Washington, DC 20580-0001

Secretary of the Treasury
15th & Pennsylvania Ave., NW
Washington, DC 20220-0001

Shay Zuckerman
8 Babli Street
Tel Aviv, Israel


U.S. Securities and Exchange Commission
Office of Reorganization
950 East Paces Ferry Road, N.E.
Suite 900
Atlanta, GA 30326-1382

United States Attorney
300 North Hogan St Suite 700
Jacksonville, FL 32202-4204

United States Trustee - ORL7/13
Office of the United States Trustee
George C Young Federal Building
400 West Washington Street, Suite 1100
Orlando, FL 32801-2210


Zachary Lake
c/o Hammer Law Offices, APLC
26565 West Agoura Road, Suite 200-197
Calabasas, CA 91302-1984

Zuckerman & Co.
c/o Shay Zuckerman
HaYarkon St. 113
Tel Aviv, Israel

Aldo G Bartolone Jr
Bartolone Law, PLLC
1030 North Orange Avenue, Suite 300
Orlando, FL 32801-1004


Amber C Robinson
Robinson Law Office, PLLC
695 Central Avenue, Ste 1501
St. Petersburg, FL 33701-3669

(p)DENNIS D  KENNEDY
PO BOX 541848
MERRITT ISLAND FL 32954-1848

Don Karl Juravin
15118 Pendio Drive
Montverde, FL 34756-3606


Hal Levenberg
Yip Associates
One Biscayne Tower
2 S. Biscayne Boulevard, Suite 2690
Miami, FL 33131-1815

Hal E. Hershkowitz
Hershkowitz & Kunitzer, P.A.
5039 Central Avenue
St. Petersburg, FL 33710-8240

James D Ryan, Esq.
Ryan Law Group, PLLC
636 US Highway One
Suite 110
North Palm Beach, FL   33408-4611


Naom Ben Zvi
23 Bar-Cochva
Bnei-Brak Israel

Pamela J Henley
343 N. Fern Creek Avenue
Orlando, FL 32803-5439

Robert H Ewald
Ewald Enterprises, Inc.
12472 Lake Underhill Road
Suite 312
Orlando, FL 32828-7144


Shay Zuckerman
8 Bavli Street
Tel Aviv, Israel

Zachary Lake
26565 West Agoura Road
Suite 200-197
Suite 200-197
Calabasas, CA 91302-1984


The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Federal Trade Commission
600 Pennsylvania Avenue NW
CC-9528
Washington, DC 20580

(d)Federal Trade Commission
600 Pennsylvania Avenue NW
Mail Crop CC-10528
Washington, DC 20580

Dennis D Kennedy
P. O. Box 541848
Merritt Island, FL 32954

(d)Dennis D. Kennedy
Post Office Box 541848
Merritt Island, FL 32954

Addresses marked (c) above for the following entity/entities were corrected
as required by the USPS Locatable Address Conversion System (LACS).

Natural Vitamins Laboratory Corporation
12815 NW 45th Avenue
Opa Locka, FL 33054-5100

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Consumer Opinion Corp.

(u)Opinion Corp.

(d)American Express National Bank
c/o Becket and Lee LLP
PO Box 3001
Malvern  PA 19355-0701

(d)Bella Collina Property Owner's Associat
c/o William C Matthews, Esq.
Shutts & Bowen LLP
300 S. Orange Avenue, Suite 1600
Orlando, FL 32801-3382

(d)Ben-Zvi Law Firm
23 Bar-Cochva
Bnei-Brak, Israel

(d)Florida Dept. of Revenue
Bankruptcy Unit
P.O. Box 6668
Tallahassee, FL 32314-6668

(d)Internal Revenue Service
Post Office Box 7346
Philadelphia PA 19101-7346

(d)Mercedes-Benz Financial
PO Box 961
Roanoke, TX 76262-0961

(d)Anna Juravin
15118 Pendio Drive
Montverde, FL 34756-3606

(d)Karan Arora
12815 NW 45th Avenue
Opa Locka, FL 33054-5100

End of Label Matrix
Mailable recipients     55
Bypassed recipients     10
Total                   65