UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

Don Karl Juravin                           Case No. 6:18-bk-06821-KSJ

      Debtor

_____/

## MOTION TO ENFORCE BUYER, WILMINGTON FINANCIAL SERVICES, LLC'S, OBLIGATIONS ON PURCHASE OF MUST CURE OBESITY, CO, JURAVIN, INC. AND ROCA LABS NUTRACEUTICAL USA, INC.

**MUST CURE OBESITY, CO., JURAVIN, INC. AND ROCA LABS NUTRACEUTICAL USA, INC** by and through Don K. Juravin, Debtor, hereby brings this Motion to enforce Buyer, Wilmington Financial Services LLC's obligations on the purchase of Must Cure Obesity, Co., Juravin, Inc, and Roca Labs Nutraceutical through the auspices of this Bankruptcy Court.

## BACKGROUND

1. On September 2, 2020 this Court entered an Order granting Chapter 7 Trustee's Motion to Approve Sale of Assets Subject to Overbid and for Approval of Overbid Procedures. (DE 392) (Exhibit "A"). Also attached as Exhibit "B" is a copy of the "Agreement Regarding Sale of Property."

1

2.  The said Order of the Court provided in Paragraph 3, that "The Chapter 7 trustee, Dennis D. Kennedy, is authorized to execute a bill of sale to Wilmington Financial Services, LLC, a Delaware limited liability company, for the following property:...

> "D. Any and all of the Debtor's interest in Must Cure Obesity, Co., Juravin, Inc. and Roca LabsNutraceutical USA, Inc."

3.  Under Paragraph 4 of the Order, "The Debtor, Don Karl Juravin, is ordered to provide any and all documents reasonably requested by the Trustee or Wilmington Financial Services , LLC with respect to the Property."    The Order further states (at Paragraph 5) that "this Court shall retain jurisdiction to determine any disputes related to the interpretation of this Order."

4.  The language of Order is clear in mandating that "all" "interest" in the named entities are included in the sale.    As such, the stock and attendant ownership in said companies is now vested in the Buyer, Wilmington Financial Services, LLC.    Acquiring the stock can only mean that the Buyer acquired and assumed and took subject to existing liabilities of each of these companies commensurate with the transfer of the stock to it of each entity.    Correlative thereto, the then previous owner Don K. Juravin should necessarily be released from the liabilities of said entities and discharged of any primary liabilities therefrom as no longer owning any interest therein and his estate having the benefit of the sale proceeds to be paid and distributed to creditors of the estate.

5.  Significant in this instance, is that the name "Juravin" was included in the sale of the interests which not incidentally is the last name of the Debtor. Each of the corporations had and have continuing reporting obligations to the Florida Division of Corporations,

The Florida Department of Revenue, the United States Department of Labor, the Internal Revenue Service and specifically in this instance, the Federal Trade Commission, to which there are outstanding consent Orders and Decrees. There is also a Massachusetts state court again pending against Juravin, Inc. which presumably requires a defense in order to avoid default.

6. To the best of Debtor's knowledge and belief no reporting to these reporting authorities has been undertaken by the Buyer, leaving the Debtor as the last remaining reporting officer for these entities. The public records of said entities is clearly out of date at least with respect to Florida. See attached Exhibit "C" and "D" evidencing the corporate information on file with the State of Florida, Division of Corporations.

7. Section 607.1622 of the Florida Business Corporation Act requires that an annual report of a Corporation be delivered to the Secretary of State, Division of Corporations before May 1 of each year. Section 607.1622 (2) requires the appointment and designation of a Registered Agent for the Corporation. Similar requirements exist under the laws of sundry states, including the State of Delaware.

8. While it may be the choice of the Buyer of the "interests" not to continue any business or undertake a statutory dissolution, however such inactivity can only leave the reporting agencies, above mentioned, on notice and belief that Mr. Juravin is still involved which is now, nor has it been since the Courts Order in the case. Mr. Juravin continues to receive governmental notices for these entities and such should not be the case. As reviewed hereunder, Wilmington Financial purchased the corporate entities in toto, ("all the interests") which means they purchased the stock. As such, unless

3

formally merged or dissolved of record, the Florida and Federal agencies have not been updated as to said entities since sold.

9.  In these instances the Buyer appears not to be complying with such registration and notice requirements.   Even more problematic is the lack of notice given to such governmental agencies as the Internal Revenue Service, the Department of Labor and the Federal Trade Commission.   Each require annual reporting or information returns, and presumably, none of such reporting has been done.   A Registered Agent in Delaware in the Buyer's name means little to satisfy the statutory and notice requirements for the then existing Florida entities.   Even if the Florida entities may have been statutorily dissolved, the governmental records do not represent properly the state of affairs and that the Wilmington Financial as Buyer is the owner of the entities, not the previous Sellers. This is simply not reflected of record, and it should be.

10. The ownership of the buyer is not identified at the Delaware Secretary of State site and the only indication is from the original agreement in which James Ryan was empowered to sign on behalf of the Buyer as "Authorized Representative" (Exhibit "B") In order to determine who are the members, or officers or directors of the Buyer, it is also intended that Debtor as part of the relief sought be allowed to conduct the discovery and/or depositions so that the responsible officers of the Buyer can be named and identified. See Exhibit "E" in which earlier in the case Attorney Ryan sets forth his plan to acquire the assets of the Debtor. Presumably this was later done through Wilmington Financial.

11. An Order of this Court is sought to require that the Buyer, through their representatives, yet to be determined, take such actions and undertakings so that Debtors name no

4

longer appears of record as a responsible party, or registered agent, or officer, or director, or in any other previously recorded capacity. Debtor is rightfully entitled to such relief, with the Court having divested Debtor's ownership in the sundry entities identified above.

12. Further, as "all of the interests" of the Corporate Sellers necessarily included their stock, it is axiomatic that the Buyer assumed all existing liabilities of these entities. Such would include monies due to the Internal Revenue Service and the judgment to the Federal Trade Commission, if any. With absolutely no exclusions to a Court Order that provided that "all interests" in these Corporate Sellers were being included, including but not limited to their stock, there can be no question that Wilmington Financial Services, LLC acceded to both the benefits and burdens of these entities, or in this case, both the assets as well as the liabilities.

13. As stated, the former Shareholder, and Debtor herein, Don Juravin, having been made subject to a bona fide sale through the auspices of this Bankruptcy Court, should concomitantly be relieved of any continuing obligations as an officer, director, shareholder, or employee of the selling entities.

## LEGAL ANALYSIS

14. There is universal authority that the Buyer of stock assumes the existing liabilities of the underlying entity being sold, absent specific exclusions or indemnifications by the Seller.   The opposite is true with an "asset" acquisition where the Buyer in the general course under Florida law, would *not* take subject to existing liabilities.   In the matter before this Court, the Order leaves no room for doubt that "Any and all interests of"

the Selling entities are mandated for sale." There can be no doubt that the word "interests" necessarily included the "stock", as the stock of the corporations are in fact synonymous with the word "interests" It is the stock that reflects and controls ownership and all rights flowing therefrom. The Stockholders appoint the Directors of the Corporation, who in turn elect the Officers. The transfer by endorsement of a stock certificate is the uniform manner by which ownership in the underlying entity is transferred.    A Bill of Sale can certainly include not only tangible personal property, but also intangible personal property, such as stock, notes or similar.    But the corollary is not true - a Stock certificate assignment does not include tangible property, equipment or the like - rather it includes and represents the ownership "interests" in the corporation.

15. The Florida Supreme Court case of <u>Bernard ex rel. Bernard v. Kee Manufacturing Co.,</u> <u>409 S. 2nd1047 (Fla. 1982)</u> is clear in distinguishing where an asset sale exists.    In fact, the term "Successor Liability" is an outgrowth of an asset sale, *not* a stock sale. The Court introduces the case as follows:

> "Petitioners, the Bernards, brought a products liability claim against respondent Kee Manufacturing Company Inc. They claimed that a lawn owner manufactured and sold in 1967 by Kee manufacturing the predecessor business to Kee, Inc. caused an injury to James Bernard, Jr., who with his mother sought recovery based on negligence, implied warranty and strict liability.  Kee, Inc, had incorporated in 1972 when it acquired  the assets of Kee from the owner Flechas J. Kee... These assets included the manufacturing plant, inventory, good will, and the right to use the name..."

16. The Supreme Court thereafter reviewed the exceptions to the general rule, that a buyer of assets will not generally assume the predecessors liabilities barring certain stated exceptions referred to as the rules of successor liability.    But the court was clear, that it was an asset sale.    It was not a stock sale.

6

17. In the matter before the Court, the terms of the sale were initiated and structured no doubt in large measure by the Chapter 7 Trustee.    The Debtor had little voice if any in the sale, and the Court approved the sale with the language stated.    The outcome is patently clear, and there is no doubt as to relative rights and obligations of the Buyer. The Buyer in this instance, acquired "all interests." In this case all interests can only mean and include the stock of the corporations, and its attendant assets and liabilities.

### THE TRUSTEE'S MOTION INITIATING THE SALE (DE349) WAS MADE SUBJECT TO ALL LIENS AND ENCUMBRANCES.

18. Paragraph 14 of the Trustee's initial Motion to Approve Sale of Assets, provides as follows: "The Trustee intends to sell the Assets as is, where is, without any warranties of any kind whatsoever, and only the right and interest of the estate is being sold.   The sale is subject to all liens and encumbrances." Respectfully the Buyer acquired the interests of the target Corporations with notice and knowledge of any imperfections, "as is", "where is" and subject to all liens and encumbrances.

19. In Paragraph 27 of the Motion the Trustee provides: "The sale will be completed on an "as is", and "where is" basis, with "no warranties, representations, recourse or contingencies of any kind whatsoever and only the right and interest of the estate is being sold." "The sale is subject to all liens and encumbrances, including without limitation, the lien held by Mercedes Benz Financial." The Buyer does not get to cherry pick the assets when buying "all the Interests" of the target corporations.    It takes all and assumed all.   Even if the Buyer had no intention of physically operating the assets, they assumed the responsibility over the assets, and should act responsibly in dealing with the same. Notifying the governmental authorities there over of their

acquisition is the least they can do, unless their intent on the acquisition was not in good faith. They need to step up to the plate and advise the governmental authorities of their ownership of the interests and attend to any responsibilities arising from such ownership interests.

## EVEN PURE ASSET ACQUISITIONS MAY HAVE SUCCESSOR LIABILITY

20. When to sell an asset in bankruptcy free and clear of liens and any other competing "interest" is a well-recognized tool available to a trustee. Whether the category of "interests" encompassed by that power extends to potential successor liability claims, however, has been the subject of considerable debate in the courts. A New York bankruptcy court addressed this controversial issue in Olson v. Frederico (In re Grumman Olson Indus., Inc.), 445 B.R. 243 (Bankr. S.D.N.Y. 2011). In Grumman Olson, the court ruled that a section 363 sale order cannot exonerate purchasers from successor liability claims by claimants who, at the time of the sale, had not yet been injured and had no contact or relationship with the debtor or its products.

21. Section 363(b) of the Bankruptcy Code provides that a trustee or DIP may use, sell, or lease estate property outside the ordinary course of the debtor's business with bankruptcy court approval. In addition, under section 363(f), the sale may be "free and clear of any interest in such property of an entity other than the estate," provided it satisfies any one of certain specified conditions. These include, among other things, if applicable nonbankruptcy law permits a sale free and clear, if the sale price exceeds the amount of all liens encumbering the property, and if the interest is in bona fide dispute.

22. Section 363(f) has been applied to a wide range of "interests," but courts have sometimes struggled to grasp the scope of the term, which is defined nowhere in the Bankruptcy Code or its accompanying legislative history. For example, courts have disagreed as to whether a successor liability claim constitutes an "interest" in property that can be extinguished by means of a sale free and clear. Some courts have narrowly construed the term "interest" to include only in rem interests (e.g., liens and security interests that attach to specific property). These courts typically have ruled that product liability claims and tort actions against the seller are unaffected by a bankruptcy sale and can be asserted against the buyer. Other courts have construed the term broadly to hold that certain liabilities (e.g., certain environmental remediation costs and employment discrimination claims) do not follow assets sold free and clear under section 363(f).

23. Special circumstances have led to the development of case-specific rules. For example, some bankruptcy courts have expanded the scope of traditional successor liability where there is an overriding need to protect federal rights or effectuate federal policies. These courts have allowed actions against a purchaser of a debtor's business if the successor had notice of the claim before the acquisition and there is substantial continuity in the operation of the business before and after the sale.

24. Courts have also struggled to develop an appropriate way to deal with "future claims" (i.e., claims that do not arise until after the bankruptcy proceedings have concluded). Some have adopted a blanket rule that future claims cannot be discharged in a debtor's bankruptcy case. Other courts have adopted a more practical approach in dealing with future claims. Instead of denying discharge of all future claims, these courts have

examined whether the debtor notified as many potential claimants as possible of the
sale, whether the debtor sought court approval to preclude successor liability, and
whether the debtor made arrangements for future claimants so that they are able to look
to some source for recovery.

25. Grumman Olson Industries, Inc. ("Grumman" or the "Debtor"), a manufacturer of truck
body parts, filed a chapter 11 petition in New York in December 2002. On July 1, 2003,
the bankruptcy court entered an order (the "Sale Order") approving the sale of certain
of the Debtor's assets to a predecessor of Morgan Olson, LLC ("Morgan"). The Sale
Order purported to exonerate Morgan from potential liability from certain tort claims,
providing in pertinent part that "[t]he sale . . . of assets to be purchased . . . shall be free
and clear of all . . . claims . . . and other interests . . . whether arising prior to or
subsequent to the commencement of this Chapter 11 case." The Sale Order further
provided that Morgan would "have no liability or responsibility for any liability or other
obligation of the Debtor arising under or related to [the asset sale] . . . including, but
not limited to, claims for successor or vicarious liability."

26. After the sale was consummated, Denise Frederico was injured when the Grumman-
manufactured truck that she was driving crashed into a telephone pole. In October 2009,
Frederico and her husband (together, the "Fredericos") commenced a personal injury
action against Morgan in the Superior Court of New Jersey. The complaint alleged that
the truck was defective and that Morgan was liable for the injuries under New Jersey's
successor liability laws. Specifically, the Fredericos asserted that Morgan continued to
use Grumman's product line, thereby holding itself "out to potential customers as
continuing to manufacture the same product line of Grumman trucks."

10

27. In March 2010, Morgan commenced an adversary proceeding in the bankruptcy court seeking declaratory and injunctive relief to preclude the Fredericos from bringing their successor liability action. Morgan contended that the Sale Order and the accompanying asset purchase agreement exonerated it from any liability, including liabilities under state successor liability laws, arising from defective products manufactured by the Debtors and sold prior to the consummation of the Sale Order. Both Morgan and the Fredericos moved for summary judgment.

28. At the outset, the bankruptcy court concluded that it had subject matter jurisdiction over the dispute despite confirmation of the Debtor's chapter 11 plan. Among other bases for this conclusion, the court explained that "[i]t is well-settled that a bankruptcy court retains jurisdiction to interpret and enforce its prior orders, especially where, as here, the bankruptcy court expressly retains jurisdiction to do so."

29. Addressing the merits, the court held that a sale under section 363(f) does not exonerate a buyer from successor liability claims by parties who, at the time of the sale, had not yet been injured and had no identifiable connection as potential creditors to the debtor or its products. Because the Fredericos did not hold a claim at the time the Sale Order was entered, the court ruled that the order did not preclude the Fredericos from suing Morgan in state court. The court expressed no view as to whether Morgan was actually liable under New Jersey successor liability law for the underlying injury.

30. The Sale Order expressly exonerated Morgan from any "claims," including those for successor liability. Section 101(5)(A) of the Bankruptcy Code defines "claim" in the broadest possible fashion to mean "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured,

disputed, undisputed, legal, equitable, secured, or unsecured." Even so, the court acknowledged that, at least with respect to future tort claims, the term "claim" has an outer boundary. The court distinguished between two types of future tort claims. In the first, the tort claimant had prepetition exposure to the debtor's product but had not yet manifested symptoms or discovered an injury. In the second, the tort claimant was injured after consummation of an asset sale or confirmation of a plan as a result of a defective product manufactured and sold by the debtor prepetition. The court placed the Fredericos in the latter group.

31. The Second Circuit, the bankruptcy court explained, has adopted a "fair contemplation" test to differentiate between contingent or unmatured claims, which qualify as "claims" under section 101(5), and potential future tort claims, which do not. Under this test, set forth in United States v. LTV Corp. (In re Chateaugay Corp.), 944 F.2d 997 (2d Cir. 1991), "a contingent or unmatured claim is a 'claim' if the occurrence of the contingency or future event that would trigger liability" may have conceivably been considered by the parties at the inception of the original relationship between the parties. Chateaugay involved environmental claims, not tort claims. Nevertheless, the court in Grumman Olson found the hypothetical posited in Chateaugay to be instructive.

32. The bankruptcy court also considered a "modified version" of the "fair contemplation" test articulated by the Eleventh Circuit in Epstein v. Official Committee of Unsecured Creditors (In re Piper Aircraft Corp.), 58 F.3d 1573 (11th Cir. 1995). In Piper, the court applied a two-part test to determine when a person holds a "claim" against a debtor manufacturer and thus may be barred from pursuing a successor buyer: (i) the events

occurring prepetition must have created a relationship; and (ii) the basis for liability must be the debtor's prepetition conduct in designing, manufacturing, and selling the allegedly defective or dangerous product.

33. In Grumman Olson, the court concluded that the Fredericos' claim failed the Piper test and fell "squarely within the Chateaugay hypothetical." The Fredericos, the court explained, had no prepetition relationship with Grumman. In fact, the only connection the Fredericos had with Grumman was through Denise Frederico's employer, who purchased the truck that she drove. As such, the court ruled that the Fredericos did not hold a "claim" against the Debtor's estate at the time of the section 363 sale.

34. Grumman Olson suggests that sweeping "free and clear" language in a sale order purporting to extinguish a purchaser's liability for potential future tort claims may not necessarily achieve that objective.

35. In the case before the Court, *the sale was not made free of liens and encumbrances, and was an "as is" "whereas sale."* Wilmington Financial cannot be allowed to complain when it purchased "all interests" that require attendant responsibilities. Such responsibilities include, at a minimum advising the governmental authorities to which the corporations had previously reported to of their successor ownership and liability therefore and an entry of appearance in state court actions pending now in Massachusetts and California.

36. The relief sought in this Motion is to have Wilmington Financial do what they ought to do in acquiring the corporate interests. Their failure to date to do so could only evidence the lack of good faith in the acquisition of these interests which most assuredly would be denied.

**WHEREFORE**, Debtor seeks the entry of an Order of this Court

(a)  to require that the Buyer, Wilmington Financial Services, LLC, through their representatives, yet to be determined, take such actions and undertakings so that Debtor's name no longer appears of record as a responsible party, or registered agent, or officer, or director, or in any other previously recorded capacity;

(b)  to allow for depositions and discovery to determine the authorized representatives of Wilmington Financial; and

(c)  to require that the said Buyer fully assume the obligations and liabilities attendant to the acquisition of the interests acquired, and

(d) such other and further relief as the court may deem adequate and just.

Dated: August 31, 2021

Law Offices of Henry Portner
s/ Henry Portner, Esquire
portnerlaw@gmail.com
FL Bar # 0883050
Tel: 561 400 0027


## CERTIFICATE OF SERVICE

The undersigned, Henry Portner, does hereby certify that all counsel of record were served via ECF on this 31st day of August, 2021.

Dated: August 31, 2021

Law Offices of Henry Portner
s/ Henry Portner, Esquire
portnerlaw@gmail.com
FL Bar # 0883050
Tel: 561 400 0027

14

# EXHIBIT A

ORDERED.

**Dated: July 02, 2020**

Karen S. Jennemann
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In Re:                                                                     Case No. 6:18-bk-06821-KSJ
                                                                                  Chapter 7

DON KARL JURAVIN

                          Debtor.
_____/

### ORDER GRANTING CHAPTER 7 TRUSTEE'S MOTION
### TO APPROVE SALE OF ASSETS SUBJECT TO
### <u>OVERBID AND FOR APPROVAL OF OVERBID PROCEDURES</u>

THIS CASE came on for hearing on June 25, 2020 at 10:00 a.m.. on the Chapter 7 Trustee's

Motion for Sale of Assets Subject to Overbid and for Approval of Overbid Procedures ("Motion")

(Doc. No. 349) and the Objection to Chapter 7 Trustee's Motion to Approve Sale of Assets Subject

to Overbid and for Approval of Overbid Procedures (Doc. No. 356) filed by the Debtor.   After

considering the Motion and the arguments of counsel and being otherwise fully advised in the

premises, it is

**ORDERED:**

1.     The Motion (Doc. No. 349) is **GRANTED** with respect to the approval of the

bidding procedures as set forth herein.

2.    The Chapter 7 Trustee, Dennis D. Kennedy, is authorized to sell certain of the Debtor's assets, as listed below, to Wilmington Financial Services, LLC, a Delaware limited liability company, pursuant to Section 363(f).   The property subject to the sale is described as follows:

    a.  2014 Jeep Wrangler, VIN # 1C4BJWDG8EL230021;

    b.  2018 Mercedes Benz GLS550W4, VIN # 4JGDF7DE7JB003154;

    c.  Any and all of the Bankruptcy Estate's causes of action, excluding any causes of action arising under Chapter 5 of Title 11 of the United States Code and/or which were not ripe as of the date Debtor's assets became assets of the Bankruptcy Estate;

    d.  Any and all of the Debtor's interest in Must Cure Obesity, Co.; Juravin, Inc.; Roca Labs Nutraceutical USA, Inc., and First Global Health Corporation; and

    e.  Any and all of the Bankruptcy Estate's interest in websites, blogs and social media accounts, together with any and all passwords necessary to control the web sites, blogs and social media accounts.

Collectively, the "Property."

The Property will be sold as is, where is, without any warranties of any kind whatsoever. The sale is subject to all liens and encumbrances, and is subject to overbid provided that any parties desiring to pay more than the Purchase Price comply with the procedures described below.

**OVERBID PROCEDURES**

3.    _Initial Bidder._   The Initial Bidder is Wilmington Financial Services, LLC, a Delaware limited liability company, with a proposed purchase price of $43,000.00 ("Purchase Price").

4.    _Additional Bids._   Additional Bids will be accepted by the Trustee during the Bidding Period, provided they meet the following conditions (in such case, the submitting party

2

shall be an "Additional Bidder" and together with the Initial Bidder, the "Active Bidders"):

- (a)    any Additional Bid must be sent **in writing via email transmission** to Dennis D. Kennedy at dan@ddkennedy.com and to Bradley M. Saxton at bsaxton@whww.com;

- (b)    the Additional Bid must exceed the current Purchase Price by a minimum of $2,000.00; and

- (c)    the Additional Bid must include a deposit in the total amount of the Additional Bid which deposit must be received by the Trustee by wire transfer no later than **3:00 p.m.** on **July 24, 2020.**  Please contact Dennis D. Kennedy at dan@ddkennedy.com or Bradley M. Saxton at bsaxton@whww.com for wiring instructions.

Any Additional Bid which meets the requirements of (a), (b) or (c) above shall be a

"Qualified Bid."

5.    <u>Bidding Period</u>.  The Bidding Period shall close at **July 24, 2020 at 3:00 p.m.**

(EST).  Accordingly, any additional bid plus the deposit must be received by this time.

6.    <u>Private Auction</u>.  If the Trustee receives a higher and better Qualified Bid for the

purchase of the Property, the Trustee will contact the Active Bidders and hold a telephone auction

of the Property ("Auction"), on the earliest date the Trustee can arrange, which will be conducted

as follows:

- a.    <u>Amount of Bid</u>.  The starting bid at the Auction is the highest Qualified Bid received by Trustee, and the minimum incremental bid at the Auction is $2,000.00 above the preceding bid.

- b.    <u>Payment of Winning Bid</u>.  The winning bidder's deposit shall be applied towards the total and final purchase price.  The winning bidder must pay the full amount of the successful bid to the Trustee by 5:00 p.m. on August 3, 2020.

- c.    <u>Failure to Pay Winning Bid</u>.  Failure to pay the full winning bid amount results in the automatic forfeiture of the deposit to the Trustee for the benefit of the Estate, the permanent disqualification of the buyer, and a sale to the next

3

highest bidder or a new auction.

    d.  <u>Transfer of Interest</u>.   After approval of the Sale by the Court, the winning bidder will be deemed the 100% interest holder in the Property.

    e.  <u>Refund of Deposit</u>.   Except as provided above in the subsection entitled "Failure to Pay Winning Bid", any funds held on deposit not associated with the winning bid will be returned to their respective owners.

7.    <u>Final Sale Hearing</u>.   The Court shall conduct a Final Sale Hearing on **August 4, 2020, at 1:00 p.m.**, before the Honorable Karen S. Jennemann, in Courtroom 6A, 6th Floor, George C. Young Courthouse, 400 W. Washington Street, Orlando, Florida 32801.

Bradley M. Saxton is directed to serve a copy of this Order on interested parties who are non-CM/ECF users and file a proof of service within 3 days of entry of the Order.

4

**EXHIBIT B**



## AGREEMENT REGARDING SALE OF PROPERTY

This Purchase and Sale Agreement ("Agreement") is made as of this ___ day of August 2019, by and between Dennis D. Kennedy, Chapter 7 Trustee ("Trustee") for the Bankruptcy Estate of Don Karl Juravin ("Bankruptcy Estate") and Wilmington Financial Services, LLC, a Delaware limited liability company ("Buyer") (Trustee and Buyer, each a "Party" and collectively the "Parties").

## RECITALS

WHEREAS, on October 31, 2018, Don Karl Juravin (the "Debtor") commenced a voluntary case under Chapter 7 of Title 11 of the United States Code 11 U.S.C. §§ 101 et seq., (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division, assigned case number 6:18-bk-06821 (the "Bankruptcy Case");

WHEREAS, in the Bankruptcy Case, the Debtor listed certain assets on his petitions and schedules, as amended, which assets are now property of the Bankruptcy Estate;

WHEREAS, Trustee desires to sell and Buyer desires to purchase those certain Assets as defined below upon the terms and conditions set forth hereto;

WHEREAS, a sale of an asset of the Bankruptcy Estate requires approval upon notice to creditors, the parties are executing this Agreement to memorialize their agreement regarding the terms of the sale, which will be reflected in the notice of sale filed with the Court;

NOW THEREFORE, in consideration of the mutual covenants and conditions contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.     Recitals. The foregoing recitals are incorporated into the body of this Agreement as if fully set forth herein.

2.     Sale of Assets. Subject to the terms and conditions of this Agreement and approval of the Bankruptcy Court, the Trustee shall sell, assign, and transfer to Buyer, and Buyer shall purchase, all right, title, and interest of the Bankruptcy Estate in the Assets, as defined herein. The Assets shall include the following:
   a. The 2014 Jeep Wrangler, VIN 1C4BJWDG8EL230021;
   b. The 2018 Mercedes Benz GLS550W4, VIN 4JGDF7DE7JB003154 (the "Mercedes");
   c. Any and all of the Debtor's prepetition causes of action, excluding causes of action arising under Chapter 5 of Title 11 of the United States Code;
   d. Any and all of the Debtor's interest in Must Cure Obesity, Co.; Juravin, Inc.; and Roca Labs Nutraceutical USA, Inc.;
   e. Any and all of the Debtor's interest in websites, blogs, and social media accounts, together with any and all passwords necessary to control the web sites, blogs, and social media accounts;

(collectively, the "Assets").

3.    Purchase Price. Buyer shall purchase the Assets for the sum of THIRTY-FIVE THOUSAND AND 00/100 DOLLARS ($35,000.00) ("Purchase Price"), subject to the conditions described herein. The Purchase Price shall be paid by wire transfer or check made payable to Dennis D. Kennedy, Chapter 7 Trustee and delivered to Dennis D. Kennedy, PO Box 541848, Merritt Island, Florida 32954. The Purchase Price shall be paid to the Trustee within three (3) days of execution of the Agreement, and the Trustee will hold the Purchase Price in escrow pending Bankruptcy Court approval of this Agreement.

4.    Sale of the Mercedes. Buyer expressly acknowledges that the transfer of title to the Mercedes is subject to a lien in favor of Mercedes-Benz Financial Services the amount of $35,711.54 as of September 1, 2019 (the "MBFS Lien"). Buyer acknowledges and agrees to pay off the MBFS Lien.

5.    Delivery of Assets to Buyer. Within ten (10) days of approval of this Agreement by the Bankruptcy Court, Trustee shall deliver a bill of sale reflecting the sale of the Assets to Buyer. With respect to the vehicles, the Buyer shall pick the vehicles up from a location where the Debtor has the vehicles located. If the Debtor fails to provide access to the vehicles then Trustee shall take such action to seek turnover of the vehicles.

6.    No Representations or Warranties. Buyer expressly acknowledges and agrees that the Assets are being sold by the Trustee as is, where is, without any representations or warranties of any kind whatsoever, and only the right and interest of the Bankruptcy Estate is being sold.

7.    Default. In the event that the Buyer fails to make payment as required under this Agreement, and if the default is not cured within ten (10) days of notice given via email from the Trustee (or his counsel) to Buyer's counsel, David Landis at DLandis@MateerHarbert.com, then the Buyer shall be in default under this Agreement and the Assets shall remain as property of the Bankruptcy Estate.

8.    Bankruptcy Court Approval. This Agreement is subject to and contingent upon approval of the United States Bankruptcy Court. The Trustee agrees to file a notice of sale within five (5) business days from the execution of this Agreement. Should the Bankruptcy Court deny approval of this Agreement, this Agreement shall be null and void.

9.    Execution in Counterparts. This Agreement may be executed in one or more counterparts, each of which is deemed an original and all of which are deemed but one agreement. This Agreement may be signed by facsimile and/or e-mail scan and any such copy of a signature is, for all intents and purposes, deemed an original signature.

10.    Amendment; Extension; and Waiver. This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto.

2 of 4

11.    Binding Effect; Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties hereto, and their respective successors, assigns, heirs, executors, administrators, officers, directors, shareholders, employees, agents and legal representatives.

12.    Severability. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws. If any provision of this Agreement or the application thereto to any Person or circumstances shall, for any reason and to any extent, be valid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

13.    Counterparts. This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument. Each counterpart may consist of a number of copies hereof each signed by less than all, but together signed by all of the parties hereto. A signature received via facsimile or email shall be considered the same as an original signature for purposes of execution of this Agreement.

14.    Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

15.    Entire Agreement. This Agreement supersedes all previous contracts and constitutes the entire agreement of whatsoever kind or nature existing between or among the parties representing the within subject matter and no party shall be entitled to benefits other than those specified herein. As between or among the parties, no oral statement or prior written material not specifically incorporated herein shall be of any force and effect. The parties specifically acknowledge that in entering into and executing this Agreement, the parties rely solely upon the representations and agreements contained in this Agreement and no others.    All prior representations or agreements, whether written or verbal, not expressly incorporated herein are superseded hereby.

16.    Legal Counsel. The Parties hereto do represent and warrant one to the other that each has been represented by counsel of their own choosing in connection with the negotiation and drafting hereof, that all Parties have participated in the drafting thereof, and that therefore this Agreement shall not be construed more or less favorably against either Party. Each Party further represents and warrants one to the other that he, she, or it has read and understands the terms hereof, and enters into such Settlement Agreement as his, her, or its own free and voluntary act.

17.    Drafting. No provision of this Agreement shall be interpreted for or against either party hereto on the basis that such party was the draftsman of such provision, both parties having participated equally in the drafting hereof, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

18.    <u>Validity and Construction</u>. This Agreement and the validity, performance and enforcement hereof, shall be interpreted and construed in accordance with the laws of the State of Florida and the United States Bankruptcy Code.

19.    <u>Prevailing Party/Attorneys' Fees</u>. In connection with this Agreement and performance thereunder, each party shall bear its own fees and costs. However, in the event it shall become necessary for any party to take action of any type whatsoever to enforce the terms of this Agreement, the prevailing party shall be entitled to recover all attorneys' fees, costs and expenses, including all out-of-pocket expenses that are not taxable as costs, incurred in connection with any such action, including any negotiations, mediations, litigation, or appeals.

IN WITNESS WHEREOF, this Agreement has been signed by each of the parties on the date first above written.

**BUYER:**

Wilmington Financial Services, LLC,
a Delaware limited liability company

By: _____
Print Name:_____
Title:_____

**TRUSTEE:**

_____
Dennis D. Kennedy, as Chapter 7 Trustee of the Bankruptcy Estate of Don Karl Juravin

18.    <u>Validity and Construction</u>. This Agreement and the validity, performance and enforcement hereof, shall be interpreted and construed in accordance with the laws of the State of Florida and the United States Bankruptcy Code.

19.    <u>Prevailing Party/Attorneys' Fees</u>. In connection with this Agreement and performance thereunder, each party shall bear its own fees and costs. However, in the event it shall become necessary for any party to take action of any type whatsoever to enforce the terms of this Agreement, the prevailing party shall be entitled to recover all attorneys' fees, costs and expenses, including all out-of-pocket expenses that are not taxable as costs, incurred in connection with any such action, including any negotiations, mediations, litigation, or appeals.

IN WITNESS WHEREOF, this Agreement has been signed by each of the parties on the date first above written.

**BUYER:**                                                    **TRUSTEE:**

Wilmington Financial Services, LLC,
a Delaware limited liability company

By: _____                    Dennis D. Kennedy, as Chapter 7
Print Name: James D Ryan                               Trustee of the Bankruptcy Estate of
Title: Authorized Representative                      Don Karl Juravin
August 31, 2019

# EXHIBIT C



Department of State  /  Division of Corporations  /  Search Records  /  Search by Entity Name  /

# Detail by Entity Name

Florida Profit Corporation
JURAVIN, INCORPORATED

### Filing Information

| | |
|---|---|
| **Document Number** | K92480 |
| **FEI/EIN Number** | 46-4280755 |
| **Date Filed** | 06/02/1989 |
| **State** | FL |
| **Status** | INACTIVE |
| **Last Event** | ADMIN DISSOLUTION FOR ANNUAL REPORT |
| **Event Date Filed** | 09/27/2019 |
| **Event Effective Date** | NONE |

### Principal Address

15118 Pendio Dr
Montverde, FL 34756

Changed: 04/24/2016

### Mailing Address

PO BOX 560510
Montverde, FL 34756

Changed: 04/06/2017

### Registered Agent Name & Address

REGISTERED AGENTS INC.
7901 4TH STREET NORTH
SUITE 300
ST.PETERSBURG, FL 33702

Name Changed: 02/09/2015

Address Changed: 03/21/2019

### Officer/Director Detail

**Name & Address**

Title PSTD

JURAVIN, DON Karl

15118 Pendio Dr.
Montverde, FL 34756

**Annual Reports**

| Report Year | Filed Date |
|---|---|
| 2016 | 04/24/2016 |
| 2017 | 04/06/2017 |
| 2018 | 04/01/2018 |

**Document Images**

| | |
|---|---|
| 04/01/2018 -- ANNUAL REPORT | View image in PDF format |
| 04/06/2017 -- ANNUAL REPORT | View image in PDF format |
| 04/24/2016 -- ANNUAL REPORT | View image in PDF format |
| 04/11/2015 -- ANNUAL REPORT | View image in PDF format |
| 02/09/2015 -- Reg. Agent Change | View image in PDF format |
| 04/02/2014 -- ANNUAL REPORT | View image in PDF format |
| 12/20/2013 -- Name Change | View image in PDF format |
| 12/11/2013 -- REINSTATEMENT | View image in PDF format |

Florida Department of State, Division of Corporations

# EXHIBIT D



Department of State / Division of Corporations / Search Records / Search by Entity Name /

# Detail by Entity Name

Florida Profit Corporation
ROCA LABS NUTRACEUTICAL USA, INC.

**Filing Information**

| | |
|---|---|
| **Document Number** | P99000027085 |
| **FEI/EIN Number** | 46-4273829 |
| **Date Filed** | 03/24/1999 |
| **State** | FL |
| **Status** | INACTIVE |
| **Last Event** | ADMIN DISSOLUTION FOR ANNUAL REPORT |
| **Event Date Filed** | 09/27/2019 |
| **Event Effective Date** | NONE |

**Principal Address**

5849 Lynn Lake Drive South, Unit A
St. Petersburg, FL 33712

Changed: 12/20/2014

**Mailing Address**

5849 Lynn Lake Drive South, Unit A
St. Petersburg, FL 33712

Changed: 12/20/2014

**Registered Agent Name & Address**

WHITING, GEORGE C
5849 LYNN LAKE DRIVE SOUTH
A
ST PETERSBURG, FL 33712

Name Changed: 04/05/2016

Address Changed: 04/05/2016

**Officer/Director Detail**

**Name & Address**

Title PSTD

JURAVIN, DON KARL

5849 Lynn Lake Drive South, Unit A
St. Petersburg, FL 33712

Title Secretary

WHITING, GEORGE
5849 LYNN LAKE DRIVE SOUTH
APT A
ST PETERSBURG, FL 33712

## Annual Reports

| Report Year | Filed Date |
|-------------|------------|
| 2016        | 04/05/2016 |
| 2017        | 04/13/2017 |
| 2018        | 04/01/2018 |

## Document Images

| | |
|---|---|
| 04/01/2018 – ANNUAL REPORT | View image in PDF format |
| 04/13/2017 – ANNUAL REPORT | View image in PDF format |
| 04/05/2016 – ANNUAL REPORT | View image in PDF format |
| 02/09/2015 -- ANNUAL REPORT | View image in PDF format |
| 12/20/2014 – AMENDED ANNUAL REPORT | View image in PDF format |
| 03/16/2014 – ANNUAL REPORT | View image in PDF format |
| 12/20/2013 – Name Change | View image in PDF format |
| 12/10/2013 – REINSTATEMENT | View image in PDF format |
| 03/20/2000 – ANNUAL REPORT | View image in PDF format |
| 03/24/1999 – Domestic Profit | View image in PDF format |

# EXHIBIT E

Exhibit A

 

**From:** James Ryan <jdr@ryanlawgroup.net>
**Sent:** Monday, November 19, 2018 3:07 PM
**To:** Paul Simonson <psimonson@scharholdings.com>
**Cc:** 'mikeryan32645@yahoo.com' <mikeryan32645@yahoo.com>; Randall Greene <rgreene@rgdevelopments.com> (rgreene@rgdevelopments.com) <rgreene@rgdevelopments.com>
**Subject:** Juravin Bankruptcy

Hi Paul, I followed up on our conversation and the budget if we take action is as follows:

- Appraiser to establish correct value of the residence. $5,000.
- BR attorney services. $20,000 - $30,000. Juravin's attorney has a reputation for being difficult.
- Proposed offer to buy multiple Juravin assets from the trustee $30,000.
  Total $55,000 to $70,000. The extra five is for the unknown.

If we do nothing the lien for club charges likely gets discharged as an under secured obligation and Scharich will likely lose the ability to succeed on a foreclosure claim. Juravin becomes hunkered down in BC and continues his shakedown. If we go on the offensive many of his businesses can be acquired cheaply. Although they have no real value, being able to shut down his company litigation and control his company web sites and social media accounts would be helpful to subduing his attacks on BC. I also suspect much of what he claims is exempt will not be.

The house should be determined to be worth significantly more than the amount he claimed and, if so, the POA lien would not be discharged. Some of his assets found to be not exempt such as vehicles will have some value to offset the expense. Most importantly, it will be shown he does not have sufficient income to ratify the mortgage obligation and / or the bankruptcy will be dismissed. Either way Scharich will then be able to succeed in the foreclosure effort and oust Juravin from the community. Also, if this happens the attorney fee and the appraiser fee can be the basis for additional lien rights on the house. Under this scenario the sale of a vehicle or two (only one has no lien) could recoup part of what is spent to buy his businesses. The services could possibly be recovered in the form of a lien on the house. The first mortgage is about $1,360,000. I expect the house to sell for more than that even at a foreclosure sale. FWIW, Randall believes that house is worth more than $2,000,000 today.

Please let me know if you have more questions.

Regards,

James D. Ryan, Esq.
Florida Bar Board Certified in Business Litigation
jdr@ryanlawgroup.net  mobile: 561.889.1001
**Ryan Law Group, PLLC**