FILED

Date: 1/09/2023        via:email
Clerk, U.S. Bankruptcy
Orlando Division

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:                                      Chapter 7
DON KARL JURAVIN                            Case No. 6:18-bk-06821 - LVV
                                            Case No. 6:20-bk-01801 - LVV
        Debtor
                                            Jointly Administered with
_____/                    Case No. 6:18-bk-06821 - LVV


**DEBTOR'S MOTION TO UNSEAL DOCUMENTS, FOR CONTEMPT, TO
COMPEL, AND FOR REMOVAL OF CHAPTER 7 TRUSTEE**

The Debtor, DON K. JURAVIN, pursuant to Rule 9014 of the Federal Rules of

Bankruptcy Procedure, and moves this Honorable Court:

1.  To order the Trustee and/or the Trustee's counsel, Mr. Saxton, to provide

    the Debtor with a copy of Trustee's Renewed and Supplemental Motion

    Under Seal For An Order To Take Possession of Debtor Property along

    with all supporting Affidavits and any other documentation. This document

    was never served on the Debtor or his then counsel;

2.  To Unseal for public view Trustee's Renewed and Supplemental Motion

    Under Seal For An Order To Take Possession of Debtor Property along

    with supporting Affidavits and any other related documentation as stated in

    the Order Granting Trustee's Motion Under Seal For An Order To Take

    Possession of Debtor Property signed by retired Judge Karen S. Jennemann

-1-

on April 29, 2021, with the execution of the break order occurring on May 5, 2021. Paragraph 11 of the Order is the point of reference:

"*11. The Clerk shall restrict public viewing of the Motion, this Break Order, and the record of any hearing only until after the Trustee obtains the Property and files his inventory.*" The inventory was filed on May 6, 2021. The order granting break order is attached as Exhibit A. The Trustee's Renewed and Supplemental Motion Under Seal For An Order To Take Possession of Debtor Property along with supporting Affidavits and any other related documentation remain sealed in the Court's records.

3. To order the Trustee to file a report summarizing the new findings as a result of the break order in comparison to the Debtor's previous filings.

4. To find the Chapter 7 Trustee, Mr. Kennedy, in contempt of this Court for his failure to provide the Debtor or Debtor's counsel at the time with a copy of his motion requesting the Break Order. The Debtor doesn't know if said motion purports to have been served on the Debtor or any other party because it remains sealed. The Debtor has not seen the motion.

5. To order the removal and replacement of Mr. Kennedy as Chapter 7 trustee in this case.

In support of these requests, the Debtor would show as follows:

The Debtor has asked Trustee Kennedy, Mr. Saxton, and Ms. Reynolds multiple times to provide a copy of the Trustee's Renewed and Supplemental Motion Under Seal for an order to take possession of debtor property along with supporting Affidavits. This document has not been provided to the Debtor. The Debtor tried to save the Court's time by contacting the trustee and his attorneys in an effort to resolve this matter, but Mr. Saxton is not willing to

provide these documents to the Debtor. In fact, the Order granting Break Order, in paragraph 11, says:

"*James Ryan, counsel for the Trustee, <u>shall serve the Debtor with a copy of the Motion </u>and this Order after the Trustee has taken possession of the Property and filed an inventory with the Court.*" Hereto Exhibit A.

Neither the Debtor nor Debtor's counsel at the time, Mr. Bartolone, were ever provided a copy of the requested documents by the Trustee's counsel James Ryan as ordered by this Court. Mr. Saxton directed the Debtor to obtain a sealed document from the court's docket. My emails with Mr. Saxton are attached, hereto as Exhibit B. The Debtor's counsel, Mr. Bartolone, subsequently, has withdrawn from the case.

In executing the Break Order, the Trustee and his team acted in a very aggressive and unprofessional manner, arriving at and entering the Debtor's home with armed federal marshals when they knew that only his wife and children would be present. They spent a great deal of time searching the belongings of the Debtor's wife, who is not a party to this case and whose belongings are not property of the bankruptcy estates. This entire episode was predicated on the idea that the Trustee would uncover assets for the benefit of creditors. Four persons, besides the U.S. Marshals, were present at the residence of the Debtor during the execution of the Break Order. They were James Ryan, Esq., Bradley Saxton, Esq., Lauren Reynolds, Esq., and Dennis Kennedy, Trustee Kennedy. The Trustee and his representatives were at the residence for four and half hours, with a cumulative workforce equivalent to 18-man hours and left nothing undisturbed. In that regard, they had more than adequate time to determine what property was Property of the Estate, and what property was not Property of the Estate.

Particularly with regard to items of personal property and written documents, they were opened and reviewed for inspection with nothing having been recovered in this raid on the Debtor's home. The credibility of the affidavits presumably relied on to support a request for relief this extreme must be called into question. The Debtor considers the forceable entry of his home by armed agents to be extreme. The Debtor has never been able to respond to what was represented in the motion for the break order as he has never been provided with a copy of it. Given that this Court granted relief to the Trustee in the Break Order which is unusual, the Debtor suspects that the Trustee's request was supported by sworn allegations that have turned out to be untrue. The Debtor should be allowed to review these allegations and to respond as appropriate. Otherwise, the Trustee could use these same parties to make allegations against the Debtor in future motions to this Court.

28 U.S.C. § 586 states that a Trustee is to assess if there are assets to be administered for the benefit of unsecured creditors. The amount of work performed by Mr. Kennedy and the professionals he has hired has resulted in very little money being recovered for the benefit of unsecured creditors. The net result of these efforts has been paltry. The total amount recovered for the bankruptcy estate is unlikely to be enough to cover administrative expenses, much less to result in a dividend for unsecured creditors.

The Trustee's attorney, Mr. James Ryan, represents third parties to this bankruptcy proceeding who are adverse to the Debtor in proceedings in state court. Mr. Ryan's client in those proceedings is paying for him to perform work for the Trustee. That client is not a creditor or interested party in this Chapter 7 case. The Trustee's employment of counsel who has allegiance to parties who are

-4-

outside of these proceedings creates a clear conflict of interest. The Chapter 7
Trustee's Handbook provides this guidance with regard to conflicts of interest for
professionals employed by a trustee:

"As a general rule, professional persons employed by a trustee must be
disinterested and must not have an interest adverse to the estate. 11 U.S.C. §§
327(a) and 101(14). There are some exceptions. If a trustee is authorized to
operate the debtor's business under section 721, and if the debtor has regularly
employed professional persons on salary, the trustee may retain or replace such
professional persons. 11 U.S.C. § 327(b). Representation of a creditor does not
disqualify a person from representing the trustee, unless there is an objection
from another creditor or the United States Trustee and the court finds there is an
actual conflict of interest. 11 U.S.C. § 327(c). The trustee may retain an attorney
for a "specified special purpose," even though the attorney previously represented
the debtor, if the attorney does not hold or represent an adverse interest to the
debtor or the estate with respect to the subject matter of the employment. 11
U.S.C. § 327(e)."

While Mr. Ryan might not have or represent an interest that is adverse to the
estate, he does represent interests whose goals are not aligned with those of the
estate (recovery of assets to be administered for the benefit of unsecured
creditors). Specifically, Mr. Ryan represents DCS Real Estate Investments,
which, like PSR Developers (who are a secured creditor in this case with no
interest in money recovered by the trustee), is under the control of Dwight Schar.
Mr. Schar and entities under his control are engaged in a campaign of bullying
and intimidation directed at the Debtor and his family. Mr. Ryan's employment
by the Trustee and the appearance of Wilmington Financial show that Mr. Schar's

-5-

influence extends to these proceedings in Bankruptcy Court. Unsurprisingly, PSR Developers is now seeking a "break order" in state court against the Debtor and his family.

Mr. Ryan was communicating with and advising PSR Developers as early as November 19, 2018, which is less than a month after this Chapter 7 case was filed. Please see the attached email and Affidavit of Richard Charles Arrighi (collectively Exhibit C). The email demonstrates that Mr. Ryan was acting on behalf of other parties well before the trustee in this case was appointed. Mr. Ryan's concerns are entirely about the interests of "Scharich" from PSR Developers succeeding in a foreclosure case that is not part of this bankruptcy. The affidavit demonstrates that Mr. Ryan works on behalf of a wealthy client who is responsible for a great deal of his income. The net result of this is that the office of the Chapter 7 Trustee is being used as part of a campaign of harassment against the Debtor and his family by a non-party to the bankruptcy case. Mr. Ryan is not at all disinterested as required by 11 U.S. Code § 327.

As is made clear in Mr. Arrighi's affidavit, Mr. Ryan attempted to obtain false testimony from Mr. Arrighi. Mr. Ryan is wholly unfit to serve the Chapter 7 Trustee. Mr. Ryan is being paid by Dwight Schar, whose interests are not necessarily aligned with those of the bankruptcy estate. With regard to the Chapter 7 case of Must Cure Obesity Co., there is more involving Mr. Ryan which casts doubt on his worthiness to represent the estate. He represents Wilmington Financial, which now owns Must Cure Obesity Co. pursuant to a purchase of assets approved by this Court. Mr. Ryan signed the purchase agreement on behalf of Wilmington. Wilmington Financial is also under the control of Dwight Schar. So, Mr. Ryan represents Dwight Schar, and he also

-6-

represents an entity controlled by Dwight Schar which purchased assets in the bankruptcy case.

The largest unsecured creditor in this case is the Federal Trade Commission (FTC) by a wide margin. Their claim is based on a civil judgment against the Debtor. Both the FTC and one of Mr. Schar's entities (Bella Collina Property Owners Association, Inc., also a client of Mr. Ryan) requested a trustee election at the initial 341 meeting in this case. At that time, Mr. Kennedy was interim trustee. Both parties who requested the election voted in favor of Mr. Kennedy. If the interim trustee, Mr. Kennedy, was acceptable, what was the purpose of this exercise? The FTC, as the largest unsecured creditor, is the party who stood to gain the most had the break order resulted in the Trustee uncovering additional assets to administer.

CONCLUSION:

The end result of all of this activity has been to allow the Chapter 7 Trustee to be used as part of Mr. Schar's campaign against the Debtor and his family. The Trustee is connected to Mr. Schar and his entities which are litigating against the Debtor in other courts. The connection is the employment of Mr. Ryan. As outlined in the affidavit of Richard Arrighi, Mr. Ryan represents Dwight Schar, who is not an unsecured creditor in this case. How can the interests of Dwight Schar be aligned with those of the bankruptcy estate, unless those interests are to harass the Debtor?

There is no reason for the Trustee's motion for a break order and all supporting documentation to remain under seal. As the lengthy and thorough inspection of the Debtor's home under armed guard uncovered no assets for the bankruptcy estate, the Court should be aware that the parties making the

allegations relied upon to make the Break Order might not be reliable. Who is protected by keeping the documents sealed? The Debtor appears to be the only party with a privacy interest in the matter, and the Debtor is specifically requesting that these documents be unsealed. The Debtor's privacy has already been violated by the invasion of his home by armed agents of the Trustee. The Trustee moved this Court for the break order, presumably on the premise that he would uncover assets in the Debtor's possession. This is "presumed" because pursuing assets for the benefit of unsecured creditors is the Trustee's role, and the Debtor has never been given copies of the motion or any supporting documents. WHEREFORE, the Debtor asks that this Court enter an Order:

1) Unsealing the motion for a break order and supporting documentation, pursuant to terms of the break order itself, or alternatively, that the Trustee provide true and correct copies to the Debtor, and that the Trustee be required to file a report detailing the assets he uncovered in executing the break order;

2) Disqualifying James Ryan from representing the Trustee in this matter, and requiring Mr. Ryan to return fees which have been paid to him by the bankruptcy estate;

3) Removing the Trustee from this case, and requiring the Trustee to reimburse the bankruptcy estate for any compensation he has received in this matter.

Date: January 09, 2023,

Respectfully,

Don Juravin, <u>Pro Se</u>
15118 Pendio Dr.
Bella Collina, FL 34756
don@juravin.com

# EXHIBIT A

**ORDERED.**

Dated:  April 29, 2021

_____
Karen S. Jennemann
United States Bankruptcy Judge

## IN THE UNITEST STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:

| | | |
|---|---|---|
| Don Karl Juravin, | ) | Case No. 6:18-bk-06821-KSJ |
| | ) | *Jointly Administered with* |
| Debtor. | ) | Case No. 6:20-bk-01801-KSJ |
| | ) | Chapter 7 |
| _____ | ) | |
| | ) | |
| Don Karl Juravin, | ) | Case No. 6:18-bk-06821-KSJ |
| | ) | |
| Must Cure Obesity, Co. | ) | Case No. 6:20-bk-01801-KSJ |
| | ) | |
| Applicable Debtors. | ) | |
| _____ | ) | |

### ORDER GRANTING TRUSTEE'S MOTION UNDER SEAL FOR
### BREAK ORDER TO TAKE POSSESSION OF DEBTOR PROPERTY

On April 28, 2021, the Court heard argument on the Renewed and Supplemental

Motion, filed under seal, for issuing a "Break Order" (the "Motion")[1], filed by Dennis

D. Kennedy, Chapter 7 Trustee for the Estate of Don Karl Juravin[2] and the Estate of

Must Cure Obesity, Co.[3], ("Trustee").  Having considered the Motion and the record, it

_____
[1] Doc. No. 490.
[2] *In re Juravin,* Case No. 6:18-bk-06821-KSJ (Bankr. M.D. Fla. Oct. 2018).
[3] *In re Must Cure Obesity, Co.,* Case No. 6:20-bk-01801-KSJ (Bankr. M.D. Fla. Jan. 31, 2020).

1

# EXHIBIT A

is

**ORDERED**:

1.    Trustee's Motion (Doc. No. 490) is **PARTIALLY GRANTED**.  A Break Order will issue directing the Trustee, under the protection of the U.S. Marshals Service for the Middle District of Florida, to obtain access and to retrieve property of the Debtor and of this bankruptcy estate.

2.    The Court reserves ruling as to Trustee's request for a *Writ Ne Exeat*, ordering the Debtor and his wife, Anna Juravin, to surrender their passports, as the Debtor is incarcerated until May 15, 2021.[4]  A further hearing on the Motion and this issue is scheduled for 4 p.m. on May 18, 2021.

3.    The U.S. Marshals Service for the Middle District of Florida ("U.S. Marshal") is authorized to enter the property and make demand for entry into any building, structure, or enclosure at **15118 Pendio Drive, Montverde, FL 34756** (together, the "Premises") to enforce and compel compliance with this Court's orders[5] and to assist the Trustee in locating, retrieving, or photographing the following described Property (together, the "Property"):

    a.  All business records (including passwords for electronically stored information) belonging to the ROCA Labs Entities and the Sold Entities[6], including without limitation ROCA Labs, Inc., ROCA Labs Nutraceutical USA, Inc., Juravin Inc.

    b.  All electronic communication devices on the Premises containing information about the Debtor, the Debtor's business interests, or property of this bankruptcy estate.

---

[4] Debtor is incarcerated in the Lake County, Florida jail serving the remainder of his thirty-day sentence. *See*, DCS Real Estate Investments, LLC v. Juravin, case no. 2017 CA 000667 (Fla. 5th Jud. Cir. Ct., Lake County).
[5] Doc. No. 449; Doc. No. 463; Doc. No. 473.
[6] Doc. No. 349; Doc. No. 356.

2

# EXHIBIT A

    c.  Debtor's wristwatch collection.

    d.  Any additional items Trustee, in his sole discretion, reasonably believes to be part of the bankruptcy estate.

    4.    Trustee shall and his professionals, including a photographer and a data recovery expert, may accompany the U.S. Marshall to the Premises to enforce and compel compliance with this Break Order and to assist in identifying and removing the Property.

    5.    Trustee shall photograph the interior of the Debtor's home to allow him to compare the contents with the items identified at a prior announced inspection.

    6.    Trustee shall take possession of the Property and promptly file an inventory of removed items with the Court.

    7.    If the Trustee finds locked storage containers he reasonably believes part of this bankruptcy estate, he may remove such containers from the Premises until he can identify and inventory the contents.

    8.    If the U.S. Marshal cannot secure the voluntary delivery of the Property by knocking and announcing its presence and requesting permission, whether due to refusal, no response, or otherwise, then, the U.S. Marshal may use any force reasonably necessary to gain entrance to the Premises, including, without limitation, breaking or removing any lock, outer door, or other hindrance or impediment to entry of the Premises. The U.S. Marshal is also permitted to open, pick the lock, or remove any cabinet door, drawer, inner door, gate, barrier, or safe or lock box contained in or on the Premises.

    9.    The U.S. Marshal and Trustee shall be held harmless of any damages or

3

# EXHIBIT A

claims because of complying with this Break Order.

      10.    Debtor shall reimburse the U.S. Marshal and Trustee for all estimated professional costs incurred in securing the turnover of the Property.

      11.    The Clerk shall restrict public viewing of the Motion, this Break Order, and the record of any hearing only until after the Trustee obtains the Property and files his inventory.

###

James Ryan, counsel for the Trustee, shall serve the Debtor with a copy of the Motion and this Order after the Trustee has taken possession of the Property and filed an inventory with the Court.

4

**EXHIBIT B**



Anna J <anna@juravin.com>

---

## Break order fillings

---

**Don Juravin** <Don@juravin.com>                                      Mon, Nov 14, 2022 at 12:43 PM
To: dan@ddkennedy.com
Bcc: Anna@juravin.com

Mr Kennedy,

Please forward me all relevant break order filings that were under seal. It is
my understanding that they were supposed to be unsealed but we can't find them on the
docket.

Thanks,

Don Juravin

**EXHIBIT B**



Anna J <anna@juravin.com>

---

## Break order fillings

---

**Don Juravin** <Don@juravin.com>                                              Mon, Nov 21, 2022 at 2:22 PM
To: dan@ddkennedy.com, Brad Saxton <BSaxton@whww.com>, Lauren Reynolds <lreynolds@whww.com>
Bcc: Anna@juravin.com

Greetings,

This is my second request for break order copies (PDF) of affidavits supporting the
break order and motion under seal for break order. I have the right to have them.

Please provide it.

[Quoted text hidden]

1/9/23, 4:40 PM



**EXHIBIT B** Break order fillings

Anna J <anna@juravin.com>

## Break order fillings

**Don Juravin** <Don@juravin.com>                    Mon, Nov 21, 2022 at 4:15 PM
To: Anna Juravin <Anna@juravin.com>, Henry Neil Portner Lawyer <portnerlaw@gmail.com>

---------- Forwarded message ----------
From: **Brad Saxton** <BSaxton@whww.com>
Date: Mon, Nov 21, 2022 at 4:11 PM
Subject: RE: Break order fillings
To: Don Juravin <Don@juravin.com>, dan@ddkennedy.com <dan@ddkennedy.com>, Lauren Reynolds
<LReynolds@whww.com>

Mr. Juravin,

Please have your counsel contact us is they need anything. All items should be available via ECF.

Thank you.

**Brad Saxton**

**Winderweedle, Haines, Ward & Woodman, P.A.**

Direct (407) 246-8672|Email: bsaxton@whww.com

**From:** Don Juravin <Don@juravin.com>
**Sent:** Monday, November 21, 2022 2:23 PM
**To:** dan@ddkennedy.com; Brad Saxton <BSaxton@whww.com>; Lauren Reynolds <LReynolds@whww.com>
**Subject:** Re: Break order fillings

EXTERNAL EMAIL: Be careful opening attachments or links

[Quoted text hidden]

--
*Sincerely,*

**Don Juravin**
code2GOD.bible
Orlando, Florida | 813.810.5100
Skype: DON8USA

# EXHIBIT C

Email: rick@rlsdevelopers.com

This email is intended for the named recipient(s) only. If you are not the intended recipient, you may not, in whole or in part, disclose, copy, distribute, review, or use this email and/or attachment associated with it.

---

**From:** Paul Simonson <psimonson@scharholdings.com>
**Sent:** Monday, November 19, 2018 4:07 PM
**To:** Randall Greene; Rick A; Rick Scharich
**Subject:** FW: Juravin Bankruptcy

Guys,

Can we please get on a call together?

Thanks.


Paul E. Simonson, C.P.A.
Chief Financial Officer

**SCHAR HOLDINGS**
217 Peruvian Avenue, Suite 2
Palm Beach, FL  33480
Direct: (561) 805-6516
Mobile: (561) 308-3054
Fax: (561) 805-6517
Email: psimonson@scharholdings.com
Skype:  simonsonpaul

**From:** James Ryan <jdr@ryanlawgroup.net>
**Sent:** Monday, November 19, 2018 3:07 PM
**To:** Paul Simonson <psimonson@scharholdings.com>
**Cc:** 'mikeryan32645@yahoo.com' <mikeryan32645@yahoo.com>; Randall Greene
<rgreene@rgdevelopments.com> (rgreene@rgdevelopments.com) <rgreene@rgdevelopments.com>
**Subject:** Juravin Bankruptcy

Hi Paul, I followed up on our conversation and the budget if we take action is as follows:
- Appraiser to establish correct value of the residence. $5,000.
- BR attorney services. $20,000 - $30,000. Juravin's attorney has a reputation for being difficult.
- Proposed offer to buy multiple Juravin assets from the trustee $30,000.
  Total $55,000 to $70,000. The extra five is for the unknown.

If we do nothing the lien for club charges likely gets discharged as an under secured obligation and Scharich will likely lose the ability to succeed on a foreclosure claim. Juravin becomes hunkered down in BC and continues his shakedown. If we go on the offensive many of his businesses can be acquired cheaply. Although they have no real value, being able to shut down his company litigation and control

# EXHIBIT C

his company web sites and social media accounts would be helpful to subduing his attacks on BC. I also suspect much of what he claims is exempt will not be.

The house should be determined to be worth significantly more than the amount he claimed and, if so, the POA lien would not be discharged. Some of his assets found to be not exempt such as vehicles will have some value to offset the expense.  Most importantly, it will be shown he does not have sufficient income to ratify the mortgage obligation and / or the bankruptcy will be dismissed. Either way Scharich will then be able to succeed in the foreclosure effort and oust Juravin from the community. Also, if this happens the attorney fee and the appraiser fee can be the basis for additional lien rights on the house. Under this scenario the sale of a vehicle or two (only one has no lien) could recoup part of what is spent to buy his businesses. The services could possibly be recovered in the form of a lien on the house. The first mortgage is about $1,360,000. I expect the house to sell for more than that even at a foreclosure sale. FWIW, Randall believes that house is worth more than $2,000,000 today.

Please let me know if you have more questions.

Regards,

James D. Ryan, Esq.
Florida Bar Board Certified in Business Litigation
jdr@ryanlawgroup.net  mobile:  561.889.1001
Ryan Law Group, PLLC
636 US Highway One, Suite 110
North Palm Beach Florida
Main:  561.881.4447  Fax:  561.889.4461
www.ryanlawgroup.net

# EXHIBIT C

## AFFIDAVIT OF

## RICHARD CHARLES ARRIGHI

---

**STATE OF FLORIDA**

**COUNTY OF LAKE**

My name is Richard Charles Arrighi. I am over the age of Eighteen (18). I reside at 15008 Pendio Drive, Bella Collina, Lake County, Florida. I suffer no legal disability, and I have personal knowledge of the facts set forth below.

1. I am a partner of Dwight Schar in DCS Real Estate Investments ("DCS").

2. I brought up the idea to purchase Bella Collina in or around 2011 and met with Dwight Schar, Paul Simonson and Randall Greene to invest.

3. In or around 2012 my idea was accepted by Mr. Schar and he invested in Bella Collina.

4. I handled acquisitions, structured financing, marketing, sales and the oversight of operations at Bella Collina from inception in 2012 until around 2018.

5. Overseeing operations at Bella Collina, I shared the executive office at Bella Collina with Mr. Simonson who is Mr. Schar's accountant and right-hand man.

6. Every decision taken or direction given at Bella Collina by Mr. Simonson or me required Mr. Schar's express approval, and Mr. Simonson, Mr. Greene and I were all tasked with advancing Mr. Schar's specific agenda.

7. Communication between Mr. Simonson and Mr. Schar was steady throughout each and every day, and because of my proximity to Mr. Simonson in the open space office, I was a *de facto* party privy to their conversations.

8. The Board of the Property Owners Association (POA) was developer-controlled, which means that Mr. Schar *de facto* controlled the Board.

# EXHIBIT C

9.  Mr. Greene was made Chairman of the Board, and his personal friend, Attorney James Ryan, was rewarded by way of Mr. Greene and Mr. Simonson assigning most of the legal work to Attorney Ryan's firm.

10. Attorney Ryan told Randall Greene and me on multiple occasions that DCS was his one of his biggest client and that the majority of his income was derived from DCS and the Bella Collina POA.

11. Messrs. Greene and Simonson strongly and repeatedly intimated that Attorney Ryan was always at their disposal in advancing Mr. Schar's agenda.

12. Soon after Mr. Juravin and his family moved to Bella Collina in Dec 2015, and after Don Juravin was "asking too much" and becoming "too much of an involved resident in Bella Collina", DCS started targeting the Juravin family through a variety of means.

13. For a number of years, I believed my partners' assertions about the Juravins being bad actors, and I observed the campaign against the Jurvavins by DCS which included the following:

    a.  The selective enforcement of Community regulations which was done primarily against them and not towards other residents at Bella Collina:

    b.  Threatening letters and email/texts;

    c.  The installation of undisclosed hidden cameras at Mr. Greene's direction specifically so that the Juravins and their visitors could be monitored and their movements reported to Mr. Greene, and all their vehicle information and driving licenses (given at the security gate) and plate numbers.

    d.  The maligning of Mr. Juravin on the internet at Mr. Greene's hand or at his direction, about which Mr. Greene boasted about;

    e.  Mr. Greene was spying on the Juravin family and their guests and businesses. This collection of information about the Juravins was utilized in order to assist the Federal Trade Commission in their case against Mr. Juravin and his company;

    f.  The banning of the Juravin family from the facilities at the Club at Bella Collina (at which membership is mandatory), while continuing to charge them Club Fees. The Juravins are the only resident family to be banned

# EXHIBIT C

from the Club that I am aware of, and the ban resulted in the two young Juravin girls being denied entry to their own graduation party that was held at the Club; and,

g. The intervention in Mr. Juravin's Bankruptcy case. As a result, attorney James Ryan was asked to make a plan to interfere with Don Juravin's bankruptcy. I was not involved in any of this activity and am aware of this based on an email forwarded to me by Simonson which the Ryan Law Group proposed a plan to purchase the bankruptcy assets of Mr. Juravin.

h. The POA, through Attorney Ryan, filed a lien against the Juravin's home for unpaid Club Fees—*the ongoing fees charged for access to and use of a community facility that the Juravin family was prohibited from accessing or using.*

i. The disputes and the litigation between DCS, the POA and the Juravins continued to multiply.

j. In fact, approximately Four Hundred Thousand Dollars ($400,000.00) had been spent by the POA alone in legal fees in connection with the campaign against the Juravins, and Mr. Simonson told me that Mr. Schar would spend whatever amount necessary to win in his fight against Mr. Juravin.

14. I once had coffee with Mr. Juravin at Starbucks and told Simonson and he expressed significant outrage that I was fraternizing with the enemy. For months, I felt compelled to keep a distance from Mr. Juravin.

15. On election day, I had the opportunity to meet Mrs. Juravin and the Juravin's young daughters and hear from them first hand about the treatment they endured during their time at Bella Collina and the impact it had on them.

16. I undertook an independent evaluation of the ongoing disputes and attendant litigation between DCS, the POA and the Juravin family in the defamation, sign, Club Fees, and selective enforcement matters, and I concluded that Messrs. Schar, Simonson, Greene and Ryan had made material misrepresentations, and had crossed a variety of ethical and legal boundaries in the battle that they had waged against the Juravins.

# EXHIBIT C

17. In good conscience, I could no longer be party to what seemed clearly to me to be an ongoing, unethical and illegal course of conduct designed to mercilessly target this particular family.

18. For the reasons stated above, as well as managerial and other business -related reasons, I respectfully requested that Mr. Schar buy out all of my interest in any and all DCS assets.

19. Attorney Ryan, as Mr. Schar's attorney for DCS, was to serve as the liaison between Mr. Schar and me in negotiating the buyout.

20. Attorney Ryan informed me that any potential buy out would be conditioned on my preparing an affidavit outlining information and issues DCS could use against Mr. Juravin in their protracted litigation.

21. I explained to attorney James Ryan that I had no knowledge of the issues they wanted me to write about Mr. Juravin, his income, etc. Mr. Ryan, who I believe was also working for the Trustee, insisted that I provide an affidavit regarding matters I had no knowledge of.

22. Further, and more alarming, Mr. Simonson wanted me to make statements to federal authorities against Mr. Juravin and texted me the following: **"I will have to call you later but Randall is telling me that you spoke to him (Juravin) numerous times over the weekend. By the way, shame on you for not wanting to get involved. You are leaving OUR company in jeopardy with someone trying to steal from us and you do not want to COOPERATE. Shame on you, shame on you, shame on you. I'm letting Dwight know exactly what happened and how you reacted. Shame on you."**

23. When I refused to perjure myself, my relationship with Mr. Schar and the other DCS partners deteriorated even further. Within a month from this point, Simonson notified me that I no longer had a role with DCS and stated it was Dwight Schar's decision. In addition, DCS immediately terminated my companies right to build homes at Bella Collina and this significantly harmed my family.

24. I conveyed to Attorney Ryan my conclusion that, upon my review of all the facts and circumstances, the hostility toward and the course of conduct against the

# EXHIBIT C

Juravins perpetrated by Messrs. Schar, Simonson and Greene were not only unwarranted and viscous, but also unethical and illegal.

25. In my efforts to mitigate some of the damage that had been done to the Juravins by my partners, I executed an affidavit outlining several issues I knew about the goings on at Bella Collina vis-a-vis the Juravins and in order to correct the many misrepresentations that had been made.

26. Attorney Ryan informed me that Mr. Schar was quite displeased that I had executed an affidavit exposing the facts surrounding the campaign of attacks against the Juravins.

27. I was urged by attorney James Ryan to retract my affidavit. I refused and explained that I wrote the truth and attorney James Ryan was badgering me and yelling at me and he actually called me a "LIAR" in an effort I believe to force me to change my affidavit if I ever wanted to get the buy out of my DCS positions by Dwight Schar.

28. After this, any discussion of Mr. Schar buying out my interests in DCS ended

29. In my discussions with Attorney Ryan where he yelled at me and called me a liar, I responded by asking him how he could say that when he had no idea of the facts. In addition, I told him that I believed he had been effectively "brainwashed" by the misrepresentations made by DCS and that DCS, not the Juravins, had initiated and perpetuated the battle between them.

30. Attorney Ryan made it clear to me that retracting the truthful affidavit I wrote in support of Mr. Juravin could facilitate a settlement with Mr. Schar. I perceived it as a condition precedent.

31. Attorney Ryan's affirmative efforts in pressuring me to withdraw my truthful, corrective affidavit were not ethical.

32. I felt that Attorney Ryan, Simonson and Schar did not pursue buying out my interests because I would not cooperate with their efforts to harm the Juravin family.

33. Attorney Ryan's affirmative efforts in pressuring me to withdraw my truthful affidavit by effectively holding my buy out from DCS hostage in order to "encourage" my compliance with his and DCS's illegal and unethical trial strategy

# EXHIBIT C

serve to perpetrate a factually incorrect picture of the entire situation upon the Court.

I, the undersigned, Richard Charles Arrighi, swear or affirm that the foregoing is true, accurate and complete, to the best of my knowledge and belief and provided of my own volition.

_____
Signature



Nayeli Diaz
Notary Public
State of Florida
Comm# HH085473
Expires 1/27/2025

Nayeli Diaz

ACKNOWLEDGED, SWORN TO AND SUBSCRIBED before me on this the 10 day of March, 2021.