UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE:

DON KARL JURAVIN,                          CASE No. 6:18-bk-06821-LVV

Debtor.                                    Chapter 7

_____

## RESPONSE TO OBJECTION TO CLAIM NO. 6-2 OF BELLA COLLINA PROPERTY OWNERS ASSOCIATION, INC.

Creditor, the BELLA COLLINA PROPERTY OWNERS ASSOCIATION, INC. (the "BCPOA"), by and through its undersigned counsel, hereby responds to the Objection to Claim No. 6-2 of Bella Collina Property Owners Association, Inc. (Doc. No. 892) (the "Objection"), as follows:

### PRELIMINARY STATEMENT

1.    The Objection is another chapter in the Debtor's continued litigation campaign against the BCPOA.  This campaign includes multiple lawsuits regarding claims that are not based in law or fact or have already been litigated and resolved.  The Debtor has been sanctioned by this court and the state court for his litigation tactics.  Despite the nature of the Debtor's claims and objections, and the courts' treatment of the Debtor's litigation tactics, the Debtor continues to cause the BCPOA to incur onerous and unnecessary fees and costs.

2.    Here, the Debtor, without standing, objects to the proof of claim of the BCPOA for the second time. The Objection is based on arguments that are objectively meritless based on the relevant provisions of the CC&R's, the Debtor's own actions, and Orders entered in prior lawsuits.  To make matters worse, as explained in more detail below, the Debtor has a pattern of

asserting claims or objections (including the Objection), withdrawing them, and then refiling them whenever he thinks it is to his advantage.

3.      This continued conduct of the Debtor repeating claims that the Debtor objectively knows or should know have no merit must stop.  Respectfully, the BCPOA requests the Objection be denied and the Court take appropriate steps to dissuade the Debtor from making specious arguments, including imposing sanctions the Court deems necessary.

## BACKGROUND

**Pertinent State Court Litigation**

4.      As part of the Objection, the Debtor claims that the requirement to conduct a turnover (the "Turnover") of the governance of the BCPOA from the developer, DCS Real Estate Investments, LLC ("DCS"), to the lot owners never occurred.  The Debtor's claim false.

5.      In a separate lawsuit in 2012, an Order (the "Turnover Order") was entered requiring the Turnover to occur.  See Ex. "A", pg. 8.  Shortly thereafter, in the same case, a motion was filed claiming DCS had not complied with the Turnover Order.  That Motion was denied and the Court determined that the Turnover did take place.  See Ex. "B", pg. 2.

6.      It cannot be disputed that the Debtor is aware that the Turnover took place. Not only has the Debtor received notice of the Turnover in multiple lawsuits (see below), the Debtor took steps to have his vote counted in at least one election of the Board. See Ex. "C".

7.      The first time the Debtor made allegations regarding the Turnover was in case no. 2018 CA 001607 (the "2018 Action"), which was pending before the Circuit Court of the 5th Judicial Circuit in and for Lake County Florida (the "State Court").  See Ex. "D" (w/o exhibits), pg. 12-15, pg. 17.

8.  On December 17, 2020, Anna Juravin and Don Juravin filed a second case in the State Court as a derivative action on behalf of the BCPOA (the "2020 Action"), whereby they claimed DCS remained in control of the BCPOA and the Turnover did not occur. See Ex. "E"

9.  Both the 2018 Action and the 2020 Action subsequently were voluntarily dismissed.

10.  The Debtor has since filed a third case in the State Court pending under case no. 2022 CA 001730 (the "Third Action"), alleging essentially the same claims as the 2020 Action. See Ex. "F". On July 10, 2023, the state court entered an Order (the "State Court Sanctions Order") dismissing the Third Action (with prejudice) and sanctioning the Debtor, his wife and his counsel for asserting claims that they "knew or should have known that their claim is not supported by material facts or existing law." See Ex. "G." An evidentiary hearing regarding the attorneys' fees to be awarded will occur within 90-days.

**The Bankruptcy Case**

11.  BCPOA is a holder of a secured claim in that amount of $9,704.84 and general unsecured claim in the amount of $391,406.86 [Claim 6-2] (the "BCPOA Claim").

12.  On February 23, 2020, the Debtor filed its First Objection to the BCPOA Claim (Doc. No. 281) (the "First Objection"), which is nearly identical to the Objection.[1]

13.  On April 13, 2020, the BCPOA filed its response to the First Objection.

14.  On June 26, 2023, the Court entered its Order of Discharge granting the Debtor a discharge under Section 727 of the Bankruptcy Code (Doc. No. 369).

15.  Thereafter, just as he did with the 2018 Action and the 2020 Action, the Debtor withdrew the First Objection on July 30, 2020 (Doc. No. 384).

---

[1] Several of the claims also mirror claims made in the First Action, the Second Action, and the Third Action.

O4264768.v1

16.     On June 25, 2021, after discovering facts that should result in the revocation of the Debtor's discharge, the BCPOA filed that Certain Complaint for Revocation of Debtor's Discharge pursuant to Section 727 of the Bankruptcy Code commencing adversary proceeding no. 6:21-ap-00103-LVV  (the "Discharge Action").

17.     On February 7, 2023, the Motion to Intervene of the Chapter 7 trustee, Dennis D. Kennedy (the "Trustee") was granted, and the Trustee joined as a plaintiff in the Discharge Action (Doc. No. 53).

18.     Recently, on June 21, 2023, the Debtor filed the Objection.  The Objection is filed on nearly identical grounds as the First Objection.

## RESPONSES

**The Debtor Lacks Standing to Object to the Claim**

19.     Before addressing the substance of the Debtor's Objection, the BCPOA submits the Debtor does not have standing to object to the BCPOA Claim.  The question of standing generally challenges whether the objecting party is the appropriate party to object to the claim in question.[2] Section 502(a) of the Bankruptcy Code requires that only a "party-in-interest" may object to a proof of claim.[3]  The Bankruptcy Code does not define the term "party-in-interest" for the purpose of objecting to a creditor's claims.

---

[2] Caserta v. Tobin, 175 B.R. 773, 774 (S.D. Fla. 1994) (citing E.F. Hutton & Co. Inc. v. Hadley, 901 F.2d 979, 984 (11th Cir. 1990)).

[3] Id. (citing Willemain v. Kivitz, 764 F.2d 1019, 1022 (4th Cir. 1985) (insolvent debtor did not have standing to object trustee's sale of assets); Kapp v. Naturelle, 611 F.2d 703, 706 (8th Cir. 1979) (insolvent debtor has no interest in how his assets are distributed); Skelton v. Clements, 408 F.2d 353, 354 (9th Cir. 1969) (debtor lacked standing to seek review of order approving asset liquidation); In re Woodmar Realty Co., 241 F.2d 768, 770-71 (7th Cir. 1957); In re Stanley, 114 B.R. 777, 778 (Bankr. M.D. Fla. 1990) (unless disallowance creates a surplus, debtor lacks standing to object to claim); In re George, 23 B.R. 686 (Bankr. S.D. Fla. 1982) (where claims far exceeded assets, debtor lacked standing to object to fee application); see also In re Martino, 2017 WL 1519797 * 6 (M.D. Fla., 2017).

20.    There are three exceptions to the general rule that a debtor is not a party-in-interest with standing to assert a claim objection, these are: i) if there is no trustee, ii) if all unsecured creditors will be paid in full with interest leaving money to disburse to the debtor; or iii) if the debt in question is not subject to discharge.[4]

21.    Here, the only potential exception to the general rule that the Debtor is a party-in-interest with standing to object to the BCPOA Claim is if the Discharge Action is determined in favor of the BCPOA and the Trustee.  When the Debtor's discharge is revoked under section 727(d) of the Bankruptcy Code, the Debtor may be able to establish standing to object to the BCPOA Claim.  There is no reason to litigate the issues relating to the BCPOA Claim because, as we stand here today, the claim (and every other claim except for the Federal Trade Commission's claim in the amount of excess of $25,000,000) is subject to the Discharge Order. Presumably, the Debtor is objecting to the BCPOA claim to try and prevent the BCPOA from having standing to continue to pursue the Discharge Action.  But, because any resolution of the BCPOA claim will not disallow the BCPOA Claim in its entirety, there is no reason to even consider the Objection at this time.

**The Debtor's Objection Lacks Merit**

22.    Even if the Debtor had standing to pursue the Objection, the Objection has no more merit than the already withdrawn First Objection.  Rule 3001(f) provides that "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." This rule creates a presumption in favor of allowance.[5] The objecting party bears the burden rebutting the presumption through "facts tending to defeat

---

[4] See Martino, 2017 WL 1519797 at * 7.
[5] In re LJL Truck Ctr., Inc., 299 B.R. 663, 666 (Bankr. M.D. Ga. 2003).

the claim by probative force equal to that of the allegations of the proof of claim."[6] The Debtor's Objection does not meet this standard.

**The Secured Claim**

23.    The Debtor claims that the Claim of Lien attached to the BCPOA Claim is false because he provides 4 monthly invoices claiming he made 4 monthly payments for his dues owed to the Club at Bella Collina (the "Club"). The BCPOA does not dispute he made certain payments. As the BCPOA attached to its response to the First Objection and attached hereto as Ex. "H" is an accounting of the amounts the Debtor failed to pay relating to the Claim of Lien. Several payments are reflected on this statement.

24.    The Debtor also admits in his Objection that he did not pay the Club Dues after he was suspended for his conduct. The Debtor includes in his Objection a letter from counsel for the BCPOA informing Juravin and his counsel of his suspension from the Club. The letter specifically states that the suspension "does not relieve him of his obligation to pay Club dues when they are due." The reason that the Debtor's suspension from the Club did not obviate his requirement to pay his dues is because the Discipline section of the Clubs Rules and Regulations state that the Club has the right to suspend members and that during such suspension, the member will be required to pay their dues. See Exhibit "I" (relevant excerpt). The CC&Rs require in section 3D that "Delinquent Club Charges" constitute a special assessment and result in a lien against the Debtor's lot. See Exhibit "J" (relevant excerpts). As a result, the Secured Claim of the BCPOA continued to accrue due to the Debtor's admission he is not paying his Club Dues during his suspension.

---

[6] Id.

O4264768.v1

25.    Based on the above, the Debtor provides no legal basis as to why he was not required to pay dues as a result of his suspension and he has not met the necessary burden to object to the BCPOA's claim.

**The Sanctions Order**

26.    The Debtor's Objection to the unsecured claim was also largely addressed in the Response to the First Objection.  The Debtor argues that the Order Awarding Contempt Sanctions, Attorneys Fees and Costs (the "Sanctions Award"), which was attached to the BCPOA Claim as Exhibit "B" cannot be included in the BCPOA Claim because the BCPOA was not a party to the Order.[7]

27.    As the Debtor is already aware, pursuant to the CC&Rs governing the BCPOA, the BCPOA is the assignee of the collection claims of the assignor, the Club.  See "Exhibit "J"". Despite the Debtor's claims to the contrary, the Club is included as a Plaintiff and as a recipient of the award granted by the Sanctions Order.  An assignee of a judgment or an order has standing to file a proof of claim[8] and the BCPOA including the Sanctions Order as part of its unsecured claim is appropriate.

**The Attorneys' Fees**

28.    The Debtor also objects to the portion of the BCPOA Claim relating to attorneys' fees incurred in the various lawsuits involving the Debtor. These amounts total $123,597.36.

29.    The Debtor objects to the $20,232.00 in fees relating to the Sanctions Award claiming that the BCPOA was not a party to that action.  But, as explained above, the BCPOA was the assignee of the Club and did have standing to assert that action.

---

[7] This was a separate sanction from the sanction orders addressed above.

[8] See In re Minbatiwalla, 424 B.R. 104, 109 (Bankr. S.D.N.Y. 2010); In re Crutchfield, 492 B.R. 60, 74 (Bankr. M.D. Ga. 2013).

O4264768.v1

30.    With respect to the $71,615.36 for attorneys' fees relating "to other POA enforcement actions" against the Debtor, the Debtor claims the amounts should not be awarded because the other actions were not identified in the BCPOA Claim.  The Debtor, however, is fully aware of the enforcement actions at issue because he included these actions in his amended Bankruptcy Schedules. Those Schedules include: i) Case No. 2017-CC-000979 in Lake County Florida; ii) Case No. 2017-CA-0667 in Lake County, Florida; iii) Case No. 2017 CA-2178 in Lake County, Florida; and iv) Case No. 2018-CA-001607 in Lake County Florida.

31.    In addition, the Debtor claims the claim in amount of $31,750.00 for fees and costs related to the Claim of Lien enforcement action were unreasonable because it "was not intensely litigated." But, the docket attached to the Objection reflects that written discovery was conducted, third-party actions were filed, motions to dismiss were fully litigated, and depositions were conducted, which would have included travel costs, court reporter costs, and transcription costs. Finally, because the bankruptcy was filed on the eve of trial, trial preparation would have taken place as well. The $31,750.00 in attorneys' fees and costs is clearly reasonable in light of the docket provided by the Debtor.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

O4264768.v1

## CONCLUSION

32.    The Objection should be denied due to i) the Debtor's lack of standing; ii) the

Debtor's failure to meet his burden to object to the BCPOA Claim; and iii) his inability to assert

a meritorious objection.  In addition, due to the Debtor pursuing objections that have no merit,

the BCPOA respectfully asserts the Court should award such additional relief it deems necessary,

including appropriate sanctions.

Dated: July 11, 2023

/s/ James A. Timko, Esq.
James A. Timko, Esq.
Florida Bar No. 0088858
**DEAN, MEAD, EGERTON, BLOODWORTH,**
**CAPOUANO & BOZARTH, P.A.**
420 S. Orange Avenue, Suite 700
Orlando, Florida 32801
Telephone:  407-841-1200
Facsimile:  407-423-1831
Email:  jtimko@deanmead.com
*Counsel for the Bella Collina Property Owners*
*Association, Inc.*

9

O4264768.v1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on all

parties listed below by ECF notification, email, and/or U.S. mail on this 11th day of July, 2023.

**Don Karl Juravin**
15118 Pendio Drive
Montverde, FL 34756
Don@Juravin.com
*The Debtor*

**Dennis D Kennedy**
P. O. Box 541848
Merritt Island, FL 32954
*The Trustee*

**Bradley M Saxton**
**Lauren M. Reynolds**
Winderweedle, Haines, Ward & Woodman, PA
329 Park Avenue North, Second Floor
Winter Park, FL 32789
*Counsel for Trustee*

**James D Ryan**
Ryan Law Group, PLLC
636 U.S. Highway One
Suite 110
North Palm Beach, FL 33408
*Counsel for the Trustee*

**United States Trustee - ORL7/13**
Office of the United States Trustee
George C Young Federal Building
400 West Washington Street, Suite 1100
Orlando, FL 32801

                              */s/ James A. Timko*
                              JAMES A. TIMKO

O4264768.v1

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR LAKE COUNTY, FLORIDA

BELLA COLLINA PROPERTY OWNERS
ASSOCIATION, INC., a Florida not for profit
corporation,

       Plaintiff,

vs.                                     CASE NO.: 2012 CA 004229

CS BUSINESS SYSTEMS, INC.,
a foreign corporation,

       Defendant.
_____/

and

BELLA COLLINA PROPERTY OWNERS
ASSOCIATION, INC., a Florida not for profit
Corporation,

       Plaintiff,

vs.-                         CASE NO.: 2013 CA 002108
                              Consolidated with Case No. 2012 CA 004229

JAMES L. SHELTON and
VIRGINIA S. SHELTON,

       Defendants.
_____/

## ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS'/COUNTER PLAINTIFFS' VERIFIED PETITION FOR APPOINTMENT OF RECEIVER AND TEMPORARY INJUNCTION

THIS CAUSE having come before the Court on October 27, 2015, and continued to March 28, 2016, on *Defendant's Verified Petition For Appointment Of Receiver And Temporary Injunction* and numerous other motions. The Court, having reviewed the pleadings and Petition, having heard argument of counsel, and being otherwise fully advised, finds as follows:



1)      Defendant/Counter Plaintiff/Petitioner, CS Business Systems, Inc. ("CSBS") and James Shelton and Virginia Shelton (the "Sheltons") (cumulatively, "Petitioners"), have filed a three count Petition seeking appointment of a Receiver under Florida Statute Chapters 617 and 720 and a temporary injunction.

2)      Petitioners all own property governed by the Bella Collina Property Owner's Association (herein "BCPOA"). Petitioners allege provisions in the BCPOA Amended Covenants, Conditions and Restrictions (hereinafter "CC&R's"), were included without informing or providing notice to the Petitioners or any other contract vendee. The challenged provisions require mandatory club membership and provide that all delinquent club charges are levied as special assessments.

3)      At the time the above styled action was filed, Petitioners were Defendants in an action to collect delinquent fees and assessments incurred as a result of the referenced provisions in the CC&R's.

4)      Petitioners assert the changes made by the original Declarant were illegal because they were adopted without member approval.

5)      Additionally, Petitioners allege conspiracy and fraud. Petitioners assert the original Declarant should have turned over control of the BCPOA to the property owners in 2005.

6)      In 2012, the original Declarant transferred its authority to the current Declarant. The current Declarant assumed its role in June 2012 and funded BCPOA's collection of fees and special assessments.

7)      Further, Petitioners claim any attempt to collect assessments would be illegal and fraudulent.

## COUNT I

8)      In Count One, Petitioners request a Receiver under Florida Statute, Section 617.1432. However, Petitioners have not complied with the requirements of the statute therefore the request must be denied.

9)      To appoint a Receiver under Florida Statute, Section 617.1432, an action must be brought to dissolve a not-for profit corporation by the lesser of ten percent (10%) or fifty (50) members of the corporation.

10)     Petitioners have not brought an action to dissolve the BCPOA and they have not been joined by the requisite number of BCPOA members. As such, the relief Petitioners request under Chapter 617 is not available.

11)     Because Petitioners request does not comply with the statutory requirements the Court is not required to address the substance of the Petition. However, if the Court were to address the substance of the Petition at this time it would not be persuaded to appoint a Receiver based on the record before it.

## COUNT II

12)     Next, Petitioners seek appointment of a Receiver under Florida Statute, Section 720.3053. Here, Plaintiff failed to provide a thirty day notice before filing suit, as required by the statute.

13)    To appoint a Receiver under Florida Statute, Section 720.3053 (2) Petitioners are required to provide the lot owners a notice of intent to apply for a Receiver "at least 30 days prior to the filing of a petition seeking receivership."

14)    Petitioners have failed to provide any evidence of compliance with the requirement of the statute.

15)    Because Petitioners did not comply with a statutory condition precedent the requested relief must be denied.

16)    Additionally, even if the Petitioners had complied with the thirty day notice requirement the Petition would still fail.

17)    To appoint a Receiver under Florida Statute, Section 720.3053 there must be a showing that the BCPOA Board lacks sufficient members to constitute a quorum.

18)    The evidence shows there had been three seats on the BCPOA Board and now there are five and that all such seats have been kept occupied on a timely basis such that there has always been a sufficient number of Board Members to constitute a quorum.

19)    Petitioners argue because the Board Members were appointed by Declarant and not elected by the members of BCPOA, the Board Members should not be recognized.

20)    However, Florida Statute, Section 720.306(9)(b) provides "[t]he validity of any action by the board is not affected if it is later determined that the person...is ineligible for board membership." Therefore, the Court finds no merit in Petitioners argument.

21)    Additionally, at the hearing the BCPOA argued that the statutes relied on by Petitioners allow for Board Members to be appointed, not elected, when there are not more nominees than there are positions available.

22)    No evidence demonstrates any nominees ever stood for election. Therefore, filling the seats on the Board of Directors by appointment and without an election was appropriate.

23)    Therefore, Petitioners request for appointment of a Receiver under Florida Statute, Section 720.3053 is denied.

## COUNT III

24)    Finally, Count Three of the Petition requests injunctive relief on several issues. The Court finds only one of those issues, the issue of turnover of the BCPOA, has merit and addresses it below. All other requests for injunctive relief are denied.

25)    Petitioner requests an injunction that would require the Developer to turn over the BCPOA to the control of lot owners.

26)    Florida Statutes and the BCPOA governing documents require one of the Board Members be an elected parcel owner when fifty percent (50%) of the lots are sold. Two of the three Board Members must be elected by parcel owners within ninety (90) days of the sale of ninety percent (90%) of the lots. Additionally, within this ninety (90) day period, the Developer, at its expense, must conduct a statutorily prescribed audit and perform statutorily prescribed duties, Florida Statute, Section 720.307.

27)     The record shows despite the fact that, ninety percent (90%) of all lots in the development were transferred by August of 2005 the Developer failed to turn over control of the BCPOA to the members.

28)     Lake County property records indicate that, on or before August 29, 2005, Developer transferred fee simple title to at least seven hundred twenty (721) developed lots to buyers, who, in accordance with the BCPOA's Articles of Incorporation, became members of the BCPOA (more have been sold since).

29)     On August 29, 2005, a total of eight hundred one (801) authorized and platted lots had been recorded in Lake County for the subdivision. Therefore, because the Developer had transferred seven hundred twenty-one (721) of the eight hundred ten (810) lots or 90.01%, more than ninety percent (90%) of the total developed lots were transferred as of that date.

30)     The Developer asserts two Affirmative Defenses for its failure to turn over the BCPOA to the members. The Court is not persuaded by either.

31)     First, Developer claims thirty-two (32) of the lots were merely transferred from Developer to preferred builders and should not be counted toward the turnover total. Respondent argues that because the preferred builders were merely assigned the rights and privileges of the Developer, the preferred builders were not members and were to be counted toward the turnover total.

32)     The Court disagrees. The Record indicates the lots were conveyed to the preferred builders in fee simple. No writing was introduced to document any assignment of rights from the Developer to the preferred builders other than fee simple ownership of the thirty-two (32) lots.

33)    Second, the Developer claims the number total number of lots for the development is greater than the eight hundred one (801) lots that were first declared in the governing documents.

34)    On December 22, 2006, the Developer recorded the second supplemental declaration in Lake County, which confirmed that Bella Collina consisted of eight hundred one (801) lots, but also referred to the inclusion of additional land into the subdivision, which land remains un-subdivided and undeveloped.

35)    There is no statutory or governing document authority for the proposition that the act of declaring additional land after the turnover date of August 29, 2005 alters the date for turnover.

36)    Therefore, August 29, 2005 is the Turnover Date as defined by BCPOA's governing documents and Florida Statute, Section 720.307.

37)    Once turnover is required, the Developer, in accordance with Florida Statute, Section 320.307, has ninety (90) days from the Turnover Date within which to complete a series of statutory obligations, including the election of a majority of non-developer lot owners to the Board of Directors of the BCPOA and the resignation of Developer appointed Board Members.

38)    In this case, ninety days (90) after the Turnover Date would have been on November 28, 2005.

39)    The Record is clear that there has been no Turnover of the BCPOA to the property owners as of the date of this Order.

40)    Florida Statute, Section 720.307 requires the election of at least one non-developer Board Member on the conveyance of 50% of the parcels. The Articles of Incorporation of the BCPOA and Florida Statute, Section 720.307 compel the turnover of the BCPOA to an owner elected board within ninety (90) days after ninety percent (90%) of the lots were sold, which triggering event occurred on or about August 29, 2005.

41)    These triggering events should have resulted in an initial election meeting and vote of parcel owners for a board of directors. No such meeting and vote ever occurred.

42)    Respondents continue to suffer immediate and irreparable injury, loss, and damage as a result of the Developers failure to comply with the Florida Statute and the BCPOA's governing documents.

43)    The Petitioners, and the other lot owners, have no adequate remedy at law.

44)    The harm, if any, which would result to the Developer and the BCPOA, if this injunction is granted, would be relatively insignificant compared to the immediate and irreparable injury, loss and damage the Petitioners, and those similarly situated, would suffer in the event that this injunction is not granted.

45)    A permanent injunction is necessary to enjoin the BCPOA from denying Bella Collina lot owners and BCPOA members control of its community.

It is therefore **ORDERED AND ADJUDGED** as follows:

A)    Petitioners request for receivership is DENIED without prejudice

B)    Petitioners request for injunctive relief for the Turnover of the Property Owner's Association to the members is **GRANTED**. Respondents shall proceed with

Page 8 of 9

Turnover in compliance with all relevant Florida Statutes and the governing documents of the BCPOA. The triggering date for the turnover shall be the date of this Order. All other requests for injunctive relief are denied.

C)      The actions of the BCPOA Board are valid and the current BCPOA members may continue in their current capacity until such time as a new board may be elected.

D)      The Court reserves ruling on all other issues before it until after the turnover occurs.

E)      Parties shall schedule a case status conference to be held 45 days after the date of the election of the BCPOA Board.

**DONE AND ORDERED** in Chambers at Tavares, Lake County, Florida, this 2 4 day of June, 2016.

_____
G. RICHARD SINGELTARY
CIRCUIT COURT JUDGE

Copies to:

JAMES D. RYAN, ESQ.
RYAN LAW GROUP, LLC
636 U.S. HIGHWAY ONE, SUITE 110,
NORTH PALM BEACH, FL 33408

E. TIMOTHY MCCULLOUGH, ESQ.
MCCULLOUGH AND MITCHELL, PA,
7463 CONROY WINDERMERE RD., SUITE A,
ORLANDO, FL, 32835

_____
HEATHER DABNEY GRENNELL
JUDICIAL ASSISTANT

Page 9 of 9

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT IN AND FOR
LAKE COUNTY, FLORIDA

BELLA COLLINA PROPERTY OWNERS
ASSOCIATION, INC., A FLORIDA NON-PROFIT
CORPORATION,
    PLAINTIFF,

V.                                         CASE NO. 2012-CA-004229

CS BUSINESS SYSTEMS, INC.
    DEFENDANT,
CSBUSINESS SYSTEMS, INC.
    COUNTER CLAIM PLAINTIFFS,

V.                                         CONSOLIDATED WITH
                                         CASE NO. 2013-CA-002108

BELLA COLLINA PROPERTY OWNERS
ASSOCIATION, INC., THE CLUB AT BELLA
COLLINA, LLC, BELLA COLLINA CLUB, LLC,
AND DCS REAL ESTATE INVESTMENTS, LLC,
AND CAMERON, DAVIS, AND GONZALEZ
    COUNTER CLAIM DEFENDANT



                              AND

BELLA COLLINA PROPERTY OWNERS
FORMERLY ASSOCIATION, INC., A FLORIDA
NON-PROFIT CORPORATION,
    PLAINTIFF,

V.                                     CASE    NO.    2012-CA-004229

JAMES SHELTON, AND VIRGINIA SHELTON
DEFENDANTS, JAMES SHELTON, AND VIRGINIA
SHELTON,
    COUNTER CLAIM PLAINTIFFS,

V.

JAMES SHELTON, and
VIRGINIA SHELTON
    Defendants,
JAMES SHELTON, and
VIRGINIA SHELTON,
    Counter Claim Plaintiffs,

V.

BELLA COLLINA PROPERTY OWNERS
ASSOCIATION, INC., THE CLUB AT BELLA
COLLINA, LLC, BELLA COLLINA CLUB, LLC,
AND DCS REAL ESTATE INVESTMENTS, LLC,
and CAMERON, DAVIS, and GONZALEZ    /



ORDER ON MOTION FOR REHEARING ON EMERGENCY MOTION FOR
DECLARATORY RELIEF AND TO ENFORCE COURT ORDER RELATED TO
TURNOVER ELECTION

THIS CAUSE came before the Court on the *Defendants' Motion For Declaratory Relief And To Enforce Court Order Related To Turnover Election*, and the Court having reviewed the Motion, and has been otherwise fully advised in the premises. Upon review, the Court finds the Motion raises no matters with merit that have not been previously argued to the Court. Accordingly, it is hereby

ORDERED AND ADJUDGED that the *Defendants' Motion For Declaratory Relief And To Enforce Court Order Related To Turnover Election* is denied without hearing. *Carnell v. Carnell*, 398 So 2d. 503 (Fla. 5th DCA 1981).

DONE AND ORDERED in Chambers at Tavares, Lake County, Florida, this 25 day of October, 2016.

_____
G. RICHARD SINGELTARY
CIRCUIT JUDGE

CERTIFICATE OF SERVICE

I HEREBY CERTIFY a true and correct copy of the foregoing Order was sent via U.S. Mail/hand delivery this 25 day of October, 2016, to the following:

JAMES D. RYAN, ESQ.
RYAN LAW GROUP, LLC
636 U.S. Highway One, Suite 110 North
Palm Beach, FL 33408

E. Timothy McCullough, Esq.
McCullough and Mitchell, PA,
7463 Conroy Windermere Rd., Suite A,
Orlando, FL 32835

_____
HEATHER D. GRINNELL
JUDICIAL ASSISTANT

**BELLA COLLINA PROPERTY OWNERS ASSOCIATION INC**
**PROXY**
**ANNUAL MEMBERS MEETING AND ELECTION**
September 22, 2016

KNOWN ALL BY THESE PRESENTS, that the undersigned hereby appoints the Secretary of the Association or
_Rick L. Schrich_____, with the full power of substitution for an in the name, place, and
stead of the undersigned, to appear and represent the undersigned, subject to the limitations set forth in Chapter 720
Florida Statutes and the applicable provisions of the Declaration of Covenants, the Articles of Incorporation, and the
Bylaws for the BELLA COLLINA PROPERTY OWNERS ASSOCIATION INC at the Special Members Meeting and Election of the
Association to be held on Thursday, September 22 at 2:00pm at the Bella Collina Clubhouse, at 15920 County Rd 455,
Montverde, Florida 34756, and any lawful adjournment thereof.

DATED this _19th_ day of _September_, 2016.

PROPERTY ADDRESS        _15118 PENDIO DRIVE (#270)_

SIGN _____        _Don K. Jornvin_
                                PRINT DESIGNATED VOTERS NAME

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

**SUBSTITUTION OF PROXY**

The undersigned, appointed as proxy above, does here by designate _____ to substitute for me in the
proxy set forth above.

DATED this _____ day of _____ [[YEAR]]

                                _____
                                PROXY SIGNATURE

**PROXY INSTRUCTIONS**

o   A proxy is used for the purpose of appointing another person to attend the meeting for you in the event you may
    not be able to personally attend. A record title owner of the lot/home must sign the proxy in order for it to be
    valid.
o   This Proxy may be submitted anytime up to and including the date of the meeting and any adjournment thereof.
    However, voting for Directors may not be accomplished via Proxy. If voting for Directors is necessary, you must
    submit your Proxy and Ballot material in the manner described herein in order for your vote to be counted.
o   You may revoke your proxy at any time and this Proxy is valid for 90 days.


EXHIBIT
tabbies

Filing # 75925348 E-Filed 08/03/2018 03:14:37 AM

**IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT,
IN AND FOR LAKE COUNTY, FLORIDA**

DON K. JURAVIN,

     Plaintiff,

v.,                                                                                          Case No.:

RICHARD ARRIGHI, RANDALL GREENE,
THE CLUB AT BELLA COLLINA, LLC,
a Florida limited liability company, BELLA
COLLINA PROPERTY OWNER'S
ASSOCIATION, INC., a Florida not for profit
corporation, KEITH CLARKE, PAUL
LEBREUX, and DCS REAL ESTATE
INVESTMENTS, LLC, a Florida limited
liability company,

     Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, DON K. JURAVIN, by and through the

undersigned counsel, and sues the Defendants listed above, and states as follows:

### PRELIMINARY STATEMENT

For the better part of two (2) years, Plaintiff DON K. JURAVIN has fought

against a terroristic, mafia-style campaign of bullying designed to harass,

intimidate, and silence JURAVIN's opposition to an orchestrated scheme to

acquire land in Bella Collina, through the developer's illegal control of the



1

community's Property Owner's Association. This developer, Defendant DCS REAL ESTATE INVESTMENTS, LLC, unlawfully usurps economic opportunities belonging to the POA, to the detriment of the POA and the few families that call Bella Collina home. And it does so, in large part, through a disbarred attorney and convicted felon who helped steal millions of dollars from the Massachusetts State Treasury.

JURAVIN now petitions this Court to help redress the wrongs that the Defendants have inflicted upon JURAVIN and other residents of Bella Collina. Counts I-VII address the intimidating, intentionally tortious conduct aimed at JURAVIN. Counts VIII-XII seek to enforce THE CLUB AT BELLA COLLINA's obligations to JURAVIN, both contractual and equitable. Counts XIII-XVII holds the agents of the developer responsible for breaching the fiduciary duties they owed to JURAVIN. Finally, Count XVIII attempts to make each defendant accountable for the unlawful conduct of the others.

## PARTIES, JURISDICTION, & VENUE

1.    This is an action for libel, tortious interference with actual business relationships, tortious interference with prospective business relationships, invasion of privacy, trespass to land, trespass to chattel, intentional infliction of emotional distress, breach of contract, breach of the implied covenant of good faith

and fair dealing, injunctive relief, accounting, declaratory judgment, breach of fiduciary duty, and civil conspiracy, for which the amount in controversy exceeds fifteen thousand dollars ($15,000.00) exclusive of costs, interest, and attorney's fees.

2.     Plaintiff DON K. JURAVIN is a citizen of the state of Florida who resides in Lake County, Florida.

3.     Defendant    BELLA    COLLINA    PROPERTY    OWNER'S ASSOCIATION, a Florida not for profit corporation ("BCPOA"), is a Florida corporation authorized to conduct business in the state of Florida, with its principal place of business located in Lake County, Florida.

4.     Defendant THE CLUB AT BELLA COLLINA, LLC, a Florida limited liability company ("CLUB")[1] is a Florida limited liability company authorized to conduct business in the state of Florida, with its principal place of business located in Palm Beach County, Florida. Defendant CLUB operates the golf and country club located in the Bella Collina subdivision.

5.     Defendant DCS REAL ESTATE INVESTMENTS, LLC, a Florida limited liability company ("DCS") is a Florida limited liability company authorized

---

[1] For purposes of this Complaint, the undersigned will use "Club" when referring to the facilities, membership, etc. of the country club within Bella Collina, and will use "CLUB" when referring to the Defendant, The Club at Bella Collina, LLC.

to conduct business in the state of Florida, with its principal place of business located in Palm Beach County, Florida. Defendant DCS operates the golf and country club located in the Bella Collina subdivision.

6.    Defendant RICHARD ARRIGHI ("ARRIGHI") is a citizen of the state of Florida who resides in Lake County, Florida.

7.    Defendant RANDALL GREENE ("GREENE") is a citizen of the state of Florida who resides in Lake County, Florida.

8.    Defendant KEITH CLARKE ("CLARKE") is a citizen of the state of Florida who resides in Lake County, Florida.

9.    Defendant PAUL LEBREUX ("LEBREUX") is a citizen of Canada who owns multiple lots in Bella Collina, in Lake County, Florida.

10.    Pursuant to Fla. Stat. § 48.193(1)(a)(1) (2017), this Court has personal jurisdiction over the CLUB, as the CLUB operates, conducts, engages in, or carries on a business or business venture in this state, and/or has an office or agency in this state.

11.    Pursuant to Fla. Stat. § 48.193(1)(a)(1) (2017), this Court has personal jurisdiction over Defendant BCPOA, as BCPOA operates, conducts, engages in, or carries on a business or business venture in this state, and/or has an office or agency in this state.

12.    Pursuant to Fla. Stat. § 48.193(1)(a)(1) (2017), this Court has personal jurisdiction over Defendant DCS, as DCS operates, conducts, engages in, or carries on a business or business venture in this state, and/or has an office or agency in this state.

13.    Pursuant to Fla. Stat. § 48.193(1)(a)(3) (2017), this Court has personal jurisdiction over Defendant LEBREUX, as LEBREUX owns real property in the state of Florida.

14.    Pursuant to Fla. Stat. § 47.011 (2017), venue is proper in Lake County, Florida, as the causes of action accrued in Lake County, Florida.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

### Defendant DCS and its Agents

15.    Defendant DCS is a development company owned and operated by Dwight Schar. Mr. Schar is one of the wealthiest individuals in the United States, has a minority ownership interest in the Washington Redskins NFL franchise, and is the former finance chairman for the Republican National Committee.

16.    Defendant ARRIGHI is a minority owner of DCS, and is the *de facto* manager of Bella Collina, overseeing real estate sales, management of the Bella Collina community, and conducting the day to day operations of Defendant CLUB.

17.    Additionally, ARRIGHI is a former Massachusetts attorney, who was disbarred after he pled guilty to his role in the theft of nearly ten million dollars ($10,000,000.00) from the Massachusetts State Treasury, the largest theft of state funds in Massachusetts history. ARRIGHI's criminal history also includes allegations of violating the terms of his bail release,[2] as well as violating his probation.[3]

18.    ARRIGHI has an ownership interest in Phoenix Realty Homes, Inc., and is affiliated with Phoenix Homes Florida, Inc. ("Phoenix"), one of only a handful of "approved" builders in Bella Collina. ARRIGHI has also held himself out as an architect who has worked on projects for Disney World,[4] despite the fact that he has never held an architecture and interior design license issued by the state of Florida.

---

[2] Prosecutors Seek to Revoke Bail for Attorney Accused in Treasury Scam, https://tinyurl.com/yb9ya8ln (last accessed August 3, 2018).

[3] *City Native Still Owes State $425,000*, https://tinyurl.com/yaksqgmp (last accessed August 3, 2018).

[4] *Richard Arrighi: Florida Architect Developing an Exciting Subdivision in Orlando*, https://tinyurl.com/ycarldma  (last accessed August 3, 2018).

19.     Defendant GREENE has a minority ownership interest in DCS, has worked extensively with DCS in the past, and is the DCS-appointed President of BCPOA.

20.     Defendant CLARKE is a licensed contractor, and a principal of Phoenix. He is also the DCS-appointed secretary and treasurer of BCPOA.

21.     Defendant Lebreux is a resident of Bella Collina, owns multiple lots within the community, and is the DCS-appointed vice president of BCPOA.

### A Brief History of Bella Collina

22.     Juxtaposed against the bucolic backdrop of Lake County is the development known as Bella Collina, a one thousand, nine hundred (1,900) acre gated community, that features approximately 800 homesites, a Nick Faldo designed golf course, and a seventy-five thousand (75,00) square foot clubhouse.

23.     But from the project's inception, Bella Collina has suffered a long-standing and well documented history of decline, beginning with the original developer, Ginn-LA Pine Island LTD, LLLP ("Ginn"), and continuing with the current developer, Defendant DCS.[5]

---

[5] *See, e.g.*, "Bella Collina property owners, in lawsuit, allege racketeering" Orlando Sentinel, (March 13, 2017), available at: https://tinyurl.com/ydyprbk6

"Construction restarts in luxury Bella Collina 'ghost town'" Orlando Sentinel, October 8, 2014), available at: https://tinyurl.com/y9ajdrwp

7

24.    At all times relevant to this Complaint, DCS has held, and continues to hold, a *de facto* control over the subdivision in various ways including, but not limited to, acquiring the vast majority of lots in Bella Collina, illegally controlling the subdivision's property owners' association, controlling the community's country club, and by "managing" the subdivision's common areas.

25.    On January 16, 2004, Ginn recorded the Declarations of Covenants, Restrictions and Easements for Bella Collina[6] in the official records of Lake County, Florida, at Book 2490, Page 568. Article 2 (Description of Bella Collina), Section 4 (Bella Collina Country Club) provides, in pertinent part:

> Declarant anticipates, but does not commit, that the Bella collina Country Club will be improved in the nearby Hillcrest site located across County Road 455 from the Committed Property for the operation of a golf club and clubhouse. Declarant represents that until

---

"Homeowners say developer bullied them into selling land" Law 360 (March 7, 2017), available at: https://tinyurl.com/yb56x9eq

"Bella Collina feud blocks real-estate broker" Orlando Sentinel, (April 21, 2015), available at:
https://tinyurl.com/y9tl9r62

"It's tee time. Where is everybody?" New York Times (May 24, 2009), available at: https://tinyurl.com/orde6g

[6] Plaintiff has not attached the governing documents cited in this Complaint, as they are extremely voluminous, and, upon information and belief, are already in the possession, custody, and control of the Defendants.

it provides notice to the contrary, membership in the Bella Collina Country Club will be made available to Owners in Bella Collina.

26.    As is evident from the plain language above, if Ginn chose to develop a country club within the community, *membership in the country club would not be mandatory for Bella Collina owners*.

27.    On April 23, 2004, Ginn conveyed the first lot in Bella Collina.

28.    Under Florida law, after the sale of the first lot, Ginn's ability to make unilateral amendments to Bella Collina's governing documents was limited by Florida's Homeowners' Association Act, Fla. Stat. § 720.301 *et seq*. (the "Act").

29.    Specifically, § 720.3075(5) of the Act, titled "prohibited clauses in association documents" provides, in relevant part:

> It is declared the public policy of the state that prior to transition of control of a homeowners' association in a community from the developer to the nondeveloper members, as set forth in s. 720.307, the right of the developer to amend the association's governing documents is subject to a test of reasonableness, which prohibits the developer from unilaterally making amendments to the governing documents that are arbitrary, capricious,or in bad faith; destroy the general plan of development; prejudice the rights of existing nondeveloper members to use and enjoy the benefits of common property; or materially shift economic burdens from the developer to the existing nondeveloper members.

30.    Moreover, § 720.315 of the Act, titled "Passage of special assessments" provides the following:

> Before turnover, the board of directors controlled by the developer may not levy a special assessment unless a majority of the parcel

owners other than the developer has approved the special assessment by a majority vote at a duly called special meeting of the membership at which a quorum is present.

31.    On May 17, 2004, Ginn recorded the Amended and Restated Declaration of Covenants, Restrictions and Easements for Bella Collina (the "Amended Covenants") in the official records of Lake County, Florida, at Book 2571, Page 1533.

32.    Article 2 (Description of Bella Collina), Section 4 (Bella Collina Golf and Country Club), Subsection B (Mandatory Membership) of the Amended Covenants provides, in pertinent part:

> In the event the Bella Collina Golf and Country Club ("Club") is developed within the Total Property, all Owners (excluding the Declarant, Builders, the Association, and the Club) who are approved for membership must acquire and maintain in good standing at least a "Sports Membership" in the Club for each Lot owned.

33.    Article 2 (Description of Bella Collina), Section 4 (Bella Collina Golf and Country Club), Subsection D (Club Charges) of the Amended Covenants provides, in pertinent part:

> Club Charges owed by Owners to the Club which become delinquent under the terms and conditions set forth in the Membership Plan Documents ("Delinquent Club Charges") are deemed to constitute Special Assessments of the Association, for which the Association shall have a lien against each Lot for all unpaid Special Assessments in accordance with the lien and foreclosure provisions set forth in Article VI.

34.    The Amended Covenants were illegal, in that the unilateral new provision of mandatory membership in the country club was unreasonable, made in bad faith, and materially shifted the economic burdens from Ginn to the existing nondeveloper members.

35.    The Amended Covenants were also illegal in that the Amended Covenants sought to classify delinquent club charges as "special assessments" without complying with section 720.315 of the Act.

36.    Section 720.307(1)(a) of the Act required Ginn, as the developer, to turn over control of the property owners' association to nondeveloper owners no later than three (3) months after ninety percent (90%) of the lots were sold. The date that triggered this obligation was August 29, 2005.

37.    Despite this requirement, however, Ginn continued to maintain control of the POA after the turnover date of August 29, 2005.

38.    Over the course of the next seven (7) years, Ginn essentially abandoned the Bella Collina project, as it faced a slew of lawsuits from lot purchasers claiming that Ginn defrauded them in the sale of their lots, combined with Ginn's economic collapse as a result of the Great Recession.

39.    Consequently, the Bella Collina governing documents remained substantially unchanged during this time period, and Ginn never sought to enforce

the illegal and unreasonable mandatory membership requirement, or to collect the "special assessment" of delinquent club dues.

## DCS Takes Over

40.    With knowledge that the Bella Collina project was severely distressed, in late 2011 or early 2012, ARRIGHI alerted GREENE and/or DCS that the Bella Collina project might be a profitable business venture for DCS.

41.    On July 2, 2012, DCS acquired Ginn's developer rights in Bella Collina, and recorded Ginn's assignment to DCS in Book 4181, 1163 of the Lake County public records. As part of the deal, DCS also acquired the golf club, and approximately fifty (50) of the remaining unsold lots in Bella Collina.

42.    After acquiring Ginn's developer rights, DCS maintained illegal control of the POA, by refusing to hold elections for lot owner POA board members as required by section 720.307 of the Act, resulting from the turnover trigger date of August 29, 2005.

43.    When DCS acquired Ginn's development rights to Bella Collina, the vast majority of lots remained vacant. Shortly thereafter, Defendants ARRIGHI, GREENE, and DCS, in combination with others, developed a litigation strategy designed to acquire these lots for pennies on the dollar, or for no money whatsoever, through the improper use of Defendants CLUB and BCPOA.

44.    As noted above, from 2005-2012, Ginn did not seek to collect various "fees" and "assessments" associated with the illegal amendments to the Bella Collina governing documents, including "membership deposits" in the club ranging from forty thousand dollars ($40,000.00) to eighty thousand dollars ($80,000.00), as well as the "special assessment" of "delinquent" country club dues.

45.    The Defendants sought to capitalize on these allegedly overdue amounts as follows: Defendant BCPOA would file suit against the property owner, ostensibly seeking to recover the unpaid "assessments" owed to BCPOA and/or the Club. BCPOA would then offer to settle the case if the property owner would convey title to the property to DCS or another third party, in exchange for which BCPOA offered to "write off" the amounts owed to it or the Club.

46.    No matter how one views the "special assessments" and mandatory "membership deposits," this litigation strategy was illegal: either the amount in controversy was illegal from the beginning, in which case BCPOA had no right to collect these amounts, or the amounts owed belonged to BCPOA, in which case DCS would acquire title to these lots, essentially for free, while totally depriving BCPOA of any and all benefit of the money owed to it.

47.    This litigation strategy proved to be a resounding success, as DCS directed BCPOA to file somewhere between four hundred (400) and five hundred (500) lawsuits, and DCS and/or entities under DCS control or influence acquired more than six hundred (600) lots, virtually for free.

48.    With an understanding of this litigation strategy, it is easy to see why DCS continued to assert illegal control of the POA: a POA controlled by nondeveloper affiliated property owners would obviously refuse to write off amounts owed to the POA in order to benefit DCS. Therefore, maintaining control of the POA was crucial.

49.    Additionally, upon information and belief, the Defendants, in combination with others, have usurped economically advantageous opportunities for their own personal benefit, to the detriment of BCPOA and its members, including JURAVIN.

50.    Similarly, upon information and belief, Defendant DCS has failed to pay monthly POA dues on the six hundred (600) lots owned by DCS, and has been able to do so with the cooperation of the DCS-controlled BCPOA board comprised of GREENE, CLARKE, and LEBREUX.

## The Retaliation against Homeowners

51.    Although DCS enjoyed tremendous success in the implementation of the illegal litigation strategy, a small number of homeowners fought back against DCS.

52.    When these homeowners had the audacity to assert their legal rights, however, DCS, through its agents, engaged in a course of conduct designed to harass and intimidate them, in an attempt to force these homeowners into capitulation.

53.    At the direction of ARRIGHI, DCS, through GREENE, has denied homeowners access to the community in numerous ways, including: disabling residents' car transponders that provide access through the security gate to Bella Collina; requiring these homeowners to register with the security guards each time they try to enter Bella Collina; instructing the Bella Collina security guards to follow these homeowners within Bella Collina and report their comings and goings to GREENE.

54.    Additionally, GREENE has denied a Lake County school bus access to Bella Collina to pick up the children of Bart and Kathryn Sutherin (who fought Bella Collina in the litigation targeted against them), forcing the Sutherin children

to board and exit the school bus at an inconvenient and dangerous location outside
of Bella Collina.

55.    GREENE's harassment of the Sutherins continued, even after the
Sutherins moved out of Bella Collina. After the Sutherins moved into a new home,
GREENE sent a Bella Collina embossed coffee mug to the family in their new
home, along with the following text:

> Once again you give yourself too much credit in assuming I am
> obsessed with you people. You don't pay your bills to anyone
> including several lawyers I know. We sent you a mug just to let you
> know that we have not forgotten that you still owe us money and we
> know where to send a copy of the judgment when we get it. You are
> the child blowing your horn and so is your husband w[ith] the chopper
> buzzing houses in BC. Next time I get an N [sic] number when comes
> out here [sic], my lawyer will file another complaint" ..."I really don't
> like white trash."

56.    Another Bella Collina family, the Heckenbergs, wanted to build an
addition to their home. However, the DCS controlled POA denied their request,
unless the Heckenbergs used Phoenix Homes (in which, upon information and
belief, both ARRIGHI and CLARKE have some interest) to build the addition.
Knowing that it had no competition for the project, Phoenix presented an
enormously inflated bid, making the project cost prohibitive.

16

## DCS Defies the Court

57.    As part of a suit in which some Bella Collina homeowner's sought to assert their rights, on June 24, 2016, the Honorable G. Richard Singeltary, Circuit Court Judge for the 5th Judicial Circuit in and for Lake County, Florida, entered a temporary injunction related to the unlawful control of BCPOA by DCS. Specifically, Judge Singeltary held that August 29, 2005 was the date that triggered Ginn's obligation to turn over control of BCPOA to the nondeveloper members. By virtue of DCS acquiring Ginn's developer rights, DCS was therefore obligated to turn control of BCPOA to nondeveloper members, and ordered DCS to do so.

58.    Subsequent to Judge Singeltary's order, Defendant DCS has refused to turn over control of BCPOA to nondeveloper members, alleging that almost all such members were ineligible to hold a seat on the BCPOA board, because they had failed to pay the illegal "special assessment" of club dues.

59.    Ironically enough, the DCS appointed BCPOA board members included Defendants CLARKE and LEBREUX, who were also delinquent in the payment of poa dues to BCPOA.

### Juravin and Bella Collina

60.    In late 2015, JURAVIN was looking to purchase a home, and found Bella Collina, which DCS held out to him (and others) as a "luxury golf residential community."

61.    Unaware of the project's checkered past and present, in January of 2016, JURAVIN purchased his home in Bella Collina.

62.    Shortly after purchasing the home, however, JURAVIN noticed that the community was anything but "luxurious." Among other things, he noticed that common areas were not maintained, that construction waste and debris was allowed to remain in the common areas, and that the subdivision was generally unkempt.

63.    What became abundantly clear was that DCS had no interest in catering to Bella Collina homeowners, either in the context of the community at large, or as members of the club.

64.    JURAVIN soon learned that the club is little more than a noisy venue for weddings and business events, rather than a luxury country club for the Bella Collina residents.

65. Facilities that are not routinely part of such private events, are allowed to fall into disrepair. For example, JURAVIN found the club's pool to be cold, dirty, and deserted, with limited operating hours.

66. Moreover, rather than improving areas of the club that would primarily benefit the members of the club, DCS is primarily concerned with expanding facilities that will boost the private event revenue stream.

67. Accordingly, JURAVIN voiced his concerns to DCS, through ARRIGHI and GREENE, who manages the property on a day to day basis.

68. Interested only in selling its inventory of lots to new owners, rather than managing the community for the benefit of current lot owners, DCS refused to take any action regarding Mr. JURAVIN's concerns.

69. Faced with little or no other recourse, JURAVIN sought to raise public awareness of the issues plaguing Bella Collina. As such, he purchased an internet domain and began publishing an online newspaper, called Bella Collina Reviews ("BCR"). The content of BCR included observations of events in the neighborhood, critiques of aesthetic issues in the community, and commentary regarding the principals and/or agents of Bella Collina, including DCS, GREENE, ARRIGHI, and Dwight Schar.

70.     In response, DCS and its agents began a terroristic campaign of bullying designed to punish Plaintiff JURAVIN for exercising his first amendment rights.

71.     DCS is currently waging this mafia-style war on multiple fronts, including an online, defamatory smear campaign directed at JURAVIN and his business through a variety of mediums, including "do it yourself" style press releases, fake reviews of JURAVIN's weight loss regimen on consumer review websites, and launching of other websites focused on the character assassination of JURAVIN, as well as the filing of multiple lawsuits against him.

72.     Furthermore, JURAVIN and his family are the victims of repeated acts of vandalism, which, upon information and belief, are occuring at the direction of DCS and/or its agents, including ARRIGHI and GREENE.

73.     Such acts of vandalism include destruction of parts of JURAVIN's outdoor kitchen; the destruction of many of the property's irrigation sprinklers; destruction of many of the property's landscaping features; cutting a hose to the JURAVIN's pool, essentially rendering it unusable; and the cutting of a cable that provides electricity to the JURAVIN home.

74.     Furthermore, in tactics reminiscent of organized crime, DCS also harasses JURAVIN by seeking to intimidate his employees and guests.

75.    During one such incident, JURAVIN and one of his employees agreed to meet at JURAVIN's home. Upon arriving at Bella Collina's front gate, however, the employee was detained and denied entry into the community for approximately twenty (20) minutes.

76.    The reason for this delay soon became apparent. The Bella Collina security guards handed the employee a demand letter, addressed to JURAVIN and authored by an attorney representing DCS, relating to a negative review of Bella Collina that JURAVIN posted on Google. Attached to the demand letter was a "post-it" note directed to the employee that said "This is for you, too."

77.    In another instance, JURAVIN attended a March 3, 2017 POA meeting, accompanied by a colleague. Upon seeing that JURAVIN was not alone at the meeting, GREENE, in a loud and confrontational manner, demanded to know who the colleague was, and why he was there.

78.    JURAVIN is also harassed daily, through a near constant campaign of abusive and intimidating prank phone calls and text messages from "burner phones."

79.    GREENE has gone so far against JURAVIN as to admittedly calling Lake County Office of Animal Services and accusing JURAVIN of animal neglect, because JURAVIN's daughters' cats were left alone in the house while the

JURAVIN family was on a brief vacation, notwithstanding the fact that the family pets were left with plenty of food, water, and available litter.

## Suspension from the Club

80.     Upon purchasing his home in Bella Collina, JURAVIN and his family became members of the club.

81.     However, as detailed below, Defendants conspired: to summarily ban JURAVIN from the club; to continue to bill (and attempt to collect) monthly membership dues from JURAVIN while simultaneously denying him access to the club; and to assert a lien on JURAVIN's home for JURAVIN's failure to pay the unlawful "special assessment" of club membership dues.

82.     The relationship between a member (such as JURAVIN) and the club arises through contract, the terms of which are contained in the Amended and Restated Membership Plan for The Club at Bella Collina (the "Membership Plan"), and The Club at Bella Collina Amended and Restated Rules and Regulations (the "Rules and Regulations") (the Membership Plan and the Rules and Regulations shall be collectively referred to as the "Club Documents" and copies of these documents are attached hereto as **Exhibit "A"** and **Exhibit "B"** respectively).

83.     Page nine (9) of the Membership Plan states as follows:

Each person who desires to acquire a Membership will be required to pay a deposit (a "Membership Deposit") in an amount as determined

22

by the Company from time to time in its sole discretion along with the submission of the executed Membership Agreement. Membership Deposits are not transferable, except as specifically provided in this Membership Plan, the Rules and Regulations of the Club and the Membership Agreement.

84. Consistent with the Membership Plan, upon joining the club, JURAVIN paid a forty thousand dollar ($40,000.00) "membership deposit." Pursuant to the terms of the Membership Plan, JURAVIN's membership deposit is refundable thirty (30) years after issuance of a club membership.

85. Sub-section twenty-one (21) of the General Club Rules section of the Rules and Regulations provides as follows: "Violation of any of these rules or conduct in a manner prejudicial to the best interests of the Club will subject the person in violation to disciplinary action by the Club *in accordance with these Rules and Regulations"* (emphasis added).

86. The Rules and Regulations section entitled "Discipline" states, in relevant part, as follows:

> Members are responsible for their own conduct and for the conduct of their family members and guests. Any Member whose conduct or whose family's or guest's conduct shall be deemed by the Club to be likely to endanger the welfare, safety, harmony or good reputation o the Club or its Members or is otherwise improper, may be reprimanded, fined, suspended or expelled from the Club and have all privileges associated with the Membership suspended or terminated by the Club. The Club shall be the sole judge of what constitutes improper conduct, but improper conduct will include, without limitation: (i) failing to meet eligibility for Membership, (ii) submitting false information on the Membership Agreement, (iii)

allowing his or her Membership card to be used by another person, (iv) failing to pay any amount owed to the Club in a proper and timely manner, (v) failing to abide by the rules and regulations as set forth herein and as established by the Club from time to time, (vi) abusing Club personnel or employees, or (vii) acting in a manner incompatible with the standard of conduct of the existing Membership or which would likely injure the reputation of the Members or the Club.

Any Member accused of improper conduct shall be notified of the Club's proposed disciplinary action and shall be given an opportunity to be heard by the Club to show cause why he or she should not be disciplined. If such Member desires to be heard, the Club shall set a time and date (not more than ten days thereafter) for a hearing. While such complaint is being concerned by the Club, the Member shall enjoy the privileges of the Club...

In the event that the Club terminates a membership, the Member's membership privileges shall cease immediately and the Member's membership deposit, less 10% transfer and administrative fee, shall be refunded to the Member in Accordance with the plan (emphasis added).

87.    In further retaliation for publishing BCR and for sharing his honest (albeit negative) opinion of Bella Collina, by correspondence dated March 17, 2018, Defendant CLUB, through attorney Michael J. Ryan, esq., notified JURAVIN that his club membership was suspended: "Based on conduct detrimental to The Club, Mr. Juravin's Club privileges are suspended. This does not relieve him of his obligation to pay Club dues when they are due" (a copy of the March 17, 2018 correspondence is attached hereto as **Exhibit "C"**).

88.     On April 3, 2018, Defendant GREENE sent the following text (a copy of which is attached hereto as **Exhibit "D"**) to JURAVIN:

> It was reported that you were possibly on the club property over the weekend. If you were, please be advised that you and your family have had any membership benefits suspended and therefore none of you are permitted on club property including the pool and gym. This does not however mean that you are relieved of paying club dues. Govern yourself accordingly.

89.     Simply because he dared to criticize the management of Bella Collina's community and club,  JURAVIN and his family have been summarily banned from the club, without the benefit of any sort of process to which JURAVIN is contractually entitled.

90.     Additionally, the CLUB maintains that JURAVIN is required to continue to pay monthly membership dues and food and beverage minimums.

91.     Furthermore, with an obvious intent to add insult to injury, JURAVIN was "suspended" from the club (rather than expelled) to cause JURAVIN further damage in two respects. First, the suspension purportedly allows the CLUB to continue to collect membership dues from JURAVIN while also denying him access to Club facilities. Second, it seeks to avoid return of JURAVIN's forty thousand dollar ($40,000.00) "membership deposit" which would be required if the CLUB expelled JURAVIN.

92.    Despite JURAVIN's repeated requests for an accounting of his membership deposit, Defendant CLUB has unjustifiably refused JURAVIN's request for an accounting.

93.    Finally, through the illegal amendments to the governing documents, including collection of club dues as "special assessments," BCPOA has sought to impose a lien on JURAVIN's home.

94.    All conditions precedent to the institution and maintenance of this action have occurred, been waived, or are otherwise excused.

95.    As a result of the conduct of Defendants detailed in this Complaint, Plaintiffs have been forced to retain the undersigned attorneys, and are obligated to pay the undersigned counsel a reasonable fee for his services.

### COUNT I -- LIBEL (GREENE)

96.    Plaintiff realleges paragraphs 1 - 95 above.

97.    On numerous occasions from late 2016 to the present, Defendant GREENE, at the instruction of DCS, published false and libelous statements about JURAVIN and his business through various online mediums, including "do it yourself" style press releases, fake reviews of JURAVIN's weight loss regimen on consumer review websites, and launching of other websites focused on the character assassination of JURAVIN.

98.    The statements made by GREENE are false, fabricated, defamatory, untruthful, and made with actual malice.

99.    GREENE authored these posts under his name, as well as under various pseudonyms, including "Avi Denowitz" of "Consumer Watch" which is a fictitious organization.

100.    GREENE's false and libelous statements were published to third parties, typically in the form of fake online reviews through the website "pissed consumer."

101.    The statements made by GREENE were intentionally, knowingly, and maliciously made to third parties, made without reasonable care as to the truth or falsity of those statements, and made to inflict damages upon JURAVIN, to tarnish JURAVIN's reputation and business, and to damage JURAVIN's current and future business relationships.

102.    As a result of GREENE's conduct, JURAVIN has been injured, and suffered damages in an amount to be proven at trial.

WHEREFORE, Plaintiff JURAVIN respectfully requests this Court enter judgment against Defendant GREENE and award damages in an amount to be proven at trial, injunctive relief prohibiting GREENE from engaging in such

conduct, an award of costs and attorney's fees as allowed by rule of court or statute, and for such further relief as this Court deems just and proper.

## COUNT II -- TORTIOUS INTERFERENCE
## WITH ACTUAL BUSINESS RELATIONSHIPS (GREENE)

103.   Plaintiff realleges paragraphs 1 - 95 above.

104.   Business relationships exist between JURAVIN and the customers to whom he markets and sales his weight-loss regimen.

105.   GREENE has knowledge of these business relationships.

106.   GREENE, at the instruction of DCS, has published false and libelous statements about JURAVIN and his business through various online mediums, including "do it yourself" style press releases, fake reviews of JURAVIN's weight loss regimen on consumer review websites, and launching of other websites focused on the character assassination of JURAVIN.

107.   As a result of GREENE's actions, GREENE has intentionally and unjustifiably interfered with JURAVIN's actual business relationships.

108.   JURAVIN has suffered damages as a result of GREENE's interference with JURAVIN's actual business relationships.

109.   Monetary damages alone are inadequate to compensate JURAVIN for the irreparable harm and injury caused by GREENE. An equitable remedy is

warranted considering the balance of hardships between JURAVIN and GREENE, and an equitable remedy would not disserve the public interest.

WHEREFORE, Plaintiff JURAVIN respectfully requests this Court enter judgment against Defendant GREENE and award damages in an amount to be proven at trial, injunctive relief prohibiting GREENE from engaging in such conduct, an award of costs and attorney's fees as allowed by rule of court or statute, and for such further relief as this Court deems just and proper.

## COUNT III -- TORTIOUS INTERFERENCE
## WITH PROSPECTIVE BUSINESS RELATIONSHIPS (GREENE)

110.   Plaintiff realleges paragraphs 1 - 95 above.

111.   JURAVIN has potential business relationships with prospective purchasers of his weight-loss regimen; namely, potential customers who wish to purchase a weight-loss system online.

112.   GREENE has knowledge of these potential relationships.

113.   GREENE, at the instruction of DCS, has published false and libelous statements about JURAVIN and his business through various online mediums, including "do it yourself" style press releases, fake reviews of JURAVIN's weight loss regimen on consumer review websites, and launching of other websites focused on the character assassination of JURAVIN.

114.  As a result of GREENE's actions, GREENE has intentionally and unjustifiably interfered with JURAVIN's potential business relationships.

115.  JURAVIN has suffered damages as a result of GREENE's interference with JURAVIN's actual business relationships.

116.  Monetary damages alone are inadequate to compensate JURAVIN for the irreparable harm and injury caused by GREENE. An equitable remedy is warranted considering the balance of hardships between JURAVIN and GREENE, and an equitable remedy would not disserve the public interest.

WHEREFORE, Plaintiff JURAVIN respectfully requests this Court enter judgment against Defendant GREENE and award damages in an amount to be proven at trial, injunctive relief prohibiting GREENE from engaging in such conduct, an award of costs and attorney's fees as allowed by rule of court or statute, and for such further relief as this Court deems just and proper.

## COUNT IV -- INVASION OF PRIVACY
## INTRUSION UPON SECLUSION (GREENE)

117.  Plaintiff realleges paragraphs 1 - 95 above.

118.  As detailed above, Defendant GREENE has subjected JURAVIN and his family to a pattern of bullying and intimidation, including vandalism, false

reporting to the Lake County Office of Animal Services, and a campaign of harassing and threatening prank calls and text messages.

119.   These actions constitute an actual and digital intrusion of Juravin's seclusion into his private quarters.

120.   This intrusion would be highly offensive to a reasonable person.

121.   This intrusion was the direct and proximate cause of injury to the JURAVIN including, but not limited to, mental distress.

WHEREFORE, Plaintiffs respectfully requests this Court enter judgment against Defendant GREENE and award damages in an amount to be proven at trial, an award of costs and attorney's fees as allowed by rule of court or statute, and for such further relief as this Court deems just and proper.

## COUNT V -- TRESPASS TO LAND (GREENE)

122.   Plaintiff realleges paragraphs 1 - 95 above.

123.   Plaintiff JURAVIN resides at 15118 Pendio Drive, in Montverde, Florida.

124.   At all times relevant to this Complaint, JURAVIN was and still is the owner of certain real property located at 15118 Pendio Drive, in Montverde, Florida.

125. As described above, as part of a terroristic campaign of bullying, GREENE has, without the consent and against the will of JURAVIN, entered the premises of JURAVIN.

126. In doing the acts alleged in this Complaint, GREENE acted maliciously and with a wanton disregard for JURAVIN's rights.

WHEREFORE, Plaintiffs respectfully requests this Court enter judgment against Defendant GREENE and award damages in an amount to be proven at trial, an award of costs and attorney's fees as allowed by rule of court or statute, and for such further relief as this Court deems just and proper.

<h3 align="center">COUNT VI -- TRESPASS TO CHATTEL (GREENE)</h3>

127. Plaintiff realleges paragraphs 1 - 95 above.

128. Plaintiff JURAVIN resides at 15118 Pendio Drive, in Montverde, Florida.

129. At all times relevant to this Complaint, JURAVIN was and still is the owner of certain real property located at 15118 Pendio Drive, in Montverde, Florida.

130. As described above, as part of a terroristic campaign of bullying, GREENE has, without the consent and against the will of JURAVIN, entered the premises of JURAVIN and damaged JURAVIN's personalty, including, without

32

limitation: portions of JURAVIN's outdoor kitchen; various landscaping features; and JURAVIN's pool.

131.  In doing the acts alleged in this Complaint, GREENE acted maliciously and with a wanton disregard for JURAVIN's rights.

WHEREFORE, Plaintiffs respectfully requests this Court enter judgment against Defendant GREENE and award damages in an amount to be proven at trial, an award of costs and attorney's fees as allowed by rule of court or statute, and for such further relief as this Court deems just and proper.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (GREENE)

132.  Plaintiff realleges paragraphs 1 - 95 above.

133.  As described above, Defendant GREENE has engaged in a terroristic campaign of bullying and retaliation against JURAVIN and his family.

134.  GREENE's mafia-style tactics include, but are not limited to:

a.      An online, defamatory smear campaign directed at JURAVIN and his business through a variety of mediums;

b.      Repeated acts of vandalism, including destruction of parts of JURAVIN's outdoor kitchen; the destruction of many of the property's irrigation sprinklers; destruction of many of the property's landscaping features; cutting a

33

hose to the JURAVIN's pool, essentially rendering it unusable; and the cutting of a cable that provides electricity to the JURAVIN home;

      c.    Harassment and intimidation aimed at guests of JURAVIN when they visit him at his home in Bella Collina;

      d.    A near constant campaign of abusive and intimidating text messages from "burner phones; and

      e.    Falsely accusing JURAVIN of animal neglect, and reporting him to the Lake County Office of Animal Services.

135. Such conduct by GREENE was intentional and reckless.

136. Such conduct by GREENE was outrageous.

137. GREENE's conduct caused JURAVIN to suffer severe emotional distress.

138. As a result of this conduct by GREENE, JURAVIN suffered damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs respectfully requests this Court enter judgment against Defendant GREENE and award damages in an amount to be proven at trial, an award of costs and attorney's fees as allowed by rule of court or statute, and for such further relief as this Court deems just and proper.

## COUNT VIII -- BREACH OF CONTRACT (CLUB)

139.   Plaintiff realleges paragraphs 1 - 95 above.

140.   JURAVIN and the CLUB are parties to the Club Documents, which are valid, legally enforceable contracts.

141.   As detailed above, the CLUB has materially breached the contract through conduct including, but not limited to:

a.   Imposing disciplinary action against JURAVIN without affording him the due process the parties bargained for;

b.   Imposing disciplinary action against JURAVIN in bad faith;

c.   effectively expelling Juravin from the club, but classifying the expulsion as a "suspension," so that the CLUB could continue to charge him membership dues;

d.   effectively expelling Juravin from the club, but classifying the expulsion as a "suspension," so that the CLUB could wrongfully retain his "membership deposit" of forty thousand dollars ($40,000.00).

142.   As a result of the CLUB's breach of the Club Documents, JURAVIN has suffered damages in an amount to be proven at trial.

WHEREFORE, Plaintiff JURAVIN respectfully requests this Court enter judgment against Defendant CLUB and award damages in an amount to be proven

at trial, an award of costs and attorney's fees as allowed by rule of court or statute, and for such further relief as this Court deems just and proper.

## COUNT IX -- BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (CLUB)

143.  Plaintiff realleges paragraphs 1 - 95 above.

144.  It is well settled that Florida contract law recognizes the implied covenant of good faith and fair dealing in every contract.

145.  JURAVIN and the CLUB are parties to the Club Documents, which are valid, legally enforceable contracts. Thus, under Florida law, these contracts contains the implied covenant of good faith and fair dealing.

146.  The CLUB materially breached the implied covenant of good faith and fair dealing contained within the contracts by, among other things:

a.  imposing disciplinary action against JURAVIN without affording him the due process the parties bargained for;

b.  imposing disciplinary action against Juravin in bad faith;

c.  effectively expelling Juravin from the club, but classifying the expulsion as a "suspension," so that the CLUB could continue to charge him membership dues;

d.    effectively expelling Juravin from the club, but classifying the

expulsion as a "suspension," so that the CLUB could wrongfully retain his

"membership deposit" of forty thousand dollars ($40,000.00).

147.  As a result of the CLUB's breach of the implied covenant of good

faith and fair dealing, JURAVIN has suffered damages in an amount to be proven

at trial.

WHEREFORE, Plaintiff JURAVIN respectfully requests this Court enter

judgment against Defendant CLUB and award damages in an amount to be proven

at trial, an award of costs and attorney's fees as allowed by rule of court or statute,

and for such further relief as this Court deems just and proper.

## COUNT X — INJUNCTIVE RELIEF (CLUB)

148.  Plaintiff realleges paragraphs 1 - 95 above.

149.  As stated above, Defendant CLUB violated the terms of the Club

Documents to be followed in imposing discipline against members of the Club,

including JURAVIN.

150.  Despite the fact that Plaintiff JURAVIN is entitled to use of the club

pending a disciplinary hearing that has not occurred, Defendant CLUB has

prohibited JURAVIN from using club facilities.

151. Unless this Honorable Court immediately enjoins Defendant CLUB, JURAVIN will continue to suffer immediate and irreparable injury, loss and damage.

152. JURAVIN has no adequate remedy at law.

153. JURAVIN has a substantial likelihood of success on the merits.

154. The harm, if any, that would result to Defendant CLUB if this injunction is granted would be relatively insignificant compared to the immediate and irreparable injury, loss and damage that JURAVIN would suffer in the event that the injunction is not granted.

155. Public policy favors the granting of the injunction that JURAVIN seeks.

156. After final trial on the merits, this Court should enter a permanent injunction to enjoin Defendant CLUB from denying JURAVIN access to the Club without the contractually bargained for due process to which he is entitled.

WHEREFORE, JURAVIN respectfully requests this Court enter a temporary injunction, after notice and hearing, enjoining Defendant CLUB from barring JURAVIN or his family from the club without affording him the contractually-bargained for due process to which he is entitled.

## COUNT XI -- ACCOUNTING (CLUB)

157.    Plaintiff realleges paragraphs 1 - 95 above.

158.    JURAVIN has paid a "membership deposit" of forty thousand dollars ($40,000.00) to Defendant CLUB.

159.    Since his unlawful suspension from the club, JURAVIN has requested an accounting of his membership deposit, but CLUB has denied him the same.

160.    JURAVIN is without an adequate remedy at law.

WHEREFORE, Plaintiff JURAVIN respectfully requests this Court enter judgment against Defendant CLUB and require that CLUB provide JURAVIN with an accounting of his membership deposit, an award of costs and attorney's fees as allowed by rule of court or statute, and for such further relief as this Court deems just and proper.

## COUNT XII -- DECLARATORY JUDGMENT (CLUB)

161.    Plaintiff realleges paragraphs 1 - 95 above.

162.    Plaintiff JURAVIN contends that he was summarily suspended from the club without the benefit of the procedural process to which he was entitled.

163.    Defendant CLUB denies this, creating a need for a declaratory judgment.

164.    There exists a bona fide, actual, present need for the declaration.

39

165.    The declaration concerns a present, ascertained or ascertainable state of facts, or a present controversy as to a state of facts.

166.    An immunity, power, privilege or right of JURAVIN is dependent upon the facts or the law applicable to these facts.

167.    Defendant CLUB has an actual, present, adverse and antagonistic interest in the subject matter of the requested declaration, in fact and/or law.

168.    Defendant CLUB's antagonistic and adverse interest is before this Court by proper process.

169.    The relief sought is not merely the giving of legal advise or the answer to a question propounded for curiosity.

WHEREFORE, Plaintiff JURAVIN respectfully requests this Court enter a declaratory judgment against Defendant CLUB declaring that JURAVIN was suspended from the club without being afforded JURAVIN's bargained-for procedural safeguards, an Order reinstating him into the club pending a good-faith hearing, an award of costs and attorney's fees as allowed by rule of court or statute, and for such further relief as this Court deems just and proper.

## COUNT XIII -- BREACH OF FIDUCIARY DUTY (BCPOA)

170.   Plaintiff realleges paragraphs 1 - 95 above.

171.   By virtue of Fla. Stat. § 720.303(1), as well as the governing documents, BCPOA owes JURAVIN a fiduciary duty. Such duty includes the duty to act in the best interest of the POA members, the duty of honesty regarding all material matters, and the duty to disclose all material facts.

172.   BCPOA has violated the duty owed to JURAVIN by acting in the best interest of the Defendants, to the detriment of other lot owners, including JURAVIN, through conduct including, but not limited to: seeking to collect purportedly delinquent club membership dues under the guise of a "special assessment"; usur

173.   As a direct and proximate result of BCPOA's breach of its fiduciary duty, JURAVIN has been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff JURAVIN respectfully requests this Court enter judgment against Defendant BCPOA and award damages in an amount to be proven at trial, an award of costs and attorney's fees as allowed by rule of court or statute, and for such further relief as this Court deems just and proper.

## COUNT XIV -- BREACH OF FIDUCIARY DUTY (GREENE)

174.   Plaintiff realleges paragraphs 1 - 95 above.

175.   By virtue of Fla. Stat. § 720.303(1), as well as the governing documents, GREENE, as President of BCPOA, owes JURAVIN a fiduciary duty. Such duty includes the duty to act in the best interest of the POA members, the duty of honesty regarding all material matters, and the duty to disclose all material facts.

176.   GREENE has violated the duty owed to JURAVIN by acting in the best interest of the Defendants, to the detriment of other lot owners, including JURAVIN, through conduct including, but not limited to, seeking to collect purportedly delinquent club membership dues under the guise of a "special assessment"; usurping economically advantageous opportunities for his personal benefit and/or the benefit of DCS; and failing to collect POA dues owed by DCS on the six hundred (600) lots owned by DCS.

177.   As a result of GREENE's breach of his fiduciary duty, JURAVIN has been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff JURAVIN respectfully requests this Court enter judgment against Defendant GREENE, and award damages in an amount to be

proven at trial, an award of costs and attorney's fees as allowed by rule of court or statute, and for such further relief as this Court deems just and proper.

### COUNT XV -- BREACH OF FIDUCIARY DUTY (CLARKE)

178.   Plaintiff realleges paragraphs 1 - 95 above.

179.   By virtue of Fla. Stat. § 720.303(1), as well as the governing documents, CLARKE, as a BCPOA board member, owes JURAVIN a fiduciary duty. Such duty includes the duty to act in the best interest of the POA members, the duty of honesty regarding all material matters, and the duty to disclose all material facts.

180.   CLARKE has violated the duty owed to JURAVIN by acting in the best interest of the Defendants, to the detriment of other lot owners, including JURAVIN, through conduct including, but not limited to, seeking to collect purportedly delinquent club membership dues under the guise of a "special assessment"; usurping economically advantageous opportunities for his personal benefit and/or the benefit of DCS; and failing to collect POA dues owed by DCS on the six hundred (600) lots owned by DCS.

181.   As a result of CLARKE's breach of his fiduciary duty, JURAVIN has been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff JURAVIN respectfully requests this Court enter judgment against Defendant CLARKE, and award damages in an amount to be proven at trial, an award of costs and attorney's fees as allowed by rule of court or statute, and for such further relief as this Court deems just and proper.

## COUNT XVI – BREACH OF FIDUCIARY DUTY (LEBREUX)

182. Plaintiff realleges paragraphs 1 - 95 above.

183. By virtue of Fla. Stat. § 720.303(1), as well as the governing documents, LEBREUX, as a BCPOA board member, owes JURAVIN a fiduciary duty. Such duty includes the duty to act in the best interest of the POA members, the duty of honesty regarding all material matters, and the duty to disclose all material facts.

184. LEBREUX has violated the duty owed to JURAVIN by acting in the best interest of the Defendants, to the detriment of other lot owners, including JURAVIN, through conduct including, but not limited to, seeking to collect purportedly delinquent club membership dues under the guise of a "special assessment"; usurping economically advantageous opportunities for his personal benefit and/or the benefit of DCS; and failing to collect POA dues owed by DCS on the six hundred (600) lots owned by DCS.

185. As a result of LEBREUX's breach of his fiduciary duty, JURAVIN has been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff JURAVIN respectfully requests this Court enter judgment against Defendant LEBREUX, and award damages in an amount to be proven at trial, an award of costs and attorney's fees as allowed by rule of court or statute, and for such further relief as this Court deems just and proper.

### COUNT XVII -- DECLARATORY JUDGMENT (BCPOA)

186. Plaintiff realleges paragraphs 1 - 95 above.

187. Plaintiff JURAVIN contends that the collection of allegedly delinquent club dues as a "special assessment" is in violation of Florida law.

188. Defendant BCPOA denies this, creating a need for a declaratory judgment.

189. There exists a bona fide, actual, present need for the declaration.

190. The declaration concerns a present, ascertained or ascertainable state of facts, or a present controversy as to a state of facts.

191. An immunity, power, privilege or right of JURAVIN is dependent upon the facts or the law applicable to these facts.

192. Defendant BCPOA has an actual, present, adverse and antagonistic interest in the subject matter of the requested declaration, in fact and/or law.

193.  Defendant BCPOA's antagonistic and adverse interest is before this Court by proper process.

194.  The relief sought is not merely the giving of legal advise or the answer to a question propounded for curiosity.

WHEREFORE, Plaintiff JURAVIN respectfully requests this Court enter a declaratory judgment against Defendant BCPOA declaring that collection of allegedly delinquent club dues as a "special assessment" is in violation of Florida law, an Order prohibiting BCPOA from future conduct in violation of such a declaratory judgment, an award of costs and attorney's fees as allowed by rule of court or statute, and for such further relief as this Court deems just and proper.

## COUNT XVIII -- CIVIL CONSPIRACY

195.  Plaintiff realleges paragraphs 1 - 95 above.

196.  Through the actions of Defendants described above, Defendants had an agreement to perform an illegal act, and/or a legal act by illegal means.

197.  Each of Defendants individually, as well as together, committed one or more overt acts in furtherance of this conspiracy.

198.  As a result of the conspiratorial activity, Plaintiffs have been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiffs respectfully request this Court enter judgment against Defendants and award damages in an amount to be proven at trial, an award of costs and attorney's fees as allowed by rule of court or statute, and for such further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable.

Dated this 3rd day of August, 2018.

*/s/ Andrew C. Hill*
Andrew C. Hill
Florida Bar No. 46755
6136 Cypress Hill Road
Winter Garden, Florida 34787
(813) 410-1648 – Telephone
legal8@gastric.care
pleadings@gastric.care
*Attorney for Plaintiff*

Filing # 118395028 E-Filed 12/17/2020 02:21:22 PM

**IN THE CIRCUIT COURT OF THE FIFTH**
**JUDICIAL CIRCUIT, IN AND FOR LAKE**
**COUNTY, FLORIDA**

ANNA JURAVIN, DON K, JURAVIN,
Derivatively on behalf of
BELLA COLLINA PROPERTY OWNERS
ASSOCIATION, INC., a Florida not for profit
corporation,

                                              Case No.:

        Plaintiffs,

        v.

DENNIS KELLEHER, PAUL LEBRAUX,
JEREMY SPRY, DCS REAL ESTATE
INVESTMENTS, LLC, a Florida limited liability
company, DWIGHT C. SCHAR, SPENCER SCHAR
and RANDALL GREENE.

        Defendants.

_____/

### COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, ANNA JURAVIN and DON K. JURAVIN, derivatively, on behalf of BELLA

COLLINA PROPERTY OWNERS' ASSOCIATION, by and through the undersigned counsel,

and sues Defendants listed above, stating as follows:

### PARTIES, JURISDICTION AND VENUE

1.   This is a business dispute for damages in excess of $30,000.00, exclusive of interest, costs

      and attorney's fees, and is therefore within the jurisdiction of this Court.

2.   Plaintiff ANNA JURAVIN ("Mrs. Juravin") is a citizen of the state of Florida who resides

      in Lake County, Florida.

3.   Plaintiff DON K. JURAVIN ("Mr. Juravin") is a citizen of the state of Florida, who resides



1.

in Lake County, Florida.

4. BELLA COLLINA PROPERTY OWNERS' ASSOCIATION, a Florida not for profit corporation ("BCPOA"), is a Florida corporation authorized to conduct business in the state of Florida, with its principal place of business located in Lake County, Florida.

5. The Juravins reside at the Bella Collina Community.

6. The Community is managed and maintained by BCPOA who manages the property in the best interest of its Members, the Residents.

7. The Juravins are members of BCPOA and are authorized to bring this derivative action subject to Chapter 718 and Chapter 617, Florida Statutes.

8. Defendants Paul Lebraux, Jeremy Spry and Dennis Kelleher are the individual officers of BELLA COLLINA PROPERTY OWNERS' ASSOCIATION.

9. Defendant Dwight C. Schar (hereinafter "Schar") resides at Ocean Blvd., South Palm Beach, Florida, and at all relevant times, funded and commanded the efforts of the Defendants. He is the de facto manager and Director of the BELLA COLLINA PROPERTY OWNERS' ASSOCIATION.

10. Defendant SPENCER SCHAR is the Property Manager at the Bella Collina community and is a citizen of the state of Florida who resides in Lake County, Florida.

11. Defendant RANDALL GREENE ("GREENE") is a citizen of the state of Florida who resides in Lake County, Florida.

12. Defendant GREENE has a minority ownership interest in DCS, has worked extensively with DCS in the past, and was the DCS-appointed President of BCPOA.

13. DCS REAL ESTATE INVESTMENTS, LLC, a Florida limited liability company ("DCS") is a Florida limited liability company authorized to conduct business in the state of Florida,

2

with its principal place of business located in Palm Beach County, Florida. Defendant DCS operates the golf and country club located in the Bella Collina subdivision.

14. Defendant DCS REAL ESTATE INVESTMENTS, LLC controls the majority of the units in Bella Collina and therefore affects policies and actions of BELLA COLLINA PROPERTY OWNERS' ASSOCIATION.

15. Section 720.307(1)(a) of the Act required the developer to turn over control of the property owners' association to the non developer owners no later than three (3) months after ninety percent (90%) of the lots were sold. The date that triggered this obligation was August 29, 2005.

16. At all times relevant to this Complaint, DCS has held, and continues to hold, a de facto control over the subdivision in various ways including, but not limited to, acquiring the vast majority of lots in Bella Collina, illegally controlling the subdivision's property owners' association, controlling the community's country club, and by "managing" the subdivision's common areas.

## DEMAND FOR ACTION BY DEFENDANTS WOULD BE FUTILE

17. Plaintiff repeatedly attempted to address the management issues by contacting the Property Manager, the BCPOA and its officers.

18. Plaintiff was subsequently advised not to contact the Bella Collina management and that their requests would be disregarded.

19. As recently as July 2020, the Juravins submitted requests for a political rally and two political signs. Some of these requests were ignored, while some were denied after pending for weeks.

20. Based on the history of hostile relations between Defendants and Plaintiffs, any for action

demand would be futile.

21. All conditions precedent to the commencement and maintenance of this action have been performed, have occurred, or been waived.

## HISTORY OF CONFLICT BETWEEN JURAVIN AND BELLA COLLINA

22. The Juravins moved to the community at the end of 2015. They chose Bella Collina because they were looking for a safe, friendly, upscale community to raise their daughters.

23. Juravin first complained about issues in Bella Collina in 2016, but the same problems continue until today.

24. Don Juravin also met with the manager in order to resolve the excess of ten issues they complained about.

25. Moving into Bella Collina required a significant investment for Juravins.

26. Juravins realized that Bella Collina had accurately been labeled a "ghost town" with most units vacant.

27. The 2015 presentations by BELLA COLLINA and by the realtor were not truthfully reflecting the quality of living at BELLA COLLINA and the value of the investment.

28. The Juravins realized that Bella Collina struggled with providing basic services to residents and enforcing their own rules and regulations involving maintenance and cleanliness.

29. The Juravins also realized residents have little to no influence on the affairs of BELLA COLLINA.

30. In fact, despite signing off on them as "received", the Juravins are yet to receive their copies of contracts, bylaws, covenants and rules from the associations.

31. During that time, the Juravins complained that the pool was not maintained and dirty.

4

32. During that time, the Juravins complained to the Manager that the gate and the property were not properly lit.

33. Since 2016, the Juravins complained that the residents leave their trash bins outside of the property for five to seven days a week, giving an overall appearance of poor upkeep.

34. Since 2016, the Juravins have also complained about visible exposed dumpsters.

35. Since 2016, the Juravins have complained about cars parked without restrictions or enforcement.

36. On at least one occasion, the Juravins attempted to contact the property security on a Friday evening, due to a safety issue and were told no security staff was available and to contact them again Monday morning.

37. For six months, they tried to resolve the issues internally, going through the Property Owners' Association channels.

38. The Juravins were looking to get involved as a way to protect their investment and standard of living.

39. About that time, the Juravins realized the complex history of the Property which included allegations of crimes that were not disclosed to them.

40. Had this information been disclosed previously, the Juravins would not have invested in Bella Collina.

41. Around that time, the Juravins also discovered that Bella Collina is controlled by the developer, Dwight Schar.

42. After that period Don Juravin placed a critical review online.

43. After that review, the Juravins started to receive threats from Randal Greene, head of the POA.

44. Although the conflict between the Plaintiffs and the Defendants started in 2016, it continues today, and has escalated through threats, intimidation, legal actions, injunctions and acts of vandalism.

45. Randal Greene ordered that the Juravins be denied basic community services for over three years while continuing to charge them fees.

46. The Juravins are not alone in their criticism of Bella Collina. Other residents joined together in a class action accusing the management of similar actions to what Mrs. Juravin has experienced with her family: illegally blocking her from entering the community, illegally blocking the local school bus from picking up her kids, and, using fear tactics and intimidation, such as sending her a mug with a note saying "We know where you live."

47. About five hundred resident families decided to not pay any further fees and abandon their lots altogether, as a result losing about 500 million dollars in investment

48. The Juravins believe the families did so because of the severe management and maintenance problems at Bella Collina and the quality of living.

49. The Juravins were threatened with having their water service disconnected.

50. BCPOA placed cameras on the Juravin property, without informing them of the location.

51. The Juravins filed for an injunction against Randall Greene.

52. In the months following the publishing of the critical review, Juravin's yard was vandalized, five tires on their cars were damaged and had to be replaced, Anna Juravin's car was keyed all around, the pool cord was cut and the pool was drained.

53. BCPOA also continued to selectively enforce provisions of the CC&R, such as for the alleged condition of the Juravins' lawn and trees.

54. BCPOA have continued to single out the Juravins for selective enforcement.

55. Upon Plaintiffs' information and belief, BCPOA did not take similar actions against units owned by DCS or Paul Simonson.

56. These units were in worse condition than that of the Juravins.

57. As Members of the Association, in June of 2020, the Juravins requested access to BCPOA records.

58. According to Florida Statutes Section 720.303 Subs. 5 (a) and (b), the Bella Collina Homeowners' Association Board of Directors was required to comply with Mrs. Juravin's request for access (Mailed June 4, 2020) for corporate documents.

59. BCPOA represented they provided all documents in their possession.

60. However, financial statements, Board and Member meeting minutes were not provided.

61. Plaintiffs created a video record of their review and copying process.

62. This recording documents what documents were made available to Plaintiffs.

63. Plaintiffs believe that these documents do not exist.

64. BCPOA therefore violated the record keeping requirements provisions of the Florida Statutes that apply to all Homeowners Associations.

65. On November 3, 2020, Richard Arrighi, former business associate of Randall Greene and Dwight Schar in the DCS venture provided a sworn affidavit to Plaintiffs (a copy of which is attached hereto as "Exhibit B").

66. His statement, based on personal knowledge stemming from sharing the office with Greene for about five years affirms in part that Dwight Schar either made all the decisions regarding DCS projects including Bella Collina himself, or was aware of all decisions made by Paul Simonson, BCHPA's Board member.

67. Arrighi stated that Simonson updated Schar on all projects throughout the day by phone in his presence.

68. On November 20, 2020, Richard Arrighi provided a sworn affidavit to Don Juravin (a copy of which is attached hereto as "Exhibit C".

69. The document outlines that Greene hired outside parties to write negative articles and blogs about Don Juravin in order to retaliate against Mr. Juravin. The affidavit's purpose was "to keep Dwight Schar, Paul Simonson and Randall Greene's identities private so Mr. Juravin and others would not know it was coming from Mr. Greene".

70. Arrighi's affidavits state that the BCPOA did not have the required Member and Board Meetings.

71. BCPOA makes decisions outside of normal procedures prescribed by the law for Florida non-profit organizations or Homeowner's Association.

72. Arrighi stated that no decision in Bella Collina was made without the knowledge or support of Dwight Schar.

73. On or about November 8, 2020, Arrighi provided Plaintiffs with emails between Randall Greene, Paul Simonson and representatives of Dwight Schar's for profit entity, Schar Holdings.

74. Emails from November 2018 show Greene gloating about the judgment regarding Juravin's yard.

75. In March 2017, Greene sends an email titled "I have had it with this f*ing Juravin".

76. Also, in this exchange, the Defendants' discuss that Greene has a "good contact in Israel," Don Juravin's country of birth.

77. The parties then muse that "Juravin is too much, we need to do something about it."

78. On November 18, 2018, Simonson on behalf of DCS, the developer, cautioned that "We need to stop paying lawyers to deal with retribution cases, this is a business, not a personal vendetta."

79. The BCPOA, however, continued with what Simonson called "personal vendetta", by pursuing legal action against the Juravins.

80. BCPOA continued to use nonprofit resources to pursue these "personal" goals.

81. This was followed by a campaign of threats and intimidation targeting Juravins.

82. BCPOA officers and developers continue to spend money without seeking approval from Members and make decisions without required meetings, holding votes and maintaining records.

83. Upon Plaintiffs' information and belief, the legal actions were not authorized by a duly elected Board of Directors.

84. BCPOA also initiated and financed a number of legal actions against other residents in similar fashion.

85. One of these actions arbitrarily sought to refuse a resident BCPOA membership despite being locked in an obligation to pay CLUB dues.

86. On another occasion, BCPOA refused membership to a family with a special needs child, and its actions are presently subject to ongoing litigation.

87. These actions hurt the reputation of Bella Collina.

88. These actions result in legal actions, court costs and attorneys' fees that BCPOA is using its resources to finance.

89. These actions contribute to the low interest in and as a result, low occupancy at Bella Collina.

90. These actions result in lowering the real estate prices.

91. These actions hurt BCPOA and the investments made by its Members.

92. Upon Plaintiff's information and belief, BCPOA was not holding elections.

93. Over the many years of the Association, dues or assessments were paid by the lot owners for maintenance items as well as reserves. On information and belief, those reserves and money are now being used by the present board for improper purposes and not for the betterment of the Bella Collina community.

94. All these actions harm the BCPOA and its Members.

## COUNT I: BREACH OF FIDUCIARY DUTY

Plaintiffs reallege Paragraphs 1-94.

95. As  officers and de facto Directors and Managers, Defendants held a position of confidence and trust  within the Company and owed a fiduciary obligation to BCPOA and its Members, and was  required to act in good faith and in the best interest of the Company.

96. By pursuing their own interests, Defendants have failed to act in BCPOA's best interests.

97. Defendants caused BCPOA damages.

## COUNT II ABUSE OF CONTROL

Plaintiffs reallege Paragraphs 1-94.

98. Defendants' misconduct alleged herein constitutes a breach of their fiduciary duties because they abused their ability to control and influence BCPOA, for which they are legally responsible.

99. As a direct and proximate result of these defendants' abuse of control BCPOA has sustained significant damages.

100. As a result of the misconduct alleged herein, Defendants are liable to the BCPOA.

## COUNT III ABUSE OF PROCESS

Plaintiff realleges Paragraphs 1-93.

101. Defendants' misconduct alleged herein constitutes a breach of their fiduciary duties because they abused the civil court process in filing suit against a member of the BCPOA, for which they are responsible, for the improper purpose of unlawfully intimidating the member and his family.

102. The BCPOA continued to require payment from the Juravins after prohibiting them from accessing the Club in 2017.

103. To date, the Juravins have not been permitted to access the Club even though the Juravins continued to pay the expenses for a year following the prohibition.

104. The Defendants maintain that the Juravins were not excluded from the Club for nonpayment.

105. The prohibition or exclusion has not been deemed an expulsion which would have permitted the Juravins to recover their $40,000 deposit.

106. The Defendants held the deposit and continued to bill the Juravins to force their silence and acceptance of the management of the community.

107. The use of legal proceedings was therefore improper.

108. These proceedings were initiated with an ulterior motive to silence and intimidate the Plaintiffs.

109. In addition, Defendants condition the BCPOA membership on approval for Membership by the Club at Bella Collina.

110. Defendants created a system where failure to obtain Membership prevents potential Residents from being able to commence construction on the lot.

111. The CC&Rs require residents to construct a dwelling on the lot within 18 months.

112. Failure to construct permits the Defendants to repurchase the lot at a price favorable to Defendants.

113. The management continues to use legal proceedings to exclude potential residents from becoming Members and being able to build on lots.

114. The approval and said ability is completely within the discretion of the BCPOA management.

115. The outcome by design is outside of potential Members' control.

116. Actions of Defendants depress the ability of the BCPOA to grow and attract new Residents.

117. Actions of Defendants create controversy and expose BCPOA to litigation.

118. Paul Simonson, an individual of power and influence over the Club and over Defendant DCS owns an investment company that in turn owns a lot in Bella Collina.

119. The owners of the lot failed to construct on the lot within the allotted time.

120. The lot was not subjected to the same compulsion rule for failure to build.

121. Management failed to enforce CC&Rs because of Simonson's role at DCS.

122. Individuals and companies related to Defendants continue to receive preferential treatment.

123. As a direct and proximate result of Defendants' abuse of process and breaches of duty alleged herein, BCPOA has sustained significant damages.

124. As a result of the misconduct and breaches of duty alleged herein, Defendants are liable to the Company.

### COUNT IV GROSS MISMANAGEMENT

Plaintiff realleges Paragraphs 1- 93

125. By their actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of BCPOA consistent with the operations of a Florida not for profit Corporation.

126. As a direct and proximate result of Defendants' gross mismanagement and breaches of duty alleged herein, BCPOA has sustained significant damages.

127. As a result of the misconduct and breaches of duty alleged herein, Defendants are liable to the BCPOA.

### COUNT V WASTE OF CORPORATE ASSETS

Plaintiff realleges Paragraphs 1-93

128. As a result of the improper conduct described herein, and by failing to properly consider the interests of the Company and its public shareholders and by refusing to conduct proper supervision, Defendants have caused and will continue to cause BCPOA to waste valuable corporate assets and incur substantial expenses to defend Defendants' unlawful actions.

129. As a result of the waste of corporate assets, Defendants are liable to the Company

## COUNT VI CONSPIRACY

Plaintiffs incorporate paragraphs 1 through 93 as though set forth fully herein.

130. Bella Collina is a discrete market for the sale and development of 801 lots.

131. DCS and the DCS related entities possess monopoly power in the market for the sale of lots in Bella Collina, owning or controlling 80% of all lots and homes.

132. The value of any lot was dependent on the operation of the POA and the actions of the developer.

133. The defendants conspired to illegally control the POA and enforce restrictive covenants which they knew to be invalid, illegal and unreasonable for the illegal purpose of destroying the value and economic viability of the lots and coercing lot owners to surrender them to DCS and the DCS entities.

134. The illegal mandatory golf club membership, illegal special assessment, illegal control of the POA, requirement that lot owners must pay for club memberships and assessments on lots, write-off of assessments on lots owned by the Conspirators, the merger of control of the boards of the BCPOA, the Golf Club, DCS, the DCS entities and the CDD, and exorbitant and unreasonable country club fees and dues constituted anti -competitive practices in the form of price discrimination, exclusive dealings, price control, anti-competitive merger, inter-locking directorates and tying.

135. This conspiracy to perform the acts described in the preceding paragraph, to monopolize this market and to restrain the development and resale of the lot owners' property violates the Sherman Antitrust Act, 15 U.S.C. and the Clayton Act §15 U.S.C. §12, et seq.

136. These violations caused the Plaintiffs, and all similarly situated current and former lot owners to suffer damages in the nature of diminished lot values and excessive carrying costs related to ownership and lack of marketability of their lots.

## COUNT VII VIOLATIONS OF§542.15, FLORIDA STATUTES, ct seq.

137. Plaintiffs incorporate paragraphs 1 through 93 as though set forth fully herein.

138. This conspiracy to perform the acts described in herein, to monopolize this market and to restrain the development and resale of the lot owners' property violates the Florida Antitrust Act of 1980.

139. These violations caused the Plaintiffs, and all similarly situated current and former lot owners to suffer damages in the nature of diminished lot values and excessive carrying costs related to ownership and lack of marketability of their lots.

**WHEREFORE, the Petitioner respectfully requests that the Court:**

**I. Disgorgement**

Issue an Order requiring the BCPOA to disgorge all ill-gotten profits or proceeds it received as a result of the acts and/or courses of conduct complained of herein, with prejudgment interest.

**II. Asset Freeze and Accounting**

Issue an Order freezing the assets of the Maxfield Estate, until further Order of the Court, and requiring from Respondent a document sworn to before a notary public setting forth all assets (whether real or personal) and accounts (including, but not limited to, bank accounts, savings accounts, securities or brokerage accounts, and deposits of any kind) in which the BCPOA

(whether solely or jointly), directly or indirectly (including through a corporation, trust or partnership), either has an interest or over which it has the power or right to exercise control.

### III. Appointment of Receiver

Issue an Order appointing a Receiver over the BCPOA, to marshal and safeguard all of said assets, to perform any other duties the Court deems appropriate, and to prepare a report to the Court and the Petitioner detailing the activities of the BCPOA, and the whereabouts of funds.

### IV. Records Preservation

Issue an Order requiring Respondent to preserve any records related to the subject matter of this action that are in the BCPOA's custody, possession or control.

### V. Damages

Enter judgment in its favor and against Defendants for all damages suffered byBCPOA, interest, costs and for such other relief as the Court deems just and proper.

### VII. Further Relief

Grant such other and further relief as may be necessary and appropriate.

### VIII. Retention of Jurisdiction

Further, the Petitioner respectfully requests the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to

entertain any suitable application or motion by the Petitioner for additional relief within the jurisdiction of this Court.

ANNA JURAVIN, PLAINTIFF

DON JURAVIN, PLAINTIFF

Jacob DeGrechie
Notary Public
State of Florida
Comm# HH030843
Expires 8/31/2024

## VERIFICATION

Under penalties of perjury, I declare that I have read the foregoing and that the facts alleged are true and correct to the best of my knowledge and belief.

Signed this _____ day of December, 2020

_____
Anna Juravin, Plaintiff

STATE OF Florida

COUNTY OF Lake

The foregoing instrument was acknowledged before me this 6th th day of December 2020 by Anna Juravin who is personally known to me (yes or no) or who has produced a FLDC as identificat

_____
Notary Public

Jacob DeGrechie
Notary Public
State of Florida
Comm# HH030843
Expires 8/31/2024

My commission expires: 08-31-2024

Under penalties of perjury, I declare that I have read the foregoing and that the facts alleged are true and correct to the best of my knowledge and belief.

Signed this _____ day of December, 2020

_____
Don Juravin, Plaintiff

STATE OF _____

COUNTY OF _L A K E_

The foregoing instrument was acknowledged before me this _6th_ th day of December 2020_ by Don Juravin w___ is personally known to me (yes or no) or who has produced a _FDL_ as identification.

_____
Notary Public

My commission expires: 08-31-2024

Jacob DeGrechie
Notary Public
State of Florida
Comm# HH030843
Expires 8/31/2024

19

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR LAKE COUNTY, FLORIDA

ANNA JURAVIN, DON K, JURAVIN,
Derivatively on behalf of
BELLA COLLINA PROPERTY OWNERS
ASSOCIATION, INC., a Florida not for profit
corporation,

      Plaintiffs,                CASE NO.:

v.

DENNIS KELLEHER, PAUL LEBRAUX,
JEREMY SPRY, DCS REAL ESTATE
INVESTMENTS, LLC, a Florida limited liability
company, DWIGHT C. SCHAR, and RANDALL
GREENE.

      Defendants.
_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff's, ANNA JURAVIN and DON K. JURAVIN, derivatively, on behalf of

BELLA COLLINA PROPERTY OWNERS' ASSOCIATION, by and through the

undersigned counsel, and sues Defendants listed above, stating as follows:

### PARTIES, JURISDICTION, AND VENUE

1.    This is a business dispute for damages in excess of $30,000.00, exclusive of

interest, costs, and attorney's fees, and is therefore within the jurisdiction of this Court.

2.    Plaintiff ANNA JURAVIN ("Mrs. Juravin") is a citizen of the state of

Florida who resides in Lake County, Florida.

3.    Plaintiff DON K. JURAVIN ("Mr. Juravin") is a citizen of the state of

Florida, who resides in Lake County, Florida.

4.    BELLA COLLINA PROPERTY OWNERS' ASSOCIATION, a Florida

not for profit corporation ("BCPOA"), is a Florida corporation authorized to conduct



business in the state of .Florida, with its principal place of business located in Lake County, .Florida.

5.    The Juravins reside at the Bella Collina Community.

6.    It is the duty of BCPOA to manage and maintain The Community in the best interest of its Members, the Residents.

7.    The Juravins are members of BCPOA and are authorized to bring this derivative action subject to Chapter 718 and Chapter 617, Florida Statutes.

8.    Defendants Paul Lebraux, Jeremy Spry and Dennis Kelleher are the individual officers of BELLA COLLINA PROPERTY OWNERS' ASSOCIATION.

9.    Defendant Dwight C. Schar (hereinafter "Schar") resides at Ocean Blvd., South Palm Beach, Florida, and at all relevant times, funded and commanded the efforts of the Defendants. He is the de facto manager and Director of the BELLA COLLINA PROPERTY OWNERS' ASSOCIATION.

10.    Defendant RANDALL GREENE ("GREENE") is a citizen of the state of Florida who resides in Lake County, .Florida.

11.    Defendant GREENE has a minority ownership interest in DCS, has worked extensively with DCS in the past, and was the DCS-appointed President of BCPOA.

12.    DCS REAL.ESTATE INVESTMENTS, LLC, a Florida limited liability company ("UCS") is a Florida limited liability company authorized to conduct business in the state of Florida,

With its principal place of business located in Palm Beach County, .Florida. Defendant DCS operates the golf and country club located in the Bella Collina subdivision.

13.    Defendant DCS REAL ESTATE INVESTMENTS, LLC controls the

2

majority of the units in Bella Collina and therefore affects policies and actions of BELLA COLLINA PROPERTY OWNERS' ASSOCIATION.

14.     Section 720.307(1)(a) of the Act required the developer to turn over control of the property owners' association to the non-developer owners no later than three *(3)* months after ninety percent (90%) of the lots were sold. The date that triggered this obligation was August 29, 2005.

15.     At all times relevant to this Complaint, DCS has held, and continues to hold, a de facto control over the subdivision in various ways including, but not limited to, acquiring the vast majority of lots in Bella Collina, illegally controlling the subdivision's property owners' association, controlling the community's country club, and by "managing" the subdivision's common areas.

16.     Plaintiff repeatedly attempted to address the management issues by contacting the Property Manager, the BCPOA and its officers.

17.     Plaintiff was subsequently advised not to contact the Bella Collina management and that their requests would be disregarded.

18.     As recently as July 2020, the Juravins submitted requests for a political rally and two political signs. Some of these requests were ignored, while some were denied after pending for weeks.

19.     Based on the history of hostile relations between Defendants and Plaintiffs, any for action demand would be futile.

20.     All conditions precedent to the commencement and maintenance of this action have been performed, have occurred, or been waived.

21.     The Juravins moved to the community at the end of 2015. They chose Bella

Collina because they were looking for a safe, friendly, upscale community to raise their daughters.

22.     Juravin first complained about issues in .Bella Collina in 2016, but the same problems continue until today.

23.     Don Juravin also met with the manager in order to resolve the excess of ten issues they complained about.

24.     Moving into Bella Collina required a significant investment for Juravins.

25.     Juravins realized that Bella Collina had accurately been labeled a "ghost town" with most units vacant.

26.     The 2015 presentations by BELLA COLLINA and by the realtor were not truthfully reflecting the quality of living at BELLA COLLINA and the value of the investment.

27.     The Juravins realized Bella Collina struggled with providing basic services to residents and enforcing their own rules and regulations involving maintenance and cleanliness.

28.     The Juravins also realized residents have little to no influence on the affairs of BELLA COLLINA.

29.     In fact, despite signing off on them as "received", the Juravins are yet to receive their copies of contracts, bylaws, covenants, and rules from the associations.

30.     During that time, the Juravins complained that the pool was not maintained and dirty.

31.     During that time, the Juravins complained to the Manager that the gate and the property were not properly lit.

4

32.     Since 2016, the Juravins complained that the residents leave their trash bins outside of the property for five to seven days a week, giving an overall appearance of poor upkeep.

33.     Since 2016, the Juravins have also complained about visible exposed dumpsters.

34.     Since 2016, the Juravins have complained about cars parked without restrictions or enforcement.

35.     On at least one occasion, the Juravins attempted to contact the property security on a Friday evening, due to_ a safety issue and were told no security staff was available and to contact them again Monday morning.

36.     For six months, they tried to resolve the issues internally, going through the Property Owners' Association channels.

37.     The Juravins were looking to get involved as a way to protect their investment and standard of living.

38.     About that time, the Juravins realized the complex history of the Property which included allegations of crimes that were not disclosed to them.

39.     Had this information been disclosed previously, the Juravins would not have invested in Bella Collina.

40.     Around that time, the Juravins also discovered that Bella Collina is controlled by the developer, Dwight Schar.

41.     After that period Don Juravin placed a critical review online.

42.     After that review, the Juravins started to receive threats from Randall Greene, head of the POA.

43.     Although the conflict between the Plaintiffs and the Defendants started in 2016, it continues today, and has escalated through threats, intimidation, legal actions, injunctions, and acts of vandalism.

44.     Randal Greene ordered that the Juravins be denied basic community services for over three years while continuing to charge them fees.

45.     The Juravins are not alone in their criticism of Bella Collina. Other residents joined together in a class action accusing the management of similar actions to what Mrs. Juravin has experienced with her family: illegally blocking her from entering the community, illegally blocking the local school bus from picking up her kids, and, using fear tactics and intimidation, such as sending her a mug with a note saying "we know where you live."

46.     About five hundred resident families decided to not pay any further fees and abandon their lots altogether, as a result losing about 500 million dollars in investment

47.     The Juravins believe the families did so because of the severe management and maintenance problems at Bella Collina and the quality of living.

48.     The Juravins were threatened with having their water service disconnected.

49.     BCPUA placed cameras on the Juravin property, without informing them of the location.

50.     The Juravins filed for an injunction against Randall Greene.

51.     In the months following the publishing of the critical review, Juravin's yard was vandalized, five tires on their cars were damaged and had to be replaced, Anna Juravin's car was keyed all around, the pool cord was cut and the pool was drained.

52.     BCPOA also continued to selectively enforce provisions of the CC&R, such

as for the alleged condition of the Juravins' lawn and trees.

53.    BCPOA have continued to single out the Juravins for selective enforcement.

54.    Upon Plaintiffs' information and belief: BCPOA did not take similar actions against units owned by DCS or Paul Simonson.

55.    These units were in worse condition than that of the Juravins.

56.    As Members of the Association, in June of 2020, the Juravins requested access to BCPOA records.

57.    According to Florida Statutes Section 720.303 Subs. 5 (a) and (b), the Bella Collina Homeowners' Association Board of Directors was required to comply with Mrs. Juravin's request for access (Mailed June 4, 2020) for corporate documents.

58.    BCPOA represented they provided all documents in their possession.

59.    However, financial statements, Board and Member meeting minutes were not provided.

60.    Plaintiffs created a video record of their review and copying process.

61.    This recording documents what documents were made available to Plaintiffs.

62.    Plaintiffs believe that these documents do not exist.

63.    BCPOA therefore violated the record keeping requirements provisions of the Florida Statutes that apply to all Homeowners Associations.

64.    On November 3, 2020, Richard Arrighi, former business associate of Randall Greene and Dwight Schar in the DCS venture provided a sworn affidavit to Plaintiffs.

65.    His statement, based on personal knowledge stemming from sharing the office with Greene for about five years affirms in part that Dwight Schar either made all the decisions regarding DCS projects including Bella Collina himself: or was aware of all

decisions made by Paul Simonson, BCHPA's Board member.

66.    Arrighi stated Simonson updated Schar on all projects throughout the day by phone in his presence.

67.    On November 20, 2020, Richard Arrighi provided a sworn affidavit to Don Juravin.

68.    The document outlines that Greene hired outside parties to write negative articles and blogs about Don Juravin in order to retaliate against Mr. Juravin. The affidavit's purpose was "to keep Dwight Schar, Paul Simonson and Randall Greene's identities private so Mr. Juravin and others would not know it was coming from Mr. Greene".

69.    Arrighi' s affidavits state that the BCPOA did not have the required Member and Board Meetings.

70.    BCPOA makes decisions outside of normal procedures prescribed by the law for Florida non-profit organizations or Homeowner' s Association.

71.    Arrighi stated that no decision in Bella Collina was made without the knowledge or support of Dwight Schar.

72.    On or about November 8, 2020, Arrighi provided Plaintiffs with emails between Randall Greene, Paul Simonson and representatives of Dwight Schar's for profit entity, Schar Holdings.

73.    Emails from November 2018 show Greene gloating about the judgment regarding Juravin's yard.

74.    In March 2017, Greene sends an email titled "I have had it with this fucking Juravin".

75. Also, in this exchange, the Defendants discuss that Greene has a "good contact in Israel," Don Juravin's country of birth.

76. The parties then muse that "Juravin is too much, we need to do something about it."

77. On November 18, 2018, Simonson on behalf of DCS, the developer, cautioned that "We need to stop paying lawyers to deal with retribution cases, this is a business, not a personal vendetta."

78. The BCPOA, however, continued with what Simonson called "personal vendetta", by pursuing legal action against the Juravins.

79. BCPOA continued to use nonprofit resources to pursue these "personal" goals.

80. This was followed by a campaign of threats and intimidation targeting Juravins.

81. BCPOA officers and developers continue to spend money without seeking approval from Members and make decisions without required meetings, holding votes, and maintaining records.

82. Upon Plaintiffs' information and belief, a duly elected Board of Directors did not authorize the legal actions.

83. BCPOA also initiated and financed a number of legal action against other residents in similar fashion.

84. One of these actions arbitrarily sought to refuse a resident BCPOA membership despite being locked in an obligation to pay CLUB dues.

85. On another occasion, BCPOA refused membership to a family with a special

needs child, and its actions are presently subject to ongoing litigation.

86.    These actions hurt the reputation of Bella Collina.

87.    These actions result in legal actions, court costs and attorneys' fees that BCPOA is using its resources to finance.

88.    These actions contribute to the low interest in and as a result, low occupancy at Bella Collina.

89.    These actions result in lowering the real estate prices.

90.    These actions hurt BCPOA and the investments made by its Members.

91.    Upon Plaintiff's information and belief, BCPOA was not holding elections.

92.    Over the many years of the Association, dues or assessments were paid by the lot owners for maintenance items as well as reserves. On information and belief, those reserves and money are now being used by the present board for improper purposes and not for the betterment of the Bella Collina community.

93.    All these actions harm the BCPOA and its Members.

### COUNT I:
### BREACH OF FIDUCIARY DUTY

94.    Plaintiffs reallege Paragraphs 1-93.

95.    As officers and de facto Directors and Managers, Defendants held a position of confidence and trust within the Company and owed a fiduciary obligation to BCPOA and its Members and was required to act in good faith and in the best interest of the Company.

96.    By pursuing their own interests, Defendants have failed to act in BCPOA's best interests.

97.    Defendants caused BCPOA damages.

## COUNT II
## ABUSE OF CONTROL

98.    Plaintiffs reallege Paragraphs 1-93.

99.    Defendants' misconduct alleged herein constitutes a breach of their fiduciary duties because they abused their ability to control and influence BCPOA, for which they are legally responsible.

100.    As a direct and proximate result of these defendants' abuse of control BCPOA has sustained significant damages.

101.    As a result of the misconduct alleged herein, Defendants are liable to the BCPOA.

## COUNT III
## ABUSE OF PROCESS

102.    Plaintiff realleges Paragraphs 1-93.

103.    Defendants' misconduct alleged herein constitutes a breach of their fiduciary duties because they abused the civil court process in filing suit against a member of the BCPOA, for which they are responsible, for the improper purpose of unlawfully intimidating the member and his family.

104.    The BCPOA continued to require payment from the Juravins after prohibiting them from accessing the Club in 2017.

105.    To date, the Juravins have not been permitted to access the Club even though the Juravins continued to pay the expenses for a year following the prohibition.

106.    The Defendants maintain that the Juravins were not excluded from the Club for nonpayment.

107.    The prohibition or exclusion has not been deemed an expulsion which would

11

have permitted the Juravins to recover their $40,000 deposit.

108.   The Defendants held the deposit and continued to bill the Juravins to force their silence and acceptance of the management of the community.

109.   The use of legal proceedings was therefore improper.

110.   These proceedings were initiated with an ulterior motive to silence and intimidate the Plaintiffs.

111.   In addition, Defendants condition the BCPOA membership on approval for Membership by the Club at Bella Collina.

112.   Defendants created a system where failure to obtain Membership prevents potential Residents from being able to commence construction on the lot.

113.   The CC&Rs require residents to construct a dwelling on the lot within 18 months.

114.   Failure to construct permits the Defendants to repurchase the lot at a price favorable to Defendants.

115.   The management continues to use legal proceedings to exclude potential residents from becoming Members and being able to build on lots.

116.   The approval and said ability is completely within the discretion of the BCPOA management.

117.   The outcome by design is outside of potential Members' control.

118.   Actions of Defendants depress the ability of the BCPOA to grow and attract new Residents.

119.   Actions of Defendants create controversy and expose BCPOA to litigation.

120.   Paul Simonson, an individual of power and influence over the Club and over

Defendant DCS owns an investment company that in turn owns a lot in Bella Collina.

121.   The owners of the lot failed to construct on the lot within the allotted time.

122.   The lot was not subjected to the same compulsion rule for failure to build.

123.   Management failed to enforce CC&Rs because of Simonson's role at DCS.

124.   Individuals and companies related to Defendants continue to receive preferential treatment.

125.   As a direct and proximate result of Defendants' abuse of process and breaches of duty alleged herein, BCPOA has sustained significant damages.

126.   As a result of the misconduct and breaches of duty alleged herein, Defendants are liable to the Company.

## COUNT IV
## GROSS MISMANAGEMENT

127.   Plaintiff realleges Paragraphs 1- 93

128.   By their actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of BCPOA consistent with the operations of a Florida not for profit Corporation.

129.   As a direct and proximate result of Defendants' gross mismanagement and breaches of duty alleged herein, BCPOA has sustained significant damages.

130.   As a result of the misconduct and breaches of duty alleged herein, Defendants are liable to the BCPOA.

## COUNT V

## WASTE OF CORPORATE ASSETS

131.   Plaintiff realleges Paragraphs 1-93

132.   As a result of the improper conduct described herein, and by failing to properly consider the interests of the Company and its public shareholders and by refusing to conduct proper supervision, Defendants have caused and will continue to cause BCPOA to waste valuable corporate assets and incur substantial expenses to defend Defendants' unlawful actions.

133.   As a result of the waste of corporate assets, Defendants are liable to the Company.

## COUNT VI
## CONSPIRACY

134.   Plaintiffs incorporate paragraphs 1 through 93 as though set forth fully herein.

135.   Bella Collina is a discrete market for the sale and development of 801 lots.

136.   DCS and the DCS related entities possess monopoly power in the market for the sale of lots in Bella Collina, owning or controlling 80% of all lots and homes.

137.   The value of any lot was dependent on the operation of the POA and the actions of the developer.

138.   The defendants conspired to illegally control the POA and enforce restrictive covenants which they knew to be invalid, illegal and unreasonable for the illegal purpose of destroying the value and economic viability of the lots and coercing lot owners to surrender them to DCS and the DCS entities.

139.   The illegal mandatory golf club membership, illegal special assessment, illegal control of the POA, requirement that lot owners must pay for club memberships and

assessments on lots, write-off of assessments on lots owned by the Conspirators, the merger of control of the boards of the BCPOA, the Golf Club, DCS, the DCS entities and the CDD, and exorbitant and unreasonable country club fees and dues constituted anti - competitive practices in the form of price discrimination, exclusive dealings, price control, anti-competitive merger, inter-locking directorates and tying.

140.    This conspiracy to perform the acts described in the preceding paragraph, to monopolize this market and to restrain the development and resale of the lot owners' property violates the Sherman Antitrust Act, 15 U.S.C. and the Clayton Act §15 U.S.C. §12, et seq.

141.    These violations caused the Plaintiffs, and all similarly situated current and former lot owners to suffer damages in the nature of diminished lot values and excessive carrying costs related to ownership and lack of marketability of their lots.

### COUNT VII
### VIOLATIONS OF § 542.15, FLORIDA STATUTES, et seq.

142.    Plaintiffs incorporate paragraphs 1 through 93 as though set forth fully herein.

143.    This conspiracy to perform the acts described in herein, to monopolize this market and to restrain the development and resale of the lot owners' property violates the Florida Antitrust Act of 1980.

144.    These violations caused the Plaintiffs, and all similarly situated current and former lot owners to suffer damages in the nature of diminished lot values and excessive carrying costs related to ownership and lack of marketability of their lots.

**WHEREFORE, the Petitioner respectfully requests that the Court:**

I.  **Disgorgement**

Issue an Order requiring the BCPOA to disgorge all ill-gotten profits or proceeds it received as a result of the acts and/or courses of conduct complained of herein, with prejudgment interest.

## II. Asset Freeze and Accounting

Issue an Order freezing the assets of the Maxfield Estate, until further Order of the Court, and requiring from Respondent a document sworn to before a notary public setting forth all assets (whether real or personal) and accounts (including, but not limited to, bank accounts, savings accounts, securities or brokerage accounts, and deposits of any kind) in which the BCPOA (whether solely or jointly), directly or indirectly (including through a corporation, trust or partnership), either has an interest or over which it has the power or right to exercise control.

## III. Appointment of Receiver

Issue an Order appointing a Receiver over the BCPOA, to marshal and safeguard all of said assets, to perform any other duties the Court deems appropriate, and to prepare a report to the Court and the Petitioner detailing the activities of the CPOA, and the whereabouts of funds.

## IV. Records Preservation

Issue an Order requiring Respondent to preserve any records related to the subject matter of this action that are in the BCPOA's custody, possession, or control.

## V. Damages

Enter judgment in its favor and against Defendants for all damages suffered by BCPOA, interest, costs and for such other relief as the Court deems just and proper.

## VII. Further Relief

Grant such other and further relief as may be necessary and appropriate.

## VIII.  Retention of Jurisdiction

Further, the Petitioner respectfully requests the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Petitioner for additional relief within the jurisdiction of this Court.

Dated: September 19, 2022

RESPECTFULLY SUBMITTED,

*/s/ April S. Goodwin*
APRIL S. GOODWIN, ESQ.
Florida Bar No.: 0502537
The Goodwin Firm
801 West Bay Drive, Suite 715
Largo, FL 33770
Attorneys for Plaintiff
Phone: (727) 316.5333
april@goodwin-firm.com
info@goodwin-firm.com

## VERIFICATION

Under penalties of perjury, I declare that I have read the foregoing and that the facts alleged are true and correct to the best of my knowledge and belief.

Signed this _____ day of December, 2020

Anna Juravin, Plaintiff

STATE OF Florida

COUNTY OF Lake

The foregoing instrument was acknowledged before me this 6th th day of December 2020 by Anna Juravin who is personally known to me (yes or no) or who has produced a FLDL as identification.

_____
Notary Public

Jacob DeGrechie
Notary Public
State of Florida
Comm# HH030843
Expires 8/31/2024

My commission expires: 08-31-2024

Under penalties of perjury, I declare that I have read the foregoing and that the facts alleged are true and correct to the best of my knowledge and belief.

Signed this _____ day of December, 2020

Don Juravin, Plaintiff

STATE OF _____

COUNTY OF _LAKE_

The foregoing instrument was acknowledged before me this _6th_ th day of December 2020_ by Don Juravin who is personally known to me (yes or no) or who has produced a _FDL_ as identification.

_____
Notary Public

My commission expires: 08-31-2024

Jacob DeGrechie
Notary Public
State of Florida
Comm# HH030843
Expires 8/31/2024

IN THE CIRCUIT COURT OF THE
5th JUDICIAL CIRCUIT IN AND
FOR LAKE COUNTY, FLORIDA

ANNA JURAVIN and DON K. JURAVIN,                    CASE NO. 2022 CA 001730
Derivatively on behalf of
BELLA COLLINA PROPERTY OWNER'S
ASSOCIATION, INC.,

      Plaintiffs,

vs.

DENNIS KELLEHER, et al

      Defendants.

_____/

### ORDER OF DISMISSAL WITH PREJUDICE AND GRANTING DEFENDANT, DCS REAL ESTATE INVESTMENTS LLC, ENTITLEMENT TO SANCTIONS AWARD

THIS CAUSE came before the Court at remote (Zoom) hearing on June 29, 2023, on

Defendant's, DCS REAL ESTATE INVESTMENTS LLC ("DCS"), Motion to Dismiss the

Second Amended Verified Complaint, in which Co-Defendants DAVID BURMAN, ARTEMIS

LIFESTYLE SERVICES INC. and BELLA COLLINA PROPERTY OWNER'S ASSOCIATION

INC., ("BCPOA") joined; and the Motion for Sanctions Under Fla. Stat. §57.105 filed by DCS.

The Court having considered the record, the motions, the exhibits, the applicable law and the

arguments of counsel for all parties, finds:

1. Plaintiffs and their lawyer knew or should have known that they failed to comply with

   the requirements of Fla. Stat. §617.07401 and thus had no standing to bring this action

   derivatively on behalf of BCPOA.

2. Plaintiffs and their lawyer knew or should have known that their claim is not supported

   by material facts or existing law.

It is therefore,

      ORDERED AND ADJUDGED that:



1. Defendants' Motion to Dismiss the Second Amended Verified Complaint, filed by DCS REAL ESTATE INVESTMENTS LLC and joined by Co-Defendants DAVID BURMAN, ARTEMIS LIFESTYLE SERVICES, INC. and BELLA COLLINA PROPERTY OWNER'S ASSOCIATION, INC., is **GRANTED**.

2. Plaintiff's Second Amended Verified Complaint is dismissed with prejudice.

3. Defendant's, DCS REAL ESTATE INVESTMENTS LLC, Motion for Sanctions Under Fla. Stat. §57.105 seeking attorneys' fees as sanctions against Plaintiffs, ANNA JURAVIN and DON K. JURAVIN, jointly and severally, and against their counsel APRIL GOODWIN, in equal parts, is **GRANTED**.

4. The Court retains jurisdiction to determine the amount of attorney's fees as sanctions to be awarded to DCS; and to determine entitlement to and amount of prevailing party attorney's fees for all other Defendants having appeared in this action.

5. An evidentiary hearing on the amount of attorney's fees to be awarded to DCS as sanctions shall be scheduled to occur within 90 days.

DONE AND ORDERED in chambers, in Tavares, Florida, this 10th day of July 2023.



DAN R. MOSLEY
Circuit Judge

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of July 2023, I electronically filed the foregoing document with the Clerk of Court using the Florida E-Filing Portal. I also certify that the foregoing document is being served this day on all counsel of record and interested parties, via transmission generated by the Florida Courts E-Filing Portal.

ANDREA COLUCCIO
Judicial Assistant to Judge Mosley

Owner Don Juravin
Lot # 270
Community Taormina
Member # BC0003046A
Ownership Current
Notes

| Date Description | Current Month Dues | | Incidentals | | Golf Deposit | | Payments | | AR Balance | | Interest 1.5% per month | | Accum Interest | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/31/2015 January 2016 Dues | $ | 428.00 | $ | 843.14 | | | $ | (625.00) | $ | 646.14 | $ | - | $ | - | $ | 646.14 |
| 1/31/2016 February 2016 Dues | $ | 428.00 | $ | 446.14 | $ | - | $ | (646.14) | $ | 874.14 | $ | - | $ | - | $ | 874.14 |
| 2/29/2016 March 2016 Dues | $ | 428.00 | $ | 266.46 | $ | - | $ | (874.14) | $ | 694.46 | $ | (0.00) | $ | (0.00) | $ | 694.46 |
| 3/31/2016 April 2016 Dues | $ | 428.00 | $ | 398.88 | $ | - | $ | (694.46) | $ | 826.88 | $ | (0.00) | $ | (0.00) | $ | 826.88 |
| 4/30/2016 May 2016Dues | $ | 428.00 | $ | 218.52 | $ | - | $ | (826.88) | $ | 646.52 | $ | (0.00) | $ | (0.00) | $ | 646.52 |
| 5/31/2016 June 2016 Dues | $ | 428.00 | $ | 145.74 | $ | - | $ | (646.52) | $ | 573.74 | $ | (0.00) | $ | (0.00) | $ | 573.74 |
| 6/30/2016 July 2016 Dues | $ | 428.00 | $ | 35.31 | $ | - | $ | (573.74) | $ | 463.31 | $ | (0.00) | $ | (0.00) | $ | 463.31 |
| 7/31/2016 August 2016 Dues | $ | 428.00 | $ | 71.91 | $ | - | $ | (463.31) | $ | 499.91 | $ | (0.00) | $ | (0.00) | $ | 499.91 |
| 8/31/2016 September 2016 Dues | $ | 428.00 | $ | 105.93 | $ | - | $ | (499.91) | $ | 533.93 | $ | (0.00) | $ | (0.00) | $ | 533.93 |
| 9/30/2016 October 2016 Dues | $ | 428.00 | | | $ | - | $ | (533.93) | $ | 428.00 | $ | (0.00) | $ | (0.00) | $ | 428.00 |
| 10/31/2016 November 2016 Dues | $ | 428.00 | $ | 430.73 | $ | - | $ | (428.00) | $ | 858.73 | $ | (0.00) | $ | (0.00) | $ | 858.73 |
| 11/30/2016 December 2016 Dues | $ | 428.00 | $ | 302.81 | $ | - | $ | (858.73) | $ | 730.81 | $ | - | $ | (0.00) | $ | 730.81 |
| 12/31/2016 January 2017 Dues | $ | 428.00 | $ | 209.95 | $ | - | $ | (730.81) | $ | 637.95 | $ | - | $ | (0.00) | $ | 637.95 |
| 1/31/2017 February 2017 Dues | $ | 428.00 | $ | 57.78 | $ | - | $ | (637.95) | $ | 485.78 | $ | - | $ | (0.00) | $ | 485.78 |
| 2/28/2017 March 2017 Dues | $ | 428.00 | $ | 163.00 | $ | - | $ | (485.78) | $ | 591.00 | $ | - | $ | (0.00) | $ | 591.00 |
| 3/31/2017 April 2017 Dues | $ | 428.00 | $ | 83.97 | $ | - | $ | (591.00) | $ | 511.97 | $ | - | $ | (0.00) | $ | 511.97 |
| 4/30/2017 May 2017 Dues | $ | 428.00 | | | $ | - | $ | (511.97) | $ | 428.00 | $ | - | $ | (0.00) | $ | 428.00 |
| 5/31/2017 June 2017 Dues | $ | 428.00 | | | $ | - | $ | (428.00) | $ | 428.00 | $ | - | $ | (0.00) | $ | 428.00 |
| 6/30/2017 July 2017 Dues | $ | 428.00 | | | $ | - | $ | (428.00) | $ | 428.00 | $ | - | $ | (0.00) | $ | 428.00 |
| 7/31/2017 August 2017 Dues | $ | 428.00 | $ | 255.18 | $ | - | $ | - | $ | 1,111.18 | $ | 6.42 | $ | 6.42 | $ | 1,117.60 |
| 8/31/2017 September 2017 Dues | $ | 428.00 | $ | 75.00 | $ | - | $ | - | $ | 1,620.60 | $ | 16.67 | $ | 23.09 | $ | 1,637.27 |
| 9/30/2017 October 2017 Dues | $ | 428.00 | $ | 75.00 | $ | - | $ | - | $ | 2,140.27 | $ | 24.21 | $ | 47.30 | $ | 2,164.48 |
| 10/31/2017 November 2017 Dues | $ | 428.00 | $ | 75.00 | $ | - | $ | - | $ | 2,667.48 | $ | 31.76 | $ | 79.06 | $ | 2,699.24 |
| 11/30/2017 December 2017 Dues | $ | 428.00 | $ | 75.00 | $ | - | $ | - | $ | 3,202.24 | $ | 39.30 | $ | 118.36 | $ | 3,241.54 |
| 12/31/2017 January 2018 Dues | $ | 428.00 | $ | 75.00 | $ | - | $ | - | $ | 3,744.54 | $ | 46.85 | $ | 165.21 | $ | 3,791.39 |
| 1/31/2018 February 2018 Dues | $ | 428.00 | $ | 75.00 | $ | - | $ | - | $ | 4,294.39 | $ | 54.39 | $ | 219.60 | $ | 4,348.78 |
| 2/28/2018 March 2018 Dues | $ | 428.00 | $ | 75.00 | $ | - | $ | - | $ | 4,851.78 | $ | 61.94 | $ | 281.54 | $ | 4,913.72 |
| 3/31/2018 April 2018 Dues | $ | 428.00 | $ | 75.00 | $ | - | $ | - | $ | 5,416.72 | $ | 69.48 | $ | 351.02 | $ | 5,486.20 |
| 4/30/2018 May 2018 Dues | $ | 428.00 | $ | 75.00 | $ | - | $ | - | $ | 5,989.20 | $ | 77.03 | $ | 428.05 | $ | 6,066.23 |
| 5/31/2018 June 2018 Dues | $ | 428.00 | $ | 75.00 | $ | - | $ | - | $ | 6,569.23 | $ | 84.57 | $ | 512.62 | $ | 6,653.80 |

|  | | | | | | | | Principal | | Interest/Late Fees | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CLUB TOTAL | $ | 12,840.00 | $ | 4,785.45 | $ | - | $ | (11,484.27) | $ | 6,141.18 | $ | 512.62 | $ | | $ | 6,653.80 |
| POA DUE | | | | | | | | | $ | - | $ | - | | | $ | |
| TOTAL DUE PER LOT | | | | | | | | | $ | 6,141.18 | $ | 512.62 | | | $ | 6,653.80 |

| | | | | | | | | | Principal | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jub Per Diem Interest | | | | | | | | | | | $ | 2.73 | |
| Jub Per Diem Dues | | | | | | | | | | | $ | 14.07 | $ 20,978.71 |

| Jays in Month | $ | 31.00 |
|---|---|---|



EXHIBIT

H

with the sale of the residence or homesite, or except after combining more than one homesite owned by the Member in accordance with the Membership Plan. A Golf Member who owns a residence or homesite in Bella Collina may resign the Golf Membership, provided he or she acquires a Sports Membership before the earlier of (i) the reissuance of the Golf Membership or (ii) 12 months after the date of resignation.

3. Notwithstanding any resignation, the Member and his or her spouse shall remain liable for any amounts unpaid on the Member's Club account.

## DISCIPLINE

1. Members are responsible for their own conduct and for the conduct of their family members and guests. Any Member whose conduct or whose family's or guest's conduct shall be deemed by the Club to be likely to endanger the welfare, safety, harmony or good reputation of the Club or its Members or is otherwise improper, may be reprimanded, fined, suspended or expelled from the Club and have all privileges associated with the Membership suspended or terminated by the Club. The Club shall be the sole judge of what constitutes improper conduct, but improper conduct will include, without limitation: (i) failing to meet eligibility for Membership, (ii) submitting false information on the Membership Agreement, (iii) allowing his or her Membership card to be used by another person, (iv) failing to pay any amount owed to the Club in a proper and timely manner, (v) failing to abide by the rules and regulations as set forth herein and as established by the Club from time to time, (vi) abusing Club personnel or employees, or (vii) acting in a manner incompatible with the standard of conduct of the existing Membership or which would likely injure the reputation of the Members or the Club.

2. Any Member accused of improper conduct shall be notified of the Club's proposed disciplinary action and shall be given an opportunity to be heard by the Club to show cause why he or she should not be disciplined. If such Member desires to be heard, the Club shall set a time and date (not less than ten days thereafter) for a hearing. While such complaint is being considered by the Club, the Member shall enjoy the privileges of the Club. Notwithstanding the foregoing, the Club may, without notice and without a hearing, immediately suspend some or all privileges associated with a Membership and/or, after notice, terminate a Member for failure to pay in a proper and timely manner, dues, fees or any other amounts owed to the Club.

3. The Club may restrict or suspend some or all of a Member's, family member's and/or guest's Club privileges. If the Club determines that a Member's conduct or the conduct of his or her family or guest is improper, the Club may terminate the Membership, suspend or restrict the Member's Membership privileges, or restrict the use privileges of the Member's family or guest whose conduct was improper. No Member is entitled, on account of any restriction or suspension, to any refund of any Membership Deposit, dues or any other fees. During the restriction or suspension, dues and other charges shall continue to accrue and shall be paid in full prior to reinstatement as a Member in good standing.

4. In the event that the Club terminates a Membership, the Member's membership privileges shall cease immediately and the Member's Membership Deposit, less 10% Transfer and Administrative Fee, shall be returned to the Member upon the closing on the sale of the Member's property in the Community. The terminated Member's obligation to pay dues with respect to the Membership shall continue until the closing on the sale of the member's property in the Community.

EXHIBIT

CFH   2005055601
Bk 02810 Pgs 0722 - 951; (230pgs)
DATE: 04/18/2005  12:06:47 PM
JAMES C. WATKINS, CLERK OF COURT
LAKE COUNTY
RECORDING FEES 1,956.50

This instrument prepared by
And return to:

Baker & Hostetler LLP
200 South Orange Avenue, Suite 2300
P.O. Box 112
Orlando, Florida 32802-0112
Attn: William C. Guthrie, Esq.

# SECOND AMENDED AND RESTATED
# DECLARATION OF COVENANTS,
# CONDITIONS, AND RESTRICTIONS
# FOR BELLA COLLINA AND
# SUPPLEMENTAL DECLARATION

SOLICITORS, 26296, 00002, 100873552.9, Bella Collina 2nd Amended Restated Declaration

4/14/05 4:39 PM



(10)   Association's Right to Transfer Association Property and/or Maintenance Responsibilities For Same.   The Association reserves the right to transfer the Association Property and/or any of its responsibilities to maintain and administer same to another entity, in whole or in part, whether public or private; provided, however, any assignment shall be subject to the easements and reservations of the Declarant and the Club Property Owner provided herein and shall not become effective unless and until approved in writing by both the Declarant and the Club Property Owner.

Section 3.   CLUB AT BELLA COLLINA.  ALTHOUGH THE CLUB IS WITHIN THE COMMITTED PROPERTY, NEITHER THE CLUB PROPERTY OWNER, THE CLUB PROPERTY, NOR THE CLUB IS GOVERNED BY THE ASSOCIATION.

A.   Improvement of Club at Bella Collina.   Declarant anticipates, but does not commit, that the Club at Bella Collina will be improved for the operation of a golf club and clubhouse on that portion of the Committed Property described on the Bella Collina West plat.

B.   Mandatory Membership.  In the event the Club is developed within the Committed Property, all Owners (excluding the Declarant, Builders, the Association and the Club) who are approved for membership must acquire and maintain in good standing at least a social "Sports Membership" in the Club for each Lot owned.  Notwithstanding any provision to the contrary herein, an Owner of more than one Lot in Bella Collina, who combines the Lots in a manner acceptable to the Club and Association in the manner provided in this paragraph, so that only one residence may be built thereon, will be required to maintain only one Membership for the combined Lots and may resign the additional Memberships.  If the Owner of more than one Lot enters into an agreement to combine Lots that is acceptable to the Club and the Association, the Owner will not be required to acquire and maintain more than one Membership provided the Owner complies with the agreement.  The obligation of the Member to pay Club Charges for the resigned Memberships will cease upon resignation of the Memberships after the combination of Lots in accordance with this paragraph.

C.   Membership Plan Documents.   Membership in the Club is subject to the terms and conditions of the Club Membership Plan, the Rules and Regulations and the Membership Agreements, as the same may be amended from time to time (the "Membership Plan Documents").  In the event the Club is converted from a non-equity club to a member-owned equity club in accordance with the Membership Plan Documents, the Membership Plan Documents shall also include the Club Equity Membership Plan, the Bylaws, the Certificate of Incorporation and the Membership Purchase Agreements.  At such time as the Club is converted to an equity club, each member of the Club will be required to convert to the corresponding equity membership in the Club in accordance with the Membership Plan Documents, and shall be required to pay an equity contribution to the Club as determined under the Membership Plan Documents.  Any required payment of an equity contribution shall be considered a Club Charge (as defined below).

D.   Club Charges.   Membership in the Club requires the payment of a membership purchase price called a membership deposit and membership dues, fees and other amounts (the "Club Charges").  Club Charges shall be determined by the Club and are subject to change as contemplated by the Membership Plan Documents.  Club Charges owed by Owners to the Club

which become delinquent under the terms and conditions set forth in the Membership Plan Documents ("Delinquent Club Charges") are deemed to constitute Special Assessments of the Association, for which the Association shall have a lien against each Lot for all unpaid Special Assessments in accordance with the lien and foreclosure provisions set forth in Article VI. If the Club provides notice to the Association that an Owner owes Delinquent Club Charges, the Association shall have the right and obligation to collect Delinquent Club Charges from Owners and to enforce its lien for Special Assessments, through and including foreclosure of the lien. In the event that the Association does not enforce its rights hereunder with respect to a Special Assessment resulting from delinquent Club Charges, the Association hereby consents and authorizes the Club to enforce the lien and foreclosure provisions of Article VI. All Delinquent Club Charges collected by the Association from Owners are the property of the Club and shall be immediately paid to the Club. Transfer of a Club membership shall be in accordance with the Membership Plan Documents.

THE ASSOCIATION HAS A LIEN AGAINST EACH LOT FOR DELINQUENT CLUB CHARGES.

E.    Club Property. The Club Property is privately owned and operated by the Club Property Owner and is not a part of the Association Property. The Club has the exclusive right to determine from time to time, in its sole discretion and without notice or approval of any change, how and by whom the Club Property shall be used. By way of example, but not limitation, the Club has the right to approve users and determine eligibility for use, to reserve use rights for future purchasers of Lots or Homes within Bella Collina, to modify the Membership Plan Documents, to reserve memberships, to sell, lease or otherwise dispose of the Club Property in any manner whatsoever and to any person whomsoever, to add, issue or modify any type, category or class of membership, to recall any membership at any time for any or no reason whatsoever, to convert the Club into a member-owned club, to make any other changes in the terms and conditions of membership or in the facilities available for use by members and to require the payment of a purchase price, initiation fee, membership deposit, dues and other charges for use privileges. ACQUISITION OF A MEMBERSHIP IN THE CLUB IS MANDATORY. OWNERSHIP OF A LOT OR ANY PORTION OF THE PROPERTY OR MEMBERSHIP IN THE ASSOCIATION DOES NOT GIVE ANY VESTED RIGHT OR EASEMENT, PRESCRIPTIVE OR OTHERWISE, TO USE THE CLUB PROPERTY AND DOES NOT GRANT ANY OWNERSHIP OR MEMBERSHIP INTEREST IN THE CLUB OR THE CLUB PROPERTY.

F.    Acknowledgements Regarding Club Property. Each Owner, by acceptance of a deed or recorded contract of sale to a Lot acknowledges:

1.    That privileges to use the Club Property shall be subject to the terms and conditions of the Membership Plan Documents.

2.    Notwithstanding the fact that the Club Property may be considered open space or a recreation area for purposes of applicable zoning ordinances and regulations, each Owner by acquisition of title to a Lot releases and discharges forever the Declarant, the Club Property Owner, the Club, their affiliates, successors and assigns and their respective members, partners, shareholders, officers, directors, employees and agents from: (1) any claim that the