UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

FILED

Date: 2/9/2024 @ 11:59AM via email
Clerk, U.S. Bankruptcy
Orlando Division

In Re:

DON KARL JURAVIN,

MUST CURE OBESITY, CO.
Debtors.
_____/

Chapter 7
Case No. 6:18-bk-06821 - LVV

Case No. 6:20-bk-01801 - LVV
Jointly Administered with
Case No. 6:18-bk-06821 - LVV

## DEFENDANT'S *Daubert* MOTION TO EXCLUDE TESTIMONY OF CHARLIE BALOT AND SUPPORTING BRIEF

Debtor/Defendant, Don Juravin, proceeding pro se and pursuant to Federal Rule of

Evidence 702, hereby moves this honorable Court for an order precluding certain testimony of

the Plaintiff's expert witness, Charlie aka Charles Balot.

**Introduction**

Mr. Balot is the Chapter 7 Trustee's expert witness regarding ESI (Electronically Stored

Information) (Docs. 1001 and 1003). In his report, Mr. Balot claims to have analyzed

information obtained from computers and other electronic equipment seized by the Chapter 7

Trustee during execution of the Break Order on May 5, 2021. In his report, (Exhibit 1),  Mr.

Balot also opines that, "To form my opinions, I am relying on the lack of cooperation from Don

Juravin during the data recovery process" and "It is my opinion that Mr. Juravin, in concert with

Anna Juravin, intentionally spoiled data and emails contained in his Google Drive account that

would have been responsive to the search terms as identified in the Court's ESI Order." (Doc.

502 in case no. 6:18-bk-06821-LVV). So, his opinion on my alleged "lack of cooperation" is

based on what he says is my "lack of cooperation." The Court should not be swayed by this

1

circular reasoning.

Mr. Balot's "expert" testimony should be excluded because it is neither relevant nor reliable. His conclusions are not based on his personal knowledge, and he is not qualified to testify as an expert on the matters in this case. There are gaps in his knowledge that render his opinions at best speculative and, in any event, too unreliable to be admissible. Mr. Balot's analysis is fraught with false assumptions at every stage. This Circuit has long guarded against admitting such proposed expert opinion acknowledging that the weighty deference given to experts may overwhelm the factfinder with undue influence. "Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." *United States v. Frazier*, 387 F.3d 1244, 1263(11th Cir. 2004).

Even in a bench trial like this, the court must make a determination that the expert's testimony is both reliable and relevant. *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010) ("Although we have held that the court in a bench trial need not make reliability determinations before evidence is presented, the determinations must still be made at some point. However, the usual concerns of the rule—keeping unreliable expert testimony from the jury—are not present in such a setting, and our review must take this factor into consideration. Nevertheless, the 'court must provide more than just conclusory statements of admissibility or inadmissibility to show that it adequately performed its gatekeeping function.'") (citations omitted); *Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009); *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1302 (Fed. Cir. 2002).

### Lack of Demonstrated Expertise

Mr. Balot failed to substantiate his expertise in forensic analysis, including a lack of essential certifications and hesitancy in disclosing his qualifications, which casts doubt on his credibility and reliability as an expert witness. In fact, from his deposition testimony, it appears that Mr. Balot has no certifications relevant to the matter about which he is to testify. His company's website lists no certifications, nor does his Linked-In page. Granted, he did refuse to answer several relevant questions.

### Professional Misrepresentation

Inconsistencies were observed in Mr. Balot's professional background, including ambiguity regarding his company's legal standing and his role, which undermine his professional integrity and credibility. "Ambiguity" is putting it in the nicest possible terms; Mr. Balot and the Chapter 7 Trustee hold out Mr. Balot's business as "Online Security, Inc." in multiple documents and online (see e.g. Doc 1003). There is no such company. In his deposition, Mr. Balot offered that "Online Security, Inc." was a "d/b/a" for a company called "Onlinelabs, Inc." That entity, "Onlinelabs, Inc." had its corporate existence terminated by the State of California on December 26, 2018 (please see Exhibit 2). Mr. Balot was unable to name any other state where his business might be incorporated. This is despite his claim under oath to be an expert at running his business (see Exhibit 3 on page 20). He claimed no other expertise. Charlie Balot, nor Online Security, Inc., nor Onlinelabs, Inc., nor any other similar name holds any kind of license with any state that a diligent search was able to find.

### Evasion of Direct Questions

In his deposition, Mr. Balot consistently refused to answer critical questions regarding his forensic methods and tools, indicating a potential lack of knowledge and transparency in his

investigative processes. He simply refused to answer a multitude of questions. He gave no reason for his refusals.

### Lack of Personal Involvement in Investigation

Mr. Balot admitted under oath to not personally performing the investigation. In particular, concerning the Excel sheet with allegedly deleted files, questioning revealed that he did not prepare that spreadsheet. This calls into question the authenticity of his findings and testimony. Rule 602 of the Federal Rules of Evidence states.

*"Rule 602. Need for Personal Knowledge*

*A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony. This rule does not apply to a witness's expert testimony under Rule 703."*

Since Mr. Balot admits to not having personal knowledge of the matters before the Court, he would need to testify as an expert. Indeed, that is how the Chapter 7 Trustee has presented him to the Court.

**Mr. Balot should not be allowed to testify as an expert witness**

Rule 702 of the Federal Rules of Evidence provides that:

*"Testimony by Expert Witnesses*

*A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:*

*(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;*

4

*(b) the testimony is based on sufficient facts or data;*

*(c) the testimony is the product of reliable principles and methods; and*

*(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."*

Mr. Balot fails to meet these requirements on several grounds. First, he has no certifications about which he was willing to testify under oath, and he testified as to no particular skills or experience in dealing with these matters. His only claimed expertise, when asked under oath, was in running his company. The running of his company is irrelevant to these proceedings, with the notable possible exception of how the Trustee managed to pay more than $50,000.00 to a non-existent corporation without vetting his hired "expert" in any way. Mr. Balot's deposition reveals that his testimony would not be based on sufficient facts or data. He clearly did not know about several key factual points which have a direct bearing on this case. For example, Balot was clearly unaware of changes that Google made to the use of their products in 2021. Mr Balot's report and testimony under oath reveals that he did not even entertain any possible ways that images might have been deleted and/or moved from the Debtor's Google drive. In *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1045 (7th Cir. 1988) the Court rejected expert testimony because of the expert's failure to control for other explanatory variables.

His deposition testimony showed no signs of being the product of reliable principles and methods, unless we define those as simply reaching a predetermined conclusion on behalf of a party that the Court favors.

Therefore, it is respectfully submitted that Mr. Balot does not meet the requisite standards of an expert witness as per Federal Rule of Civil Procedure 26 or *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993). His testimony cannot be deemed reliable or credible, and his

continued participation as an expert witness would be prejudicial to the administration of justice. Furthermore, he refused to answer questions that were directly related to how he arrived at his opinion, stating that he would only do so "when required" (See Exhibit 3 on page 59).

### Mr. Balot's report does not comply with the Federal Rules of Civil Procedure

Federal Rule of Civil Procedure 26(a)(2)(B), made applicable to this case by Local Bankruptcy Rule 7001-1(n) and by this Court's January 22, 2024 Order (Doc 302), requires that

*"(B) Witnesses Who Must Provide a Written Report. Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:*

*(i) a complete statement of all opinions the witness will express and the basis and reasons for them;*

*(ii) the facts or data considered by the witness in forming them;*

*(iii) any exhibits that will be used to summarize or support them;*

*(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;*

*(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and*

*(vi) a statement of the compensation to be paid for the study and testimony in the case."*

Mr. Balot's report (included here as Exhibit 1 and found in Doc 1003) is unsigned. Mr. Balot stated under oath that there were additional bases for his opinion that he would not reveal in a deposition. It also doesn't provide a list of all other cases in which, during the previous 4 years, he has testified as an expert at trial or deposition. It includes no exhibits. It contains no information about his qualifications. Simply put, the report just doesn't comply with the rules. It should be excluded. To top it off, the report was not filed in a timely manner. It was only included in an "amended" disclosure filed after the due date reflected in this Court's order.

Furthermore, the report states "The deleted files contained communications, account records including a Juravin will and trust account, time keeping records and documentation regarding financial transfers." The report states absolutely nothing about how Mr. Balot came to these conclusions. In fact, the data itself shows that all of the files that Mr. Balot claims were "deleted" by the Debtor were images. Where an expert relies exclusively upon counsel for facts and data, and does nothing to verify those facts, this factor, coupled with other deficiencies, may subject an expert to exclusion. *See, e.g., Munoz v. Orr*, 200 F.3d 291, 301-02 (5th Cir. 2000). There is no indication that Balot verified anything other than what was necessary to reach the conclusion that he was paid for.

**ARGUMENT**

The proponent of expert testimony, in this instance, the Chapter 7 Trustee has the burden of establishing the admissibility of the testimony, *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 592 n.10 (1993). The 9th Circuit Court of Appeals, in *Henderson v. GMAC Mortg. Corp.*, 347 Fed. App'x. 299, 301 (9th Cir. 2009) affirmed the exclusion of an expert that "provided little information about where and when he obtained his education and training, his conclusions lacked factual support, and the opinions he provided required no scientific, technical, or other

7

specialized knowledge." Mr. Balot provided no information about any education or training at all when questioned under oath. In fact, he refused to answer what certifications he has. His conclusions, as revealed in his report, do not appear to be supported by anything factual.

When an expert's opinion is based solely or predominantly upon experience, the expert must explain how that experience lends to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. 2000 Advisory Committee Notes, Fed. R. Evid. 702; *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135-36 (2d Cir. 2013). Again, Mr. Balot under oath only claimed expertise in the realm of running his business. If there is more which qualifies him as an expert in the matters before the Court, that seems like it would have been a good time to explain. Even if Mr. Balot has some level of expertise in dealing with some aspects of ESI, an issue that sometimes arises in connection with an expert's qualifications is whether there is "fit" between an expert's expertise and the opinions the expert seeks to offer. *See Radio Sys. Corp. v. Lalor*, No. C10-828RSL, 2014 WL 4626298, at *2-3 (W.D. Wash. Sept. 12, 2014). In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) the United States Supreme Court held that the trial court's gatekeeping obligation to determine the reliability of the evidence extended to "technical or other specialized knowledge" as well. Mr. Balot is the only expert witness disclosed by the Plaintiff.

Federal Rule of Evidence 702 and *Daubert* require trial courts to engage in a three phase analysis geared toward evaluating the expert's qualifications, the reliability of his/her methodology, and the relevance of his/her testimony. *Frazier, 387 F.3d at 1260.* The party seeking to qualify the expert has the burden of meeting these elements by a preponderance standard. *Rink v. Cheminova, Inc., 400 F.3d 1286, 1292 (11th Cir. 2005).* The inquiry centers on qualifications (i.e. whether the expert has requisite qualifications), reliability (i.e. whether the

underlying reasoning or methodology is scientifically valid and applicable) and relevance (i.e. whether the evidence fits to the disputed facts and assist the trier of fact in reaching conclusions). Mr. Balot revealed no qualifications when testifying under oath, and his unreliability is underscored by the strange history of his company. The bottom line is that the Chapter 7 Trustee hired a company that doesn't exist.

WHEREFORE, the Debtor respectfully requests that this Court grant this motion and disqualify Mr. Balot as an expert witness in this case.

Date: February 9, 2024

Respectfully submitted,

Don Karl Juravin, */Pro Se/*
15118 Pendio Dr.
Bella Collina, FL 34756
don@juravin.com
8138105100

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 9, 2024, a true and correct copy of the foregoing has been furnished by electronic mail to:

Charles Balot, c/o James D. Ryan, Esq., jdr@ryanlawgroup.net;

Dennis D. Kennedy, Trustee, c/o James D. Ryan, Esq., jdr@ryanlawgroup.net;

Dennis D. Kennedy, Trustee, c/o Brad Saxton, Esq., bsaxton@whww.com

Don Karl Juravin, */Pro Se/*
15118 Pendio Dr.
Bella Collina, FL 34756
don@juravin.com
8138105100

**EXHIBIT 1**

**online security** ®

*protecting digital assets worldwide*

**Ryan Law Group, PLLC**

# DON KARL JURAVIN Case No. 6:18-bk-06821-KSG

Submitted to:    James D. Ryan, Esq.
Ryan Law Group, PLLC
636 U.S. Highway One
Suite 110
North Palm Beach, Fl 33408

By:    Charles Balot
OnlineSecurity
10801 National Blvd. Suite 245
Los Angeles, CA  90064

OnlineSecurity


protecting digital assets worldwide

**Ryan Law Group, PLLC**

# Table of Contents

Retention and Compensation.........................................................3
Qualifications................................................................................4
Information Relied Upon ..............................................................5
Discussion.....................................................................................5



*protecting digital assets worldwide*

**Ryan Law Group, PLLC**

# Retention and Compensation

1. OnlineSecurity was retained in the present matter on February 9th, 2021 to provide computer forensics technical and consulting services on the Don Karl Juravin bankruptcy matter presently being heard in the United States Bankruptcy Court, Middle District of Florida Orlando Division. My conclusions and opinions are contained within the scope of this report. I have had no prior relationship with either the Trustee or his counsel involved in this matter.

2. The agreed upon billing rates are: OnlineSecurity's consultants, researchers and technical specialists are billed at rates of $275 per hour, expert witness fees at $400 per hour with a 4-hour minimum, in addition to charges for necessary expenses and disbursements (including document and database charges). The expert witness fee rate shall be for testifying at depositions and testifying at trial. Preparation for testifying at depositions and trial shall be charged at $275 per hour. Attending a deposition, assisting in responding or propounding written discovery, reviewing documents or deposition transcripts and similar work at your request shall be charged at $275 per hour. To date OnlineSecurity has been paid more than $50,000 for the work performed.

OnlineSecurity

**Ryan Law Group, PLLC**


*protecting digital assets worldwide*

# Qualifications

3.   I am currently employed as CEO at OnlineSecurity, Inc., where I have worked since March of 1997.  OnlineSecurity was founded in 1997.  It provides professional services in the areas of computer forensics, electronic discovery and data preservation and recovery. In my role as CEO, I perform and supervise all aspects of its work.

4.   The primary scope of the services regularly provided by OnlineSecurity, Inc., involves the collection, analysis reporting on and testify about electronically stored information ("ESI"). The matters most frequently involve theft of intellectual property, fraud, sexual harassment, wrongful termination and the willful destruction of evidence.

**Ryan Law Group, PLLC**



*protecting digital assets worldwide*

# Information Relied Upon

5.  To form my opinions, I am relying on the lack of cooperation from Don Juravin during the data recovery process, the timing of the activity in his Google Drive account relative to the timing of his cooperation and, the ESI recovered from Mr. Juravins electronic devices and from his Google Drive account. This information includes the Google Drive account Activity Log, a report created by OnlineSecurity that identifies files that are listed as deleted on the Google Drive account Activity Log and were found to exist within the files recovered from Mr. Juravin's devices. I also reviewed some of the ESI that was responsive to the search terms set forth in the Court's ESI Order to contrast it with information provided in the Activity Log. Records regarding money transferred using the TransferWise service were among the records I have reviewed.

6.  The Activity Log:

    a.  identifies more than 80,000 files that were either deleted or placed in the trash folder on June 22nd, 2021. It identifies Don Juravin as the user that deleted and trashed these files.

    b.  Identifies additional files were deleted by Don Juravin on July 8, 2021.

    c.  Identifies files that were viewed by both Don Juravin and Anna Juravin on numerous occasions and edited by Anna Juravin on numerous occasions.



protecting digital assets worldwide

**Ryan Law Group, PLLC**

# Opinions

7. It is my opinion that Mr. Juravin, in concert with Anna Juravin, intentionally spoiled data and emails contained in his Google Drive account that would have been responsive to the search terms as identified in the Court's ESI Order. The deleted files contained communications, account records including a Juravin will and trust account, time keeping records and documentation regarding financial transfers.

8. The information and opinions expressed in this report are based on my review of material currently available. I reserve the right to review any new material that becomes available and if appropriate, to revise or amend my opinions based on the results of that review.

Lauren Schindler

| | |
|---|---|
| **From:** | Lauren Schindler |
| **Sent:** | Wednesday, January 24, 2024 9:02 PM |
| **To:** | Don Juravin |
| **Subject:** | attached - Balot Report  6:21-ap-00103 |
| **Attachments:** | Balot Report  esrv.pdf |

The report of Mr. Balot is attached.


LAUREN J. SCHINDLER, ESQ.
LAUREN@RYANLAWGROUP.NET
RYAN LAW GROUP, PLLC
636 U.S. HIGHWAY ONE ⚓ SUITE 110
NORTH PALM BEACH, FLORIDA ⚓ 33408
MAIN (561) 881-4447 ⚓ FAX (561) 881-4461
LAUREN'S MOBILE (561) 452-2256

**Alert! Protect against Fraudsters:** Due to increased incidences of emailed wire instructions being intercepted, call our office to confirm the name, ABA no. & account no. when sending/receiving wire instructions. Thank you!
**CONFIDENTIALITY NOTICE:** This e-mail is intended for the exclusive use of the addressees and may contain privileged/confidential information.  If you received this in error, please immediately notify us by telephone at 561-881-4447 and destroy the original message. The Electronic Communications Privacy Act, [19 USC 2510-2521] applies to this e-mail. Unauthorized review or distribution is strictly prohibited.
**IRS DISCLOSURE** - CIRCULAR 230:  I am required to advise you that if there is any tax advice contained herein, it is not intended to be used, and cannot be used, by the addressee or any taxpayer, for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code.

**EXHIBIT 2**



# Secretary of State
## Certificate of Status

I, SHIRLEY N. WEBER, PH.D., California Secretary of State, hereby certify:

| | |
|---|---|
| **Entity Name:** | ONLINELABS, INC. |
| **Entity No.:** | 1713379 |
| **Registration Date:** | 09/29/1992 |
| **Entity Type:** | Stock Corporation - CA - General |
| **Formed In:** | CALIFORNIA |
| **Status:** | Suspended - FTB/SOS |

The above referenced entity's powers, rights and privileges are suspended in California.

This certificate relates to the status of the entity on the Secretary of State's records as of the date of this certificate and does not reflect documents that are pending review or other events that may affect status.

No information is available from this office regarding the financial condition, status of licenses, if any, business activities or practices of the entity.



**IN WITNESS WHEREOF**, I execute this certificate and affix the Great Seal of the State of California this day of February 07, 2024.

**SHIRLEY N. WEBER, PH.D.**
**Secretary of State**

**Certificate No.:** 180472532

To verify the issuance of this Certificate, use the Certificate No. above with the Secretary of State Certification Verification Search available at bizfileOnline.sos.ca.gov.

# ONLINELABS, INC. (1713379)



**Request
Certificate**

| | |
|---|---|
| *Initial Filing Date* | 09/29/1992 |
| *Status* | Suspended - FTB/SOS |
| *Standing - SOS* | Not Good |
| *Standing - FTB* | Not Good |
| *Standing - Agent* | Good |
| *Standing - VCFCF* | Good |
| *Inactive Date* | 12/26/2018 |
| *Formed In* | CALIFORNIA |
| *Entity Type* | Stock Corporation - CA - General |
| *Principal Address* | 3000 S. ROBERTSON BLVD. SUITE 288 LOS ANGELES, CA 90034 |
| *Mailing Address* | 3000 S. ROBERTSON BLVD. SUITE 288 LOS ANGELES,CA90034 |
| *Statement of Info Due Date* | 09/30/2017 |
| *Agent* | Individual CHARLES BALOT 3000 S. ROBERTSON BLVD. SUITE 288 LOS ANGELES, CA  90034 |

A0515559

# *# 1713379*

**CERTIFICATE OF AMENDMENT**

**OF**

**ARTICLES OF INCORPORATION**

**FILED**
In the office of the Secretary of State
of the State of California

## OCT 1 5 1998

*Bill Jones*
BILL JONES, Secretary of State

CHARLES BALOT certifies that:

1.  He is the president and secretary of TSA & HAHS CORPORATION, a California corporation.

2.  Article 1 of the Articles of Incorporation of the Corporation is amended to read as follows.

    "1. The name of the corporation is ONLINELABS, INC."

3.  The foregoing amendment of Articles of Incorporation has been duly approved by the Board of Directors.

4.  The foregoing amendment of Articles of Incorporation has been duly approved by the required vote of shareholders in accordance with Section 902 of the Corporations Code. The total number of outstanding shares of the Corporation is 17,000. The number of shares voting in favor of the amendment equaled or exceeded the vote required. The percentage vote required was more than 50%.

I further declare under penalty of perjury under the laws of the State of California that the matters set forth in this certificate are true and correct of my own knowledge.

Date: _____ 10/7 ____, 1998           _____

                                      CHARLES BALOT, President and Secretary

LEM\ONLINELABS\INC\ARTICLES AMEND



# State of California
## Secretary of State

**Statement of Information**

(Domestic Stock and Agricultural Cooperative Corporations)
FEES (Filing and Disclosure): $25.00.
If this is an amendment, see instructions.
**IMPORTANT – READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

| S |

**FF21608**

# FILED

In the office of the Secretary of State
of the State of California

**AUG-09 2016**

This Space for Filing Use Only

---

**1.  CORPORATE NAME**

ONLINELABS, INC.

---

**2.  CALIFORNIA CORPORATE NUMBER**

C1713379

---

**No Change Statement** (Not applicable if agent address of record is a P.O. Box address.  See instructions.)

3.  **If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.**

☐  If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed **to Item 17.**

---

**Complete Addresses for the Following** (Do not abbreviate the name of the city.  Items 4 and 5 cannot be P.O. Boxes.)

| | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 4.  STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE<br>3000 S. ROBERTSON BLVD. SUITE 288, LOS ANGELES, CA 90034 | | | |
| 5.  STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY<br>3000 S. ROBERTSON BLVD. SUITE 288, LOS ANGELES, CA 90034 | | | |
| 6.  MAILING ADDRESS OF CORPORATION, IF DIFFERENT THAN ITEM 4 | CITY | STATE | ZIP CODE |

---

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers.  A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 7.  CHIEF EXECUTIVE OFFICER/<br>CHARLES  BALOT | 3000 S. ROBERTSON BLVD. SUITE 288, LOS ANGELES, CA 90034 | | | |
| 8.  SECRETARY<br>SHARON ISRAEL BALOT | 3000 S. ROBERTSON BLVD. SUITE 288, LOS ANGELES, CA 90034 | | | |
| 9.  CHIEF FINANCIAL OFFICER/<br>CHARLES  BALOT | 3000 S. ROBERTSON BLVD. SUITE 288, LOS ANGELES, CA 90034 | | | |

---

**Names and Complete Addresses of All Directors, Including Directors Who are Also Officers** (The corporation must have at least one director.  Attach additional pages, if necessary.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 10.  NAME<br>CHARLES BALOT | 3000 S. ROBERTSON BLVD. SUITE 288, LOS ANGELES, CA 90034 | | | |
| 11.  NAME<br>SHARON  BALOT | 3000 S. ROBERTSON BLVD. SUITE 288, LOS ANGELES, CA 90034 | | | |
| 12.  NAME | ADDRESS | CITY | STATE | ZIP CODE |

---

13.  NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY:

---

**Agent for Service of Process**  If the agent is an individual, the agent must reside in California and Item 15 must be completed with a California street address, a P.O. Box address is not acceptable.  If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 15 must be left blank.

14.  NAME OF AGENT FOR SERVICE OF PROCESS  Note: The person designated as the corporation's agent MUST have agreed to act in that capacity prior to the designation.

CHARLES BALOT

| 15.  STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, **IF AN INDIVIDUAL**  CITY<br>3000 S. ROBERTSON BLVD. SUITE 288, LOS ANGELES, CA 90034 | | STATE | ZIP CODE |
|---|---|---|---|

---

**Type of Business**

16.  DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION

CONSULTING

---

17.  BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 08/09/2016 | SHARON ISRAEL BALOT | SECRETARY | |
|---|---|---|---|
| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |

---

| SI-200 (REV 01/2013) | Page 1 of 1 | APPROVED BY SECRETARY OF STATE |
|---|---|---|

**EXHIBIT 3**

audio1572554191

# audio1572554191

## don@juravin.com



https://scribie.com/files/eb844110ec7b428c9f8c43f0a370e903c99f84e3

## Certificate of Authenticity

TO WHOM IT MAY CONCERN

We received the original Zoom recording by Kerr & Associates.

This is to certify that the speech in this audio file has been converted into text manually by our transcribers on Scribie.com to the best of their ability.

Since the transcript is not only in writing but also backed up and synced by a matching audio file, we can attest that the transcript has a minimum accuracy of 99%.

Signed

Judith Mogamog
Operations Manager
CGBiz Corporation DBA Scribie
+1 866 941 4131 | support@scribie.com

audio1572554191

**Mr. Balot:** California, 90064.

**Mark King:** Okay. Date of birth, sir?

**Mr. Balot:** 3/8/52.

**Mr. Balot:** Okay. And do you have an email address in case you want to read this so I can just email you the transcript if you request to read?

**Mr. Balot:** Certainly. Balot, my last name, B as in boy, A-L-O-T, @onlinesecurity, all one word.com.

**Mark King:** Easy enough. Alright, now the fun part. Can you show me a picture ID of yours? We usually want a driver's license.

**Mr. Balot:** Sure. Hold on one second.

**Mr. Balot:** And if you just hold it in front of your face so that you can't see the camera, then I'll be picking up... Could you push it away from you, sir? Can you push it away? Okay, so it's a California ID, California driver's license. Are all counsel satisfied with the identification of the witness? Is everybody okay with that?

**Mr. Ryan:** Yep.

**Mark King:** Okay.

**Mr. Juravin:** I did not see the driving license, but if you did, then it's fine.

**Mark King:** He can hold it up again if you want. A little low. Don't want to lose the deposition before we start.

**Mr. Balot:** Yeah, give me a second.

**Mark King:** No problem. Mr. Juravin, can you see that?

**Mr. Juravin:** Yes, thank you.

**Mark King:** Okay. I'll go ahead and swear in the witness when he's ready. If he would just raise his right hand. Do you swear or affirm a testimony you're about to give the following deposition will be the truth, the whole truth, and nothing but the truth, so help you God?

**Mr. Balot:** I do.

**Mark King:** Thank you. You may proceed counsel... Or Mr. Juravin.

**Mr. Juravin:** Mr. Balot, good morning.

audio1572554191

**Mr. Balot:** 'Morning.

**Mr. Juravin:** Do you have an attorney representing you today?

**Mr. Balot:** I have an attorney on the line, yes, who's a part of the case?

**Mr. Juravin:** Okay, who is your attorney?

**Mr. Balot:** That would be Mr. Ryan.

**Mr. Juravin:** So it was my understanding from Mr. Ryan that he's not your attorney. You are his expert witness, but he's not representing you.

**Mr. Balot:** He's representing me.

[overlapping conversation]

**Mr. Juravin:** So is Mr. Ryan, your attorney representing you today, Or are you an expert... Let me please finish, because otherwise, Mark cannot write it down.

**Mr. Balot:** No, he's not my personal attorney.

**Mr. Juravin:** So today, in this setting right now, do you have an attorney representing you?

**Mr. Balot:** No, I do not.

**Mr. Ryan:** Objection to form.

**Mr. Juravin:** Okay. You do not have an attorney representing you. Okay. Who else on your end or on your behalf is listening right now?

**Mr. Balot:** No one else.

**Mr. Juravin:** Do you have any devices there that help you to answer?

**Mr. Balot:** No, I do not.

**Mr. Juravin:** Okay. You refused to receive emails from me, and they were blocked or advised by Mr. Ryan. Did you refuse to receive emails from me?

**Mr. Balot:** Yes, I was instructed not to, and I decided not to as well.

**Mr. Juravin:** Instructed by whom?

**Mr. Balot:** Mr. Ryan.

**Mr. Juravin:** Okay. How many family members do you have working in your firm?

audio1572554191

**Mr. Balot:** One.

**Mr. Juravin:** One family member, and that will be?

**Mr. Balot:** Michael Balot.

**Mr. Juravin:** Michael. What is the name of the company?

**Mr. Balot:** Online Security.

**Mr. Juravin:** Is it Online Security, Inc, or just Online Security?

**Mr. Balot:** It's Online Security.

**Mr. Juravin:** No Inc?

**Mr. Balot:** No Inc.

**Mr. Juravin:** So, it's a mistake what we have seen in all the documents, the addition of the word "Inc"?

**Mr. Balot:** Yeah, that's there. We're actually a DBA.

**Mr. Juravin:** DBA of what company?

**Mr. Balot:** Online Labs.

**Mr. Juravin:** Online Labs, Inc?

**Mr. Balot:** That would be correct.

**Mr. Juravin:** Okay. And Online Labs Inc, is it a working company?

**Mr. Balot:** Yes, it is.

**Mr. Juravin:** It's a valid company?

**Mr. Balot:** It's a what, I'm sorry?

**Mr. Juravin:** Valid.

**Mr. Balot:** What do you mean by valid?

**Mr. Juravin:** Active?

**Mr. Balot:** Yes.

audio1572554191

**Mr. Juravin:** Okay. The California Secretary of State says that the company is not in good standing, and it's actually not a valid company. Are you aware of that?

**Mark King:** I'm sorry. I'm sorry. Excuse me. We had three people talking at once there. Mr. Ryan, you objected to form?

**Mr. Ryan:** I did.

**Mark King:** And your answer, sir?

**Mr. Balot:** Not to my knowledge.

**Mr. Juravin:** You are not aware of that?

**Mr. Balot:** No, I am not.

**Mr. Juravin:** I am sharing my screen. One second, please. It's the first time I'm doing that here. There you go. I'm sharing my screen and the name of the company is Online Labs, correct? Lab or Labs?

**Mr. Balot:** There is a space between Online and Labs.

**Mr. Juravin:** I don't see you here at all. So maybe there is no space? And now I see that. So there is no space in your company's name. And when I click... Okay.

**Mark King:** I'm sorry, what was his answer?

**Mr. Juravin:** That is correct, he said.

**Mark King:** I need it from the witness.

**Mr. Balot:** You need to give me time to answer so that we're not, overriding what Mr. King can do.

**Mr. Juravin:** I am looking right now with you, and I would like to enter this one into Exhibit A. And it shows that Online Labs, Inc is actually suspended, not in good standing. Again, not in good standing, and two times, and it shows that it's inactive since 2018. Is that correct?

**Mr. Balot:** If that's what that says, yes.

**Mr. Juravin:** So basically, would it be fair to say that you are operating without a business license or without a business permission from the Secretary of State of California?

**Mr. Ryan:** Objection to the form.

**Mr. Balot:** No, that's not correct.

**Mr. Juravin:** Okay.

audio1572554191

**Mark King:** Excuse me. Time out. Mr. Ryan said objection to form and you answered over it. Mr. Balot, what's your answer?

**Mr. Balot:** That is not correct.

**Mr. Juravin:** Please explain me, if your company's Online Labs, Inc, and it has been suspended since 2018, how can it be that it's okay? And can you please explain it?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** We operate under the name Online Security.

**Mr. Juravin:** You told me that Online Security is a DBA.

**Mr. Balot:** At one time, it was.

**Mr. Juravin:** So one more time. You operate under Online Security as a DBA, but where is it registered as a DBA, with the State of Florida?

**Mr. Balot:** Not with the State of Florida. With the State of California.

**Mr. Juravin:** I'm sorry. With the State of California. Where is it registered with the State of California that your company is a DBA?

**Mr. Balot:** I just explained that to you. You answered your own question.

**Mr. Juravin:** So please, one more time, you are doing business as a DBA of a company that is actually suspended already six years.

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I'm sorry. Excuse me. Mr. Balot, you're answering over his objection, so I'm getting the objection, but not your answer. I apologize. Could you answer?

**Mr. Balot:** That is not correct.

**Mr. Juravin:** Please explain.

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I think I've explained it already.

**Mark King:** Mr. Balot, you answered over his objection again. Could you skip a beat? I'm sorry.

**Mr. Balot:** I apologize. We are operating totally fully under the name of Online Security.

**Mr. Balot:** But Online Security is not registered anywhere with the State of Florida, and let me show you.

audio1572554191

**Mr. Ryan:** Objection to form.

**Mr. Juravin:** Can we make him... To make it faster, can we agree, Mr. Ryan, that you object to anything that I'm saying, and that will be easier? Can we agree right now, for the record, that anything that I'm saying, you are objecting to form?

**Mr. Ryan:** No, sir.

**Mr. Juravin:** Why is not?

**Mr. Ryan:** 'Cause that...

[overlapping conversation]

**Mr. Juravin:** I would like to, I would like to save the time, and I'm telling you that, because it seems like you want to interfere with my line of questioning, and I'm telling you that please to stop with it, and I accept that you object to anything that I'm saying. You have objection to form, okay. To everything. So, let's continue. The name that you are operating under is Online Security, correct?

**Mr. Balot:** That is correct.

**Mr. Juravin:** Is it Online Security, Inc?

**Mr. Balot:** No, it is not.

**Mr. Juravin:** It is not. Okay. Security. I'm writing "Online Security," and there is no results. I am adding here space. And there is none of your companies. Correct? Do you see my screen? Is any one of them your company?

**Mr. Balot:** Excuse me? No.

**Mr. Juravin:** So, basically Online Security is not listed with the State of California in any way. Correct?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Again, it is a registered DBA.

**Mr. Juravin:** Where is it registered? Where is it registered, Mr. Balot?

**Mr. Balot:** In the County of Los Angeles.

**Mr. Juravin:** Can you provide us with a link or can you tell me where the DBA? Is it not necessary to register A DBA with the State of California?

**Mr. Balot:** I couldn't explain to you exactly, but it is a registered DBA in the County of Los Angeles.

**Mr. Juravin:** Okay. But the DBA needs to be working under a company. DBA is not a company by itself. It needs to work under a legitimate company. And your company is no longer in business.

**Mr. Ryan:** Objection to form.

**Mr. Juravin:** Am I right that according to the Secretary of State of California, you are not in business?

**Mr. Ryan:** Objection to form.

**Mr. Juravin:** Online Labs. Here we go. Onlinelabs, one word, Inc, is suspended since 2018.

**Mr. Balot:** Yes. I see that.

**Mr. Juravin:** SO, you see that, and it says that it's not in good standing. So basically, when the trustee contract you for work, you were not... You didn't have a valid company at the time.

**Mr. Ryan:** Objection to form.

**Mr. Balot:** That is not correct.

**Mr. Juravin:** Okay. Let's move on. We covered that. Here, do you see my screen, in LinkedIn? Did you provide this information to LinkedIn? Are you aware that Online Security, Inc is here on LinkedIn?

**Mr. Balot:** Yes, I am.

**Mr. Juravin:** And it says Online Security, Inc, which doesn't exist.

**Mr. Balot:** That is an error.

**Mark King:** Can I get your answer, sir?

**Mr. Balot:** Certainly. That is an error.

**Mr. Juravin:** And this error existed for 10 years or 12 years, and you have never corrected it?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** No.

**Mr. Juravin:** Okay. So, so far, we have a DBA that is not registered. We have so far another LinkedIn that is deceiving. Now we have Online Labs with an R, registered mark. Have you ever registered the name Online Labs or Online Security with the US Patent Office?

**Mr. Ryan:** Objection to form.

audio1572554191

**Mr. Balot:** I don't know.

**Mr. Juravin:** So, if I tell you that it's not registered, because we could not find any registration, and yet you are using R for registered mark without any registration, would it surprise you?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Can't answer that question.

**Mr. Juravin:** Okay. Let's continue, let's move forward. Is this your site?

**Mr. Balot:** That is correct.

**Mr. Juravin:** It looks very spammy, and actually, it looks like a scam. And let's go one by one, and you tell me why am I wrong, please. Do you have any privacy... Do you have any terms and conditions on your site?

**Mr. Balot:** I would have to click into it to tell you.

**Mr. Juravin:** Here it is. I'm clicking right now, and it does not have terms and conditions.

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I'm looking at privacy policy.

**Mr. Juravin:** Privacy is not terms and conditions.

**Mr. Ryan:** Objection to form.

**Mr. Juravin:** Do you have any terms and conditions on your site?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Not that I...

**Mr. Juravin:** I cannot hear him. He's running over him, and I cannot hear it myself.

**Mr. Balot:** Not that I am aware of.

**Mr. Juravin:** So, you see here and you see that you don't have terms and conditions. Please tell me where should I go on your site to learn about the official name of the registered company? Where can I see anywhere on your site that the official name of the registered company? Anywhere?

**Mr. Balot:** Everywhere you see Online Security.

**Mr. Juravin:** Online Security is a DBA; it's not a real company.

**Mr. Balot:** That's your opinion.

audio1572554191

**Mr. Juravin:** It is... Okay, we will not argue with that. We would leave it up to the court. So, is there anything in the privacy policy that tells me which is the company's name, anywhere?

**Mr. Balot:** I'm not familiar enough with that to answer.

**Mark King:** Sorry, Mr. Balot? I got the objection by Mr. Ryan. I didn't get the beginning of your answer, sir.

**Mr. Balot:** I am not familiar enough with the privacy policy to comment.

**Mr. Juravin:** Is it your company?

**Mr. Balot:** Yes.

**Mr. Juravin:** How long have you owned the company?

**Mr. Balot:** As Online Security, since, I believe, 2008.

**Mr. Juravin:** 2008. And before that, what was it?

**Mr. Balot:** TSA.

**Mr. Juravin:** Before that, and did you own also TSA?

**Mr. Balot:** Yes.

**Mr. Juravin:** And did TSA do exactly the same thing as Online Security?

**Mr. Balot:** Certain portions of our work, yes.

**Mr. Juravin:** Okay. And why did you change it from TSA to Online Security?

**Mr. Balot:** For branding purposes.

**Mr. Juravin:** Okay. Let's move on. I'm looking here About Us, and About Us, I see nothing with your name or anybody. It mentions Team, but it has nobody's name. Am I right?

**Mr. Balot:** Yes.

**Mr. Juravin:** Any reason why you don't list... Let's look at more info. Do you see here in company's profile anything aside from a building?

**Mr. Balot:** No.

**Mr. Juravin:** Can you learn anything about anybody that works in the company? Can you learn anything about it from this page?

audio1572554191

**Mr. Balot:** I don't feel that needs to be part of the website.

**Mr. Juravin:** You don't feel that About Us needs to have the name of the professionals?

**Mr. Balot:** No, I do not.

**Mr. Juravin:** Okay. What about listing their credentials?

**Mr. Balot:** Same answer.

**Mr. Juravin:** Is that the building where you work?

**Mr. Balot:** Presently, yes.

**Mr. Juravin:** How many employees in the company?

**Mr. Balot:** There are two.

**Mr. Juravin:** Who are the employees?

**Mr. Balot:** Michael Balot.

**Mr. Juravin:** Okay.

**Mr. Balot:** And I'm not going to name the other.

**Mr. Juravin:** So, this is a deposition, and I'm asking you to know the names of the employees that work there, because I need to verify information later. And you are refusing to give me the name of the other employee?

**Mr. Balot:** That is correct.

**Mr. Juravin:** Okay. What name did you use in 2018?

**Mr. Balot:** Online Security.

**Mr. Juravin:** Did you use the other name as well in 2018?

**Mr. Balot:** What other name?

**Mr. Juravin:** The name of the company that was suspended, Online Labs.

**Mr. Balot:** No.

**Mr. Juravin:** You did not... Please try to recall to the best that you can. In 2018, did you use the name Online Labs?

**Mr. Balot:** It's possible, yes.

audio1572554191

**Mr. Juravin:** Okay. Do you know if you used it, or not?

**Mr. Balot:** I cannot answer that question.

**Mr. Juravin:** Okay. When did you stop using Online Labs?

**Mr. Balot:** Approximately 2018.

**Mr. Juravin:** When exactly, do you know?

**Mr. Balot:** I do not.

**Mr. Juravin:** Why did you stop using that name?

**Mr. Balot:** We decided Online Security was a better name to operate under.

**Mr. Juravin:** Were you sued? Did you have lawsuits under the Online Labs and bad reputation on the web?

**Mr. Balot:** Not to my knowledge, no.

**Mr. Juravin:** Can you tell me how many times you were sued, whether personally or whether through one of your companies?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** None. None, to my knowledge.

**Mr. Juravin:** You or any one of your companies were never sued anywhere?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I believe in the early 2000s, we had a small claims action in Los Angeles.

**Mr. Juravin:** Only small claim in Los Angeles? Okay.

**Mark King:** I'm sorry. I didn't get his answer. What, sir?

**Mr. Balot:** Yes. To the best of my knowledge, **yes.**

**Mr. Juravin:** Okay. When you say best of my knowledge, is it because you have memory problems, or is it because... Give me any other reason, because when somebody is sued, they will remember that.

**Mr. Ryan:** Objection to form.

**Mr. Juravin:** So I want to ask you if there are memory issues, because we have a long way to go

audio1572554191

now with questions that will involve memory, and if there are, if you have memory issues, I don't want to... I'm sorry, I don't have the vocabulary, but I will not torture you with questions of memory. So, do you have memory issues?

**Mr. Balot:** I think as everybody ages, they do, but mine are not by any means acute.

**Mr. Juravin:** Okay. You answered me originally that you don't use the Online Labs and that you haven't used it at the time that you were hired. But when I look here, I see that in May 2017, 21, you did use the name.

**Mr. Ryan:** Objection to form.

**Mr. Juravin:** You did use the name Online Labs.

**Mr. Ryan:** Objection to form.

**Mr. Juravin:** One second. I will... Here we go. You do have Online Labs and Online Security together in 2018... I'm sorry, in 2000... Once again. May 17th, 2021. And I would like to enter this one into exhibit please. Exhibit... Is it 2 or B?

**Mark King:** I prefer 2, if that's alright with counsel.

**Mr. Juravin:** There is no counsel.

**Mark King:** I meant the other counsel. There's two other attorneys here.

**Mr. Ryan:** Yeah.

**Mr. Balot:** Okay. So this will be number 2. So in May 17th, 2021, you basically used both Online Labs and Online Security.

**Mr. Ryan:** Objection to form.

**Mr. Juravin:** Is that what you see on the screen, like I do?

**Mr. Balot:** Yes, it is.

**Mr. Juravin:** There are here, registered mark. Do you know if any one of your companies was registering with the US Patent Office? Because we could not find anything.

**Mr. Ryan:** Objection to form.

**Mr. Balot:** No.

**Mr. Juravin:** So they are not registered with the US Patent Office, and yet you used a registered mark?

**Mr. Ryan:** Objection to form.

audio1572554191

**Mr. Juravin:** Would that be right? Mr. Ryan, can you please let me finish and then can you object, because I'm still not done, and then you interrupt me and I have to repeat it. So one more time. Online Labs and Online Security are both with registered trademark, and yet they are not really registered with the US Patent Office.

**Mr. Ryan:** Objection to form.

**Mr. Juravin:** Would that be right?

**Mr. Balot:** I can't say.

**Mr. Juravin:** You don't know if you registered the companies with the trademark office?

**Mr. Balot:** I can't say.

**Mr. Juravin:** And it's your company?

**Mr. Balot:** That is correct.

**Mr. Juravin:** Do you think it's your responsibility to know what is on your website?

**Mr. Balot:** Yes.

**Mr. Juravin:** Okay. Here again... I'm sorry?

**Mr. Balot:** I need to take a break for one second. Excuse me.

**Mr. Juravin:** No problem.

**Mr. Balot:** I'll be right back.

**Mr. Juravin:** No problem.

**Mark King:** Excuse me. The previous name, was that TSA, or something else?

**Mr. Juravin:** Thomas. Sarah. Apple.

**Mark King:** Okay, that's what I thought. Thank you.

**Mr. Balot:** I'm back.

**Mr. Juravin:** Okay. Let's continue. Let's continue, and here, again, we don't have no terms of service. Just a second, let me show you. And there is no terms of service on this site, either. No terms of service terms, and no privacy. Is that correct?

**Mr. Balot:** That's a prior iteration of our website that we corrected.

audio1572554191

**Mr. Juravin:** I understand. And yet I'm asking you, as of May 17, you don't have no privacy and not terms.

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I'd have to review the website to tell you.

**Mr. Juravin:** Can you look at it? Can you look at it, because it's right now here in front of you. Do you see anywhere that you would like me to click that says the word "terms" or says the word "privacy"?

**Mr. Balot:** It is not there.

**Mr. Juravin:** About Us. Do you see here names of anybody that works in the company?

**Mr. Balot:** No, I do not.

**Mr. Juravin:** Do you know somebody by the name of Randanza?

**Mr. Balot:** No, I do not.

**Mr. Juravin:** Okay. Would you agree with me that the site that looks like this, like with no privacy, no terms, no registered trademark properly, can be perceived as not serious?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I think that's a very vague question, and I cannot agree with it.

**Mr. Juravin:** Okay. Do you think a site that doesn't have picture of the person that owns it, professionals, and doesn't have a real company's name, can be perceived as a scammy or not serious site?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I disagree.

**Mr. Juravin:** Okay.

**Mr. Balot:** I'm sorry, let me let me say that again. I disagree.

**Mr. Juravin:** Okay. So you think you would've bought from a site that doesn't have privacy, doesn't have terms, doesn't have... Based on what, would you work with this company? Based on what?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** It's a vague question. Be more specific.

audio1572554191

**Mr. Juravin:** Okay. Why do you think the trustee in the State of Florida will choose a site like this, on the other side of the country, when the site looks like a scam and doesn't have any pictures of anybody, doesn't have any CV, absolutely has nothing?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I can't answer that.

**Mr. Juravin:** Okay. Did you have prior knowledge or did you know anybody from the trustee's office, like Mr. Ryan or anybody else, that referred them to you?

**Mr. Balot:** I did not.

**Mr. Juravin:** Did anybody... I'm sorry. Who first approached you to hire you?

**Mr. Balot:** Mr. Ryan.

**Mr. Juravin:** When did he approach you? About what date?

**Mr. Balot:** I believe it was February of 2021.

**Mr. Juravin:** Okay. Did he tell you that he was referred by somebody?

**Mr. Balot:** I do not remember.

**Mr. Juravin:** Okay.

**Mark King:** I'm sorry. Please repeat.

**Mr. Balot:** I do not remember.

**Mark King:** Thank you.

**Mr. Balot:** You're welcome.

**Mr. Juravin:** How many employees did you have at the time?

**Mr. Balot:** Three.

**Mr. Juravin:** Three. Aside from yourself, or including yourself?

**Mr. Balot:** Aside from myself.

**Mr. Ryan:** Okay. So it was yourself. Was Michael also there?

**Mr. Balot:** Correct.

**Mr. Juravin:** So you, Michael, it was also Richard, correct?

audio1572554191

**Mr. Balot:** Richard who?

**Mr. Juravin:** Richard Grolick.

**Mr. Balot:** That would be correct.

**Mr. Juravin:** Okay. I'm sorry, I just have a hard time for some reason, it's a mental block pronouncing his last name and that's why I called him Richard. Who will be the third person?

**Mr. Balot:** Ron Lavender.

**Mr. Juravin:** Ron Lavender. Okay. And what did Ron Lavender do?

**Mr. Balot:** He was a technician.

**Mr. Juravin:** And Richard?

**Mr. Balot:** Richard was a consultant and technician and computer forensic.

**Mr. Juravin:** Okay. And what did you do in general in the company?

**Mr. Balot:** I oversee all of the company's engagements.

**Mr. Juravin:** Did you yourself... Before I ask you, let me have that.

[background conversation]

**Mr. Juravin:** Let me continue, let me continue. I'm jumping to other subject. Okay. Did you instruct Mr. Ryan how to send you the computers?

**Mr. Ryan:** Objection to form. And I'm gonna instruct the witness not to answer the question. You're getting into communications between trustee's counsel and the trustee's expert, and that would be privileged communication.

**Mr. Juravin:** But he's an expert, and we check the rules, and as an expert, he's... You are not his attorney. He's an expert, and therefore, he needs to answer me everything that I'm asking him. Later, you can object to it in court, but right now, I should be allowed to ask him anything that I want.

**Mr. Ryan:** No, sir. When you infringe on privileged communications, I am within my bounds to instruct the witness not to answer and...

**Mr. Juravin:** We will approach the court and we will see. Mr. Balot, I asked you to provide all evidence that you plan to present to the court during the trial, but I haven't received anything from you.

**Mr. Ryan:** Objection to form.

audio1572554191

**Mr. Juravin:** Can you tell me please, why?

**Mr. Balot:** My understanding...

**Mr. Ryan:** Excuse me for a second. Mr. Juravin, you've been told numerous times that you're...

**Mr. Juravin:** I understand that this is my deposition, and I will continue. This is my deposition, and please don't tell me...

**Mr. Ryan:** No, sir...

**Mr. Juravin:** Don't tell me how to conduct my deposition.

**Mr. Ryan:** Sir, I'm gonna make my statement on the record...

**Mr. Juravin:** Make your statement and let me continue.

**Mr. Ryan:** Sir, so, you've been told numerous times that the communications between Mr. Balot and you will be asked through me, and everything that you've been provided that you've asked for has come from my office. Your efforts to make it as though you're entitled to communicate directly with the trustee's witness or that he is obligated to provide stuff from him directly to you is without basis, and it's badgering and harassment.

**Mr. Juravin:** I got it. I heard you, and let me please continue.

**Mark King:** I'm sorry. Excuse me, excuse me. In order to make a good record, you all need to talk one at a time. I believe Mr. Ryan was in the middle of an objection.

**Mr. Ryan:** So when you say things that are intentionally misleading, it creates a back record, Mr. Juravin.

**Mr. Juravin:** That's my deposition. And you can object to it later. I would like to continue now.

**Mr. Ryan:** And I can instruct a witness not to answer when it's appropriate. Go ahead.

**Mr. Juravin:** Mr. Balot, I asked you to provide all evidence that you plan to present to the court at trial. You haven't provided it. Is that correct?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I will not answer that question.

**Mr. Juravin:** I asked you to provide all names and contacts of the people who were working on this case. You have not provided me that. Is that correct?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I will not... Excuse me. I will not answer that question.

audio1572554191

**Mr. Juravin:** I asked you to provide all supporting documents for all claims you are going to make at the trial in court. You have not provided me anything. Is that correct?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I will not answer that question.

**Mr. Juravin:** I asked you to provide all correspondings between anyone in your companies and any of the trustee's representatives. Did you provide me any?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I will not answer that question.

**Mr. Juravin:** I asked you to provide all agreements with the trustee or any of his representatives, and you have not provided that.

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Any of those materials that I've been requested by the trustee, I have provided to them.

**Mr. Juravin:** But you have not provided them to me, according to the subpoena.

**Mr. Balot:** I will not answer that question.

**Mr. Juravin:** All your correspondings with Mr. Gronik regarding this case and why he left the company, and you have not provided that as well.

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I consider those two questions. Please make yourself clear.

**Mr. Juravin:** I asked for all your correspondings with Richard regarding the case. You have not provided that.

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I will not answer that question.

**Mr. Juravin:** Okay. Do you consider yourself an expert?

**Mr. Balot:** Need to be more specific.

**Mr. Juravin:** What are you expert in?

**Mr. Balot:** You need to be more specific.

audio1572554191

**Mr. Juravin:** I'm asking you, what are you, in this court case, what are you expert in? What are your expertise?

**Mr. Balot:** In running my company.

**Mr. Juravin:** Your expertise are in running your companies?

**Mr. Balot:** That is correct.

**Mr. Juravin:** Are you certified as a computer examiner? CCE. Do you have certification?

**Mr. Balot:** Not in that area, no.

**Mr. Juravin:** Are you have a certified forensic computer examiner, called CFCE?

**Mr. Balot:** That's an acronym I've never heard of, but I have had experts working for me and under me that have certificates.

**Mr. Juravin:** But not you.

**Mr. Balot:** Me personally, no.

**Mr. Juravin:** Do you have something called ENCE, certificate for examiner?

**Mr. Balot:** Are you referring to EnCASE?

**Mr. Juravin:** Yes.

**Mr. Balot:** Okay. Yes.

**Mr. Juravin:** So, you do have a certification of EnCASE?

**Mr. Balot:** Not me personally, no.

**Mr. Juravin:** Okay. So you do not have. Do you have any certification? Do you have any certification whatsoever?

**Mr. Balot:** Yes.

**Mr. Juravin:** Which one, please?

**Mr. Balot:** I refuse to answer that question.

**Mr. Juravin:** I cannot hear you.

**Mark King:** I didn't hear it.

**Mr. Balot:** I refuse to answer that question.

audio1572554191

**Mr. Juravin:** You are refusing to answer what certification you have, correct?

**Mr. Balot:** That is correct.

**Mr. Juravin:** Okay. Have you ever been accused of scam or misleading in the court... I'm sorry. Have you ever been accused of scam or misleading in the court or on social media?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** No.

**Mr. Juravin:** You haven't. Okay. I will save the time and I will do it later with the court. Now, can you tell me, what is RAID 10, known also as RAID one plus zero. RAID is R-A-I-D.

**Mr. Balot:** As it relates to computers?

**Mr. Juravin:** Correct.

**Mr. Balot:** Okay. It's just a way to cluster hard drives.

**Mr. Juravin:** Can you tell me more than that? Any more information, just aside from what you said? Can you give more specific?

**Mr. Balot:** Excuse me. You would need to be more specific.

**Mr. Juravin:** I'm asking you to de describe to me what is a RAID configuration.

**Mr. Balot:** I just described it to you.

**Mr. Juravin:** Can you please repeat it?

**Mr. Balot:** I just said it to you.

**Mr. Juravin:** I will ask you to repeat it.

**Mr. Balot:** A way to cluster hard drives.

**Mr. Juravin:** Okay. Can you tell me the types of equipment did you have in your lab to mirror hard disks?

**Mr. Balot:** That would be computers, along with the associated applications that allow you to image a computer.

**Mr. Juravin:** Can you tell me which the names of the apps, and if you have any other special equipment?

**Mr. Balot:** You need to be more specific, in terms of other equipment.

audio1572554191

**Mr. Juravin:** Aside from computers, do you have any instruments that help you to retrieve information or mirror?

**Mr. Balot:** "Mirror" is not a proper term.

**Mr. Juravin:** Okay. Can you tell me what other instruments do you have, aside from computers and apps?

**Mr. Balot:** In order to do what?

**Mr. Juravin:** In order to do your forensic work.

**Mr. Balot:** Again, the way a forensic image is made is with another computer, with the appropriate application on it that will allow you to forensically image the hard drive of another computer.

**Mr. Juravin:** Can you tell me the name of the apps that you are using?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** EnCASE, Axiom, and FTK.

**Mr. Juravin:** How long would it take you... Do you think that the equipment that you have in your lab is advanced? Would you consider it advanced?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** By whose standards?

**Mr. Juravin:** Industry standards.

**Mr. Balot:** I think it's within the realm of what industry standards are.

**Mr. Juravin:** Not the best.

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I'm not gonna answer that question.

**Mr. Juravin:** You'll not answer the question if the apps and computers that you have in your lab are the best in the industry.

**Mr. Balot:** That's an arbitrary question. I refuse to answer it.

**Mr. Juravin:** Okay. Can you tell me how long your equipment, how long would it take for your computer, for your lab, to mirror one terabyte of hard disk?

**Mr. Balot:** One terabyte of a hard disk? From what kind of computer?

audio1572554191

**Mr. Juravin:** Excuse me?

**Mr. Balot:** From what type of computer?

**Mr. Juravin:** From a Mac.

**Mr. Balot:** Again, would it be a desktop? Would it be a laptop?

**Mr. Juravin:** Desktop.

**Mr. Balot:** Desktop? What vintage desktop?

**Mr. Juravin:** What vintage? I'll keep it simple. One terabyte SSD.

**Mr. Balot:** Again, what vintage? When was the computer released?

**Mr. Juravin:** It's not the computer. It's a standalone... It's a standalone hard disk. Let me please ask you properly.

**Mark King:** Excuse me. Sorry. Woah, woah. When you both talk, I get nothing. So, the last thing I have is, question, what Vintage? I'll keep it simple. One terabyte SSD, answer, again, what vintage? When was the computer released?

**Mr. Juravin:** One more time. Standalone. Standalone SSD. Portable, made by SanDisk. How long would it take you to mirror something like that?

**Mr. Balot:** I need more clarification.

**Mr. Juravin:** What other clarification, aside from one terabyte of SSD?

**Mr. Balot:** I need to know the version of the software running on the computer.

**Mr. Juravin:** But I just mentioned that there is no computer. It's a standalone, portable, one terabyte hard disk.

**Mr. Balot:** Understood, but there's an operating system in the background that needs to be considered when you're imaging the computer. So in order to that give you a valid answer to your question, I would need to know the version of the software.

**Mr. Juravin:** Mr. Balot, this will be the third time that I'm trying to tell you that there is no computer. It's just a simple SSD portable hard disk. And it doesn't have any computer; it just have images on it and data. It doesn't have operating system. How long does it take to mirror one terabyte like that?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** It's not a mirroring process. It's a forensic process. Please use the proper terms.

audio1572554191

**Mr. Juravin:** How long would it take you to copy it?

**Mr. Balot:** Please, I need to have you use the proper term, to forensically make an image.

**Mr. Juravin:** Tell me, please, the formula that I will calculate the time that it takes to download, mirror, whatever it is that you want to call it. And one, if I call you as a client and I'm asking you how long would it take to mirror, would you also lecture me like this, or would you give me an estimate of how long it takes to copy it?

**Mr. Balot:** I would want to understand what kind of data is on the drive that is gonna determine the length of time, as well as any of the operating system that is on the hard drive as well.

**Mr. Juravin:** Are you telling me that when you copy data, there is a difference between if it's a Word document or if it's a picture?

**Mr. Balot:** I'm not saying that. There is a difference as an example between a bunch of Word documents and financial data, email data, so on and so forth.

**Mr. Juravin:** So if I just want a copy, I just want a copy one terabyte of data, you telling me that the download time will be different between depends on the content of the one terabyte?

**Mr. Balot:** That is correct.

**Mr. Juravin:** Can you please tell me which is heavier, one pound of cotton balls or one pound of iron?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Of what?

**Mr. Juravin:** Iron. Metal.

**Mr. Balot:** I don't understand your question.

**Mr. Juravin:** If I have one pound of iron, metal, or which one would be heavier, one pound of cotton balls or one pound of iron?

**Mr. Ryan:** Mr. Juravin, your question is an insult and it's argumentative...

**Mr. Juravin:** No, it's not insult. It's the way that I wanna ask the question.

**Mark King:** I'm sorry. Excuse me. Excuse me. Could you let Mr. Ryan finish, please? He's halfway through a sentence.

**Mr. Ryan:** You're attempting to get argumentative and to badger the witness, and I'd prefer that you focus on the substance of why we're here today.

audio1572554191

**Mr. Juravin:** Okay.

**Mr. Ryan:** I'm not gonna have the witness be badgered and berated. That's not appropriate.

**Mr. Juravin:** Mr. Balot, can you tell me what instructions did you give Mr. Ryan packing and shipping and preserving the computers?

**Mr. Ryan:** Objection. And I'm gonna instruct the witness not to answer. You're asking for communications between the trustee's counsel and the trustee's expert, and there are privileges and you're not getting into the area of the category of questions that you...

**Mr. Juravin:** Yes, I am.

**Mark King:** I'm sorry. Excuse me. Hold on. Mr. Ryan, could you finish your sentence, category of questions that you...

**Mr. Ryan:** That you might be able to inquire into. There are very limited areas that you can inquire of with regards to communications between the trustee's counsel and the trustee's expert.

**Mr. Juravin:** Okay.

**Mr. Ryan:** So for now, I'm instructing him not to answer that question with regards to packing materials.

**Mr. Juravin:** So, Mr. Balot, I asked you what instruction you gave Mr. Ryan, and your answer is?

**Mr. Balot:** Based on advice from Mr. Ryan, I will not answer that question.

**Mr. Juravin:** Okay. Can you tell me what was the temperature in Claremont, Florida, May 5th, 2021?

**Mr. Balot:** Why would I know that?

**Mr. Juravin:** Do you know how... Do you have pictures of the computers that, once you received the boxes, how many boxes have you received?

**Mr. Balot:** I don't recall.

**Mark King:** Mr. Balot, you don't remember how many boxes of computers you got?

**Mr. Ryan:** Objection to form.

**Mr. Juravin:** No?

**Mr. Balot:** I don't...

**Mr. Juravin:** Okay.

audio1572554191

**Mr. Balot:** Let me answer, please. I don't recall.

**Mr. Juravin:** Okay. Who received the packages?

**Mr. Balot:** Either myself or Richard Gralnik.

**Mr. Juravin:** Who opened and operated on them and worked on them?

**Mr. Balot:** Either myself or Richard Gralnik.

**Mr. Juravin:** Before we continue, I would like to let you know that when we received back your packages, we hired a private investigator and we used gloves, and we basically, for many hours, recorded everything. And we kept it for fingerprints, like this piece for example. So we can identify who actually worked on our equipment. And now I would like to ask you, who worked, actually worked, on the computers themselves?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Gralnik or myself.

**Mr. Juravin:** Okay. Have you ever called me to ask me for any password, or you and I were ever in any communication?

**Mr. Balot:** I believe Richard Gralnik was.

**Mr. Juravin:** Were you ever in communication with me?

**Mr. Balot:** Not to my recollection.

**Mr. Juravin:** You do not recall if you ever talked to me before today?

**Mr. Balot:** I believe I might have been part of several teleconferences that you were part of.

**Mr. Juravin:** Are you telling me that, because you were never introduced to me, are you telling me that Richard maybe talked to me but never said that you are also on the line? Is it possible that somebody was with me, but... Is it possible that Richard talked to me but did not tell me that you are also on the line?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Can't recall.

**Mr. Juravin:** Say it again, please?

**Mr. Balot:** I cannot recall.

**Mr. Juravin:** Because we have laws in Florida regarding that. And I would like to know if there was any call that you can think of in which you were listening to conversation but was not

audio1572554191

introduced.

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Not that I can recall.

**Mr. Juravin:** I'm sorry, say it again please?

**Mr. Balot:** Not that I can recall.

**Mr. Juravin:** Okay. The temperature in Claremont was 93 degrees on May 5th, 2021. Inside the car, a closed car, as a forensic expert, can you tell me what will be the temperature in a closed car? Can you guess or can you estimate?

**Mr. Balot:** I don't care to answer that question.

**Mr. Juravin:** You don't care about the temperature in which the computers were handled?

**Mr. Balot:** No, I do not.

**Mr. Juravin:** Okay. Can you tell me at what temperature hard disk start deforming or lose data? I'm sorry. Let me ask again. Can you tell me at what... Just a second. I'm disconnecting my screen, because there is no need for it right now. There you go. Okay. Can you tell me at what temperature a hard disk will start losing weight... Will start losing data or will start getting damaged. At what temperature?

**Mr. Balot:** Could not answer that question.

**Mr. Juravin:** I want to ask it again, because it's important and maybe I was not clear. At what temperature a hard disk will start lose data or will get damaged?

**Mr. Balot:** Cannot answer that question.

**Mr. Juravin:** Okay. The temperature in Mr. Ryan's car reached 166 degrees, according to the calculations that we made. Do you know how long Mr. Ryan kept the computers before he sent them to you?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Don't have any knowledge of that.

**Mr. Juravin:** Okay. I want to tell you the time that we found out on the web and the time that we checked that it takes to mirror. One second please. Okay. That it takes to mirror a one terabyte. It's 3.2 hours. Would that seem right to you?

**Mr. Ryan:** Objection to form.

**Mr. Juravin:** As an expert, would it seem correct, about average 3.2 hours?

audio1572554191

**Mr. Balot:** Objection.

**Mr. Balot:** Within the realm possibility, yes.

**Mr. Juravin:** Okay. If Mr. Ryan had the computers for 28 hours, possibly, would he be able to mirror three times at least hard disks of one terabyte? Provided that each one takes about 3.2 hours.

**Mr. Balot:** Your question is not clear.

**Mr. Juravin:** I will repeat. Provided that it takes 3.2 hours to copy or mirror a hard disk of one terabyte, is it possible that within 28 hours, anyone with those computers could have copied the data?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I cannot agree with that.

**Mr. Juravin:** Say it again, please?

**Mr. Balot:** I cannot agree with that.

Mr. Juravin: And why is that?

**Mr. Balot:** Because you're talking about a scenario that doesn't hold any reality to it.

**Mr. Juravin:** If somebody takes computers and somebody has 28 hours, and it takes 3.2 hours to mirror a copy, then do you think within 28 hours, they can copy two or three hard disks?

**Mr. Balot:** Excuse me one second. Sorry, I'm back with you. Question, again?

**Mr. Juravin:** Provided that it takes about 3.2 hours to copy a hard disk or mirror, would you think that within 28 hours, one can copy two or three hard disks?

**Mr. Balot:** Two or three?

**Mr. Juravin:** We have 28 hours. Within 28 hours, is it possible to copy three times one terabyte, and each takes 3.2 hours?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** You need to be more clear.

**Mr. Juravin:** I don't know how I can be clearer than that.

**Mr. Balot:** Well, you're throwing around a lot of numbers. Okay. If you are saying three hard drives, a terabyte a piece, am I correct in that?

**Mr. Juravin:** And each one takes 3.2, you are correct. 3.2 hours.

audio1572554191

**Mr. Balot:** Yes. And the question is?

**Mr. Juravin:** Is it...

**Mr. Balot:** Let me finish. Within 28 hours, okay, you're saying, can that be done.

**Mr. Juravin:** Correct.

**Mr. Balot:** It's possible, yes.

**Mr. Juravin:** Okay. Normally, when you get normally computers, are you instructing other customers to send it to you with the keyboard and the cables?

**Mr. Balot:** Yes.

**Mr. Juravin:** And what do you do if you don't get cables and keyboards?

**Mr. Balot:** For instances where we have to go buy the appropriate keyboard, we don't have one in our lab.

**Mr. Juravin:** What about cables?

**Mr. Balot:** Same answer would apply to cables.

**Mr. Juravin:** Okay. Even though they are all the same, all the MEC cables and all the cables are normally the same with two or three different outlets. Eventually, they have a variety of about six or seven, correct?

**Mr. Balot:** No.

**Mr. Juravin:** Okay. Let's move on. Can you tell me what was the main, how many computers did you get of mine?

**Mr. Balot:** I believe altogether between computers and cellphones, we've got 16 or 17 different devices.

**Mr. Juravin:** Which one was the main one?

**Mr. Balot:** Could not tell you that right now.

**Mr. Juravin:** Okay. Would you say that most of the work was done by Richard or by you?

**Mr. Balot:** By Richard.

**Mr. Juravin:** Did you do more than 10% or so, or was majority and everything was actually Richard?

audio1572554191

**Mr. Balot:** Majority of everything, in terms of the technical aspects of it, was done by Richard.

**Mr. Juravin:** Okay. One second. Okay. In the court date on January 16, you came in with a box. Did you plan to present to the court evidence that was not provided already by Mr. Ryan?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I did not arrive in court with a box.

**Mr. Juravin:** Did you plan... Thanks for correcting me, but I thought I saw that, but thanks. Did you plan of providing the court with new evidence?

**Mr. Balot:** No.

**Mr. Juravin:** Okay. Do you have any more evidence aside from the one provided by Mr. Ryan?

**Mr. Balot:** No, I do not.

**Mr. Juravin:** Can you tell me the, I received very late last night, your... Yes, I received late last night the one from... Actually, I don't know what to call it, but the proposal... Or I'm sorry, I have to... It's you becoming a witness, or what do you want to call it? Because it doesn't have a title.

**Mr. Ryan:** The report, Mr. Juravin.

**Mr. Juravin:** It's a report. It doesn't say that on the first page. Okay. I received the report. Can you tell me who wrote it?

**Mr. Balot:** I wrote that.

**Mr. Juravin:** Did you receive any instructions or any copies from Mr. Ryan?

**Mr. Ryan:** Objection to form.

**Mr. Balot: I did not.**

**Mr. Ryan:** And I'm going... No. Hold on. I'm gonna instruct you the witness not to answer about his communications between the trustee and the trustee's attorney. Those are privileged communications. I'm sorry, I said that wrong. Let me please restate my objection. I'm objecting with regards to questions of communications between the trustee's expert and the trustee's attorney.

**Mr. Juravin:** Actually, it was right also the first time. Mr. Balot, can you please tell me exactly which order of the court have I violated?

**Mr. Balot:** I am not an attorney, and I couldn't comment on that.

**Mr. Juravin:** Your site says that you're giving legal advice and that's what I read on the two sites from 2000... From 2021, and also the current.

audio1572554191

**Mr. Ryan:** Objection to form.

**Mr. Balot:** No. We don't give legal advice.

**Mr. Juravin:** Okay.

**Mr. Balot:** I'm sorry. Let me finish. We do not give legal advice.

**Mr. Juravin:** Okay. Can you tell me which order do you think that I violated? Which court order do you think I violated?

**Mr. Balot:** I could not answer that.

**Mr. Juravin:** Can you tell me which court order [1:10:46.7] _____ have been violated?

**Mr. Balot:** Could not answer that.

**Mr. Juravin:** Okay. Because in your report, it seems like accusations that we did something not according to the court order. That's what I would understand from your opinion. Do you think we did something wrong that is not according to a court order?

**Mr. Balot:** Could not answer that.

**Mr. Juravin:** Okay. Let's continue. Please tell me the first incident or any incident in which you asked me for a password and I did not give it to you within minutes.

**Mr. Balot:** I never asked you for a password. That was Richard Gralnik who was querying you for it.

**Mr. Juravin:** Are you familiar with Richard's affidavit?

**Mr. Balot:** On a topical perspective? Yes.

**Mr. Juravin:** I'm sorry. I did not understand.

**Mr. Balot:** From a 10,000-foot overview, yes.

**Mr. Juravin:** So you're not familiar with it in details.

**Mr. Balot:** Not on an intimate level at this point, no.

**Mr. Juravin:** Okay. Would you know who wrote that affidavit?

**Mr. Balot:** Mr. Gralnik.

**Mr. Juravin:** You know for sure that he wrote it?

**Mr. Balot:** Well, I wasn't sitting in his lap when he did it, but yes, he's the one who produced it.

audio1572554191

**Mr. Juravin:** Okay. Can you tell me, when is the last time that you talked to Richard?

**Mr. Balot:** Probably a year ago.

**Mr. Juravin:** Okay. Is it possible that it's two years ago?

**Mr. Balot:** It's possible, yes.

**Mr. Juravin:** Okay. Why is it that you have not produced Richard to support his affidavit?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I won't answer that question.

**Mr. Juravin:** Did you make an attempt to bring Richard to defend or explain his affidavit?

**Mr. Balot:** No, I did not.

**Mr. Juravin:** Do you stand by his affidavit?

**Mr. Balot:** Yes, I do.

**Mr. Juravin:** Okay. So why didn't you adopt it and enter it into your report?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I won't answer that question.

**Mr. Juravin:** Okay. So I can basically ask you question about his... So, in that case, I can ask you right now questions, detailed questions, about his affidavit, and you will be able to answer me, correct?

**Mr. Balot:** That is not correct.

**Mr. Juravin:** But you just said that you stand by his affidavit.

**Mr. Balot:** Let's go back to my answer earlier where I said I'm aware of Mr. Gralnik's declaration. Okay? Am I aware of it in total detail? I am not.

**Mr. Juravin:** Okay. Can you tell me, even, even one incident where I did not respond to Richard with a password within minutes. Within minutes. I even make it, you know... I'm taking it to extreme. Within minutes.

**Mr. Balot:** I believe there was communication between you and Richard that I was privy to, that showed that it was days on ends, sometimes weeks, where we weren't given certain passwords that I understand were required for us to continue with our work.

**Mr. Juravin:** And now I'm asking you to provide it to me. Can you please provide me any incident that I did not respond within minutes? Not hours. Minutes.

**Mr. Balot:** I'd have to review the material.

**Mr. Juravin:** I'm confused. I'm sorry, I'm confused. So help me, please. Okay? Please help me. In your opinion, you wrote that I'm uncooperative, that based on me and Anna not being cooperative, therefore, you made a lot of assumptions. That's in your page six of six. So, you made already your professional opinion that I was not cooperative. And now I'm asking you to support it. Give me, please, one incident that I was not cooperative within minutes. Not even two hours, not three hours; minutes.

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Again, based on my review of the communication and the fact that I was CC'd on that communication between you and Mr. Gralnik, who was an employee of our company at the time, there were multiple instances. I can't pinpoint exactly one right now, where my understanding was, we were stymied in terms of getting certain passwords that were required to get access to certain devices as well as certain online accounts that we needed in order to effectuate our work.

**Mr. Juravin:** Mr. Balot, my life is on the line. So your impressions are not enough. I need facts. Please tell me, based on what you wrote as an expert, that I was not cooperative. I'm asking for one incident that, and if you need time to look through the papers or through whatever it is that you have, any communication, I will wait. And I need to know one incident, one, during the six months that I did not respond in minutes. Please give me one.

**Mr. Balot:** Again, there were multiple...

**Mr. Ryan:** Objection to form.

**Mr. Juravin:** I'm sorry...

**Mark King:** Sorry, was there an objection?

**Mr. Ryan:** Yes. Objection to form.

**Mr. Balot:** I refuse to answer that question.

**Mr. Juravin:** So you wrote an opinion, which I received. When did you write this opinion?

**Mr. Balot:** That was written... Today is Thursday, Tuesday. On Wednesday.

**Mr. Juravin:** So you wrote it really late, as of late, and you're telling me that you wrote the opinion, but you don't have factual data to support it right now.

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I refuse to answer that question.

audio1572554191

**Mr. Juravin:** I don't remember you being CC'd on anything, aside from one email with my attorney, Aldo. Would that be correct?

**Mr. Balot:** No, that is not correct.

**Mr. Juravin:** Can you please point me to the emails in which you were CC'd, along with Richard, and in which you also responded, you were part of the conversation?

**Mr. Balot:** I refuse to answer that question.

**Mr. Juravin:** Okay. You told earlier, you said earlier, that you basically were CC'd on the emails, and since my life is on the line here, I looked through everything, and I just don't see anything that you were part of.

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I refuse to answer that question.

**Mr. Juravin:** Okay. As far as conversations, I understand that you were not part of the conversations that I had with Richard, correct?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I refuse to answer that question.

**Mr. Juravin:** You cannot tell me if you were eavesdropping to the conversation between Richard and I?

**Mr. Balot:** I refuse to answer that question.

**Mr. Juravin:** Do you plan of testifying in court that you were listening or part of the conversations between Richard and I? Because Richard never introduced you in any conversation.

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Refuse to answer that question.

**Mr. Juravin:** Would I find your fingerprints on this hard disk? Do you recognize this hard disk? I'm showing you SanDisk. Do you recognize it?

**Mr. Balot:** Yes, I do.

**Mr. Juravin:** Can you tell me what it is?

**Mr. Balot:** It's an external storage device for data.

**Mr. Juravin:** What is the size of it?

audio1572554191

**Mr. Balot:** I couldn't tell you.

**Mr. Juravin:** What device was it connected to?

**Mr. Balot:** I'd have to go back in the records to be able to make that determination.

**Mr. Juravin:** So, I thought that in preparation for this hearing, for this deposition, you would know. Would you like to take a few minutes and look through your notes? And I'll wait, because it's important for me.

**Mr. Balot:** No, I would not.

**Mr. Juravin:** Would I find your fingerprints on this one? Do you know if you have your fingerprints on this?

**Mr. Balot:** In all likelihood, yes.

**Mr. Juravin:** On this hard disk. Did you analyze it? I'm sorry, did you copy the information from that yourself?

**Mr. Balot:** Me personally, no.

**Mr. Juravin:** Okay. Did you personally copy any data from the devices?

**Mr. Balot:** I oversaw the process of having that done.

**Mr. Juravin:** But you did not do it personally?

**Mr. Balot:** No, I did not.

**Mr. Juravin:** Okay. This device, is it possible to copy it, to download it, within 3, 4 hours? It's SSD.

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Fair enough. What's the size of the drive?

**Mr. Juravin:** One terabyte.

**Mr. Balot:** Yes, it is.

**Mr. Juravin:** Thank you. Do you know which one of the 17 was the main computer?

**Mr. Balot:** You asked me that question earlier, and I'll give you the same answer: I do not.

**Mr. Juravin:** Do you know how old each one of the computers?

**Mr. Balot:** I believe when we did an inventory of them, in all likelihood, we have serial numbers

which would tell us the date of the manufacturing of the computer.

**Mr. Juravin:** Okay. But you don't know which one was the main computer. Okay. Let's go through the dates now. Let's go through the dates. Do you remember when the break order happened in my house?

**Mr. Balot:** What do you mean by that?

**Mr. Juravin:** When the computers were collected.

**Mr. Balot:** I believe that was sometime in May of 2021.

**Mr. Juravin:** It was 5th of May. Mr. Ryan collected the computers at 2:20, and left the house at 2:20. Can you tell me any reason... No, I'm jumping to the next one. A day later, at 6:00 PM, he dropped them off to ship them to you. You received them probably a day or two later. I guess on the 7th, you received them. May 7th, you received the devices. Have you received any papers, any documents, or just electronic computers?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Just computers.

**Mr. Juravin:** Okay.

**Mr. Balot:** Excuse me. Can I add to that, please?

**Mr. Juravin:** Yes.

**Mr. Balot:** A computer as well as cellphones, and also external backup devices.

**Mr. Juravin:** Okay. How many external backup devices?

**Mr. Balot:** I don't have the inventory in front of me. But I believe it was in the neighborhood of two or three.

**Mr. Juravin:** I'm willing to wait. Would you please take, because I want to talk to you about it, and please take in front of you all the communications that you have between Richard and I, because we have to go through the list. So, please take all the communications that you have between Richard and I and the list of whatever it is that you need, and I'll wait. And please gather everything so we can continue to go one-by-one.

**Mr. Ryan:** Mr. Juravin, he's not going to gather documents during a deposition.

**Mr. Juravin:** But he should have been prepared for it. I cannot have Mr. Balot show up in court and suddenly testify that he remembers. I need him to look right now at all the evidence, and I need to depose him about it. So, if needed, we will... I'm not done. If needed, let's take a break of 15 minutes, 20 minutes. Please gather all the information that you have, because you prepared the report. And the report is based on everything that you have, and you just did the report a couple of

audio1572554191

days ago. So, I would like to pause and for you to gather the information that made you prepare this report so I can ask you about it.

**Mr. Ryan:** Mr. Juravin, he's not going to do that. You provided a document that purports to be a subpoena duces tecum only days ago. It identifies documents that go way beyond anything relevant to the testimony. It identifies a lot of material that's already been provided to you. And the amount of time that it allowed for the compilation of additional information was inadequate. You have the material that is going to be presented as support for Mr. Balot's opinions. And he's not going to go looking for the history of emails between yourself and Mr. Gralnik. And I don't even think that those were within the description of what you listed on your subpoena. So.

**Mr. Balot:** Yes, it is. Yes, it is.

**Mark King:** Okay, well, if you say so. But I don't think that's accurate.

**Mr. Juravin:** Okay. Number one, it is. Number two, Mr. Balot, when you wrote your report, did you write it as feelings, or did you write it based on data, on facts?

**Mr. Balot:** It was based on facts. .

**Mr. Juravin:** Where are the facts that... I mean, the facts were... You just assembled it a day ago, and it's based on facts. So when you write that I was not cooperative, you probably looked through the correspondings with Richard, and that's how you came to that conclusion. So it must be next to you. It must be somewhere. It shouldn't be too difficult to also recall when. So, do you have the correspondings between Richard and I? Let me ask you differently. Do you have the correspondings between Richard and I?

**Mr. Balot:** As I said earlier, I was CC'd or BCC'd on all communications between Richard, yourself, and Mr. Bartalone, along with any communications with Mr. Ryan. And I relied on that in terms of reviewing it, okay, to form the opinions that are in my report.

**Mr. Juravin:** And did you review it...

**Mr. Ryan:** Excuse me, just for the record, before you go on the next question. I'm looking at the document that you sent to the clerk this morning to be a notice of filing your "subpoena." And there's no mention in the production line with regards to communication between anybody at Mr. Balot's company and you.

**Mr. Juravin:** Because I was not... I did not know that Mr. Balot will be on the emails, because Mr. Balot was BCC'd. I never saw him on the...

**Mr. Ryan:** No mention of any kind... There's no mention of any request for communications between you and anyone at Mr. Balot's company. So if you had communications by email with Mr. Gralnik, you didn't identify them as something that you wanted produced.

**Mr. Juravin:** Okay. Mr. Balot, were you BCC'd from me, on my behalf, when I answered Richard, and I did not know that you are privy to it? Did you receive it? Because I did not send it to you. So how technically is it possible for you to receive it?

audio1572554191

**Mr. Balot:** Again, if I saw an email from you, it wasn't directly made out to me. It was because Richard would've sent it to my review.

**Mr. Juravin:** Okay. In that case, you probably know all the communications with Richard, excluding the phone calls. Would that be right to say?

**Mr. Balot:** I couldn't say with 100% accuracy that's true, but the majority of them, yes.

**Mr. Juravin:** So, you saw majority of the emails between Richard and I, but none of the conversations.

**Mr. Balot:** Again, I believe I've listened in maybe on one or two teleconferences from my recollection, and that's the best I can answer that question at this time.

**Mr. Juravin:** Okay. Were you ever introduced in the conversation... When I talked to Richard did Richard ever introduced you and say, "I want you to know that the CEO of the company's here listening as well?"

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I can't...

**Mr. Juravin:** I'm sorry? I didn't hear you.

**Mr. Balot:** I can't...

**Mr. Juravin:** I couldn't hear you.

**Mr. Balot:** I can't recall.

**Mr. Juravin:** Okay. So you cannot recall if you were part of the conversations with Richard and I, or you cannot recall if you were introduced?

**Mr. Balot:** Again, you're asking the same question over and over again. I answered earlier...

**Mr. Juravin:** So I need an answer, please.

**Mr. Balot:** I gave you an answer already. Please refer to that answer.

**Mr. Juravin:** I'm asking you if you were part of any conversation in which you were not introduced.

**Mr. Balot:** I've already answered that question.

**Mr. Juravin:** I'm asking you to answer me again, please.

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I refuse.

**Mr. Juravin:** Okay. Here in the production, I see all corresponding between anyone in your companies and any of the trustee's representatives.

**Mr. Ryan:** Is that a question?

**Mr. Juravin:** I'm sorry. I will read it again. All your correspondings with Mr. Gralnik regarding this case, it is here. I did ask it in the production. All the corresponding between you, Mr. Balot and Richard.

**Mr. Ryan:** And is that a question?

**Mr. Juravin:** Yes.

**Mr. Ryan:** If I understand, all you're doing is you're reading from a document.

**Mr. Juravin:** Correct. I'm...

**Mark King:** I'm sorry...

**Mr. Ryan:** What's the question?

**Mark King:** Could you finish your... Mr. Ryan, if I understand, all you are doing is you are reading...

**Mr. Ryan:** From a document.

**Mr. Juravin:** Okay. So the question is like this: I requested to receive all your correspondings with Mr. Gralnik regarding this case. That was not provided, correct?

**Mr. Balot:** Are you asking me for my [1:36:37.9] _____ correspondence?

**Mr. Juravin:** Yes.

**Mr. Balot:** Hold on, let me... Please give me time to finish, then you can talk, okay? This isn't my first rodeo when it comes to this, and it's very hard dealing with somebody like yourself. I understand you're representing yourself, and you don't understand the form of doing a deposition. But I am trying to give you the clearest answers I possibly can, based on what I understand your questions to be. So, in terms of communications between Richard Gralnik and myself on this case, in particular, there isn't any, okay? All that exists are emails that I was copied on, okay, that he was communicating with both you and, I believe, your attorney.

**Mr. Juravin:** Okay. Were you also CC'd or BCC'd communications between Richard and I where Aldo was not involved?

**Mr. Balot:** I believe I was, yes.

audio1572554191

**Mr. Juravin:** When is the last time that you looked at them?

**Mr. Balot:** Maybe a few weeks ago, I believe.

**Mr. Juravin:** Okay. And did you see, in any of these emails, any time that somebody had to ask from me a second time for anything?

**Mr. Balot:** To the best of my recollection, yes.

**Mr. Juravin:** Can you please point out to any email in which somebody says, "I've waited more than even ten minutes, and I haven't received something"?

**Mr. Balot:** Earlier, it was two minutes, now we're at ten minutes. And there are instances within those emails, from my recollection, where we're talking weeks later where we haven't received some of the passwords required on certain of your social media accounts as well as your Google Drive account, in order for us, I should say, to be able to access the data and the information we needed based on our instructions from our client, the trustee.

**Mr. Juravin:** I said within minutes, not within two minutes, not ten. I said within minutes, because I hold myself to a standard of responding very fast. And I'm asking if you saw, in any of these emails, something that I did not respond very fast, that I ignored. Any email in which I ignored? Can you point out to any such email?

**Mr. Ryan:** Mr. Juravin, you've asked this question about eight or nine times, and it's been answered thoroughly. At this point, you're simply badgering the witness with regards to him having specific details about specific emails that he hasn't looked at in weeks and that he was not even required to produce to you. So, if you wanna just badger the witness, we're gonna have a problem.

**Mr. Juravin:** I want to get the answers...

**Mr. Ryan:** If you wanna ask substantive questions about his opinions, then go for it. If you wanna ask him what he's relying on as the basis for his opinions, well, then you can do that, too.

**Mr. Juravin:** Okay. That's exactly what I'm doing.

**Mr. Ryan:** And badger him in a way that isn't doing yourself any favors. And we're an hour and a half or almost two hours into this, and I still haven'...

**Mr. Juravin:** Let me continue.

**Mr. Ryan:** Seen you scratch the surface about what we're here for today.

**Mr. Juravin:** Mr. Balot, when is the first password that you received to their equipment?

**Mr. Balot:** I'd have to review my records to be able to tell you that. And I think that, as Mr. Ryan just pointed out, this is badgering. And again, okay, once maybe this is fully reviewed, I could answer that question, but I don't believe, as Mr. Ryan said, that's why we're here today in terms of

audio1572554191

the questions that you've got to ask me that ultimately will move this forward.

**Mr. Juravin:** Okay. When is the first time that you entered my... That you had access to the equipment?

**Mr. Balot:** Equipment, or your social media sites, or your Google Drive account? Which ones?

**Mr. Juravin:** Okay. My Gmail, which actually gives... Would you agree that once you have my Gmail account access, you have access to the drive and everything else?

**Mr. Balot:** From my recollection, that's not correct. We were given an initial password, and then we needed further two-factor authentication, which we did not get for weeks.

**Mr. Juravin:** So you are telling me that when... You are saying that when I gave you password, I was not available to authenticate it online immediately?

**Mr. Balot:** From the best of my recollection, that's correct.

**Mr. Juravin:** Okay. And your recollection is from a couple of weeks ago when you reviewed the information.

**Mr. Ryan:** Objection to form.

**Mr. Balot:** That, and that in the past, from what I can recall.

**Mr. Juravin:** Okay...

**Mr. Balot:** The past being... Wait, let me finish my answer, please. That the past being from the beginning of this assignment till today.

**Mr. Juravin:** Okay. When you received my... When you have access to my Gmail, and my Gmail is a G Suite, isn't it?

**Mr. Balot:** To the best of my recollection, yes.

**Mr. Juravin:** Once you have the password and the access, you basically can control everything and see everything that I have. Is that right?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I won't answer that question.

**Mr. Juravin:** I will ask it maybe differently. Once you have access to Google G Suite, Google Suite, you have access to the drive to photos, to my email, basically to everything. Is that correct?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Not absolutely 100% everything. We still don't have access to the administrative part of

the site.

**Mr. Juravin:** What site?

**Mr. Balot:** Your Google Drive site.

**Mr. Juravin:** Okay. Are you saying that when you have access, when you get access, the password and the email and I authenticate it and you have access to G Suite, okay, do you know the current name of G Suite?

**Mr. Balot:** I'm not familiar with it at this point, no.

**Mr. Juravin:** Okay. It's called Workspace. So when I give you access to that, okay, to Google, do you know that you can access basically everything? And everything is the drive, all the applications, all the photos, all the emails, all the aliases, even. Everything with one password and one email.

**Mr. Ryan:** Objection to form.

**Mr. Balot:** What was provided to us, the password, worked, but we also needed authentication, which is, again, as maybe you understand since you've used a G Suite, okay, is the second authentication that's required in order for 100% access, 100% access constituting the admin portion, the backend of the site as well also, which we did not have access to.

**Mark King:** What backend of the site? Mr. Balot, you, as an expert, once you get all of this access, okay, you got email, you get the password, you get the authentication. Provided you get that, can you access totally everything of Gmail that belongs to Don Juravin. Do you need anything else that does not allow you to gain access to everything possible?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Again, as I mentioned earlier, the one thing we do not get, okay, in the scenario you described is access to the administrative portion of the Gmail Suite, which, I don't know if you understand what that is or not. What's required for that is further authentication. And there were periods, from my recollection, where we were trying to get to that portion of the site, and for weeks on end, we did not have cooperation. There was also points where, for whatever reason, from my recollection, passwords were being changed, okay, and we reported that, and then we had to get new passwords.

**Mr. Juravin:** Okay. So you are saying basically when you get access to my G Suite, you cannot get access to admin?

**Mr. Balot:** That is correct.

**Mr. Juravin:** Okay. Would you like me to show you how it's being done with one password right now?

**Mr. Balot:** That's right now. We're talking about three years ago.

audio1572554191

**Mr. Juravin:** And do you think three years ago, it was different with access?

**Mr. Balot:** In what we were presented, yes.

**Mr. Juravin:** So you're saying that basically Google changed the terms, and right now, they allow access with one password to the admin, but they did not allow one access with the admin before?

**Mr. Balot:** That's possible, yes.

**Mr. Juravin:** Is it possible, or is it really so?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I'd have to [1:48:45.9] ____.

**Mr. Juravin:** Okay. So, just to summarize that point, you're saying that three years ago, with one password, you could not reach the admin?

**Mr. Balot:** That is correct.

**Mr. Juravin:** Okay. Let's continue. One second. Let me see. I have a lot of questions, but I will try to summarize them. One second. Okay. I see here that basically Richard, Richard got the data from my attorney May 25th. And on May 25th, he had access to all the electronic devices and to the G Suite. But he had problems getting into the Apple cloud. Do you recall that?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Yes, I have some memory of it.

**Mr. Juravin:** Okay. And I told him that the iCloud of Apple is something that I haven't used in many, many, many years, and if he wants, I will authenticate it for him and he's welcome to do whatever he needs to do. Do you recall that?

**Mr. Balot:** I do not.

**Mr. Juravin:** Okay. Do you recall me telling him that he cannot get into certain computers because they are vintage? They are one of the very first computers that Apple introduced, and they are sold that I will not even know how to turn them on. And I told Richard that he's welcome to break in any way that he wants, but this one is like memories for my kids. Do you recall that?

**Mr. Ryan:** Objection to form.

**Mr. Juravin:** You don't?

**Mr. Balot:** I don't recall it.

**Mr. Juravin:** Okay. One second. I wanna see if I need to, for the next thing, to share my... Okay, can you tell me who is Abner Shemesh?

audio1572554191

**Mr. Balot:** I never heard that name.

**Mr. Juravin:** Okay, because he appears to sport of your company, but maybe it's a mistake. Is Sharon your wife?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Yes, she is.

**Mr. Juravin:** And you don't recall being... I asked you earlier, and you did not recall any lawsuits, correct, that Sharon or you were involved?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I refuse to answer that question.

**Mr. Juravin:** Okay. Can you tell me when your agreement with Mr. Ryan was signed?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Don't recall.

**Mr. Juravin:** You don't recall when the agreement was signed with Mr. Ryan, the contract?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Don't recall.

**Mr. Juravin:** Is it possible that you took possession of the computers and even went in to my system even before the agreement and the court order was signed?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** [1:52:47.9] ____.

**Mark King:** I'm sorry. Was your answer, I don't recall?

**Mr. Balot:** Yes, sir.

**Mark King:** Thank you.

**Mr. Juravin:** Do you know when court ordered to hire you... Or the firm, I'm sorry. When the court ordered to hire your firm was signed by the judge?

**Mr. Balot:** I don't recall.

**Mr. Juravin:** Okay. Okay, can you tell me, what is the difference between hard disk technology

audio1572554191

called NF... I'm sorry, NTFS versus FAT.

**Mr. Balot:** Those are partitions on hard drives.

**Mr. Juravin:** And can you tell me which one of them is Windows, which one of them is Mac?

**Mr. Balot:** NFT, you said?

**Mr. Juravin:** FAT, yes.

**Mr. Balot:** FAT would be Windows.

**Mr. Juravin:** FAT will be Windows. Okay. Okay. You provided an exhibit of 77 pages of files that disappeared. Do you remember about what time... Okay. And I'm showing you, but it's already part of the exhibits. Can you see it, or not? Okay. Exhibit number 2, and that's basically 77 pages, and it says File Juravin, files deleted.

**Mr. Ryan:** Mr. Juravin?

**Mr. Juravin:** Yes.

**Mr. Ryan:** You've been identifying exhibits to this deposition, and...

**Mr. Juravin:** I will do that.

**Mr. Ryan:** Exhibit number 1 and Exhibit number 2, and now you're talking about something that the trustee has identified as Exhibit number 2...

**Mr. Juravin:** I will correct my mistake.

**Mr. Ryan:** Trustee's Exhibit number 2.

**Mr. Juravin:** You're right, and let me fix it in a minute. One second, I will bring it up.

**Mr. Ryan:** And what the record reflected is a excerpts from the Google Drive activity.

**Mr. Juravin:** Yeah. One second.

**Mark King:** You said, Google Drive activity...

**Mr. Juravin:** No, give me a minute, and I will... Guys, give me a minute. I just need to see which a trustee exhibit is.

**Mark King:** Is it possible to take five-minute break at this point? We've gone a couple of hours. Just five minutes.

**Mr. Juravin:** No problem.

audio1572554191

**Mark King:** Is that okay, counsel?

**Mr. Ryan:** Yes. Yes.

**Mr. Juravin:** We can adjourn for two minutes... Five minutes, you're saying?

**Mark King:** Yeah, five.

**Mr. Juravin:** Five minutes.

**Mark King:** Alright, thank you.

[pause]

**Mr. Juravin:** Guys, I am back. And let's continue.

**Mr. Ryan:** Not sure whether Mr. Shockburn is back yet.

**Mr. Juravin:** Mark, tell us...

**Mr. Ryan:** This exhibit is not going to be entered for us because it's a previous exhibit, trustee's Exhibit 2, correct?

**Mr. Juravin:** Yes. So I don't need to enter it in... Okay. So, that's fine. You are right.

**Mr. Ryan:** Unless you want to. I'm not an attorney, but I'm just saying so far.

**Mr. Juravin:** Yes. Can we continue?

**Mark King:** It's up to counsel. Is Mr. Saxton here?

**Mr. Ryan:** Let's continue, and I'll advise him what's going on when he gets back.

**Mr. Juravin:** Okay. Okay. Mr. Balot, can you see on the screen I'm sharing with you my screen?

**Mr. Balot:** Yes.

**Mr. Juravin:** Can you tell me who produced this one?

**Mr. Balot:** I believe this was produced by Mr. Gralnik.

**Mr. Juravin:** Okay. Do you remember the date that he produced it?

**Mr. Balot:** I do not.

**Mr. Juravin:** Okay. So we don't have a date here. Do you see any date?

**Mr. Balot:** Well, there is a date on top, obviously.

audio1572554191

Mr. Juravin: No, the date on the top, it says files deleted from Google Drive between June 1 to June 30th, '21. But there is no date here.

[overlapping conversation]

**Mr. Juravin:** Let me please do my deposition.

**Mr. Ryan:** Well, I want to accurately represent this.

**Mr. Juravin:** Let him answer whatever he answers.

**Mark King:** I'm sorry, Mr. Ryan was in the middle of a sentence. I can't get two people at once.

**Mr. Juravin:** Okay. Mr. Balot, do you see any other date on this exhibit which tells you when it was produced?

**Mr. Balot:** Again, I'd have to see 100% of it, every single page, to be able to say within any accuracy yes or no.

**Mr. Juravin:** If I tell you that this is the first page, can you tell me if it has a date on it?

**Mr. Balot:** As I said earlier, I see a date on top noting 6/1 through the 30th, '21.

**Mr. Juravin:** Okay. Do you see a date for each one of this alleged deleted files? Do you see a date when each one of them was deleted?

**Mr. Balot:** I believe that there was a spreadsheet that this was taken from that additionally shows the deleted dates.

**Mr. Juravin:** Okay. And that was taken by Richard, correct?

**Mr. Balot:** Yes.

**Mr. Juravin:** Okay. Can you tell me, would it be accurate to say that all of them or all of them are really JPEGs?

**Mr. Balot:** If that's what they're noted as, yes, but a JPEG, again, is just a picture of a document.

**Mr. Juravin:** Okay. Can you tell me what date this image is from?

**Mr. Balot:** What day it was done?

**Mr. Juravin:** What day?

**Mr. Balot:** I don't understand your question.

**Mr. Juravin:** Okay. What is the file names? Do you see the file names?

**Mr. Balot:** I believe that there are within the realm of this document, a handful, if not more, with the file name descriptions.

**Mr. Juravin:** And can you see and tell me what year it's from?

**Mr. Balot:** Again, this comes from a spreadsheet. I believe that also includes a column that the notes day in here.

**Mr. Juravin:** Okay. But the JPEG itself, let me read it to you. If it's not clear, maybe I'll make it bigger. Here we go. Do you see that all of them almost have 2012?

**Mr. Ryan:** Objection to form.

**Mr. Juravin:** Do you see that the name of the file is 2012?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Yes.

**Mr. Juravin:** Okay. Do you recognize this type of... As an expert, do you recognize these type of files just by the name?

**Mr. Balot:** I don't understand your question.

**Mr. Juravin:** Okay. When you see a file that tells you the date like this and then tells you the hour, what kind of files do you think it is?

**Mr. Balot:** I couldn't begin to tell, because a JPEG, again, is just an image of what the file is.

**Mr. Juravin:** Okay. Is it possible that all of this... Is it likely that all of these are pictures?

**Mr. Balot:** I cannot answer that question.

**Mr. Juravin:** So you cannot... Okay. So you cannot say as an expert that it's likely to be an image of a picture.

**Mr. Balot:** I can't say that with 100% accuracy, no.

**Mr. Juravin:** Okay. Can you tell me what happens... Are you familiar with Google Photos?

**Mr. Balot:** Google Forms?

**Mr. Juravin:** Google Photos.

**Mr. Balot:** Can you spell that for me, please?

**Mr. Juravin:** Google photos.

audio1572554191

**Mr. Balot:** Photos, okay. Thank you. Yes, I am, somewhat.

**Mr. Juravin:** Maybe I'm not pronouncing correctly. I apologize. Google Photos. Like pictures?

**Mr. Balot:** Yes.

**Mr. Juravin:** Okay. Can you tell me, if you know of anything that happens with Google Photos, anything major that happened with Google Photos in 2021?

**Mr. Balot:** I could not.

**Mr. Juravin:** Okay. So let me tell you, in June 1st, 2021, Google announced that major changes to Google Photos and that people will have to pay for storage. Are you familiar with that?

**Mr. Ryan:** Objection to the form.

**Mr. Balot:** I have some recollection of that.

**Mr. Juravin:** Okay. So, you have recollection that Google changed the payment from free to paid on...

**Mr. Ryan:** Objection to the form.

**Mr. Juravin:** I'm not done, and I don't know how you can object something that I'm really not done yet.

**Mr. Ryan:** I apologize.

**Mr. Juravin:** Are you... In June 1, Google changed the terms from free to paid. Do you have any recollection of that?

**Mr. Balot:** Not specifically, no.

**Mr. Juravin:** Okay. Okay. Is it possible that this is part of the way that Google rearranged things in Google Photos and moved or deleted old photos? Is it possible?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I could not answer that question.

**Mr. Juravin:** Okay. Do you see here it says HDR?

**Mr. Balot:** Yes, I do.

**Mr. Juravin:** Do you know what is HDR? I'll make it big.

**Mr. Balot:** Thank you. I don't know what that acronym means, no.

audio1572554191

**Mr. Juravin:** Okay. HDR is basically a photo, it's a photo term. It's kind of better quality. So...

**Mr. Balot:** Does it mean high definition?

**Mr. Juravin:** Something with... It takes multiple pictures and combines them into one for better clarity. So, you know, I thought that you will immediately identify that all of these come from Google Photos and things can go faster. Mr. Balot, can you tell me, how many pictures do I have in my Google Photos?

**Mr. Balot:** I could not tell you.

**Mr. Juravin:** It was part of the Google Drive.

**Mr. Balot:** That's an assumption.

**Mr. Juravin:** Okay. What do you mean an assumption? You have all the... You have the access to the drive. You have access to my photos. So you should have seen how many photos I have, the number of photos that I have.

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I never saw the photos on your Google Drive.

**Mr. Juravin:** You haven't seen the Google photos. So...

**Mr. Balot:** That is correct.

**Mr. Juravin:** I'm sorry. You said that is correct?

**Mr. Balot:** Yes, I did.

**Mr. Juravin:** Can you tell me out of the one terabyte, what percentage were pictures?

**Mr. Balot:** Again, these JPEGs that we're looking at here could be things other than pictures.

**Mr. Juravin:** Okay. Can you tell me, on the Google Drive, any type of images, what percentage were images?

**Mr. Balot:** Well, anything that says "JPEG" would be an image. It could be an image of different things.

**Mr. Juravin:** I understand. But let's define image, as PDF, as JPEG. Do you know that when you enter Gmail, you can enter of course immediately the drive and the drive defines it into documents, images, audio, and video? Do you know that?

**Mr. Balot:** I'm aware of that, yes.

audio1572554191

**Mr. Juravin:** In that case, you probably if you entered my Google Drive, you should have been made aware of the four categories. So I'm asking you if you know, in the category of images what percentage and how many files were there?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** We cannot tell, because, again, a JPEG can be something other than just a photo image. Could be a copy or a rendering of a document, of an email. Countless other things.

**Mr. Juravin:** Okay. But I discussed that with Richard. So I thought that once, because you said that maybe you listened to the conversations, Richard and I discussed that. So, that's why I'm asking you if you know that because Richard and I talked about it.

**Mr. Ryan:** Objection to the form.

**Mr. Juravin:** Okay. Let's move on. According to the emails, I provided Richard with the access, and Richard told me that he has the access already in May 26th. I need to place it on the screen. Let me please change screen, please, and let me go over the exhibits, my exhibits. I'm disconnecting screen and sharing screen again, and there you go. Okay. Mr. Balot, can you see my screen?

**Mr. Balot:** Yes, I can.

**Mr. Juravin:** Mark, I'm showing right now my exhibits.

**Mark King:** So far, I have two. Do you want something marked as number 3?

**Mr. Juravin:** It's basically just defendant exhibits. That's all I'm sharing.

**Mark King:** Each one, we need to identify it, and you're going to have to send it to me so that I can append it to the transcript.

**Mr. Juravin:** No, I don't want to do that, I just... I understand. No, I will not do it for now. Mr. Balot...

**Mark King:** Just to be clear, I've got business search as number 1, and company profile as number 2. That's all I've got so far.

**Mr. Juravin:** Okay. And then I used exhibits from the trustee's exhibits.

**Mark King:** You showed trustee's exhibit number 2, but that won't be attached to this unless you make it an exhibit to this.

**Mr. Juravin:** No, that's fine.

**Mark King:** Okay.

**Mr. Juravin:** Okay. Mr. Balot, do you see the way that the computers were shipped to you? Do you see the computers are thrown in the backseat?

audio1572554191

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Can you be a little more clear in your question?

**Mr. Juravin:** Do you see my screen? And do you see what is in the backseat of Mr. Ryan's car?

**Mr. Balot:** I don't know that it's Mr. Ryan's car, but I can say that it looks like there are some computers stacked up there, along with some cables.

**Mr. Juravin:** And one thrown on the other side behind the driver's seat. Do you see that as well?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Yes, I do.

**Mr. Juravin:** And you are telling me that the fact that it's 93 degrees outside, and inside the car, 160 degrees, when it's closed, you don't know if it will affect the hard disks?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I can't say with any certainty that it would.

**Mr. Juravin:** Okay. Let's go through the exhibits here that I thought that maybe you went over. Let me make it big, enlarge it so you can read it carefully, so you can read it clearly. Can you see my screen?

**Mr. Balot:** Yeah.

**Mr. Juravin:** Okay. One second, I wanna see... One second, please. Did you identify files that belongs to Roca labs or to gastric.care in part of the files that were deleted.

**Mr. Balot:** That work was done by Richard Gralnik, and I don't have an answer for that.

**Mr. Juravin:** That's okay. So just for you to know that May 17, okay, a bunch of files were transferred out from my hard disk, and maybe they are part of the deletions. Okay. Do you see on the screen that on May 18, I'm sending an email to junior. Junior is Aldo. Do you see that...

**Mr. Balot:** Aldo?

**Mr. Juravin:** Aldo Bartoloni, it's the attorney.

**Mr. Balot:** Thank you.

**Mr. Juravin:** Okay. Do you recall that you were CC'ed on the first one?

**Mr. Balot:** I do not.

audio1572554191

**Mr. Juravin:** Okay. One second. I want to find the email that will clarify a lot of things. Okay. This one is not important right now, one second. Okay, this is the email that I'm informing you and Aldo, and that's July 23rd. You are CC'd here. You are CC'd not because I know you, but because you were on the initial chain thread. Aldo, Mr. Gralnik, and I worked on it together, and we are all set. As I mentioned to you, only a few hours needed to copy since Mr. Gralnik and I observed the Sabbath. We agreed that copying will end by Sabbath. So basically, Richard and I worked on everything together, and that was on the 23rd. July 23rd. We were done. In other words, I gave him everything, everything was done and you were CC'd on it, and Richard was aware of it as well. Here we go. Do you see here that Richard is sending me an email? Let me enlarge it for you. Okay. Tell me if it's better.

**Mr. Balot:** That's fine.

**Mr. Juravin:** Here on July 23rd, Richard is writing, "Mr. Juravin, the preservation of your Gmail account is done. Feel free to reset the password." Do you see that?

**Mr. Balot:** I do.

**Mr. Juravin:** Okay. Were you... I don't know how to say it in English, previewed, or did you see that email? Did he share it with you?

**Mr. Balot:** I don't recall.

**Mr. Juravin:** You don't recall. Okay. And then I informed Aldo and you that everything is done. So if everything was done on the 23rd, why do you think Richard needed to issue an affidavit on August 17th?

**Mr. Balot:** Why?

**Mr. Juravin:** Yes.

**Mr. Balot:** Is that your question?

**Mr. Juravin:** Correct. If everything was done July 23rd, why was it necessary for Richard to issue an affidavit?

**Mr. Balot:** Why? I don't have the answer to that.

**Mr. Ryan:** Objection to form.

**Mr. Juravin:** Okay. Mr. Ryan, if you can just let... Because it's important for me to be on the record, so, if you can wait with your objection until Mark gets it. Okay. So, that, we established on that.

**Mr. Ryan:** I'm not sure what you're saying. You want me to wait with my objection until when?

**Mr. Juravin:** If just delete your answer by two seconds. Okay. Again, another one, it's like, I forward it and it says that the preservation is done. The only thing missing is the iCloud, which was

audio1572554191

not used for many, many, many years.

**Mr. Ryan:** Objection to form.

**Mr. Juravin:** Okay. On August 10th, do you see here that I'm confirming with Richard that he received everything, and I wrote to him that I was available for every call and responded within minutes to every need you have. I asked you that after three months, it must end, and I need my privacy back. Do you see that?

**Mr. Balot:** Yes, I see what you've written.

**Mr. Juravin:** Okay. And this one was directed to Richard and to Aldo. And when I said privacy back, I meant that he held to the passwords for months. And I asked him, because I wanna change them. And then I wrote to him, I told Aldo that twice, you have told me that you are done, and as a result, I have changed the passwords back twice. So me changing the passwords, it's only after Richard gave me the permission. Is that clear from here?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** If in your mind, it's clear, I would imagine so.

**Mr. Juravin:** Okay. Do you see any response from Richard saying, "No, it is not true"?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** No, I do not.

**Mr. Juravin:** Okay. Then we are in August 19th. I was asked again for the third time to provide, again, for the third time, I was asked to provide the password. For the third time. So here I'm getting the... Do you see that I'm getting the request for authentication for the iCloud at 1:22 PM on August 19? And I respond within 10 minutes. And I say, "Richard, shalom. Here is the password again for both accounts." That will be the third time. Again, for the third time, I'm giving him the password, within 10 minutes. Would that be right?

**Mr. Balot:** If that's what you did, yes.

**Mr. Juravin:** Thank you. I will give you a chance to read it instead of me reading it out loud.

[pause]

**Mr. Balot:** I've read it. I do not see included here, is your approach to Mr. Gralnik, using the sentiment as one Jew to another. Can you help me?

**Mr. Juravin:** I'm sorry, say it again?

**Mr. Balot:** Just as I had said to you, Mr. Juravin, I don't see included in this email where you approach Mr. Gralnik using the terms as one Jew to another. Can you help me out here?

audio1572554191

**Mr. Juravin:** Because that did not exist. But I'm asking you just right now. You're giving me information that I did not ask. If you want, we will get to it. Okay? We will get to it. But can you please answer me now in this deposition, I'm asking you, when you look at this email, does it seem to you like somebody who is not cooperative?

**Mr. Balot:** I would say that I could turn around and write an email right now. That again, it doesn't reflect the actual reality in the situation. That if I'm writing it myself and authoring it myself, certainly can make it look as though I'm in the right when maybe I'm not.

**Mr. Juravin:** Okay. Let me... Okay. If Richard received this kind of email and it was inaccurate, would you assume that Richard will send me back an email refuting that, saying that I'm wrong. Would you?

**Mr. Balot:** I cannot answer that question.

**Mr. Ryan:** Objection to form.

**Mr. Juravin:** So, if you receive an email like this, and it's not true, would you respond and say it is not true?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Not if I'm working on behalf of a client, no.

**Mr. Juravin:** Okay. So, based on this email alone, would you say that I was very cooperative?

**Mr. Balot:** I cannot say that.

**Mr. Juravin:** Is there anything more that I could have done than what you see here?

**Mr. Balot:** I can't answer that question.

**Mr. Juravin:** Okay. Let me continue, then. Did you see this email before, or is it your first time?

**Mr. Balot:** I believe it's the first time.

**Mr. Juravin:** Okay. Do you see the explanation to Richard that I'm writing? "If you see that I deleted anything, it's because Google charges us for space and I simply don't need junk. Nothing is deleted from the past." Do you see that?

**Mr. Balot:** I see that, but I take that as your interpretation.

**Mr. Juravin:** Okay. Mr. Balot, did you or anybody of your employees deleted any of the information? Any preservation, because you were instructed to do so by the trustee, or not to preserve portions of the database?

**Mr. Balot:** Not to my knowledge.

audio1572554191

**Mr. Juravin:** Okay. Because that's the information that I got from Richard.

**Mr. Ryan:** Objection to form.

**Mr. Juravin:** Okay. Now, mister... Is it true that Richard could have retrieved any information going back at least 30 days, and according to Google, 60 days at this time when he had access in July 23rd?

**Mr. Balot:** To my best of my knowledge, that's correct.

**Mr. Juravin:** Okay. So you are aware of the fact that Google actually allows 60 days back to retrieve information.

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Yeah. On a rolling basis, that's my understanding.

**Mr. Juravin:** Okay. Let me see. We don't have much more. I'm looking for... Yes, I will try to make it really large here. But do you have any idea how many times I've spoken to Richard on the phone?

**Mr. Balot:** I couldn't tell you exactly, no.

**Mr. Juravin:** If I tell you that it's more than 20 times?

**Mr. Balot:** That's possible.

**Mr. Juravin:** Okay. Does it sound to you like somebody who is not cooperative?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Again, it's within the sequence of when those calls happened and what was the nature of those calls before I could even comment.

**Mr. Juravin:** Okay. Then in that case, we don't have a choice but to read the text messages together. Okay? Because you said that you need to know the nature, so let's do it. July 29th at 12:40 PM: "Hi, Don. I need the access codes for your iPads."

**Mr. Balot:** Excuse me one minute. You said talk to Richard. Now you're showing us text messages. So, please be clear on what we're talking about here. Telephone calls, or text messages?

**Mr. Juravin:** Both. Here we have the phone calls. Just one log, one, one log, and you can see one, two, three, four, five, six, seven, eight...

**Mr. Balot:** Mr. Juravin, I can't clearly see those.

**Mr. Juravin:** Okay. Over 20 calls.

audio1572554191

**Mr. Balot:** As I just said, I can't clearly see those.

**Mr. Juravin:** Oh. Okay, let's do that here.

**Mark King:** Excuse me, Mr. Juravin, are you gonna make this a composite exhibit number 3, or...

**Mr. Juravin:** Yes. All of that will be... No, I don't need to. I'm sorry. This is part of my exhibit, anyway.

[pause]

**Mr. Balot:** Okay. I can see it clearer.

**Mr. Juravin:** And this the number 310-569-5141 is Richard's number, correct?

**Mr. Balot:** That is his cellphone number, correct.

**Mr. Juravin:** Okay. Can you tell me why Richard left?

**Mr. Balot:** For a better opportunity.

**Mr. Juravin:** Okay. Do you know why he does not want to deal with anything from the past in Online Security?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I couldn't tell you exactly why, no.

**Mr. Juravin:** Okay. Okay. I think this one just shows you the level of interaction. Based on the level of interaction that you see now, if you were not...

**Mr. Balot:** Mr. Juravin?

**Mr. Juravin:** Yes.

**Mr. Balot:** Mr. Juravin? Can you stop for a moment please? Can you expand the text messages once again, please?

**Mr. Juravin:** Sure.

**Mr. Balot:** And can you scroll down, stop there. Correct me if I'm wrong. We're gonna be getting a copy of this, Mr. King?

**Mr. Juravin:** You have it already. It was given days before the... Before January 16th.

**Mark King:** I believe the witness was talking to me.

**Mr. Balot:** Yes. Mr. King, will we be getting a copy of this?

audio1572554191

**Mark King:** If it's marked as an exhibit and given to me, I will automatically turn it around, but I've asked, and it is not being marked as an exhibit at this time.

**Mr. Balot:** Mr. Juravin, could you mark this as an exhibit, please?

**Mr. Juravin:** No, no need, because it's part of the court records, and you can get it.

**Mr. Balot:** Is that true, Mr. Ryan?

**Mr. Ryan:** Mr. Balot, if it's part of the court record, I'll send you a copy.

**Mr. Balot:** Thank you.

**Mr. Juravin:** Mr. Ballot, in all honesty, now that I show you only part of my interactions with Richard, would you like to amend your opinion?

**Mr. Balot:** No, I would not.

**Mr. Juravin:** Okay. Even though you see all of that for the first time now, correct?

**Mr. Balot:** Some of this, for the first time. Some of it were third, fourth, fifth time.

**Mr. Juravin:** Okay. And still, you don't think that I was cooperative, and you cannot point out when exactly I was not cooperative.

**Mr. Balot:** Again, I'd have to review the materials to be more accurate in that regard.

**Mr. Juravin:** Okay. But do you remember that I asked you earlier, two, three times, if you can point out to any time that I was not cooperative within minutes, and you told me that you don't have the data, correct?

**Mr. Balot:** Again, that'd have to be reviewed and I'm going based on memory from that period of time and the struggles that we had with your lawyer, Mr. Bartoloni, as well as you, in terms of gaining cooperation, in regards to passwords and authentication on your various accounts.

**Mr. Juravin:** Would it be fair to say that it's the way that you feel, but when I asked you several times for facts, you could not provide me those?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Again, I refuse to answer that question.

**Mr. Juravin:** You refuse to answer me if your opinion is based on facts or if it's based on... If it's based on facts or emotions?

**Mr. Balot:** My opinions aren't based on any way, shape, or form, emotions based on facts that I've reviewed, which I'm not sharing.

audio1572554191

**Mr. Juravin:** Which are not what?

**Mr. Balot:** Which I am not sharing.

**Mr. Juravin:** So you have facts that you are not willing to share?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** In this deposition, no.

**Mr. Juravin:** Okay, so...

**Mark King:** I'm sorry. I didn't get the answer, sir.

**Mr. Balot:** In this deposition, the answer would be no.

**Mr. Juravin:** So, what you are saying is that you are not willing to share facts in this deposition, correct?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** That would correct.

**Mr. Juravin:** Please let the witness answer. One more time. You are not willing to share facts in this deposition, on which you prepared your report.

**Mr. Ryan:** Objection to form.

**Mr. Balot:** That's correct.

**Mr. Juravin:** When would you share those facts?

**Mr. Balot:** When it's required.

**Mr. Juravin:** Okay. Here it is, August 19, and do you see that I cooperated and immediately gave, helped, approved authentication. You see that?

**Mr. Ryan:** Objection to form.

**Mr. Juravin:** Let me enlarge it for you.

[pause]

**Mr. Balot:** Cooperating with whom, Mr. Juravin?

**Mr. Juravin:** Richard.

audio1572554191

**Mr. Balot:** Okay. And where do you have the tie off to Richard.

**Mr. Juravin:** Oh, Richard made all the changes, and I just helped him minute by minute. I helped him minute by minute.

**Mr. Balot:** This log doesn't portray that to me.

**Mr. Juravin:** Okay. Do you see here, July 23rd, 2012?

**Mr. Balot:** Yes, I do.

**Mr. Juravin:** Do you see that California, access from California?

**Mr. Balot:** Yes, I do.

**Mr. Juravin:** Do you see that you changed the password? You archived Google data on July 23rd? Do you see that?

**Mr. Balot:** I see that there's an entry there that portrays that, yes.

**Mr. Juravin:** And can you tell me where was it done?

**Mr. Balot:** As it says here, California, USA.

**Mr. Juravin:** Do you think it's Richard?

**Mr. Balot:** Good chance it was, yes.

**Mr. Juravin:** Good chance that it was. Okay. So, basically... And this is also Richard, access to less secured apps was turned on. In other words, I turned off all the access or all the security so I can give proper access to Richard. Do you see that, in 3:00 PM?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** Sorry. But this is confusing to me, because I'm seeing a sequence of time here that doesn't fall in place.

**Mr. Juravin:** Okay. Basically, I think we covered that enough, but basically, the most important thing, that's at 6:28 PM, California, archived all the Google data requested. That's the most important.

**Mr. Balot:** Excuse me.

**Mr. Juravin:** Yes.

**Mr. Balot:** That's not what it says.

**Mr. Juravin:** Please tell me what it says.

audio1572554191

**Mr. Balot:** "Requested."

**Mr. Balot:** Okay. And since the password was changed by me 40 minutes earlier, then California requested, and here we go. And this is the authentication. Is that Firefox '91, does do you recognize it as from California? Are you using the Firefox? Would that...

**Mr. Balot:** That's just a version.

**Mr. Juravin:** Okay. But does it look like somebody... Does it look like something that Richard will do?

**Mr. Balot:** It was something, a browser being used from California for the sign in, yes.

**Mr. Juravin:** Okay. Does it seem like something that Richard will do?

**Mr. Balot:** Sorry, be more specific?

**Mr. Juravin:** Does it look like something that Richard will do in order to gain access to the account?

**Mr. Balot:** Are you saying that the note here, that it was Firefox, absolutely ties off to the fact that Richard was doing the work?

**Mr. Juravin:** Richard was given the access, the passwords.

**Mr. Balot:** I'm asking you a question.

**Mr. Juravin:** Yes. That's my corresponding... Yes, that's my record-keeping, that Richard basically took possession of the Google account.

**Mr. Balot:** Yes.

**Mr. Juravin:** Thank You.

**Mr. Balot:** It's possible that it was Richard.

**Mr. Juravin:** Okay. Just one second. Let me see if I have... Because I'm nearing the end. Okay. This is the summary that I wrote to my attorney and I provided it also to... It's part of the court record, so, Mr. Ryan can give it to you. Let me see if I... Anything else? Okay. I would like to summarize it. We have the...

**Mr. Balot:** Mr.Juravin?

**Mr. Juravin:** Yes.

**Mr. Balot:** I'm not gonna listen to a summary. I'll be more than happy to listen to direct questions.

**Mr. Juravin:** You are right. When I say summary, I just means that I just want to summarize it in a

sentence or two. The files that were deleted that you have a log of deletion was done by Richard, isn't it?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** You mean... Are you referring to the portrayal of the deletions, coming from an Excel spreadsheet?

**Mr. Juravin:** Yes.

**Mr. Balot:** That ultimately went into the exhibit?

**Mr. Juravin:** Yes.

**Mr. Balot:** And presented to...

**Mr. Balot:** Correct.

**Mr. Juravin:** Was that done by.

**Mark King:** I'm sorry, question. Excuse me. Mr. Juravin, you've said three things in the middle of his answer, which obscured those parts of his answer. I'm sorry.

**Mr. Juravin:** I'm striking my... No need for my question. No need. I'm sorry. No need. No need. I'm taking it back. Let me look a second here and see if I have anything else. Yes, I have a question. Why was it required for you, Mr. Balot, to keep the computers for six months?

**Mr. Balot:** I'm not aware that it was six months, but that's the time that it took for us to fully accomplish the tasks that we were charged with.

**Mr. Juravin:** Even though we agreed that it takes only a few hours to duplicate a hard disk?

**Mr. Balot:** Again, it goes beyond just a few hours to accomplish, create a forensic image of a hard disk. There's a lot of machinations that go into the work that we do, and the additional questions that come, once we have reported back to our client.

**Mr. Juravin:** I got it. That's it for the moment. And let me... I need 10 minutes, please, break, to regroup my thoughts here. And if we can take a break for 10 minutes, and I will see if I have any additional questions. Mr. Ryan, you probably want to ask him, or no need?

**Mr. Ryan:** I probably will not be asking any questions today.

**Mr. Juravin:** SO, give me please 10 minutes, if we can. And let's adjourn in 10 minutes, and maybe we will even wrap it up.

**Mr. Ryan:** Okay.

**Mr. Juravin:** Thank you, guys.

audio1572554191

**Mark King:** Mr. Ryan, is it possible you may know a couple spellings?

**Mr. Ryan:** Yes, sir.

**Mark King:** I got Gralnik 'cause it was on the scroll. Radanza?

**Mr. Ryan:** Randazza. R-A-N-D-A-Z-Z-A.

**Mark King:** Okay. Abner Shermesh. I don't know if it's Abner or Abaner.

**Mr. Ryan:** I have no idea who he is.

**Mark King:** I'm on my own. Okay. I'll ask him. I think that's it. Aldo, I got. Gralnik, G-R-A-L-N-I-K. He was... He meant, a bunch of times. Richard Gralnik. I'm good. I'll ask him about Abner Shermes, whoever that is.

**Mr. Ryan:** Okay.

**Mark King:** I guess we are... Well, it'll go on the record, Mr. Balot whether you wanna read or waive... I assume you wanna read.

**Mr. Ryan:** Probably.

**Mark King:** Okay. And I've got his email address. If it's okay with you guys, we'll send him an email of the transcript, with the errata sheet, unless you want it to go through you.

**Mr. Ryan:** You can go directly to him.

**Mark King:** Okay.

**Mr. Ryan:** That's fine.

**Mark King:** Are you guys gonna get a copy of this, or no?

**Mr. Ryan:** Yes. If it's ordered.

**Mark King:** Well, yeah, obviously. [chuckle] Obviously, it must be ordered for you to order a copy.

**Mr. Ryan:** Yeah. Okay.

**Mark King:** Because sometimes when these Zooms, they get finished, somebody says thank you and fills the Zoom and I can't ask anything.

**Mr. Ryan:** Brad, I'm gonna hit mute here and give you a call for a second, if you're available.

**Mark King:** Thank you.

audio1572554191

[pause]

**Mr. Juravin:** I'm putting you on mute now. Not on mute, just... Anything else, Anna, that you have? Because I think... Okay, I'm here.

**Mark King:** Well, we need to get a witness, too...

**Mr. Juravin:** Do we? Do we really?

**Mark King:** We don't need the other attorney. You can ask the good questions, but... Oh, he showed up. Mr. Ryan, I was just telling Mr. Juravin that we really don't need the other attorney, but you've got to have a witness.

**Mr. Ryan:** Yeah, well, I mean, I can put it on autopilot.

**Mr. Balot:** No one's appeared.

**Mark King:** Objection to form.

**Mr. Ryan:** Just leave a, you know, a picture of me nodding my head for a while.

**Mark King:** You know, I had an attorney once that instead of saying, "objection to form," he said he didn't want to interrupt, so he would just stick his finger up. And I was supposed to write, "objection to form."

**Mr. Juravin:** I like that.

**Mark King:** I hate it!

**Mr. Ryan:** It doesn't make a very good record, does it?

**Mark King:** No. "Whereupon attorney sticks finger up at reporter."

**Mr. Juravin:** No, it also depends which finger. Okay. Let's continue. Mr. Balot, I don't have much more. I'm looking at your report. I'm looking to your report, and in your report, in page six, number seven, it says "Don Juravin in concert with Anna Juravin." Based on what did you decide that my wife and I are in concert?

**Mr. Balot:** Well, again, within the realm of that spreadsheet that portrays the deleted information, she was listed as one of the people accessing the site to erase or trash the various files.

**Mr. Juravin:** I'm sorry, because I'm not clear. The spreadsheet that I showed you earlier as Exhibit 2, based on that one? So based on the spreadsheet of Exhibit 2, you concluded that Anna and I were in concert?

**Mr. Ryan:** Objection to form. Mr. Juravin, he didn't say that. You're assuming facts that are not in evidence.

audio1572554191

**Mr. Juravin:** I know, but please let me do my deposition. You cannot tell me how to ask. Me and my broken English.

[overlapping conversation]

**Mr. Ryan:** I know, but you're assuming facts that aren't in evidence, and...

**Mr. Juravin:** I know, but please let me... You're not his attorney, and let me ask him the way that I want to ask h I'm.

**Mr. Ryan:** I'm the trustee's attorney, and I'm defending this deposition for the trustee. So I have every right to do everything that I'm allowed to do.

**Mr. Juravin:** Do you think the witness is not capable?

[overlapping conversation]

**Mr. Ryan:** If you want to ask questions about the spreadsheet that lists names, Anna Juravin and Don Juravin, that's fine. If you want to [3:04:07.8] _____ questions about a different...

[overlapping conversation]

**Mr. Juravin:** I'm asking the questions the way that I want to ask. I will ask the questions the way that I want to ask, and you can later tell the court that it's not valid. Mr. Balot, is your opinion in number seven where you say that "Mr. Juravin, in concert with Anna Juravin," is based on Exhibit number 2 of the spreadsheet?

**Mr. Balot:** That's correct.

**Mr. Juravin:** Okay. Did you see, by the way, Anna's name anywhere on Exhibit 2?

**Mr. Balot:** I would need to review it, no.

**Mr. Juravin:** You haven't seen it, right? The name Anna?

**Mark King:** I'm sorry, your answer?

**Mr. Balot:** I haven't reviewed it to be able to form an opinion.

**Mr. Juravin:** Okay. I'm moving on. The word "intentionally," can you tell me how you derived the word "intentionally"?

**Mr. Balot:** Well, it's amazing. I think I learned that word maybe in third grade, and it came out of my head as I was writing that report.

**Mr. Juravin:** Okay. But I explained to you earlier about the Google Photos.

**Mr. Balot:** Again, that, to me, is not a full explanation of what those JPEGs portray.

audio1572554191

**Mr. Juravin:** I got it. Okay. The next thing. This hard disk that I showed you earlier, I think I asked you what it is, and you did not fully know what it is. Is that correct?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** No, that's not correct, when I can't see it because it's in a plastic bag and I can't...

[overlapping conversation]

**Mr. Juravin:** I ask if you recognize it.

**Mark King:** I'm sorry, the witness is answering! He's in the middle of an answer. That is not correct, when I can't see it because it's in a plastic bag and I can't... Would you finish your answer, please?

**Mr. Balot:** Certainly. I'd be happy to, as long as Mr. Juravin will hold his tongue. Again, it was in a plastic bag. I cannot see the full scope of what it is that you're holding based on the fact that it's in a plastic bag, and the portrayal that I'm looking at online is a little bit blurry.

**Mr. Juravin:** It is a SanDisk. And it's part of the computer parts that you returned to us. It was connected to the main computer. And it's basically... And I need to know if you examined that hard disk yourself.

**Mr. Balot:** I personally did not. Richard Gralnik did. And he and I discussed his opinion of it and what was found on it.

**Mr. Juravin:** Okay. Can you please tell me, what was his opinion?

**Mr. Balot:** Again, I couldn't tell you word-for-word what that was, okay, but I'd have to go back in the records.

**Mr. Juravin:** So, I thought that you were prepared for this deposition and I thought that you will have the information about what's on this disk. Should we maybe, I think in this right now, since so much is unknown, we will just have to ask the judge for another deposition and give you the time to learn whatever it is that you need to learn. I don't have... Yeah, I have one last question. You added in your report a Transfer Wise, do you recall that?

**Mr. Balot:** Yes.

**Mr. Juravin:** Can you tell me what's so special about this travel wise?

**Mr. Ryan:** About what?

**Mr. Balot:** Travel wise? Go ahead, Mr. Ryan.

**Mr. Ryan:** I missed the question.

audio1572554191

**Mr. Juravin:** Travel wise.

**Mr. Ryan:** No, I, that's, you misstated it, Mr. Juravin. It says transfer wise. Transfer.

**Mr. Juravin:** You're right. Sorry. Transfer wise. But Mr. Balot understood me. Transfer Wise. You're right.

**Mr. Balot:** That is not correct that I fully understood you, but now I do. And your question is what?

**Mr. Juravin:** You mentioned that you found money transfers using Transfer Wise service. What's special about this transfer that was not known earlier to the court?

**Mr. Ryan:** Objection to form.

**Mr. Balot:** I couldn't exactly tell you.

**Mr. Juravin:** Okay. So, you don't know if there is anything special there?

**Mr. Balot:** Describe special. What does special mean?

**Mr. Juravin:** Special means that it was not revealed earlier to the court.

**Mr. Ryan:** Objection to form.

**Mr. Balot:** That, I couldn't comment on.

**Mr. Balot:** I'm done. Unless Mr. Ryan has questions, and then I will go back and ask and continue my question.

**Mr. Ryan:** [3:10:10.2] _____.

**Mr. Juravin:** Let the record show that Mr. Ryan is doing funny faces.

**Mr. Ryan:** I'm not doing funny faces.

**Mr. Juravin:** I'm kidding. I'm kidding, Mr. Ryan.

**Mr. Ryan:** I'd appreciate it if you wouldn't put dishonest statements.

**Mr. Juravin:** Mr. Ryan, I'm kidding.

**Mr. Ryan:** Well, this is not a time for kidding, sir.

**Mr. Juravin:** Then I apologize.

**Mr. Ryan:** No, if they're done, we're done. And Mr. Balot, would you like the opportunity to read this deposition if Mr. Juravin orders a copy of it?

audio1572554191

**Mr. Balot:** Absolutely. Yes, I would.

**Mark King:** Mr. Juravin, would you like to order this transcript?

**Mr. Juravin:** Not at this time. I'll consult with my wife here, and then I'll talk to you.

**Mark King:** Okay. And you're going to get me those two exhibits that you marked? You're going to send them on to us, email it to me?

**Mr. Juravin:** Yes, I would.

**Mark King:** Okay. So, anything else, gentlemen?

**Mr. Ryan:** Please, let me know if it's ordered so that I have an opportunity to order a copy.

**Mr. Juravin:** Thank you very much.

**Mark King:** And I assume, Mr. Saxton, you're sharing with Mr. Ryan anything he gets?

**Mr. Balot:** Okay.

**Mr. Ryan:** Again, I apologize.

**Mr. Balot:** Yeah.

**Mark King:** Mr. Saxton is not going to be ordering a separate copy, you guys are on the same team.

**Mr. Balot:** One copy will do fine for the both of us.

**Mark King:** I understand. Okay. Thank you very much.

**Mr. Juravin:** Thank you, Mr. Balot. Thank you, everybody.

**Mr. Balot:** You, too.

audio1572554191

**Thank you for choosing Scribie.com**

Cross-check this transcript against the audio quickly and efficiently using our online Integrated Editor. Please visit the following link and click the Check & Download button to start.

https://scribie.com/files/eb844110ec7b428c9f8c43f0a370e903c99f84e3

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In re:

DON KARL JURAVIN,

      Debtor.

_____/

Chapter 7
Case No. 6:18-bk-06821-LVV
Case No. 6:20-bk-01801-LVV
Jointly Administered with
Case No. 6:18-bk-06821-LVV

## AFFIDAVIT FOR ACCEPTANCE OF TRANSCRIPT

STATE OF FLORIDA      )
                       ) ss:
COUNTY OF LAKE      )

I, Don Juravin, being duly sworn, depose and state as follows:

1. I am the Debtor/Defendant in the above-captioned matter, and I am competent to

make this affidavit. The facts stated herein are based on my personal knowledge.

2. Due to constraints of time and budget, I have procured the services of an

external transcription service to transcribe a Zoom recording of a deposition

pertinent to this case. This service offers a faster turnaround and is more financially

accessible to me than traditional court reporting services.

3. The source of the transcription is a Zoom recording, which remains available for

verification and comparison. This ensures the reliability and verifiability of the

transcript produced by the external service.

1

3. The source of the transcription is a Zoom recording, which remains available for verification and comparison. This ensures the reliability and verifiability of the transcript produced by the external service.

4. The transcription method used by the external service allows for repeated listening to the recording, which enhances the accuracy of the transcript beyond what might be achievable through real-time court reporting.

5. Given the time constraints and my limited financial resources, I respectfully request that the court accept this transcript as a memorandum or the equivalent of a notation of my memory.

6. I propose that the Trustee or any opposing party may, if they choose, procure a transcript through traditional means and challenge the accuracy of the transcript submitted by me.

7. Without the acceptance of this transcript, my ability to effectively present my case is severely hindered. The outcome of this case is crucial to my future and that of my family.

8. The adoption of new technology for efficiency is widespread, and its application in this legal proceeding would not only benefit me, as a pro se litigant, but also serve the interests of justice.

9. I hereby attest to the authenticity of the Zoom recording submitted to the transcribing company and affirm that it was delivered without alterations or modifications.

2

I understand that false statements made herein are made under the penalty of perjury.

DATED this *7th day of February 2024.*

_____
Don Juravin

Subscribed and sworn to before me this *7th day of February 2024.*

_____
Notary Public

My Commission Expires: 11/23/2026

STATE OF FLORIDA, COUNTY OF LAKE

Sworn to and subscribed before me this
7th day of February 2024

_____
Signature of Notary Public, State of Florida

Joshua Steele
Print, Type Commissioned Name of Notary Public
Personally Known ☐ or ☑ produced identification
Type of identification produced FL DL

JOSHUA STEELE
Notary Public
State of Florida
Comm# HH322601
Expires 11/23/2026

3